530

| 1 | **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY** |
| 2 | Name WINZER,                    LACY |
|   |       (Last)              (First)              (Initial) |
| 3 | Prisoner Number     T 86160 |
| 4 | Institutional Address _____ P.O.BOX 705; LA 315U |
| 5 |                         SOLEDAD, CA 93960-0705 |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

LACY WINZER
_____  )
(Enter the full name of plaintiff in this action.)  )
                                  )
        vs.                       )    Case No. _____
                                  )    (To be provided by the clerk of court)
BILL CURRY (WARDEN)               )
_____  )    **PETITION FOR A WRIT**
                                  )    **OF HABEAS CORPUS**
_____  )
                                  )
_____  )
                                  )
_____  )
(Enter the full name of respondent(s) or jailor in this action)  )

**CV 08   2341  PJH**

**(PR)**

**Read Comments Carefully Before Filling In**

**When and Where to File**

    You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located.  If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

1    Who to Name as Respondent

2         You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1. What sentence are you challenging in this petition?

12             (a)    Name and location of court that imposed sentence (for example; Alameda

13                    County Superior Court, Oakland):

14        SUPERIOR COURT OF CONTRA COSTA COUNTY        CITY OF PITTSBURG, CA.

15                    Court                                      Location

16             (b)    Case number, if known    NO. 050508671

17             (c)    Date and terms of sentence    APRIL 14, 2006

18             (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                    parole or probation, etc.)        Yes  X      No _____

20                    Where?

21                    Name of Institution:    CORRECTIONAL TRAINING FACILITY

22                    Address:    SOLEDAD, CA. 93960

23        2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26        PENAL CODE 211/212. 5 (C)

27        PENAL CODE 484 / 666

28

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                     Yes _X_      No _____

    Preliminary Hearing:           Yes _X_      No _____

    Motion to Suppress:            Yes _____     No _____

4. How did you plead?

    Guilty _____    Not Guilty _X_    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _X_    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?            Yes _____     No _X_

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment             Yes _X_      No _____

    (b)    Preliminary hearing     Yes _X_      No _____

    (c)    Time of plea            Yes _X_      No _____

    (d)    Trial                  Yes _X_      No _____

    (e)    Sentencing             Yes _X_      No _____

    (f)    Appeal                Yes _X_      No _____

    (g)    Other post-conviction proceeding    Yes _____     No _X_

8. Did you appeal your conviction?      Yes _X_      No _____

    (a)    If you did, to what court(s) did you appeal?

              Court of Appeal           Yes _X_      No _____

              Year: _2007_      Result: _CONVICTION AFFIRMED_

              Supreme Court of California    Yes _X_      No _____

              Year: _2007_      Result: _SAME AS ABOVE_

              Any other court           Yes _____     No _X_

              Year: _____      Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                        Yes __X__    No____

(c)    Was there an opinion?              Yes __X__    No____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                                 Yes ____    No _X_

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?              Yes ____    No _X_

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: _____ N/A _____

Type of Proceeding: _____ '' _____

Grounds raised (Be brief but specific):

a._____ '' _____

b._____ '' _____

c._____ '' _____

d._____ '' _____

Result: _____ '' _____ Date of Result:_____

II.    Name of Court: _____ '' _____

Type of Proceeding: _____ '' _____

Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS            - 4 -

1    a._____ N/A _____

2    b._____ " _____

3    c._____ " _____

4    d._____ " _____

5    Result: _____ " _____Date of Result:_____

6    III.   Name of Court: _____ " _____

7    Type of Proceeding: _____ " _____

8    Grounds raised (Be brief but specific):

9    a._____ " _____

10   b._____ " _____

11   c._____ " _____

12   d._____ " _____

13   Result: _____ " _____Date of Result:_____

14   IV.   Name of Court: _____ " _____

15   Type of Proceeding: _____ " _____

16   Grounds raised (Be brief but specific):

17   a._____ " _____

18   b._____ " _____

19   c._____ " _____

20   d._____ " _____

21   Result: _____ " _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                        Yes _____    No X

24   Name and location of court: _____ N/A _____

25   B. GROUNDS FOR RELIEF

26        State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One:    **THE** COURT FAILED TO INSTRUCT ON BATTERY / ASSAULT AS A
   LESSER INCLUDED OFFENSE VIOLATING PETITIONER'S RIGHTS TO INSTRUCTIONS ON DEFENSE
6                     THEORY OF HIS CRIMINAL CASE

7  Supporting Facts:_____APPENDIX 1   at Page 10_____

8  _____

9  _____

10 _____

11 Claim Two: UNDER THE UNUSUAL CIRCUMSTANCES OF THIS INCIDENT, THE
          COURT'S INSTRUCTIONS WERE INADEQUATE TO INFORM THE JURORS
12        OF THE NEXUS BETWEEN FORCE AND INTENT REQUIRED FOR ROBBERY

13 Supporting Facts:_____APPENDIX A (Throughout)_____

14 _____

15 _____

16 _____

17 Claim Three: PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND THAT
           VIOLATED HIS DUE PROCESS RIGHTS GUARANTEED THROUGH THE
18                   UNITED STATES CONSTITUTION

19 Supporting Facts:_____APPENDIX A at Page 23_____

20 _____

21 _____

22 _____

23     If any of these grounds was not previously presented to any other court, state briefly which

24 grounds were not presented and why:

25 _____

26 _____

27 _____

28 _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1          List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3   of these cases:

                                    SEE PAGE (iii)

4   _____

5   _____

6   _____

7   Do you have an attorney for this petition?                      Yes_____      No _X_

8   If you do, give the name and address of your attorney:

9   _____

10         WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _April 23, 2008_              _Lacy Vinzer_

14              Date                          Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21  Pages 7 - 9 are

22  the "In Forma Pauperis"

23  Certification Papers.

24

25

26

27

28

                                    6½

PET. FOR WRIT OF HAB. CORPUS

TABLE OF CONTENTS

CASES

Discription                                                                    Pages

Table of Contents ................................................. i
Table of Exhibits ................................................ ii
Table of Authorities............................................. iii
Petition for Writ of Habeas Corpus ................................ 1
I.  Background...................................................... 2 - 5
II. Statement of The Case .......................................... 6
III.Statement of The Facts ........................................ 6 - 9
IV. Appendix A - ARGUMENT I of II
    THE COURTS FAILURE TO INSTRUCT ON BATTERY AND ASSAULT AS
    LESSER INCLUDED OFFENSES OF ROBBERY VIOLATED PETITIONERS DUE
    PROCESS RIGHT TO INSTRUCTIONS ON THE DEFENSE THEORY OF HIS
    CASE VIOLATING THE UNITED STATES CONSTITUTION ................... 10

    A. Factual and Procedual Summary................................. 10
    B. Battery and Assault Are Lesser Included Offenses of Robbery... 11
    C. There Was Substantial  Evidence That The "force" Used By
       Petitioner Did Not Coincide With The Intent To Steal And
       Thus constituted Only Assault Or Battery, Not Robbery......... 14
    D. The Failure To Instruct On Battery And Assault Was A Federal
       Constitutional Error......................................... 15
    E. The Failure to Instruct On Battery and Assault Was Prejudical
       Under Either State or Federal Standards...................... 16
    F. Under  The  Unusual  Circumstances  Of  The  Incident  The
       Courts Instruction Were Inadequate To Inform The Jurors Of The
       Nexus Between Force And Intent Required For Robbery And It Light-
       en The Prosecutions Burden Via Presumptions.................. 17
    G. The courts Failure To Properly Instruct On Force And Intent
       Was Prejudicial to Petitioner................................ 20

CONCLUSION........................................................... 21

V.  Appendix A - ARGUMENT II of II
    PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND THAT
    VIOLATED HIS DUE PROCESS RIGHTS GUARANTEED THROUGH THE UNITED
    STATES CONSTITUTION........................................... 23

TABLE OF CONTENTS - CONT

Exhaustion Requirement Of Section "f" ............................. 26 - 27

CONCLUSION / PRAYER FOR RELIEF...................................... 27

Declaration Pertaining To The Exhibits and Brief..................... 28

Proof of Service................................................... 30

i (cont-)

T A B L E   O F   E X H I B I T S (EX)

EX NO:      DISCRIPTION

1           LETTER FROM J. A. MAULITZ   (11-23-07)

2           PETITION FOR REVIEW TO THE SUPREME COURT OF CALIFORNIA
            (CASE NO: A113629) COURT OF APPEALS "OPINION" INCLUDED

3           REPORTERS TRANSCRIPT (VOLUMN I) CITING PAGES (FACE SHEET
            AND RT's                              )

4           REPORTERS TRANSCRIPT (VOLUMN II)(RT) CITING PAGES (FACE
            SHEET AND RT's              ); (AUGUST 3, 10, 11, 15 &
            16 OF 2005 AND APRIL 14, 2006)

5           COURT TRANSCRIPT (CT) CITING PAGES (FACE SHEET AND CT's)

6           OPINION OF CASE FROM FIRST APPELLATE DISTRICT, DIVISION
            FIVE, COURT OF APPEAL OF CALIFORNIA; AUGUST 29, 2007
            (A113629) SUPER. COURT. NO. 050508671

ii

TABLE OF AUTHORITIES

CASES

| DISCRIPTION | PAGE (S) |
|---|---|
| Bradley v. Duncan(9th Cir, 2002) 315 F. 3d. 1091, 1098-9 | 15, 19 |
| Chapman v. California (1967) 386 U.S. 18 | 16,17,19 |
| Conde v. Henry (9th Cir, 1999) 198 F. 3d. 734, 739-741 | 15, 19 |
| Daye v. Atty Gen of New York (1983)696 F.2d.186,194 | 27 |
| Evitts v. Lucey 469 U.S. 387 (1985) | 23 |
| Green, supra, 27 Cal 3d. at 54 | 18 |
| Griffen v. United States 109 F. 3d 1217,1219 (7th 1997) | 25 |
| Hart v. Gomez 174 F. 3d 1067, 1073 (9th Cir, 1999) | 25 |
| Humphrey v. Cady 405 U.S. 504, 516 n. 18 (1972) | 27 |
| In re Seaton (2004)34 Cal.4th. 193 [17 Cal.Rptr. 3d 633] | 26 |
| In re Winship 397 U.S. 358, 364 (1970) | 12 |
| Mayle v. Felix (2005) 125 S. Ct. 2562 | 27 |
| McGuire v. Estelle 902 F. 2d 749, 752-753 (9th Cir 1990) | 27 |
| Middleton v. McNeil (2004) 541 U.S. 433, 438 | 16 |
| Neder v. United States (1999) 527 U.S. 1, 8-11 | 19 |
| People v. Flood (1998) 13 Cal. 4th 470, 480 | 19 |
| People v. Lopez (1998) 19 Cal 4th 282, 287-8 | 12 |
| People v. Moon (2005) 137 Cal 4th 1, 25 | 12 |
| People v. Mungia (1991) 234 Cal. App. 3d 1703 | 12, 13 |
| People v. Thomas (2005) 133 Cal. App 4th 488, 494 | 13 |
| People v. Watson (1956) 46 Cal.. 2d 818 | 16 |
| People v. Wright (1996) supra 52 Cal. App. at 209 | 13,25 |
| Pirtle v. Morgan (9th Cir 2002) 313 F. 3d 1160, 1172 | 24 |
| Rincon-Pineda, supra 145 Cal. 3d, at 885 | 20 |
| Reutter v. Crandel 109 F. 3d 575, 577-78(9th Cir 1997). | 27 |
| Sandstrom v. Montana (1979) 442 U.S. 510, 520 | 19 |
| Strickland v. Washington (1984) 466 U.S. 668, 684-686 | 23, 25 |
| Sullivan v. Lousiana 508 U.S. 275, 278 (1993) | 12,19,20 |
| United States v. Baumgardner 85 F. 3d. 1305, 1309-10 | 22 |
| United States v. Cronic 466 U.S. at 658-661 | 23 |
| United States v. Gaudin 515 U.S. 506, 522-23 (1995) | 13,17,19 |

AUTHORITIES - CONT-

United States v. Morillo 158 F. 3d, 18, 25 (1st Cir, 1998)  12
United States v. Span(9th Cir. 1996)75 F.3d 1383,1389-1390  24
United States v. Uchimira 125 F.3d.1282,1286(9th Cir,97)    13,17
Tucker v. Prelesnik 181 F. 3d 747, 757 (6th Cir, 1999)      25
Virgin Islands v. Parrilla 7. F.3d 1097,1103(3rd Cir.93)    21
Williams v. Taylor (2000) 529 U.S. 362, 391                 24

## STATUTES

Sixth Amendment To The United States Constitution      19,20,26
Fourteeth Amendment To The United States Constitution  12,26
CALCRIM (1600)                                         19
CALJIC 4.40.2                                          10,11,21
CALJIC 9.40.2                                          11
California Rules of The Court, rule 855                19
Penal Code § 1258                                      12
Penal Code § 240                                       13
Penal Code § 211                                       13
McCormic Evidence §§ 336-337 (5th ed. 1999)

Lacy Winzer  T-86160
P.O.Box 705; LA 315U
Soledad, Ca.  93960-0705
In Pro Per

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Lacy Winzer,                        )        Case No.
                                    )
        Petitioner,                 )
                                    )
                                    )
v.                                  )
                                    )
Ben Curry, Warden, et., al,         )
                                    )
        Respondent.                 )

PETITION FOR WRIT OF HABEAS CORPUS

BY PERSON IN STATE CUSTODY

MENORANDUM OF POINTS AND AUTHORITIES

**BACKGROUND**

This is a shoplifting case with a twist. The security
guard who pursued petitioner Lacy Winzer out of the Target store
was in plain clothes. The only independent eyewitness, Joseph
Mahoney, testified that the guard never identified himself as
Target security. The security guard, Blake Rogers, grabbed
petitioner before petitioner struck him. Rogers had failed to
follow Target security procedures on numerous occasions. The
prosecutor charged petitioner with robbery and petty theft.
Petitioner contends that there was substantial eivdence that, at
most, the force used by petitioner constituted assault or
battery, and not robbery, because petitioner did not know Rogeras
was not motivated by the intent to steal. Despite petitioner
request, the trial court refused to give jury instructions on
battery; neither did the court give instructions on assault, or
otherwise make clear that a robbery conviction would require that
the force used by petitioner was motivated by the specific intent
to steal. The jury convicted petitioner of both robbery and
petty theft. The robbery convicted must be reversed.

The court of Appeal assumes, without deciding, that --
as petitioner contends-- battery and assault were lesser included
offensces of the robbery charge under the accusatory pleading
test. (Op. at 10) The court of Appeal goes on to find, however,
that there was no substantial evidence that petitioner's striking
of Rogers was not motivated by t5he intent to steal. ((p. 1t 14.)
The Court also holds that the failure to instruct on assault and

2                                                    Z

battery was harmless. (Op. at 14-16.) The Court is wrong on both counts.

It is important to note that neither the prosecutor nor the trial court ever disputed that there was substantial evidence in support of a battery or assault conviction. The Court of Appeal improperly discounts the substantially of the defense evidence in at least three ways. First, the Court points out that Mahoney testified that he did not remember what Rogers was yelling at petitioner, and later testified that he never heard Rogers identify himself a Target security. (I RT 230, 236) The Court strains to suggest that these statements may be taken together to mean that Mahoney simply did not remember if Rogers identified himself. (Op. at 12.) But this interpretation is flatly inconsistent with what Mahoney actually said, especially in light of his testimony that he " could not tell" that Rogers was a Target security guard. (IRT 235-236). Mohoney clearly indicated that he never heard Rogers identify himself as Target security.

Second, the California Supreme Court misconstrues the evidence regarding what Mahoney was able to observe. The Court states that "Mahoney only provided evidence the Rogers did not identify himself as Target security "by the time Mahoney observed" petitioner and rogers. (Op at 12, 3mphasis in original.) In fact, Mahoney was abel to observe all of the relevant portion of the encounter between petitioner and Rogers! Mahoney was five feet from the store's doors, facing them. He saw petitioner as he was exiting the doors, with Rogers about three steps behind him, and heard yelling. (IRT 229-230). rogers testified that he did not identify himself as security until just as petitioner exited the store. (IRT 57-58). This is precisely the moment that Mahoney observed and described, and he never heard Rogers identify himself as security. Mohnoney's testimony was entitled to greater weight that that accorded by the Court of Appeal/Supreme Court!

Third, contrary to the Court of Appeal's opinion, the fact that

3

3

Rogers had been written up on two previous occasions certainly would help
persuade a jury that he failed to identify himself on this occasion.  The fact
that the previous incidents did not specifically entail a failure by Rogers to
identify himself as Target security, a distinction that the Court emphasizes
is irrelevant.  The point is that in his very short tenure as a Target
security guard--ten months--Rogers had failed to follwo procedure on two other
occasions, egregiously enough to require documentation by his supervisor.
Further, in the course of the incident at hand, Rogers failed to follow
procedure by discarding the T-shirts instead of retaining them, and by
describing the stolen merchandise in his report as socks instead of T-
shirts.  (IRT 80, 111-113, 118.)  All of this evidence tended to show that
Rogers did not fully understand the parameters and requirements of his
position.

Accordingly, it is reasonably probable that the jury would have
convicted petitioner of battery or assault instead of robbery, if properly
instructed.  In fact, the California Supreme Court has acknowledged the
distinction between cases in which the trial court failed to instruct sua
sponte on lesser included offenses and those in which the instructions were
requested.  Recently, the Supreme Court applied the Chapman standard in
assessing a trial court's failure to instruct on lesser included offenses.
Certainly under the Chapman standard, this petition should be granted and
reversal is required.

$4$ AND $5$

II    STATEMENT OF THE CASE

Lacy Winzer was charged with one count of second degree robbery committed
by means of force and fear and one count of petty theft with a prior theft
conviction. (Clerk' Transcript("CT") 36).  Petitioner denied all charges
and allegations. (CT 51).  The court denied the defense's request for a
jury instruction on battery.(I Reporter's Transcript ("RT") 261, II RT
352-3).  The jury found petitioner guilty of second degree robbery and
petty theft with priors as charged. (CT 224-5).

Petitioner moved for a new trial on the grounds that the trial court
improperly denied his a jury instruction defining battery as a lesser
included offense to robbery. (CT 250-1, II RT 347-355.)  The court denied
the new trial motion.(CT 286,  II RT 354-5.)  The trial court sentenced
Petitioner to the upper term of five years for robbery, stayed the
sentence for petty theft with a prior, and struck the prior prison term
enhancements. (CT 287).  Petitioner filed a timely appeal. (CT 290)  The
Court of Appeals of California affirmed the judgment on August 29, 2007.
(Ex 2, enclosed).

III    STATEMENT OF FACTS

At about 4:00 p.m. on May 10, 2005, Lacy Winzer was viewed in person and
on closed circuit television by security guards working at the Target
store in Pittsburg.(I RT 50-53, 129, 181-2).  Petitioner selected a
shopping cart and proceeded to the Men's Department in the back of the

store. (I RT 137, 163.).  Alex Azevedo was working security at the front
door and noticed petitioner when he walked in. (I RT 129)  His co-worker
called undercover agent Blake Rogers to let him know that a suspicious
person had entered the store (I RT 133-4).

Rogers saw petitioner on the video, in the men's department (I RT 53.)
Azevedo also observed petitioner from the front security office (I RT 137)

Petitioner chose a package of T-shirts off a rack. (I RT 54-5, 138, 132).
Rogers saw petitioner put the package down the front of his pants.(I RT
73, 105-6)  Azevedo claimed to have seen petitioner conceal the
merchandise, but acknowledged that he did not have a clear view of
petitioner(I RT 139-140)   After Rogers saw petitioner conceal the
package, he left the office to go to the floor. (I RT 55, 74) Petitioner
walked to the front of the store, parked his cart, and exited the building
(I RT 56.)

Rogers stated that he identified himself as Target security just as
petitioner walked out the doors (I RT 57-58. 68 )  Rogers was still inside
the store when he identified himself to petitioner, and about five feet
from him.(I RT 59, 89)   Rogers was in plain clothes. (I RT 58)  According
to Rogers, when he approached petitioner, petitioner hit him in the face
about three times (I RT 59)   De la torre observed petitioner hit Rogers
on camera (I RT 189)

At trial, neither Rogers nor De la Torre could remember whether Rogers
touched petitioner first or whether petitioner hit him first. (I RT 84-6,

191). During the preliminary examination, however, Rogers acknowledged that first he grabbed petitioner's arms, and then petitioner broke away with one arm and hit him. (I RT 266-7). Azevedo testified that Rogers identified himself as Target security, told petitioner to stop, grabbed petitioner's arm, and then petitioner hit Rogers. (I RT 145-6)

Rogers grabbed petitioner's arm and tried to gain control (I RT 60-2.)

Joseph Mahoney, a high school student, was standing outside Target waiting for his grandmother that afternoon, about five feet from the Target entrance. (I RT 226-228). He heard some yelling or movement, turned and saw petitioner run out of the store, followed closely by a white male. (I RT 228-230). Mahoney could not tell that the white male(Rogers) was a Target security guard (I RT 235). Rogers was wearing normal street clothes. (I RT 236). Rogers touched petitioner first. (I RT 236.) The two men began fighting (I RT 229). Mahoney never heard Rogers identify himself as Target security.( I RT 236.) Nor did he hear any of the security guards tell petitioner to stop resisting.(I RT 232)

De la Torre compiled a time-lapse videotape of the incident that was given to the police and shown to the jury. (I RT 71, 168-9) This video showed a still photo from every two to three seconds, so it had gaps in it. (I RT 197) De la Torre did not comply with Target's policies and procedures, which required that he retain the non-time-lapse video of the incident.(I RT 209) As Rogers himself testified, the video shown to the jury was of "horrible" quality.(I RT 71)

8

When Rogers and the others detained petitioner, they found the package of
t-shirts in his pants, and photographed it.(I RT 79-80, 148)  Despite
store policies requiring that the evidence be retained, the t-shirts were
discarded upon Rogers' instruction, allegedly because they had pubic hair
on them (I RT 80, 111-113)

A Pittsburg police officer, who later arrived on the scene, saw pubic hair
on the package and on the table nearby, but neglected to put this fact in
her police report. ( I RT 214, 223-4)  The officer searched petitioner and
determined that he was not wearing underwear.(I RT 217-8)  Instead of the
t-shirts allegedly found on petitioner, a "similar" package of t-shirts
was given to the police and introduced into evidence. ( I RT 114, 200-1,
219-220.)

Rogers had only worked at Target for ten months at the time of this
incident, but he had already been written up twice by De la Torre: once
for apprehending someone who had no Target items on them. ( I RT 49, 117-
8, 122-124.). Rogers also mistakenly wrote in his report of this incident
that petitioner had stolen socks. (I RT 118).

9

IV  APPENDIX  A

## ARGUMENT 1

THE COURTS FAILURE TO INSTRUCT ON BATTERY AND ASSAULT AS
LESSER INCLUDED OFFENSES OF ROBBERY VIOLATED PETITIONERS
DUE PROCESS RIGHT TO INSTRUCTIONS ON THE DEFENSE THEORY
OF HIS CASE VIOLATING THE UNITED STATES CONSTITUTION

A. FACTUAL AND PROCEDURAL SUMMARY

Petitioner has a right to a fair trial. The jury as factfinders must

be allowed to give it to him. The respondents claim petitioner used force,

unnecessary to his defense and position, however, if the jurors were

instructed properly they would have understood that force involved in robbery

must be motivated by the intent to steal, and/or that the force used by

petitioner may have only constituted some lesser crime than robbery, it is

highly unlikely that they would have convicted petitioner of robbery.

Petitioner's counsel requested that the court instruct on battery as a lesser

included offense of robbery. (See court transcript (CT) at 126-127, Ex 5 (only rele-

vant pages will be cited or used a evidence). The court denied the request as follows:

> "Battery is not a lesser. In the old days of course,
> lesser related...would be one that we give, but it's not a
> lesser included offense, because it's force or fear. So,
> it is not a lesser -- assault or battery is not lesser. So
> I won't give the .(I RT 261, emphasis added.). Then the
> trial court gave several jury instructions relating to
> robbery and the use of force, beginning with CALJIC 9.40,
> which says, "...Every person who takes personal property in
> the possession of another, against the will and from the
> person or immediate presence of that person, accomplished
> by means of force or fear and with the specific intent
> permanently to deprive that person of the property, is
> guilty of the crime of robbery...In order to prove this
> crime, each of the following elements must be proved: (1) a
> person had possession of property of some value, however
> slight; (2) the property was taken against the will of that
> perosn; (3) the taking was accomplished eithe by force or
> fear; and (4) the property was taken with the specific
> intent permanently to deprive that person of the property.
> (See court transcript (CT) at 126-127, Ex 5)(only relevant pages will be cited).

After several intervening instructions unrelated to robbery, the court gave

CALJIC 9.40.2, which purports to state the "after-formed intent" rule:

10

> To constitute the crime of robbery, the perpetrator must
> have formed the <u>specific intent</u> to permanently deprive the
> person in possession of the property of that property
> before or at the time that the act of taking the property
> occurred. If this intent was not formed until after the
> property was taken from the person or immediate presence
> of the victim, the crime of robbery has not been
> committed. CT 131)

The court then gave CALJIC 9.40.3 regarding store employees as victims of

robbery, and then the following non-CALJIC instructions:

> The requisite force or fear needed to establish a robbery
> need not occur at the time of the initial taking.
> Assuming all other required elements have been proven, the
> use of force or fear to escape with or otherwise retain
> even temporary possession of the property constitutes
> robbery. It is not an essential element of the crime of
> robbery that the use of force or fear be used to gain
> direct physical possession of the property taken.
> Assuming all other elements have been proven, a robbery is
> committed if an individual uses force or fear to retain
> possession of the property prior to reaching a place of
> relative safety. (CT 133-4.)

To summarize, the court instructed the jury that robbery requires intent,

taking, and force (or fear). The court explained the nexus between the intent

and the taking (i.e., that the intent must arise before the taking). (CALJIC

9.40.2, at CT 131.) And the court explained the nexus between the force and

the taking (i.e., that the force can occur after the initial taking, in order

to retain the property, and still constitute robbery) (CT 133.), but the court

never explained the nexus between the force and the intent--i.e., that the

force has to be motivated by the intent to steal--even though this was the

crux of the defense.

    B.    BATTERY AND ASSAULT ARE LESSER INCLUDED OFFENSES OF ROBBERY

> It's been held: "Under the elements test, we look
> at many things to see if all the legal and judicial
> elements of the lesser crime are included in the
> definition of the greater crime, such that the greater
> cannot be committed without committing the lesser. <u>Under
> the accusatory pleading test</u>, by contrast, we look <u>not to
> official definitions</u>, but to whether the accusatory
> <u>pleading describes the greater offense in language such
> that the offender, if guilty, must necessarily have also</u>

committed the lesser crime." People v. Moon (2005) 37
Cal. 4th 1, 25, quoting People v. Lopez (1998) 19 Cal. 4th
282, 287-8.) 1/

In the present case, battery was a lesser included offense of robbery under

the "accusatory pleadings" test, because petitioner was charged in the

information with committing robbery by means of "force and fear." (CT 36).

> The Due Process Clauses of the 14th Amendment requires the
> government to prove beyond a reasonable doubt every
> element of the crime with which a defendant is charged In
> re Winship 397 U.S. 358, 364 (1970). The reasonable doubt
> standard applies in both state and federal proceedings
> Sullivan v. Louisiana 508 U.S. 275, 278 (1993). If the
> government fails to sustain its burden of proof on any
> element, the defendant must be acquitted McCormick
> Evidence §§ 336-337 (5th ed. 1999); indicating that the
> burden of persuasion requires convincing the factfinder
> that a fact in issue should be decided a certain way. The
> Due Process Clause places on the prosecution the burden of
> persuasion on every element of the crime charged and only
> rarely does the burden shift to the defendant United
> States v. Morillo 158 F. 3d, 18, 25 (1st Cir. 1998).

Force is required to commit battery, but a minimal amount of force is

sufficient.. Accordingly, if the minimal force required for battery is

necessarily included within the force required to commit robbery, then battery

is a lesser included offense of robbery. In People v. Mungia (1991) 234 Cal.

App. 3d 1703, said, "..the terms 'force' and 'fear' as used in the definition

of the crime of robbery have no technical meaning peculiar to the law and must

be presumed to be within the understanding of jurors." (d). Indeed, the

CALJIC and other instructions used in this case did not define "force" for the

jury.

1. Assault is a lesser included offense of robbery.

The argument that battery is a lesser included offense of robbery--

and thus required a sua sponte instruction by the trial court- applies with

equal or greater force to assault. Under the accusatory pleading test,

assault is necessarily included in robbery, because if a robbery is committed

1/ (Although Penal Code § 1258 affects litigants in state court, petitioner wishes this Honorable Court to
know he does not have the Federal cites comparable to 1258, even though Haines v. Kerner seems
applicable). Petitioner shows that although he cites state case law in some portions of this Federal
Writ he relies exclusively on Federal Case Law while presenting his meritorious claims.

by use of force and fear, it necessarily includes an assault. By contrast, as shown above, the force contemplated in the definition of robbery is "something more...than just that quantum of force which is necessary to accomplish the mere seizing of the property." People v. Thomas (2005) 133 Cal.App. 4th 488, 494. The court in Mungia also clearly contemplated a physical act when assessing force in the robbery context.(Id. at 1708-9). Such an act of force must certainly include the attempt and ability to commit the least touching required for assault (Penal Code § 240; People v. Wright (1996), supra, 52 Cal. App. at 209).

2. In denying petitioner's request for an instruction on battery, the trial court relied on the Third District's decision in People v. Wright (1996) 52 Cal. App. 4th 203, which held that a "trial court has no duty to instruct sua sponte on assault as a lesser included offense of robbery."(Id. at 210). but the California Supreme Court, while acknowledging the existence of the Wright decision, has pointly declined to resolve whether Wright was correct!! The court has expressly left open whether assault and battery are lesser include offenses of robbery by "force or fear" under the accusatory pleading test.

Petitioner submits that Wright was incorrectly decided on a number of grounds. First, Wright held that "force is not an element of robbery independent of fear." In so holding, Wright essentially rewrites the robbery statute, section 211, which plainly states that robbery may be "accomplished by means of force or fear" (§ 211, emphasis added)

> Its been held that a defendant may be acquitted when the court omits from the jury instructions any element that the prosecution must prove beyond a reasonable doubt. United States v. Gaudin, 515 U.S. 506, 522-23 (1995), and "removal of an element from the jury is a "structural" error that cannot be harmless United States v. Uchimira 125 F. 3d. 1282, 1286 (9th Cir, 1997)

13

Begin Copy 2 on other Typewriter

C.   THERE WAS SUBSTANTIAL EVIDENCE THAT THE "FORCE" USED BY
     PETITIONER DID NOT COINCIDE WITH THE INTENT TO STEAL,
     AND THUS CONSTITUTED ONLY ASSAULT OR BATTERY, NOT ROBBERY

If indeed assault and / or battery were lesser included offenses under
the accusatory pleading test (see part B supra), then there is no question there
was substantial evidence to warrant instructions on these offenses.   Indeed,
neither the prosecutor nor the court disputed that the evidence was susceptible
to the inference that the striking of Rogers was independent of the theft and
thus not robbery.   It was undisputed at trial that petitioner hit security guard
Blake Rogers in the face. (I RT 59-60, 145.), but it was also undisputed that
Rogers, who was in plain clothes, pursued petitioner out of the store and
grabbed petitioner by the arms before petitioner "broke away with one arm" and
hit Rogers. (I RT 145-6, 170-1, 266-7).   Rogers and another Target security
guard who was present, Alex Azevedo, claimed that Rogers identified himself as
Target security before he grabbed petitioner. (I RT 58-9, 145- 6.).   Certainly
it was in their best interest, as Target employees, to say so, but an impartial
witness, Joseph Mahoney, observed the incident from about five feet away, and
described it in great detail. (I RT 228-239.)   Mahoney testified that he never
heard Rogers identify himself as Target security (I RT 228, 236.).

If the jurors believed Mahoney rather than the two security guards, they
might well have found that peititioner responded to an unidentified attacker by
fighting back, without any intent related to the taking of the T-shirts(also see
Argument II--CHAIN OF EVIDENCE, etc.).   Such application of force would
constitute battery or assault (absent the crime self-defense), but not robbery!
Accordingly, the trial court and the California Supreme Court erred by not
giving both battery and assault instructions.   Another scenario petitioner
wishes to interject is this:  It is improbable that petitioner knew or suspected

14

Rogers was a security guard for the store trying to apprehend him and there is a

fair probability the jury would have found that Rogers knew petitioner did not

know Rogers was chasing him, had adequate instructions been given. Petitioner

had "diminished mental capacity," because his 'tunnel vision' saw only outside

the store. When Rogers grabbed him, mere excited reflex caused petitioner to

strike Rogers, not any thought of evading apprehension for a crime petitioner

felt he had already gotten away with. If as respondents say, that petitioner's

lady friend was a look-out, then that look-out would have alerted petitioner to

any potential arrest threat (I RT 132 ).     That never happen or came from the

lady (co-defendant), thus petitioner's State-of-Mind at the time of being

grabbed was one of being assaulted by an unknown culprit attempting to attack or

rob him...not one of being potentially arrested.

D.   THE FAILURE TO INSTRUCT ON BATTERY AND ASSAULT WAS A FEDERAL CON-
     STITUTIONAL ERROR

     The trial court's refusal to instruct the jury on the lesser included

offenses of battery and assault, even though the battery instruction was

requested by petitioner, deprived petitioner of due process, trial by jury on

every element of the charged crime, and effective assistance of counsel  Conde

v. Henry (9th Cir. 1999) 198 F. 3d 734, 739-741 . In Conde, the Ninth Circuit

reviewed a state court trial on kidnapping for the purpose of robbery.   In an

argument analogous to the argument petitioner makes in the present case, Conde

argued that the kidnapping was not undertaken with the intent to steal, and so

did not constitute kidnapping for robbery. The Ninth Circuit held that the

refusal of the requested lesser offense instruction deprived defendant of his

"well established" right to instruction of the defense theory of the case (d. at

739.)  Refusal to give the instruction was constitutional error Bradley v.

Duncan (9th Cir. 2002) 315 F. 3d 1091, 1098-9[failure to instruct on defense

violated due process]            /5

Although the California Supreme Court has held that the
omission of sua sponte instructions on lesser offenses does not violate due
process, it has acknowledged Conde and Bradley and other "defense theory of
the case" opinions, and has expressly left open the question of whether it
is a due process violation to refuse to instruct on lesser offense when
such instruction is requested.

E.  THE FAILURE TO INSTRUCT ON BATTERY AND ASSAULT WAS PREJUDICIAL UNDER
    EITHER STATE OR FEDERAL STANDARDS

The failure to provide the requested battery and assault instructions,
together with the failure to instruct properly on the elements of robbery (see
Section II below) constituted structural error, which is reversible per se.  If
the failure to instruct is not held reversible per se, in light of the federal
constitutional error it should be viewed, at a minimum, as subject to the
"reasonable doubt" standard of Chapman v. California (1967) 386 U.S. 18.
Nonetheless, the error is prejudicial even if it is assessed under the standard
enunciated in People v. Watson (1956) 46 Cal. 2d 818, i.e, it is reasonably
probable that a result more favorable to the defendant would have occurred in
the absence of error.

The prosecutor caused further damage by making the following closing
argument:

> Someone comes up on petitioner, and starts hitting him.  Doesn't
> matter if he identifies himself as Target Security or not.  Why is
> he punching him?  He's trying to get away.  He's using force to
> get out of the store. (II RT 319).

The prosecutor simply could not have said that it "[d]oesn't matter if he
identifies himself as Target Security or not" if the jury had been properly
instructed.  The prosecutor's argument further encouraged the jury to understand
the ambiguous jury instructions to mean that as long as petitioner used force,
it did not necessarily have to be motivated by the intent to steal to constitute
robbery. (see, e.g., Middleton v. McNeil (2004) 541 U.S. 433, 438.).

*16*

t

Petitioner committed a forcible crime, rather than theft alone, but there was indisputable, substantial and material evidence that the force used by petitioner constituted only assault or battery, and not robbery. The instructions incorrectly presented jurors with a classic "all or nothing" choice, which essentially assured conviction [The fact that the jury was not instructed on assault and battery as a way to hold petitioner responsible for his forcible behavior was exacerbated by the fact that the instructions on robbery were also inadequate regarding the use or force, again assuring an improper conviction. (See Section II below). If the jury had known that there was a way to hold petitioner accountable for his aggression against Rogers without finding him guilty of robbery, it is reasonably certain that they would have acquitted him of robbery. It is clearly not beyond a reasonable doubt that the instructional error did not contribute to the verdict-Chapman, supra, 386 U.S. at 23]

> Its been held, "...that a defendant may be acquitted when the court omits from the jury instructions any element that the prosecution must prove beyond a reasonable doubt." United States v. Gaudin, 515 U. S. 506, 522-23 (1995), and "...removal of an element from the jury is a "structual" error that cannot be harmless," United States v. Uchimura 125 F.3d 1282, 1286 (9th Cir, 1997).

F.  UNDER THE UNUSUAL CIRCUMSTANCES OF THE INCIDENT, THE COURT'S INSTRUCTIONS WERE INADEQUATE TO INFORM THE JURORS OF THE NEXUS BETWEEN FORCE AND INTENT REQUIRED FOR ROBBERY AND IT LIGHTEN THE PROSECUTIONS BURDEN VIA PRESUMPTIONS

1. The Instructions Were Incomplete and Misleading.

In addition to instructing on lesser included offenses,The trial court is also required to instruct sua sponte on "the general principles of law relevant to the issues raised by the evidence." As shown above, the instructions given in this case did not inform the jury of the "general principles of law relevant to the issues raised by the evidence." The primary issue raised by the evidence, according to petitioner, is whether the force applied by petitioner was motivated by the intent to steal. This issue was "necessary for the jury's

17

understanding of the case," yet none of the instructions adequately informed the

jury on this issue. This is particularly true since the instruction that was

given suggested that the force used did constitute robbery:

> The requisite force or fear needed to establish a robbery need not
> occur at the time of the initial taking. Assuming all other
> required elements have been proven, the use of force or fear to
> escape with or otherwise retain even temporary possession of the
> property constitutes robbery (CT -133)

Moreover, petitioner's foremost defense was that he did not commit

robbery because his assault on Rogers was not motivated by the intent to steal,

as required by (Green, supra, 27 Cal. 3d at 54). He argued that the force he

used was instead motivated simply by the intent to defend himself against an

attacker who was wearing street clothes and did not identify himself as Target

security (See I RT 45-6, and II RT 307.) There is substantial evidence

supporting this defense [e. g., Mahoney's testimony, and indirectly the evidence

of Rogers' overzealousness and impropriety in other dubious detentions of

suspected shoplifters) and it is no way " inconsistent with the petitioner's

theory of the case. Accordingly, the trial court was required, sua sponte, to

inform the jury that "the act of force...by which the taking is accomplished in

robbery must be motivated by the intent to steal.(See Green). Beyond the fact

that the instructions omitted the requirement that the force was motivated by

intent to steal, the instructions that were given were misleading. They

explicitly tied intent to the "act of taking." (CT 131). They also explained

that force had to be connected with the taking or retention of property. (CT

133-134). Because there was no comparable instruction requiring a nexus between

the intent and the use of force, the implication was that any use of force

connected with an intentional taking constituted robbery, even if the force

itself was motivated by some intent other than theft. (See CT 131 et seq.) This

is not the law. The court's error amounts to a denial of due process because it

misstated the crucial issue of intent. Improper instructions on the element of

intent constituted a deprivation of due process, evaluated under the Chapman standard. (Sandstrom v. Montana (1979) 442 U.S. 510, 520.)

As shown above, the inadequate instructions also violated the Sixth Amendment, which guarantees [petitioner] the right to a jury finding on all elements of the charges against him. Sullivan v. Louisiana (1993) 508 U.S. 275, 277-278. The Sixth Amendment is violated when jury instructions inadequately describe or omit elements of, or defenses against, the petitioner.

Neder v. United States (1999) 527 U.S. 1, 8-11; People v. Flood (1998) 13 Cal. 4th 470, 480.

> "Instructional error relieving the prosecution of the burden of
> proving beyond a reasonable doubt each element of the charged
> offense violates the defendant's rights under both the United
> States and California Constitutions"-United States v. Gaudin (1995)
> 515 U.S. 506, 510. Moreover, the trial court's misleading
> instructions were violative of due process because they failed to
> instruct the jury adequately on the defense theory of the case.
> Conde v. Henry (9th Cir. 1999) 198 F.3d 734, 739-740; Bradley v.
> Duncan (9th Cir. 2002) 315 F. 3d 1091, 1098-1099.

Although the trial in this case occurred in 2005 just a few days before the formal adoption of the new CALCRIM instructions, it is fruitful to review the new, improved instructions on robbery, and the way they handle the question at issue here. In contrast to the CALJIC instructions, the CALCRIM instructions have the imprimatur of the Judicial Council as official instructions. (Cal. Rules of Court, Rule 855.) CALCRIM 1600 specifically states the following as the final element of robbery (in pertinent part):

> "When the defendant used force or fear to take the property, he
> intended to deprive the owner of it permanently... "

While the old instruction delivered here addressed only the relationship between intent and the act of taking ("the property was taken with the specific intent permanently to deprive that person of the property"), the official CALCRIM instruction on robbery makes it an element of the crime that the

defendant had to have the intent to steal <u>at the time he used force or fear.</u>

The fact that the trial court explained to the jury that "the requisite force or fear need not occur at the time of the initial taking" did not address the problem here. <u>It is apparent that the force here did not occur at the time of the initial taking,</u> but the critical question is whether the prosecutor proved beyond a reasonable doubt that, when the force was exerted, it was motivated by the specific intent to steal. The trial court and California Supreme Courts erred in failing to instruct the jury sua sponte on this issue.

    2.   Petitioner's Request for Battery Instructions Put The
         Court On Notice Of The Defense Theory Of The Case And
         Required Clarifying Instructions

Petitioner's request for a battery instruction was a request that the jury focus on the force used by petitioner and whether it was motivated by the specific intent required for robbery. It was, in essence, a request for a instruction clarifying that the force used by petitioner had to be shown, beyond a reasonable doubt, to be motivated by the intent to steal. Such a clarifying instruction would relate to the reasonable doubt standard for proof of guilt to particular elements of the crime charged." Petitioner was entitled to such an instruction upon request. (<u>Rincon-Pineda, supra</u> 145 Cal. 3d at 885.)

Further, trial courts have a duty to tailor the instructions to the particular facts of the case, even when an instruction submitted by defense counsel is incorrect.

    G.  THE COURT'S FAILURE TO PROPERLY INSTRUCT ON FORCE AND
        INTENT WAS PREJUDICIAL TO PETITIONER

The Sixth Amendment guarantees a criminal defendant the right to a jury finding on all elements of the charges against him <u>Sullivan v. Louisiana</u>

(1993) 508 U.S. 275, 277-278.

The misleading and incomplete instructions certainly may have contributed to the guilty verdict here. The language of CALJIC 9.40 informed the jury that the taking must be by means of force or fear and with intent to steal, but it did not suggest that the force or fear must be motivated by the intent to steal. The court gave no instruction on the connection between intent and force, i.e., that the force had to be motivated by the intent to steal--even though this was the crucial issue in the case. Moreover, because the instructions <u>did inform the jury that force had to be connected with the taking</u>, and that the taking had to be intentional; with no further instruction regarding force, the instruction implied that any use of force connected with an intentional taking constituted robbery, even if the force itself was motivated by some intent other than theft. However, the court allowed the load the prosecution had to prove difficult to established facts through the use of presumption, that is, it enabled the tier of fact to determine the existence of a statutory element of a crime, an "ultimate" or "elemental" fact from the existence of one or more "basic" or "evidentiary" facts already proven beyond a reasonable doubt. If the jury had understood that the force used by petitioner against Rogers had to be motivated by the intent to steal in order to constitute robbery, they likely would have reached a different result on the robbery verdict.

Petitioner contends that, for this reason, and those outlined above, the error in instructing the jury was not harmless beyond a reasonable doubt. The conviction, accordingly, must be reversed.

CONCLUSION

Federal decisions hold, "...an instruction that infliction of injury is presumptive evidence of intent to commit mayhem unconstitutionally shifted burden of persuasion on element of intent. Virgin Islands v. Parrilla 7 F. 3d.

21

1097, 1103 (3rd Cir 1993); and see <u>United States v. Baumgardner</u> 85 F.3d, 1305, 1309-10.

On the above grounds, Petitioner requests that the Court reverse his judgment in this case.

Date: _April 23, 2008_

Respectfully submitted,

ARGUMENT II OF II

PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND
THAT VIOLATED HIS DUE PROCESS RIGHTS GUARANTEED THROUGH THE
UNITED STATES CONSTITUTION

Both the Sixth and Fourteenth Amendments guarantee a criminal
defendant the right to counsel in general and to effective assistance of
competent counsel.(Evitts v. Lucey 469 U.S. 387 (1985); Strickland v.
Washington (1984) 466 U.S. 668, 684-686.) The Supreme Court set forth
standards which say, "...to gain a reversal based on an ineffective assistance
of counsel argument, defendants must show first that their representation did
not meet an objective standard or reasonableness and second, that the poor
representation affected the outcome."(i.e., resulted in a guilty verdict when
effective representation could have achieved an acquittal).

In this case the defendants counsel made little effort to confront the
judge. She had not prepared for the possible resistance of the court opposing
any necessary instruction that touched-on the defense theory of the case.
This severely prejudiced petitioner (United States v. Cronic 466 U. S. at
658-61). The defendant "bears the burden of proof on such a claim and must
show the attorney failed to act in a manner to be expected of a reasonably
competent attorney acting as a diligent advocate, and that counsels acts or
omissions resulted in the withdrawal of a potentially meritorious defense."

1.  Petitioner shows:

a.  It appears from the record that while petitioner's counsel
requested instructions on battery, she did not offer the court specific
proposed language that would clarify the robbery instructions regarding the
use of force. Under the circumstances of this case, however, petitioner
contends that because the court "undertook to instruct the jury" concerning
force and intent, and "had earlier instructed it on those principles," a
"proper consideration of the evidence" required that the instructions given be

23

accurate, and counsel's failure to make any further specific request on the subject did not waive the argument on appeal. If however, counsel's failure to offer a specific clarifying instruction is deemed to have waived the issue on appeal, her failure amounted to constitutionally ineffective assistance of counsel.

b. Failure to request an instruction or to add additional statutory language curing the theory on defendant's only defense does constitute ineffective assistance of counsel (United States v. Span (9th Cir. 1996) 75 F. 3d 1383, 1389-1390.) Similarly, failure to request instruction on the "main thrust of the defense" had been held ineffective assistance of counsel. (Pirtle v. Morgan (9th Cir. 2002) 313 F. 3d 1160, 1172.) The failure to object to improper jury instructions constitutes ineffective assistance of counsel. Trial counsel should have requested specific clarifying instructions on the robbery count. (See Lucas v. O'Sea 179 F.3d 412, 419 (6th Cir 1999)

c. Her request for instructions on battery makes it evident that she was aware of the crucial role of the question of whether the intent to steal motivated the assault on Rogers.

d. The next crucial step, which she failed to take, was to request that the instructions on robbery make clear that there was no robbery if there was a reasonable doubt as to whether petitioner assaulted Rogers with the specific intent to retain the T-shirts. There was no absolutely no "downside" to requesting such clarifying instructions. "The omissions of defense counsel involved a critical issue, and that the omissions cannot he explained on the basis of any knowledgeable choice of tactics." A reasonable probability is sufficient to undermine confidence in the outcome." Williams v. Taylor (2000) 529 U. S. 362, 391.) There is no question that counsel should have requested clarifying instructions on robbery. This standard does

24

not require an petitioner to prove by a preponderance of the
evidence that the result would have been different.(See
Strickland, supra at p. 694). As long as petitioner can raise a
reasonable probability that the result would have been different
with adequate counsel, a reviewing court must reverse the
judgment. In fact, the ultimate focus of inquiry must be on the
fundamental fairness of the proceeding whose result is being
challenged. This analysis requires appellate scrutiny of the
nature and extent of defense counsel's error, as well as the
strength of the prosecutions' evidence.

        e. Given the judge's concerned response to the motion for
a new trial, it is clear that he was sympathetic to petitioner's
argument about the evidence of force for robbery. (See, e.g., II
RT 354 [court found de-published case persuasive in rejecting the
reasoning of Wright]). If counsel had offered the judge a way to
clarify the instructions to take into account the particular
evidence that had been introduced, it seems highly likely that the
judge would  have accepted and used such a clarification. This
shows that here, counsel's performance fell below an objective
standard of reasonableness. Tucker v. Prelesnik 181 F. 3d 747, 757
(6th Cir 1999), and her performance prejudiced petitioner's case
because there is a reasonable probability the outcome of the trial
would have been different (see Hart v. Gomez 174 F. 3d 1067, 1073
(9th Cir 1999). She caused a breakdown of the adversarial process
rendering the result unreliable, in fact, she practically
abandoned petitioner (see Griffen v. United States 109 F. 3d 1217,
1219 (7th Cir 1997).

                                25

f.   Trial and Appellate counsel provided ineffective assistance of counsel by failing to show the relevancy of the original T-Shirt evidence to the jury.   Petitioner was accused by Rogers of shoplifting a pack of T-Shirts (See Petitioner's Petition For Review to the Supreme Court of California, (Ex-2)filed October 1, 2007 at page (p) 3, 4, 6, 7, 8 15 & 26;and see I RT 54-55, 80, 111-113, 118, 138, 182).   Rogers partner, Azevedo, did not have a "clear view" of petitioner's stuffing the T-Shirts in his pants as Rogers claims (I RT 139-140, 148).

Neither, Loss Prevention Manager David de la Torre, nor Rogers, complied with store policy (or rules of evidence) which required them to retain video and T-shirts (I RT 80, 111-113; I RT 209).   The jury had a right to see and feel the real (original) T-shirt evidence.   The attorney provided ineffective assistance by failing to show:

(1).   The chain of evidence was a crucial part of the defense theory.   This evidence was violated by Rogers and company and never disputed by petitioner's counsel, violating his 6th and 14th Amendment Rights.

(2).   Petitioner questioned his attorney concerning this issue, but counsel said, "...that issue was 'moot.'"   Petitioner discovered this is because the, "intent of the prosecution in presenting 'substitute evidence' was just to illustrate to the jury what the alleged evidence looked and felt like." but still vio-lated petitioner's rights (I RT 114, 200-1, 219-220) In re Seaton (2004) 34 Cal 4th 193 [17 Cal. Rptr. 3d. 633]

**EXHAUSTION REQUIREMENT OF SECTION "f"**

Petitioner has fairly presented the substance of his claim

To the State Courts to allow the State Courts "an opportunity to apply controlling legal principles to the facts bearing upon his constitutional claims (See Argument I p. 9-11).       The fact that the T-shirt discrepancy is presented in the "Statement of Facts," then in Argument I at "C" paragraph 2, and Argument II at "C""2", paragraph 5, of his Appellate brief does not make this claim "distinct' from the claims he has already presented Humphrey v. Cady 405 U.S. 504, 516 n. 18 (1972); Reutter v. Crandel 109 F. 3d 575, 577-78 (9th Cir 1997). This claim may be allowed because it relates back to the arguments put forth by petitioner and arise out of the same, "conduct, transaction, or occurrence set forth in the original pleadings." Mayle v Felix (2005) 125 S. Ct. 2562. It's been held that the, "exhaustion requirement is satisfied even though 2 of 4 claims not presented on appeal to State Supreme Court, when the claims were briefed and argued on direct appeal before State Appeals Court. McGuire v. Estelle 902 F. 2d 749, 752-753 (9th Cir 1990) (reversed on other grounds see 502 U.S. 62(1991), and petitioner has a specific right through the constitution while he has alleged a pattern of facts that is well within the mainstream        of        constitutional litigation Daye v. Attorney General of the State of New York (1983) 696 F. 2d 186, 194.

## DECLARATION IN SUPPORT OF WRIT OF HABEAS CORPUS

I, Lacy Winzer, T86160, declare the following:

I am the Petitioner in the attached action.

I am currently a state prison inmate.

I have had to obtain the assistance of other prisoners who appeared to have some knowledge of law, under very difficult and restrictive conditions, to assist me in writing and filing the papers currently being filed the court.

I swear that everything in this document is true and correct to the best of my knowledge. I swear the pages of the court transcripts (CT) and Reporters Transcripts (RT) Volume I & II are true and correct copies of my case and are the originals given to me by the courts.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on *April 23, 2008*, at *Needed.* California.

By: *Lacy Winzer 4/23/08*

28

## DECLARATION SUPPORTING MOTION FOR COUNSEL

I, . LACY WINZER _____, declare the following:

1. I am the plaintiff in the above-entitled action.

2. I am currently a state prison inmate with no meaningful source of income to utilize in employing assistance of counsel.

3. My personal attempts to read law books, Rules of Court and Court Procedures have resulted in utter confusion and furthered my inability to comprehend what action I should take next to further prosecute this action.

4. I have had to obtain the assistance of other prisoners, who appeared to have some knowledge of law, under very difficult and restrictive conditions to assist me in writing and filing the papers currently on file before the court.

5. PETITION   FOR WRIT OF HABEAS CORPUS BY PERSON IN STATE CUSTODY
_____
_____

6. _____
_____
_____

7. _____
_____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on (date) *April 23, 2008* , at (place) SOLEDAD _____, California.

*Lacy Winzer* 4/23/08
(Signature)

Plaintiff In Pro-Se

29

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, __LACY WINZER_____, declare:

I am over 18 years of age and a party to this action. I am a resident of __SOLEDAD STATE PRISON__

_____Prison,

in the county of __MONTEREY_____,

State of California. My prison address is: __P.O. BOX 705; LA 315U_____,

_____SOLEDAD, CA. 93960-0705_____.

On_____,
                                    (DATE)

I served the attached: __PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE__

__CUSTODY W/ATTACHMENTS AND EXHIBITS_____
                              (DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

    ATTORNEY GENERAL OF CALIFORNIA
    455 GOLDEN GATE AVE.
    SAN FRANCISCO, CA 94102

    I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on __4/23/08__          __Lacy Winzer_____
                  (DATE)                (DECLARANT'S SIGNATURE)

Civ-69 (Rev. 9/97)                              ::ODMA\PCDOCS\WORDPERFECT\22832\1

1    IN THE DISTRICT COURT OF APPEAL OF THE STATE OF CALIFORNIA

2          IN AND FOR THE FIRST APPELLATE DISTRICT

3                ---o0o---

4

5

6    PEOPLE OF THE STATE OF CALIFORNIA,   )

7          Plaintiff and Respondent,  )

8      vs.                  )  No. _____

9    LACY WINZER,             )CCC No. 050867-1

10       Defendant and Appellant.  )

11                              COPY

12

13

14          REPORTER'S TRANSCRIPT ON APPEAL

15      FROM THE SUPERIOR COURT OF CONTRA COSTA COUNTY

16    HONORABLE DAVID B. FLINN, JUDGE - DEPARTMENT NO. 6

17              August 3, 2005

18   HONORABLE PETER L. SPINETTA, JUDGE - DEPARTMENT NO. 11

19              August 10, 2005

20              August 11, 2005

21              August 15, 2005

22              August 16, 2005

23              April 14, 2006

24      A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

25

26                VOLUME I

27             Pages 1 - 290      Ex 3

28

1    A P P E A R A N C E S

2    FOR THE PEOPLE AND THE RESPONDENT:

3                        HON. BILL LOCKYER

4                        Attorney General State of California

5                        455 Golden Gate Avenue, 1st Floor

6                        San Francisco, California 94102

7                        BY:  ____  ____ ____ ____   ____

8                                          Deputy

9    FOR THE DEFENDANT AND APPELLANT:

10                        First District Appellate Project

11                        730 Harrison Street, Suite 201

12                        San Francisco, California 94107

13                        BY:  ____ ____ ____ ____   ____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                          INDEX OF WITNESSES

2                      C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

3

4        PEOPLE OF THE STATE OF CALIFORNIA:

5                                      E-X-A-M-I-N-A-T-I-O-N

6                          Direct  Cross  Redirect  Recross

7        Blake Rogers            50     81     117       122

8        Alexander Azevedo      126    149     169

9        David De La Torre      178    191     208       208

10       Michelle Ligouri       214    220

11       Joseph Mahoney         226    235     239

12

13                          ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                        INDEX OF WITNESSES

2                   C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

3

4        DEFENDANT LACY WINZER:

5                                    E-X-A-M-I-N-A-T-I-O-N

6                        Direct  Cross  Redirect  Recross

7        Michelle Ligouri          241    242

8

9                           ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

INDEX OF WITNESSES

2

A-L-P-H-A-B-E-T-I-C-A-L-L-Y

3

4

PEOPLE OF THE STATE OF CALIFORNIA:

5

E-X-A-M-I-N-A-T-I-O-N

6

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
7| Azevedo, Alexander | 126 | 149 | 169 | |
8| De La Torre, David | 178 | 191 | 208 | 208 |
9| Ligouri, Michelle | 214 | 220 | | |
10| Mahoney, Joseph | 226 | 235 | 239 | |
11| Rogers, Blake | 50 | 81 | 117 | 122 |

12

13

---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1                       INDEX OF WITNESSES

 2                  A-L-P-H-A-B-E-T-I-C-A-L-L-Y

 3

 4    DEFENDANT LACY WINZER:

 5                                    E-X-A-M-I-N-A-T-I-O-N

 6                         Direct  Cross  Redirect  Recross

 7    Ligouri, Michelle           241    242

 8

 9                          ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1                        INDEX OF EXHIBITS

2      PEOPLE OF THE STATE OF CALIFORNIA:

3

4      Exhibit No.                              Marked    Evidence

5          1      Single Photo - Victim Rogers   Premark     254

6          2      Single Photo - Victim Rogers   Premark     254

7          3      Single Photo - Victim Rogers   Premark     254

8          4      Single Photo - Victim Rogers   Premark     254

9          5      Single Photo - Victim Rogers   Premark     254

10         6      Target Store Diagram           Premark     255

11         7      Target Store Front Diagram     Premark     255

12         8      Single Photo - Lacy Winzer     Premark     255

13         9      Single Photo - T-Shirts        Premark     255

14        10      Package of T-Shirts            Premark     255

15        11      Videotape                      Premark     255

16

17                        ---o0o---

18

19

20

21

22

23

24

25

26

27

28

```
 1                        INDEX OF EXHIBITS

 2   DEFENDANT LACY WINZER:

 3

 4   Exhibit                              Marked    Evidence

 5   A       Assets Protection Training   Premark     256

 6   B       Assets Protection Directives Premark     256

 7   C       Assets Protection Training   Premark     256

 8   D       Assets Protection Directives Premark

 9   E       Assets Protetion Op. Directives Premark  256

10

11                      ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             IN AND FOR THE COUNTY OF CONTRA COSTA

3          HONORABLE DAVID B. FLINN, JUDGE, PRESIDING

4                        DEPARTMENT 6

5

6    THE PEOPLE OF THE STATE OF    )

7    CALIFORNIA,                   )

8                   Plaintiff,     )   No. 5-050867-1

9           vs.                    )

10   LACY WINZER,                  )

11                   Defendant.    )

12   _____)

13

14

15

16

17             REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                        AUGUST 3, 2005

19             COURTHOUSE, MARTINEZ, CALIFORNIA

20

21

22

23

24

25

26

27

28

2

```
1                    A P P E A R A N C E S

2   For the People:    ROBERT J. KOCHLY, DISTRICT ATTORNEY

3                      BY:   JEAN SKILLING

4                      Deputy District Attorney

5                      Contra Costa County

6

7   For the Defendant:  DAVID COLEMAN, III, PUBLIC DEFENDER

8                      BY:   WINNIE GIN

9                      Deputy Public Defender

10                      Contra Costa County

11

12  For Target:        BREIDENBACH, HUCHTING & HAUBLET

13                      BY:   GARY COLLIS

14                      Attorney at Law

15                      1000 Wilshire Boulevard, 19th Floor

16                      Los Angeles, California 90017

17

18

19

20

21

22

23

24

25

26

27

28
```

3

1   AUGUST 3, 2005                                10:37 a.m.

2                             ---oOo---

3                     P R O C E E D I N G S

4         MS. SKILLING:  Department 6, add-on 2, Lacy Winzer,

5   050867-1.  Defendant appears in custody with Ms. Gin.

6   Mr. Gary Collis on behalf of Target.

7         MR. COLLIS:  Good morning, your Honor.

8         THE COURT:  Good morning.  I got that file.  What

9   line number was it again?

10        MS. GIN:  Add-on 2, your Honor.

11        THE COURT:  Oh, yes.

12        THE CLERK:  Target is by?

13        MR. COLLIS:  Gary, G-A-R-Y, Collis, C-O-L-L-I-S.

14        THE COURT:  I guess we should take the issues that

15   are before the court in order and hear from both sides.  Issue

16   by issue is probably more rational, and issue number one is

17   whether the service is valid.

18        In my experience, counsel, the burden of a motion to

19   quash for improper service lies with the moving party, and

20   that means providing to the court information in the moving

21   papers and to the opposing side in the moving papers what the

22   capacity of the person that was served is and why they're not

23   a managing agent.

24        It may follow from the title if they're not a

25   director or officer but they might be a managing agent, and

26   your papers just said that -- didn't say; they just said it

27   was improper.  So you want to address that?

28        MR. COLLIS:  Well, yes, your Honor.  It's my

1    one is for the crime of petty theft.

2            I will tell you that there are two issues in this

3    case.  The two issues are, was Target property taken on

4    May 10th, 2005, at approximately 4:00 p.m. in the afternoon?

5    The second issue is, did Mr. Blake Rogers, who worked at

6    Target at that Pittsburg location, who was employed as a

7    senior assets protection specialist, did he follow the

8    Target policies and procedures that he was trained to do,

9    and the rules that are governed by people in a loss

10   prevention security department in all Targets, and why

11   didn't he follow it?

12           Let me tell you what really happened on May 10th

13   of 2005.  Mr. Blake Rogers will testify that he observed my

14   client with the package, that he observed him making motions

15   as if he was putting it down his pants.  He was in the

16   closed circuit television room in which they have monitors,

17   and, of course, they have videotaping equipment, and the

18   videotape that Mr. Walpole referenced to is something that

19   you will see that shows you what Mr. Rogers saw that

20   particular afternoon.  He was at that particular closed

21   circuit T.V. room.  He thought he saw my client conceal an

22   item that belonged to Target.

23           In that same room was his supervisor, David

24   De La Torre.  He told Mr. De La Torre, "I saw someone take

25   something from Target.  I am now going to go get him."  He

26   runs out of the office.  He's in plain clothes.  He's not

27   wearing the traditional Target red shirts, if you guys are

28   Target shoppers.  He's in plain clothes, in which he's

 1   dressed in slacks and a collared shirt.

 2          My client is exiting the store, and Mr. Rogers

 3   says -- and he's already testified to this at a preliminary

 4   hearing.  You will hear he's already testified before in

 5   this particular case before we had this trial, that he

 6   announced himself, he was from Target, he grabbed ahold, or

 7   tried to grab ahold of my client, and at that point my

 8   client hit him.  And that's where the allegations of robbery

 9   occurs, because my client hits a security personnel who

10   belongs to Target while he has Target property on his

11   person.

12          But there was a young man about the age of 17 by

13   the name of Joseph Mahoney who was outside the store who was

14   waiting for his grandmother, and he observed the entire

15   incident, and he will testify that he did not hear

16   Mr. Rogers identify himself as Target security, which is

17   according to the directives, what you must do before you

18   stop someone you believe is shoplifting from your particular

19   store.

20          And Mr. Mahoney tells the police officer, Officer

21   Ligouri, who arrived at the scene later, after my client was

22   arrested by Target and the Pittsburg Police Department was

23   contacted, and he tells Officer Ligouri of the Pittsburg

24   Police Department, "I was there.  I saw what happened.  This

25   guy from Target -- who I later found out was from Target, he

26   was in plain clothes -- ran up to the African-American

27   gentleman, gave him a bear hug, didn't say anything."  And

28   he saw the African-American gentleman hit this person

1      Q    When you were looking on this camera, or when

2   you're operating this monitor, can you actually adjust the

3   camera to get different perspectives to move the camera

4   around?

5      A    Yes.

6      Q    How do you do that?

7      A    There's a little joystick, and it has a little

8   swivel knob on the top.  You can move it around left and

9   right, and when you want to focus in on something you move

10  the nozzle, the tip of it.

11     Q    You say you saw the defendant in the Men's area,

12  was there anyone that appeared to be with him at that time?

13     A    Yes, it appeared that he had a female accomplice

14  with him at the time.

15     Q    And when you say -- What exactly did you see him

16  do?

17     A    I observed him at first.  Somebody actually called

18  him out.  I started observing him.  He made a quick

19  selection on a package of Fruit of the Loom T-shirts.  And

20  it appeared to me that his accomplice was kind of acting

21  like a watchout a little bit.

22     Q    Why do you say that?

23     A    Just the way she was kind of poking her head

24  around the corner, standing in the front of the aisle.

25     Q    What specifically did you see the defendant do?

26     A    Specifically I saw the defendant select a package

27  of T-shirts.

28     Q    Where were these T-shirts at?

```
 1        A      They were in the Men's Department on the back of
 2   the wall.
 3        Q      What did you see him do with these T-shirts?
 4        A      I seen him select the T-shirts, look around a
 5   little bit, open up the front of his pants, place the
 6   T-shirts in, put his shirt over it.
 7        Q      Was the defendant when he was doing this, did he
 8   have a cart with him, was he by himself --
 9        A      He had a cart.  He had a push cart.
10        Q      The ones with the wheels?
11        A      The ones with the wheels, yes, sir.
12        Q      Was your supervisor, was he watching this screen
13   as you were watching this screen?
14        A      Yes, he was.
15        Q      When you saw the defendant do this, what did you
16   do?
17        A      After I seen the subject conceal the merchandise,
18   I immediately went out to the floor and had David stay in
19   the camera room.
20        Q      So your supervisor, he stayed in the camera room
21   as you went outside?
22        A      Yeah, and we kept in communications with
23   walkie-talkies.
24        Q      When you went -- And when you say outside, do you
25   mean actually into the store or outside of the store?
26        A      Actually inside the store.
27        Q      Okay.  And when you went inside the store, what
28   did you do?
```

1  threshold, he looked back to see if anybody was following

2  him.

3          MS. GIN:  Objection.  Move to strike about looked

4  back to to see if anybody was following.  I have no

5  objection to look back, but I think it's this witness'

6  opinion about why Mr. Winzer looked back.

7          THE COURT:  Sustained.

8          It will be disregarded.

9  BY MR. WALPOLE:

10     Q    Describe how he looked back.  Did he turn the

11 full -- all the way back around, or did he look over the

12 shoulder, or what did he do?

13     A    It was just like that (indicating).

14     Q    Were you able to make eye contact with him?

15     A    Yes.

16     Q    When he looked back, what happened next?

17     A    I immediately identified myself as Target

18 security.

19     Q    What were you wearing at that time?

20     A    I wear plain clothes.  I'm an undercover shopper,

21 so I can -- I dress basically just like this.

22     Q    Why do you wear plain clothes?

23     A    For the simple fact that if you're in red Target

24 outfits, most people are going to notice that you're

25 following them.  You know, or something like that.  And you

26 wear street clothes, try to be a product of your environment

27 possibly.

28     Q    When you say you identified yourself, what did you

1    say specifically?

2         A    I identified myself as Target security.

3         Q    And about how far away from defendant were you at

4    that point?

5         A    I think I was approximately five feet away at that

6    time now.

7         Q    What happened next?

8         A    As I identified myself, he struck me in the face

9    with a closed fist approximately three times.

10        Q    You say he turned and looked back at you.  Was it

11   at that point you say you identified yourself as he was

12   looking back at you?

13        A    Immediately, yes, sir.

14        Q    When he looked back, did he then square himself,

15   or did continue to walk towards the front door?

16        A    No, he squared himself.

17        Q    You say he struck you.  Backing up a little bit in

18   time, when he turned around, about how far away were you

19   from him, again?  I'm sorry.

20        A    About five feet away at that time.

21        Q    Did you approach him any further, or did you stay

22   about that distance?

23        A    No, I was coming up on him.  I was coming up on

24   him immediately.  I was getting closer.

25        Q    When you say he struck you how, did he strike you?

26        A    With a closed fist.

27        Q    Do you remember if it was a right hand or a left

28   hand?

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1        A     I don't particularly remember.
 2        Q     Do you remember where he hit you?
 3        A     It was one in the forehead.  And I had a bloody
 4   lip.  So it was in the mouth.
 5        Q     How many times did he strike you?
 6              MS. GIN:  I'm sorry, your Honor, I didn't hear
 7   that last answer.
 8              THE WITNESS:  It was in the mouth and forehead.
 9   BY MR. WALPOLE:
10        Q     About how many times did he strike you?
11        A     Approximately three times.
12        Q     When he was hitting you what were you doing?
13        A     Whenever he was hitting, I got him in position of
14   control.
15        Q     Did you ever actually punch him?
16        A     No.  Excuse me, when he was hitting me, I just
17   grabbed his arm in a controlled position.
18        Q     When you say controlled position, did you receive
19   any training at Target about how to detain someone who's
20   resisting?
21        A     Yes, I did.  Nonviolent physical intervention.
22        Q     What does that mean?
23        A     Basically, it's a class to help you defend
24   yourself.  You know, we don't have any guns, pepper spray,
25   or nothing.  We have to know how to handcuff somebody
26   properly.  We have to know how to, you know, to detain the
27   subject.
28        Q     You said at some point you tried to grab him.
```

```
 1        Q    Did you photograph those T-shirts?

 2        A    Yes, I did.

 3        Q    Showing you what's previously been marked as

 4   People's Exhibit 9, do you recognize People's Exhibit 9?

 5        A    Yes, I do.

 6        Q    What does that appear to be?

 7        A    A package of T-shirts that he appeared to shove in

 8   the.

 9        Q    Were those the actual T-shirts that you recovered?

10             THE COURT:  You mean was that a photograph?

11             MR. WALPOLE:  Yeah.

12        Q    Was that a photograph of the actual T-shirts that

13   you recovered?

14        A    Yes.

15        Q    Were those T-shirts handed over to the police

16   department?

17        A    Yes.

18        Q    So the police saw these T-shirts?

19        A    I believe it was a day later they got the

20   merchandise.

21        Q    Was it these actual T-shirts, or were these actual

22   T-shirts thrown away?

23        A    The actual T-shirts thrown away.

24        Q    Why were they thrown away?

25        A    They were in the front part of his pants, there

26   was pubic hair on them.  Didn't want them.

27        Q    So I take it you weren't going to resell these to

28   customers based on where it was at?
```

```
 1        Q    So you don't recall if she was in the aisle next
 2   to the socks.  You just remember she was in racetrack
 3   someplace near Mr. Winzer?
 4        A    Yeah, I believe she was in the front of the
 5   racetrack, looking out.
 6        Q    And when you say looking out, she was moving her
 7   head back and forth?
 8        A    Yeah, just kind of taking a look, taking a nice
 9   look around seeing who's present.
10        Q    And you observed that on the 12 by 12, or on all
11   those other T.V. monitors?
12        A    12 by 12.
13        Q    And that, of course, is videotaped too, as well?
14        A    Yes, ma'am.
15        Q    If you can look at Defendant's E, which states
16   "Assets Protection Operational Directives Preserving,
17   Processing, and Documenting Recovered Evidence, effective
18   March 7th, 2005, two of two pages."  Can you just take a
19   look at that, Mr. Rogers?
20        A    I took a look at it, ma'am.
21        Q    Are you familiar with it?
22        A    Yes, ma'am.
23        Q    And were you following that directive when you
24   were working for Target on May 10th as an assets protection
25   specialist?
26        A    Yeah.
27        Q    This directive instructs you on how to preserve
28   evidence that is taken from a suspected thief; is that
```

1   correct?  Or shoplifter.

2        A    Yes, ma'am.

3        Q    Does this directive instruct you to preserve

4   evidence?

5        A    Yes, ma'am.

6        Q    And part of your duties is to preserve evidence;

7   is that correct?

8        A    Yes, ma'am.

9        Q    And that you are supposed to put the evidence

10  either in your evidence locker or give it to the police?

11       A    Yes, ma'am.

12       Q    And when we talk about evidence, we're talking

13  about things that you have taken from the shoplifter that

14  belongs to Target; is that correct?

15       A    Yes, ma'am.

16       Q    And that you're instructed to store all physical

17  evidence in a bag or container and seal the evidence in a

18  bag or container to protect the items from tampering?

19       A    Yes, ma'am.

20       Q    Then you're also instructed to have an evidence

21  property tag identifying who the asset protection specialist

22  was, who the shoplifter was, the date that this item was

23  taken from the shoplifter; is that correct?

24       A    Yes, ma'am.

25       Q    And that at that point you, as an assets protects

26  specialist has the option of keeping it in the Target for

27  protection of evidence, or give it to the police department?

28       A    Yes, ma'am.

113

1      Q    Okay.  In this particular case with Mr. Winzer,

2  you did not do any of these things; is that correct?

3      A    Yes, ma'am.

4      Q    And you said that this item that was taken from

5  Mr. Winzer was thrown away, but you didn't do it?

6      A    Yes, ma'am.  We could not resell the package.

7      Q    Does the directive tell you to throw away the

8  evidence if you can't resell it?

9      A    I'm not sure.  It was my call to throw that

10  package away -- well, we didn't want it in there with, like

11  I said, the pubic hair on it, and the package was ripped,

12  and no one was to come in contact with that.

13      Q    But this directive tells you that if Target

14  property is taken from a shoplifter, you actually take that

15  property away from the public in terms of selling it, you

16  put it in evidence, either in your property evidence locker

17  or in the police evidence locker; is that correct?

18      A    Usually if we do anything, we give it to the

19  police.  We don't have an evidence locker at Target.

20      Q    So you don't sell, necessarily, things you take

21  from suspected shoplifters that is Target property?

22      A    That is correct.

23      Q    In looking at People's Exhibit 9 this is the

24  picture of the package you said -- you testified to -- came

25  from my client; is that correct?

26      A    Yes.  Yes.

27      Q    Did you take the photograph, or did someone else

28  take it?

118

```
 1        A     Yes, ma'am.

 2        Q     Were you also written up --

 3        A     However, I think --

 4        Q     If I can ask the question?

 5        A     Go ahead.  Sorry.

 6        Q     Were you also written up on April 2nd, 2005, by

 7    your supervisor David De La Torre for a non-productive

 8    incident in which you apprehended someone who had no items

 9    of Target on them?

10        A     Yep.

11        Q     And that's also part of your personnel file?

12        A     Yeah.

13        Q     And in your report in this case, did you write

14    down that the property taken by Mr. Winzer was Fruit of the

15    Loom socks?

16        A     Yes, I did.

17        Q     And that's a mistake?

18        A     That's a mistake.

19        Q     In terms of People's Exhibit 10, do you know where

20    that particular package is located in terms of the rack in

21    the back of the store?  Is it the top, in the middle, or

22    down at the bottom?

23        A     That I don't know.  I do not know.

24        Q     Did you identify the UPC code of the item that was

25    stolen or that was retrieved in this case?

26        A     Yes, ma'am.

27        Q     And did you note that in your report?

28        A     No, I didn't.  But I did do an evidence list,
```

132

```
 1   bring a shopping cart in with him?
 2        A    He selected a shopping cart right after entering
 3   the front doors.
 4        Q    Taking a look at what's previously been marked as
 5   People's 7, do you recognize that?
 6        A    Yes.
 7        Q    Is that a general layout of the front area of the
 8   store where the front doors are located?
 9        A    Yes, sir.
10        Q    And about where?  Can you just verbally describe?
11        A    Roughly directly through the front doors.
12        Q    Is it maybe to the left of where it says
13   "registers"?  Is it in that general area?
14        A    Yes, sir.
15        Q    Was he carrying anything with him when he came
16   inside?
17        A    No.
18        Q    You didn't see him bring any bags or any T-shirts
19   with him?
20        A    No, sir.
21        Q    When you saw him enter inside, was he with anyone?
22        A    He was with an unknown female adult.
23        Q    When they entered into the store, what did you do?
24        A    I waited till they passed, and then one of my
25   fellow peers who works with me came out.  We called him to
26   APS, which is asset protection specialist, and Blake Rogers
27   started watching him right around the front area, right
28   around jewelry.
```

138

1    Department.

2        Q    While he was in the Men's Department, the camera

3    that you saw in front of you -- actually let me step back.

4            The camera that you had in front of you, is that

5    something that was on time delay, or is that something that

6    was a steady stream of images?

7        A    It's a steady stream.  It's live.  The camera's

8    hooked up.  So the picture it's looking at goes directly to

9    the monitor, and from the monitor to the VCR which is on

10   time delay.

11       Q    And earlier this morning, did I show you a

12   surveillance tape depicting this general time frame?

13       A    Yes.

14       Q    And on the tape, is that live time or is that --

15       A    That's time delay.  It takes a shot of recording

16   every three seconds.

17       Q    And as far as comparing the quality, the screen

18   that you were in front of, is it a better quality than the

19   tape you watched this morning?

20       A    It's pretty, pretty clear.  The tape this morning

21   was pretty fuzzy.  We don't have any problems like that.

22   It's just like watching television.

23       Q    When you saw the defendant in the Men's

24   Department, what did you see specifically?

25       A    I saw him select a pair of T-shirts, a package of

26   T-shirts.  At that time he walked approximately 15 feet

27   away, put them down the front of his pants.

28       Q    So on this camera shot that you had, you actually

```
 1   saw him select the T-shirts.

 2       A    Yes.

 3       Q    Where were the T-shirts at?

 4       A    They're on the back wall of the Men's, the left

 5   side of the store.

 6       Q    When he grabbed them off the shelf, did he

 7   immediately put them in his pants, or did he put them

 8   somewhere else?

 9       A    No, he put them in the top of the shopping cart

10   that he selected at the front.  He still had the shopping

11   cart with him, still pushing it around.

12       Q    How much time passed from the time that he

13   selected -- initially selected these T-shirts to when he put

14   it down the front of his pants.

15       A    Approximately one minute.

16       Q    The tape that I showed you this morning, is that

17   the same camera angle that you saw the defendant when he

18   selected this merchandise and concealed it?

19       A    Yes.

20       Q    Is there any portions in the time delay where --

21   in comparing the time delay tape versus when you're watching

22   it live, did you have a clearer shot of him concealing this

23   merchandise?

24       A    Not a clear shot.

25       Q    Could you actually see the merchandise going in,

26   or was it just more of a movement of his hands?

27       A    We saw him select it on the live time.  We saw him

28   select merchandise out of the top portion of the basket and
```

1    lift up his shirt, and then he turned away.  So we saw more
2    or less the back of him, and then his arm moved in an upward
3    position down the front of his pants.  He turned back
4    around, and the T-shirts were gone.

5        Q    After you saw the defendant do this, did you see
6    him go anywhere?

7        A    He hung around in Men's about 30 more seconds,
8    heading towards the operators booth, which is in the top
9    left-hand corner of the store.  At that time he exited back
10   out to the main aisle and proceeded to the front.

11       Q    From when he left -- From when he first concealed
12   the merchandise in his pants to the point where he was
13   coming down the aisles, did you maintain a visual on him as
14   far as the camera monitors are concerned?

15       A    Yes.

16       Q    At any point did you ever see him dispose of these
17   items?

18       A    No, he was in plain view, in the center of the
19   main aisle.  We had a pretty good camera shot on live time.
20   The video that is taken on time delay, it's kind of hard to
21   see, but on live time it's real.  So it's real clear.  We
22   have real good shots.  We were able to maintain significant
23   observation as he headed back towards the front of the
24   store.

25       Q    When he was heading back towards the front of the
26   store, was that in back towards you?

27       A    Yes, at the front office.

28       Q    As he was heading back towards the front of the

1    he had stepped foot outside of the door.

2        Q    Is it like during the process as he's walking out?

3        A    Right.  As he came towards the front of the store,

4    as soon as he got close enough to the store door, we come

5    out of the office.  It's a gamble we take.  Sometimes we get

6    seen.  Sometimes we don't.  At this time we did not get

7    seen.  We come out, myself and Tommy Weaver was right behind

8    me.  We were looking around the corner and we noticed him

9    approaching the door.  As soon as he stepped out, Blake came

10   up behind him.

11       Q    Did you hear whether or not Blake identified

12   himself?

13       A    Yes, Blake.  He got to the door.  After he stepped

14   outside of the store threshold -- basically after he stepped

15   out of the door --

16            THE COURT:  He being who?

17            THE WITNESS:  Sorry.  Mr. Lacy Winzer.  After

18   Mr. Winzer stepped outside of the door, Blake Rogers was on

19   his way to make an apprehension.  As Mr. Winzer turned

20   around and Blake at that time identified himself as Target

21   security.  "You need to stop."

22   BY MR. WALPOLE:

23       Q    Did Blake ever touch the defendant in any way?

24       A    He reached out and grabbed a hold of his arm.  At

25   this time both the defendant and Blake were outside of

26   the -- right outside of the store.

27       Q    Let me see if I get the sequence down.  So Blake

28   identified himself.  When Blake reached out for him, was

146

1    that before or after he identified himself?

2        A    It was after.

3        Q    So Blake identified himself, and he reached out

4    and tried to touch the defendant?

5        A    Yes.

6        Q    And as he reached out what happened at that point?

7    What did the defendant do?

8        A    Myself, saw the defendant hit Blake in the face

9    approximately two times.

10        Q    Were you actually able to see Blake actually

11    physically touch the defendant or no?

12        A    Yes.

13        Q    Did he punch him, or was he just trying to grab

14    him?

15        A    Blake just grabbed his arm.  He was trying to get

16    his arm or get him in handcuffs or bringing him back the

17    office.  We're never sure if people are going to resist

18    arrest or if people are going to go compliant.  So we always

19    try to get them in such a way so that they can't run.  Blake

20    had him by the arm and he turned around and hit him in the

21    face.

22        Q    When you say he hit him in the face --

23        A    That is Mr. Winzer hit Blake Rogers in the face.

24        Q    How many times did he punch him?

25        A    I saw two.

26        Q    What happened next?

27        A    They were in a pretty fast motion heading out

28    towards the street, which is approximately 20 feet away from

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

148

```
 1        A     His shirt was pulled up right around his chest
 2   area and he had a package of T-shirts in his front
 3   waistband, half of which was sticking out, half of which was
 4   still concealed.
 5        Q     When you say in his waistband, was it in his back,
 6   was it in his side?
 7        A     It was in his front waistband, his pants.
 8        Q     Did any of you there recover this item, pull this
 9   item out?
10        A     After he was in the office, after we had the
11   situation under control and out of everybody's way, we
12   handcuffed him to the bench and removed the T-shirts at that
13   time.
14        Q     Did you have a look at the T-shirts?
15        A     Yes.
16              MR. WALPOLE:  May I approach, your Honor?
17              THE COURT:  Yes.
18   BY MR. WALPOLE:
19        Q     Showing you what's previously been marked as
20   People's Exhibit 9, do you recognize that?
21        A     Those are the T-shirts that we recovered from his
22   front waistband.
23        Q     When you went outside, could you see Blake still
24   trying to wrestle with the defendant?
25        A     At that time, the time that I exited the doors,
26   Blake was already on the ground.  He was trying to gain
27   access to both -- to bringing both hands behind his back.
28        Q     During this whole process, Blake trying to handle
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1   shoplifter is outside the store first; right?

2       A    Yes, ma'am.

3       Q    That's part of the directives of Target?

4       A    Yes, ma'am.

5       Q    When you saw Blake touch Mr. Winzer was that

6   outside the store?

7       A    It was outside of the store.

8       Q    And so Mr. Rogers was outside the store when he

9   touched Mr. Winzer; is that correct?

10      A    He -- Blake followed him out.  He touched him

11  after Mr. Winzer had exited the store.

12      Q    So Mr. Rogers was outside the store?

13      A    Yes, ma'am.

14      Q    When I say outside the store, he had gone past the

15  doors?

16      A    When he made contact and touched him, he was

17  outside of the store as Blake Rogers being outside of the

18  store.  When he identified himself as Target security, he

19  was inside of the store.  Mr. Winzer was outside of the

20  store.

21      Q    And when you said you saw Mr. Winzer hit

22  Mr. Rogers, you said that Mr. Winzer turned around; is that

23  correct?

24      A    Right.

25      Q    So when Mr. Rogers touched Mr. Winzer, where was

26  that at?  On his shoulder?

27      A    I believe that he grabbed him on this part, the

28  bicep portion of his arm.  That was after Mr. Winzer had

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    turned around.  I don't know why he turned around.  I just
2    noticed him turn his head back, look behind him, and that's
3    when Blake went up to make -- identified himself as Target
4    security and placed his arm on his bicep area.
5         Q     When you say that Mr. Winzer turned around, are
6    you staying he turned his entire body and squared up with
7    Blake Rogers, or did he just turn his head?
8         A     He turned his head.
9         Q     So you never saw Mr. Winzer square up to
10   Mr. Rogers?
11        A     No, he was about halfway.  Blake grabbed his -- to
12   my knowledge, I believe Blake had grabbed his left arm and
13   he was turning around this way.
14        Q     So Mr. Winzer was still walking outside past the
15   front doors, towards the parking lot turned his head when
16   Mr. Rogers grabbed his elbow?
17        A     Identified himself first and then grabbed his arm.
18        Q     Because identification is part of the directives;
19   right?
20        A     Yes, ma'am.  We try to follow it as best as
21   possible.
22        Q     Do you know if it's part of the directives to
23   throw away merchandise you take from a shoplifter?
24              MR. WALPOLE:  Objection.  Argumentative.
25              THE COURT:  Argumentative.
26   BY MS. GIN:
27        Q     Is it part of directives that you throw away
28   evidence that you seize from a shoplifter?

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    BY MR. WALPOLE:

2              Q.    What drew your attention to watch the

3    monitor at this time?

4              A.    Um, he had been -- the gentleman sitting

5    over there, he had been called out by one of my

6    employees.  He was accompanied by another female -- an

7    unknown female, and they were pushing an empty shopping

8    cart, walking fast in the men's department.

9              Q.    What specifically did you see?

10             A.    I saw him select a package of white

11   T-shirts on camera, and I observed him conceal them down

12   the front of his -- in his front waistband.

13             Q.    Did you have a chance to watch a

14   videotape, I guess it -- it was Friday morning?

15             A.    Yes.

16             Q.    And was that -- was I present?

17             A.    Yes.

18             Q.    And did that -- that videotape, did it

19   depict what you saw on that particular day?

20             A.    It depicted what I saw, because time

21   lapse videotape, it records every three seconds.  So, it

22   looks somewhat choppy.

23             Q.    When you say you saw him grab a package

24   of T-shirts, where did he grab the package from?

25             A.    From the display the shelf.

26             Q.    Was that on the tape that I showed you

27   on Friday morning, the actual selection of the items?

28             A.    I don't recall if it was on the tape.

```
 1        Protection External Directives.  CCTV Shoplifter
 2        Apprehensions, effective March 7th, 2005.  If you could
 3        take a look at that.
 4              THE COURT:  Ms. Gin, do you have a question?
 5        BY MS. GIN:
 6              Q.    Now that you have had a chance to review
 7        what has been marked as Defense Exhibit B, are you
 8        familiar with that directive?
 9              A.    Yes.
10              Q.    And were you operating under that
11        directive back on May 10th of this year?
12              A.    It appears that the guidelines were
13        adhered to.  However, not retained -- or I should say
14        the directive states non time-lapsed surveillance should
15        be maintained.  I retained time-lapsed surveillance.
16              Q.    Were you operating under this directive
17        on May 10th of this year?  Strike that.
18              Were these the Target policies and procedures
19        that you were supposed to follow back in May 10th of
20        this year
21              A.    Yes.
22              Q.    And as you just testified to, you did
23        not comply one hundred percent with these directives; is
24        that correct?
25              A.    Yes.
26              Q.    In this directive, it tells you that you
27        may make apprehensions of shoplifters using close
28        circuit TV, providing each of the following guidelines
```

| | |
|---|---|
| 1 | the front doors, at all? |
| 2 | A.    Yes. |
| 3 | Q.    About how far away from the front doors |
| 4 | were you? |
| 5 | A.    I would say, like, like five -- five |
| 6 | feet away from the entrances. |
| 7 | Q.    Okay.  And what were you doing there? |
| 8 | Were you coming in the store? |
| 9 | A.    No, I was just waiting out there, |
| 10 | waiting for my grandma. |
| 11 | Q.    Okay.  Were you looking out towards the |
| 12 | street to see if a car was going to come by, or were you |
| 13 | looking back towards the -- |
| 14 | A.    I was, like, facing the doors. |
| 15 | Q.    You were facing the Target doors? |
| 16 | A.    Yes. |
| 17 | Q.    Okay.  And do you remember seeing |
| 18 | anything? |
| 19 | A.    No. |
| 20 | Q.    Do you remember hearing anything? |
| 21 | A.    No. |
| 22 | Q.    Did anything happen that day?  What did |
| 23 | you see? |
| 24 | A.    I saw the -- I saw him run out, and |
| 25 | then -- |
| 26 | Q.    Actually, let me slow you down a little |
| 27 | bit.  When you say "'him", do you see someone here in |
| 28 | the courtroom that you saw that day? |

```
 1                    A.   The criminal, sir.
 2                    Q.   Just for the record, she's taking stuff
 3      down.  Can you tell me, when you say you saw someone, is
 4      he in the courtroom here today?
 5                    A.   Yes, yes.
 6                    Q.   And can you point out where he's at and
 7      what he's wearing?
 8                    A.   (Indicates.)
 9                    Q.   Can you tell me what he's wearing?
10                    A.   The white -- oh, the day, or now?
11                    THE COURT:  At this time, today.
12                    THE WITNESS:  The white, like.
13                    MR. WALPOLE:  Your Honor, the record reflect
14      the witness has identified the defendant?
15                    THE COURT:  The record will so reflect.
16      BY MR. WALPOLE:
17                    Q.   I am asking you some of these questions,
18      because we have a court reporter here who is taking
19      everything down and preserving it for a record, okay?
20                    A.   Yes.
21                    Q.   When you say you saw the defendant,
22      where did you see him at?
23                    A.   I saw him running outside of Target,
24      followed by a white male.  And they started fighting.
25      And I don't think that really, like, punches got, like,
26      connected, but they got, like, in like a bear hug.  And
27      then they got out to, like, the street area, and --
28                    Q.   Let me slow down a little bit.
```

```
 1                  Did you see one person -- you say "punches".
 2      Did you see who threw the punches?
 3              A.    Not particularly.
 4              Q.    Okay.  When you say you saw the
 5      defendant coming out the front doors and there was a
 6      person behind him --
 7              A.    Um-hum.
 8              Q.    -- do you know about how far behind the
 9      defendant this other person was?
10              A.    Like, three footsteps maybe.
11              Q.    And why were you looking -- if your
12      grandma was coming to pick you up, why were you looking
13      back towards the Target doors?
14              A.    Just pacing, I guess, waiting for her.
15              Q.    Was there a particular noise or some
16      sort of sound that drew your attention?
17              A.    I just heard like a bunch of yelling
18      coming out of, like, the doors.
19              Q.    So, you heard someone yell something?
20              A.    Yes.
21              Q.    Do you recall what specifically you
22      heard being yelled or said?
23              A.    No.
24              Q.    When you saw this whole struggle, did
25      you ever hear the defendant say anything?
26              A.    No.
27              Q.    Did you ever hear the other person say
28      anything?
```

```
 1                    A.    No.

 2                    Q.    But someone did say something at the

 3        front doors?

 4                    A.    Yes, I just can't remember who it was.

 5                    THE COURT:  Can you remember who said it?

 6                    THE WITNESS:  It was, I think, the security

 7        guy.

 8                    THE COURT:  The what?

 9                    THE WITNESS:  The security guy.  The white

10        male.  I don't know his name.

11                    THE COURT:  All right.

12        BY MR. WALPOLE:

13                    Q.    So, you heard the security guy say

14        something?

15                    A.    Yes.

16                    Q.    And then, there was some punches thrown?

17                    A.    Yes.

18                    Q.    And then, what happened?

19                    A.    They were like in a bear hug, and --

20                    Q.    Did you see who grabbed who?

21                    A.    I think it kind of just both grabbed

22        each other at the same time.

23                    Q.    Then, what happened?

24                    A.    Then, they got out like towards the

25        street area, and I think they lost balance, whatever,

26        were struggling, and they were rolling on the ground,

27        and that's -- and then the white male tried to get like

28        the handcuffs on the defendant, and he was struggling,
```

```
 1        and two more security guys came and jumped on the
 2        defendant, and they --
 3              Q.    Do you recall what the other two
 4        security guys looked like?
 5              A.    I think one was a white male, and the
 6        other one was a black male.  And they were both security
 7        people for Target.
 8              Q.    You said there were some punches thrown
 9        and that there was a -- they were grabbing each other?
10              A.    Yes.
11              Q.    Someone was grabbing someone?
12              A.    Yes.
13              Q.    Do you remember what happened, first,
14        the punches or the grabbing?
15              A.    The punches, first.
16              Q.    Did you hear the security guards ever
17        tell the defendant to stop resisting, when they were
18        trying to get him in handcuffs?
19              A.    I did not hear that.  They probably said
20        that before they came out of Target, but I didn't hear
21        anything after that.
22              MS. GIN:  Move to strike about "probably said"
23        that, Your Honor.  Calls for speculation.
24              THE COURT:  Sustained.  Just testify to what
25        you saw and heard.  The last question and answer will be
26        disregarded.
27        BY MR. WALPOLE:
28              Q.    At some point, were they able to get him
```

| | |
|---|---|
| 1 | into handcuffs? |
| 2 | A.    Yes. |
| 3 | Q.    What happened next? |
| 4 | A.    Then they took him back to, like, a |
| 5 | room. |
| 6 | Q.    Did you see them take him back to a |
| 7 | room? |
| 8 | A.    No.  No, I didn't. |
| 9 | THE COURT:   That last question and answer will |
| 10 | be disregarded, as well. |
| 11 | BY MR. WALPOLE: |
| 12 | Q.    After you saw the defendant on the |
| 13 | ground, did you actually see him get handcuffed? |
| 14 | A.    No, because once everyone jumped on him, |
| 15 | I went back inside. |
| 16 | Q.    Oh, so then, once they had him on the |
| 17 | ground, you went inside the store? |
| 18 | A.    Yes. |
| 19 | Q.    And did you see anything else that |
| 20 | happened after that point? |
| 21 | A.    No, they just told me that they took |
| 22 | him. |
| 23 | THE COURT:   You don't have to answer what they |
| 24 | told you. |
| 25 | THE WITNESS:   Sorry. |
| 26 | BY MR. WALPOLE: |
| 27 | Q.    Did the security guards, the Target |
| 28 | security guards, did they talk to you? |

1          A.    Yes, they brought me in a room

2    afterwards and asked me some questions.

3          Q.    How long after you went back inside, you

4    stopped watching, you went inside, how long after that

5    did the Target Security talk to you?

6          A.    Like 10, 15 minutes.

7          Q.    Did they ask that you stick around at

8    some point?

9          A.    Yes, they had a female cop come and talk

10   to me, and they gave me the phone number and told me if

11   I had any questions to call them, whatever.

12         Q.    Did the security guards ask that you

13   stay there and wait until the police officer arrived?

14         A.    Yes.  Yes, she did.

15         Q.    Did you say, "Yes, she did"?

16         A.    Yes.

17         Q.    Or was it a female security guard?

18         A.    Sorry.  Yes, he did.

19         Q.    So, it was one of the Target people that

20   said:  Hey, stick around.  Wait until the police show

21   up?

22         A.    Yes.

23         Q.    Did you provide your phone number?

24         A.    Yes.

25         Q.    Before you saw this happen out front,

26   were you inside the store, at all?

27         A.    No.

28         MR. WALPOLE:  No further questions, Your Honor

```
 1                   THE COURT:  Thank you.

 2              Ms. Gin.

 3                      CROSS-EXAMINATION

 4    BY MS. GIN:

 5              Q.    Good morning.

 6              A.    Good morning.

 7              Q.    Did you tell the female police officer

 8    what happened?

 9              A.    Yes.

10              Q.    Was your memory -- was your memory of

11    what happened better when you talked to the officer, or

12    is it better now?

13              A.    Um, probably back when I told the female

14    police officer.

15              MR. WALPOLE:  I'm sorry, I couldn't hear that

16    answer.

17              THE WITNESS:  It was probably right when I

18    talked to the female police officer.

19    BY MS. GIN:

20              Q.    Did you tell the female police officer

21    that you heard a lot of movement or a lot of yelling?

22              A.    Lot of yelling.

23              Q.    And when you saw the white male, could

24    you tell he was a Target security person?

25              A.    No, because he was like undercover

26    security for the Target.

27              Q.    Had you known that when you first saw

28    him come out of the store?
```

```
 1              A.    No.
 2              Q.    In fact, when you first saw the white
 3    male, he was dressed --
 4              A.    Just like --
 5              Q.    -- just like you and me?
 6              A.    Yes.
 7              Q.    Did you ever hear this white male say
 8    out loud: I'm Target Security?
 9              A.    No.
10              Q.    Did you hear him -- strike that.
11              And did you see this white male touch the
12    black male first?
13              A.    Yes.
14              Q.    And did you see the white male touch the
15    black male on his shoulder?
16              A.    I don't remember, now.
17              THE COURT:  For clarification purposes, when
18    you say "first", perhaps you could amplify on what you
19    mean by "first".  Before what?
20    BY MS. GIN:
21              Q.    You saw the black male outside the
22    store; is that right?
23              A.    Yes.
24              Q.    Then, you saw the white male outside the
25    store?
26              A.    Yes.
27              Q.    Right behind the black male?
28              A.    Yes.
```

1        Q.    Did you see the white male then reach

2    out with his hand to touch the black male's shoulder?

3        A.    Yes.

4        Q.    As they were outside the store?

5        A.    Yes.

6        Q.    At that point, when you saw the white

7    male touch the black male's shoulder, did the black male

8    turn around and hit the white male, or did the black

9    male seem to be continuing to run outside the store?

10        A.    I think he was trying to run continuing.

11        Q.    At that point, as the white male has his

12    hand on the black male's shoulder and the black male is

13    seemed to be running away from the white male, did you

14    see the white male bear hug the black male?

15        A.    I can't remember.

16        Q.    Would it refresh your recollection to

17    look at the statement you made to the female officer?

18        A.    Yes.

19        Q.    On page 4 of Officer Ligouri's report.

20    If you could just read this paragraph.  Take your time.

21        A.    Okay.

22        Q.    In looking at that portion of the report

23    by the female officer, does it help refresh your

24    recollection about the bear hug?

25        A.    Yes.

26        Q.    Did you see the white male bear hug the

27    black male?

28        A.    Yes.

```
 1                    Q.    And when you saw that bear hug from the
 2      white male, was that outside the store?  Was that
 3      outside the store?
 4                    A.    Yes.
 5                    Q.    How far outside the store, was it?  Was
 6      it closer to the parking lot, now, or was it still in
 7      that area in the front entrance of Target?
 8                    A.    It was like -- like I say, a little like
 9      in between.  Like in the middle, maybe.
10                    Q.    Were they on the ground when you saw the
11      bear hug, or were they still standing upright?
12                    A.    No, they were still standing.  They
13      didn't get on the ground until they were on the street.
14                    Q.    And the street that we are talking
15      about, is the parking lot street?
16                    A.    Yes.
17                    Q.    And you didn't hear any conversation
18      between the white male or the black male before the bear
19      hug?
20                    A.    No.
21                    Q.    Any statements between the black male
22      the white male when they were down on the ground?
23                    A.    No.
24                    Q.    Or after the bear hug?
25                    A.    No.
26                    Q.    And you didn't know either of the two
27      people?
28                    A.    No.
```

```
 1              MS. GIN:   No more questions
 2              THE COURT:  Any questions?
 3              MR. WALPOLE:  Yes, Your Honor.
 4                      REDIRECT EXAMINATION
 5    BY MR. WALPOLE:
 6              Q.    When you had a chance to look at your
 7    statement to the police, do you recall whether or not
 8    you were actually facing the front doors, or you were
 9    facing the street and then turned around?
10              A.    I was facing the doors.  Here is the
11    door, and I was facing -- they came out like that side
12    of the doors, and I had, like, turned my head.  Like I
13    heard like a bunch of yelling, so I turned my head to
14    see what was going on.
15              Q.    When you say turned your head, which --
16              A.    Turned my head (indicates).
17              THE COURT:  Indicating to the right.
18              THE WITNESS:  Yes.
19              MR. WALPOLE:  No further questions
20              THE COURT:  Anything further?  May this
21    witness be excused?
22              MR. WALPOLE:  Yes, Your Honor.
23              THE COURT:  Subject to recall?
24              MS. GIN:  Yes, Your Honor.
25              THE COURT:  Mr. Mahoney, subject to recall
26    means that if either of the attorneys or their
27    representatives were to contact you and ask you to come
28    back and testify some more, you would be obligated to do
```

1    was held on June 7th, 2005, in Delta Court, located in

2    the City of Pittsburg, in which Mr. Rogers testified

3    under oath.

4             Starting first with page 10, lines 16 through

5    21.

6             I'm sorry, starting at line 15.  Starting

7    with:      "Question.  And then what happened?

8             "Answer.  They walked in the Men's Department,

9         selected a package of T-shirts.

10            "Question.  And when you say "selected", who

11        was it that selected as between the two of the

12        individuals that you saw?  The defendant and this

13        unidentified person?

14            "Answer.  Lacy."

15        Page 14, line 17 through 27.

16            "Question.  Were the defendant and this other

17        person outside of the store when you approached

18        them?

19            "Answer.  Yes, they were.

20            "Question.  And I believe you indicated that

21        you identified yourself and, when you did so, the

22        female began to walk a different direction, or what

23        happened?

24            "Answer.  When I identified myself as Target

25        Security, they both looked back at me.  She started

26        walking very quickly, and at this time I put -- I

27        grabbed Lacy Winzer's arms."

28        Page 15, lines 4 through 7.

1          "Question.  And when you grabbed him by the

2     arms, what happened?

3          "Answer.  He broke away with one of them and

4     struck me, approximately three times, in my head."

5          Page 19, lines 14 through 20.

6          "Question.  So, when you first actually made

7     physical contact with Mr. Winzer, it was outside

8     the store?

9          "Answer.  Yes, it was.

10          "Question.  How close to the doors were you

11     when you first made contact with Mr. Winzer?

12          "Answer.  Probably two feet outside the door."

13          Page 20, line 16 to 19.

14          "Question.  Now, when you walked outside to

15     make contact with Mr. Winzer, how far away were you

.16     from him when you first identify yourself as Target

17     Security?

18          "Answer.  Two feet."

19          Pages 22, lines 21 to 24.

20          "Question.  And when you told Mr. Winzer that

21     you were Target Security, that's when he swung at

22     you?

23          "Answer.  I identified myself as Target

24     Security.  I put my hand on his wrist, and then he

25     swung at me."

26          That so stipulated by Mr. Winzer.

27          THE COURT:  Both counsel have stipulated to

28     the admission of these statements which are taken from a

1    also did not give CALJIC instruction 9.41, robbery,

2    "fear" defined.  This case is really predicated on use

3    of force, right?  Not fear.

4            MR. WALPOLE:  Yes.

5            THE COURT:  I didn't see any need to give that

6    definition.  Do either of you feel that's necessary?

7            MS. GIN:  No.

8            MR. WALPOLE:  No.

9            THE COURT:  Thank you.

10           We will see you tomorrow.  Be ready to go.

11           MR. WALPOLE:  Thank you.

12           (Evening recess.)

13                     ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    IN THE DISTRICT COURT OF APPEAL OF THE STATE OF CALIFORNIA

2    IN AND FOR THE FIRST APPELLATE DISTRICT

3    ---o0o---

4

5

6    PEOPLE OF THE STATE OF CALIFORNIA,    )

7    Plaintiff and Respondent,    )

8    vs.    )  No. _____

9    LACY WINZER,    )CCC No. 050867-1

10    _____ Defendant and Appellant.    )

11

12    COPY

13

14    REPORTER'S TRANSCRIPT ON APPEAL

15    FROM THE SUPERIOR COURT OF CONTRA COSTA COUNTY

16    HONORABLE DAVID B. FLINN, JUDGE - DEPARTMENT NO. 6

17    August 3, 2005

18    HONORABLE PETER L. SPINETTA, JUDGE - DEPARTMENT NO. 11

19    August 10, 2005

20    August 11, 2005

21    August 15, 2005

22    August 16, 2005

23    April 14, 2006

24    A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

25

26    VOLUME II

27    Pages 291 -

28

Ex 4

```
1   A P P E A R A N C E S

2   FOR THE PEOPLE AND THE RESPONDENT:

3                        HON. BILL LOCKYER

4                        Attorney General State of California

5                        455 Golden Gate Avenue, 1st Floor

6                        San Francisco, California 94102

7                        BY: _____

8                                          Deputy

9   FOR THE DEFENDANT AND APPELLANT:

10                       First District Appellate Project

11                       730 Harrison Street, Suite 201

12                       San Francisco, California 94107

13                       BY: _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1  INDEX OF WITNESSES

2  C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

3

4  PEOPLE OF THE STATE OF CALIFORNIA:

5  E-X-A-M-I-N-A-T-I-O-N

6  Direct  Cross  Redirect  Recross

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Blake Rogers | 50 | 81 | 117 | 122 |
| Alexander Azevedo | 126 | 149 | 169 | |
| David De La Torre | 178 | 191 | 208 | 208 |
| Michelle Ligouri | 214 | 220 | | |
| Joseph Mahoney | 226 | 235 | 239 | |

7  Blake Rogers

8  Alexander Azevedo

9  David De La Torre

10 Michelle Ligouri

11 Joseph Mahoney

12

13                    ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1               INDEX OF WITNESSES

2            C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

3

4    DEFENDANT LACY WINZER:

5                          E-X-A-M-I-N-A-T-I-O-N

6                    Direct Cross Redirect Recross

7    Michelle Ligouri          241    242

8

9                    ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1              INDEX OF WITNESSES

2          A-L-P-H-A-B-E-T-I-C-A-L-L-Y

3

4    PEOPLE OF THE STATE OF CALIFORNIA:

5                       E-X-A-M-I-N-A-T-I-O-N

6                    Direct Cross Redirect Recross

7    Azevedo, Alexander      126    149    169

8    De La Torre, David      178    191    208    208

9    Ligouri, Michelle       214    220

10   Mahoney, Joseph         226    235    239

11   Rogers, Blake            50     81    117    122

12

13                      ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          INDEX OF WITNESSES

2          A-L-P-H-A-B-E-T-I-C-A-L-L-Y

3

4     DEFENDANT LACY WINZER:

5                              E-X-A-M-I-N-A-T-I-O-N

6                       Direct  Cross  Redirect  Recross

7     Ligouri, Michelle        241    242

8

9                    ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                          INDEX OF EXHIBITS

2    DEFENDANT LACY WINZER:

3

4    Exhibit                                Marked   Evidence

5    A        Assets Protection Training    Premark    256

6    B        Assets Protection Directives  Premark    256

7    C        Assets Protection Training    Premark    256

8    D        Assets Protection Directives  Premark

9    E        Assets Protetion Op. Directives Premark   256

10

11                          ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF CONTRA COSTA

3                HONORABLE PETER L. SPINETTA, JUDGE

4                      DEPARTMENT NO. 11

5                          ---o0o---

6

7      THE PEOPLE OF THE STATE OF CALIFORNIA,    )

8                          Plaintiffs,        )

9          vs.                                )  No. 050867-1

10     LACY WINZER,                            )

11     _____ Defendant.     )

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      August 16, 2005

16          A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

17

18     A P P E A R A N C E S:

19     For the People:            ROBERT KOCHLY

20                                District Attorney

21                                BY: CHRISTOPHER WALPOLE

22                                Deputy District Attorney

23                                Contra Costa County

24     For Defendant:             DAVID COLEMAN

25                                Public Defender

26                                BY:  WINNIE GIN

27                                Deputy Public Defender

28                                Contra Costa County

1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2    STATE OF CALIFORNIA      )      ss.

3    COUNTY OF CONTRA COSTA   )

4        I, TAMRA E. STRASSBURGER-KEEN, RPR, CSR No. 5404,

5    Official Court Reporter for the Superior Court, do

6    hereby certify:

7        That I am a Certified Shorthand Reporter, duly

8    licensed so to practice by the Department of Consumer

9    Affairs, Certified Shorthand Reporter's Board of the

10   State of California, by License No. 5404.

11       That on August 10, 15 and 16, 2006, I reported in

12   stenographic writing the proceedings had in said Court

13   and cause, at the hearings in said matter, before the

14   Honorable Peter L. Spinetta, Judge, presiding.

15       That I caused said stenographic writing to be

16   transcribed by computer-aided transcription.

17       That the foregoing pages constitute and are a full,

18   true, accurate and correct transcription of my said

19   stenographic writing, and a correct and verbatim record

20   of the requested proceedings so had and taken, as

21   aforesaid, at said time and place, to the best of my

22   ability.

23       IN WITNESS WHEREOF, I have hereunto set my hand

24   this 11th day of July, year 2006.

25

26

27             TAMRA E. STRASSBURGER-KEEN, RPR

28             CSR #5404, OFFICIAL COURT REPORTER

346

1

2               IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3                  IN AND FOR THE COUNTY OF CONTRA COSTA

4                   HONORABLE PETER L. SPINETTA, JUDGE

5                         DEPARTMENT NO. 11

6

7       _____

8    THE PEOPLE OF THE STATE OF CALIFORNIA

9            Plaintiff,

10   versus                                    Case No.   05-050867-1

11   LACY WINZER,

12           Defendant.

13   _____/

14                          ---oOo---

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17             FRIDAY, APRIL 14, 2006; 10:45 a.m.

18          A.F. BRAY BUILDING, MARTINEZ, CALIFORNIA

19                        APPEARANCES:

20   For the People:      ROBERT KOCHLY, DISTRICT ATTORNEY
                          BY:   CHRISTOPHER WALPOLE, DEPUTY
21                        725 Court Street
                          Martinez, California  94553
22
     For the Defendant:  DAVID C. COLEMAN, PUBLIC DEFENDER
23                        BY:  WINNIE GIN, DEPUTY
                          800 Ferry Street
24                        Martinez, California  94553

25

26

27   Reported by:            JANENE R. BIGGS

28                           C.S.R. No. 11307

         JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    to give it.  It might not be basis for appeal, but it still

2    would be error.  I have to give it.

3            On the other hand, if it's not a lesser, a

4    necessarily included offense, then I don't have to give it,

5    regardless of whether or not you request it.  And then I'm

6    left with Wright as the controlling decision, which says

7    even in the situation where the accusatory pleading says,

8    just like we have in this case, pleads it in conjunctive

9    force and fear, it's not a necessarily included offense,

10   because force is used for robbery purposes.  This is the

11   same as fear, or, in any event, even if it's not exactly the

12   same as fear, is brought enough that includes behavior

13   beyond touching.

14           So I'm just obligated to follow that decision.

15   That's why it's auto equity.  Or auto sales.

16           MS. GIN:  It's auto sales equity, your Honor.

17           THE COURT:  And I'm bound by the Court of Appeal

18   decision in that respect.

19           For what it's worth, you know, I must say when I

20   read the Fuentes case I thought -- and it made distinctions

21   between rejecting the reasoning in Wright, and I found that

22   relatively persuasive at that time.  But the case has been

23   depublished.  It hasn't been depublished in the scenario

24   where the Supreme Court has taken up both cases and

25   therefore depublished both and wait and see what happens.

26   It just depublished the Fuentes case and left the Wright

27   case.

28           I'm bound by the law to deny motions -- motion for

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1              MS. GIN:  I think that if you sentence him to the
 2    Department of Corrections they will take care of it, if he
 3    gets put on parole.
 4              THE COURT:  Okay.  Thank you.
 5              THE CLERK:  Judge, I notice this was placed under
 6    seal.  Do you want this placed under seal in the file?
 7              MS. GIN:  Are you talking about the Target matter?
 8              THE CLERK:  Yes.
 9              THE COURT:  Yes.
10              MS. GIN:  Judge Flinn, Judge.
11              THE COURT:  Okay.  We'll keep it under seal.
12              MS. GIN:  It has to be sealed.
13              THE COURT:  Not to be opened, except by the Court
14    of Appeals.  Thank you.
15              (Whereupon, the proceedings were concluded.)
16
17
18
19
20
21
22
23
24
25
26
27
28
```

376

```
 1   STATE OF CALIFORNIA      )
 2                            )   Ss.
 3   COUNTY OF CONTRA COSTA )
 4
 5        I, JANENE R. BIGGS, a Certified Shorthand Reporter in
 6   and for the State of California, do hereby certify:
 7        That said proceedings were taken before me at said time
 8   and place, and were taken down in shorthand by me, and was
 9   thereafter transcribed into typewriting, and that the
10   foregoing transcript constitutes a full, true and correct
11   report of said proceedings which took place.
12
13
14             AUGUST 16, 2006
15
16
17
18
19             CERTIFIED SHORTHAND REPORTER
20
21
22
23
24
25
26
27
28
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307



## IN THE COURT OF APPEAL OF THE STTE OF CALIFORNIA
## IN AND FOR THE FIRST APPELLATE DISTRICT

THE PEOPLE OF THE STATE OF CALIFORNIA  )
                                   )
                                   )
                                   )    CONTRA COSTA COUNTY
                                   )    SUPERIOR NO: **05-050867-1**
                                   )    DCA NO:
                                   )    DIVISION:
      **LACY DEWAYNE WINZER,**           )
                                   )
                                   )

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CLERK'S TRANSCRIPT ON APPEAL
### FROM JUDGMENT & SENTENCE RENDERED
### APRIL 14, 2006
### THE HONORABLE, PETER L. SPINETTA,
### JUDGE OF THE SUPERIOR COURT, CONTRA COSTA COUNTY

<u>FOR DEFENDANT AND APPELLANT:</u>
FIRST DISTRICT APPELLATE PROJECT
3730 HARRISON STREET, #201
SAN FRANCISCO, CA  94107

<u>FOR PLAINTIFF AND RESPONDENT:</u>
STATE ATTORNEY GENERAL
BILL LOCKYER
455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA  94102-3664

CT

Ex 5

## INDEX

|  | PAGE |
|---|---|
| REPORTER'S TRANSCRIPT OF PRELIMINARY EXAMINATION, 06/07/05 | 001 |
| INFORMATION, FILED 06/21/05 | 036 |
| PROBATION OFFICER'S REPORT AND RECOMMENDATION, FILED 04/14/06 | 039 |
| MINUTE ORDER OF THE SUPERIOR COURT | |
|     JUNE 22, 2005 – ARRAIGNMENT | 051 |
|     JULY 19, 2005 – PRE TRIAL | 052 |
| MOTION TO QUASH SUBPOENA DUCES TECUM ISSUED TO TARGET CORPORATION; ALTERNATIVE MOTION FOR IN CAMERA REVIEW AND PROTECTIVE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF EUGENE J. EGAN, FILED 07/19/05 | 053 |
| AMENDED MOTION TO QUASH, ETC., FILED 07/21/05 | 063 |
| OPPOSITION TO MOTION TO QUASH SUBPOENA DUCES TECUM ISSUED TO TARGET CORPORATION, FILED 08/02/05 | 073 |
| PROTECTIVE ORDER LIMITING THE USE OF DOCUMENTS, FILED 08/03/05 | 084 |
| MINUTE ORDER OF THE SUPERIOR COURT | |
|     AUGUST 2, 2005 – READINESS CONFERENCE | 087 |
|     AUGUT 3, 2005 – READINESS CONFERENCE | 088 |
|     AUGUST 8, 2005 – TRIAL TRAILING | 089 |
|     AUGUST 9, 2005 – TRIAL TRAILING | 090 |
|     AUGUST 10, 2005 – CASE ASSIGNED FOR TRIAL | 091 |
| IN LIMINE MOTIONS, FILED08/10/05 | 092 |
| TRIAL MOTIONS IN LIMINE ON BEHALF OF DEFENDANT LACY WINZER, FILED 08/10/05 | 095 |

MINUTE ORDER OF THE SUPERIOR COURT

AUGUST 10, 2005 – JURY TRIAL – DAY ONE, JURY SELECTION          097

AUGUST 11, 2005 – JURY TRIAL – DAY TWO, JURY SELECTION          099
JURY TRIAL

AUGUST 15, 2005 – JURY TRIAL – DAY THREE          102

PEOPLE'S SELECTED JURY INSTRUCITONS          103

STIPULATION AND ORDER FOR RELEASE OF EXHIBITS AFTER FINAL          106
DETERMINATION OF CASE, FILED 08/16/05

ORIGINAL JURY INSTRUCTIONS GIVEN & DELIVERED, FILED 08/16/05          107

REDACTED COPIES OF JURY REQUESTS DURING DELIBERATIONS          153

REDACTED JURY LISTS OF VENIRE (ALPHA & RANDOM)          156

QUESTIONNAIRES OF THE ALTERNATE JUROR AND THE PROSPECTIVE          163
JURORS NOT SWORN TO TRY THIS CASE

REDACTED JUROR QUESTIONNAIRES (SWORN JURY)          210

REDACTED COPIES OF THE VERDICTS          223

MINUTE ORDER OF THE SUPERIOR COURT

AUGUST 16, 2005 – JURY TRIAL – DAY FOUR          226

EXHIBIT LIST          230

PEOPLE'S SENTENCING BRIEF, FILED 08/29/05          231

NOTICE OF MOTION AND MOTION TO CONTINUE, FILED 09/14/05          240

MINUTE ORDER OF THE SUPERIOR COURT

SEPTEMBER 16, 2005 – TRIAL ON BIFURCATED ISSUES, REPORT          242
AND SENTENCE

NOTICE OF MOTION AND MOTION TO CONTINUE, FILED 12/06/05          243

MINUTE ORDER OF THE SUPERIOR COURT

    DECEMBER 9, 2005 – TRIAL ON BIFURCATED ISSUES, REPORT       245
    & SENTENCE

LETTER TO MR. WINZER, FROM HONORABLE PETER L. SPINETTA,       250
DATED 02/02/06

LETTER TO ARLENE SIMMONS, FROM LACY WINZER, DATED 01/25/06       247

NOTICE OF MOTION FOR NEW TRIAL AND MOTION FOR NEW TRIAL,       250
FILED 03/06/06

AMENDMENT TO MOTION FOR A NEW TRIAL, FILED 03/10/06       255

MINUTE ORDER OF THE SUPERIOR COURT

    MARCH 16, 2006 – MOTION FOR NEW TRIAL ON BIFURCATED       256
    ISSUES/REPORT & SENTENCE

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION       257
FOR A NEW TRIAL, FILED 03/17/06

MINUTE ORDER OF THE SUPERIOR COURT

    APRIL 7, 2006 – MOTION FOR NEW TRIAL/TRIAL ON BIFURCATED       263
    ISSUES/REPORT & SENTENCE

LETTER RE LACY D. WINZER, FROM JAMES COURTNEY FROM THE       264
SALVATION ARMY ADULT REHABILITATION CENTER, DATED 11/03/05

EXHIBIT LIST RE: TRIAL ON BIFURCATED ISSUES       269

PAGES 270 – 285 ARE SEALED RECORDS SENT TO THE DISTRICT COURT
OF APPEAL ONLY

MINUTE ORDER OF THE SUPERIOR COURT

    APRIL 14, 2006 – MOTION FOR NEW TRIAL/COURT TRIAL ON       286
    BIFURCATED ISSUES/REPORT & SENTENCE/COMMITMENT TO
    STATE PRISON

ABSTRACT OF JUDGMENT- PRISON COMMITMENT, FILED 04/14/06       288

NOTICE OF APPEAL, FILED 04/14/06                                290

PRIOR CONVICTION PACKET                                          292



1  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2   IN AND FOR THE COUNTY OF CONTRA COSTA

3  HONORABLE CHERYL R. MILLS, JUDGE, PRESIDING

4     ---oOo---

5 THE PEOPLE OF THE STATE OF   )

6 CALIFORNIA,        )

7       Plaintiff, )  050867-1

8   vs.       ) No. 145395-0

9 LACY DEWAYNE WINZER,   ) (Pages 1-35)

10      Defendant. )

11 _____)

12

13  REPORTER'S TRANSCRIPT OF PRELIMINARY EXAMINATION

14   COURTHOUSE, PITTSBURG, CALIFORNIA

15     DEPARTMENT NO. 19

16    TUESDAY, JUNE 7, 2005

17

18    *A P P E A R A N C E S*

19 **FOR THE PEOPLE:**

20 ROBERT KOCHLY, DISTRICT ATTORNEY

21 **BY:  THOMAS ROMERO,**

22 DEPUTY DISTRICT ATTORNEY

23 CONTRA COSTA COUNTY

24 **FOR THE DEFENDANT:**

25 DAVID C. COLEMAN, III, PUBLIC DEFENDER

26 **BY:  WINNIE GIN,**

27 DEPUTY PUBLIC DEFENDER

28 CONTRA COSTA COUNTY

FILED

2005 JUL -6  A 11: 55

ORIGINAL

1

## INDEX OF WITNESSES

2

### C H R O N O L O G I C A L L Y

3

4

FOR THE PEOPLE OF THE STATE OF CALIFORNIA:

5

### E X A M I N A T I O N

6

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
7 | Blake Rogers | 7 | 17 | 31 | |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                              INDEX OF WITNESSES

2                          C H R O N O L O G I C A L L Y

3

4    FOR THE DEFENDANT, LACY DEWAYNE WINZER:

5                              E X A M I N A T I O N

6               DIRECT     CROSS     REDIRECT     RECROSS

7    None

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                 <u>INDEX OF EXHIBITS</u>

2

3 <u>FOR THE PEOPLE OF THE STATE OF CALIFORNIA:</u>

4                                         <u>I.D.</u>       <u>EVID.</u>

5  1          Cert. Prior             32         32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INDEX OF EXHIBITS

2

3 FOR THE DEFENDANT, LACY DEWAYNE WINZER:

4                                        I.D.       EVID.

5 None

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                     --oOo--

```
 1   TUESDAY, JUNE 7, 2005                    AFTERNOON SESSION

 2                     P R O C E E D I N G S

 3                          - - -oOo- - -

 4            THE COURT:  People vs. Winzer.

 5            Docket 145395-0 with trailing probation docket

 6   118729-3.

 7            Counsel, appearances.

 8            MR. ROMERO:  Thomas Romero representing the

 9   People.

10            MS. GIN:  Winnie Gin appearing with

11   Mr. Winzer, who is present and in custody.

12            THE COURT:  Okay, and who's your Officer,

13   Mr. Romero?

14            MR. ROMERO:  Yes, this is Officer Lagori,

15   Pittsburg Police Department, I would designate as my

16   investigating officer.

17            And I would call, if appropriate, as my first

18   witness Mr. Blake Rogers.

19            THE COURT:  Okay, Mr. Rogers, come on up.

20   Remain standing up here while you're sworn in.

21            THE CLERK:  Please raise your right hand.

22

23                      BLAKE ROGERS,

24        called as a witness on behalf of the People,

25                 being first duly sworn,

26                  testified as follows:

27

28            THE CLERK:  Please be seated.
```

000036

F:6/21
A:6/22

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF CONTRA COSTA

THE PEOPLE OF THE STATE OF CALIFORNIA,

VS.

LACY WINZER,

DEFENDANT./

NO. 050867-1
DA NO. C 05 006229-9
INFORMATION

01) PC 211/212.5(c)
02) PC 484/666
W/PRIORS
W/DEF ENHANCEMENTS

In the Superior Court of the State of California, in and for the
County of Contra Costa:

The District Attorney of the County of Contra Costa hereby accuses
LACY WINZER, Defendant, of the crime of felony, a violation of PENAL
CODE SECTION 211/212.5(c) (SECOND DEGREE ROBBERY), committed as
follows:

On or about May 10, 2005, at Pittsburg, in Contra Costa County, the
Defendant, LACY WINZER, by means of force and fear, did unlawfully
take personal property from the person, possession and immediate
presence of Blake Rogers.

COUNT TWO:

The District Attorney of the County of Contra Costa hereby further
accuses LACY WINZER, Defendant, of the crime of felony, a violation
of PENAL CODE SECTION 484/666 (PETTY THEFT WITH PRIOR THEFT
CONVICTION), committed as follows:

On or about May 10, 2005, at Pittsburg, in Contra Costa County, the
Defendant, LACY WINZER, did unlawfully steal, take, lead, and drive
away the personal property of Target.



000126

# 9.40. ROBBERY (PEN. CODE, § 211)

[Defendant is accused [in Count[s]  *ONE*  ] of having committed the crime of robbery, a violation of section 211 of the Penal Code.]

Every person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive that person of the property, is guilty of the crime of robbery in violation of Penal Code section 211.

The words "takes" or "taking" require proof of (1) taking possession of the personal property, and (2) carrying it away for some distance, slight or otherwise.

["Immediate presence" means an area within the alleged victim's reach, observation or control, so that he or she could, if not overcome by violence or prevented by fear, retain possession of the subject property.]

"Against the will" means without consent.

In order to prove this crime, each of the following elements must be proved:

1. A person had possession of property of some value

however slight;

    2. The property was taken from that person or from [his] [or] [her] immediate presence;

    3. The property was taken against the will of that person;

    4. The taking was accomplished either by force or fear; and

    5. The property was taken with the specific intent permanently to deprive that person of the property.

000131

# 9.40.2. ROBBERY--AFTER ACQUIRED INTENT

To constitute the crime of robbery, the perpetrator must

have formed the specific intent to permanently deprive *the person in possession*

*of the property of that*

~~[person of their]~~ property before or at the time that the act of taking

the property occurred. If this intent was not formed until after the

property was taken from the person or immediate presence of the

victim, the crime of robbery has not been committed.

Page 1 of 1

000134

# FORCE/FORCE TO RETAIN POSSESSION

It is not an essential element of the crime of robbery

that the use of force or fear be used to *gain* direct physical

possession of the property taken. ~Assuming all other elements have been~ ~~robbery have been~~ *proven, a robbery*

*is* committed if an individual uses force or fear to *retain*

possession of the property prior to reaching a place of relative

safety.

Law Offices of
JOY A. MAULITZ
Post Office Box 170083
San Francisco, California 94117

_____

Telephone: 415-680-8046

November 23, 2007

CONFIDENTIAL LEGAL MAIL

Lacy Winzer T86160
P.O. Box 705
Soledad, CA 93960-0705

Re: *People v. Winzer,* No. A113629

Dear Mr. Winzer:

The Supreme Court has denied review of your case. A copy of the order is enclosed. Your federal issues are now preserved for review in the federal court. My appointment as your attorney has expired. I am no longer your attorney and I will not be able to represent you in any further proceedings.

The record of your case is enclosed. If you want, you can file a petition for writ of habeas corpus in the federal court. A packet of information and forms is enclosed to help you do this. **A writ petition must be filed by November 14, 2008.** The law concerning the statute of limitation is developing and somewhat complex, but if you file by then, you will be safe and will avoid any limitation issues. If you choose to file a petition for habeas corpus, it must be filed in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102.

I regret that your appeal was not more successful. Do not hesitate to write if you have questions.

Sincerely,

*Joy am*

Joy A. Maulitz

cc: First District Appellate Project (w/o encl.)

Court of Appeal, First Appellate District, Div. 5 - No. A113629
**S156813**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

LACY WINZER, Defendant and Appellant.

The petition for review is denied.

SUPREME COURT
**FILED**

NOV **1 4** 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

LACY  WINZER  T-86160
P.O.  Box 705  LA-315U
Soledad, Ca.  93960

United States District Court
Northern District
450 Golden Gate Ave  Box 36060
San Francisco, Ca.  94102