1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | VIOLET M. LEE, State Bar No. 77144
Deputy Attorney General
6 |  455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7 | Telephone:  (415) 703-5896
Fax:  (415) 703-1234
8 | Email: Violet.Lee@doj.ca.gov

9 | Attorneys for Respondent

10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

15 | **LACY WINZER,**

Petitioner,

16

17 | v.

**BILL CURREY, Warden,**

18 | Respondent.

19

C 08-2341 PJH (PR)

**EXHIBITS 1 TO 4**

20

21

22

23

24

25

26

27

28

EXHIBITS 1 to 4

Winzer v. Currey
C 08-2341 PJH (PR)

# EXHIBIT 1

000288

## ABSTRACT OF JUDGMENT – PRISON COMMITMENT · DETERMINATE
**[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]**

CR-290

| RIOR COURT OF CALIFORNIA, COUNTY OF: | **CONTRA COSTA** |
|---|---|

| | | | |
|---|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA vs. DEFENDANT: **LACY WINZER** | DOB: **01-25-73** | 05-050867-1 | -A |
| AKA: | | | -B |
| CII#: **A08463616** | | | **F I L E D** |
| BOOKING #: **2005010504** | ☐ NOT PRESENT | | -C |
| COMMITMENT TO STATE PRISON ABSTRACT OF JUDGMENT | ☐ AMENDED ABSTRACT | | -D |

APR 14 2006

K. TORRE, CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By_____ Deputy Clerk

| DATE OF HEARING | DEPT. NO. | JUDGE |
|---|---|---|
| **04-14-06** | **11** | **HON. PETER L. SPINETTA** |
| CLERK **ARLENE J. SIMMONS** | REPORTER **JANENE BIGGS, CSR 11307** | PROBATION NO. OR PROBATION OFFICER |
| COUNSEL FOR PEOPLE **CHRISTOPHER WALPOLE, DEP. D.A.** | COUNSEL FOR DEFENDANT **WINNIE GIN, DEP. P.D.** | ☐ APPTD. |

1. Defendant was convicted of the commission of the following felonies:
   ☐ Additional counts are listed on attachment
   ____ (number of pages attached)

| CNT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | JURY | COURT | PLEA | TERM (L, M, U) | CONCURRENT | CONSECUTIVE 1/3 VIOLENT | CONSECUTIVE 1/3 NON-VIOLENT | CONSECUTIVE FULL TERM | INCOMPLETE SENTENCE (see below †) | 654 STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YRS. | MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 211/212.5© | 2ND. Degree Burglary | 2005 | 08-16-05 | X | | | U | | | | | | | 5 | 0 |
| 2 | PC | 484/666 | Petty Theft with Priors | 2005 | 08-16-05 | X | | | | | | | | | X | | |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |
| | | | | | · · | | | | | | | | | | | | |

2. ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTIONS OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

4. ☐ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes).

5. INCOMPLETE SENTENCE(S) CONSECUTIVE

| COUNTY | CASE NUMBER |
|---|---|
| | |
| | |
| | |

6. | TOTAL TIME ON ATTACHED PAGES: | | |

7. ☐ Additional indeterminate term (see CR-292).

8. | TOTAL TIME EXCLUDING COUNTY JAIL TERM: | 5 | 0 |

rm is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CR –290 (Rev. January 1, 2003)

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE**
*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]*

Penal Code,
§§ 1213, 1213.5

APR 20 2006

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: **LACY WINZER**

| 05-050867-1 | -A | -B | -C | -D |

9. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):

a. Restitution Fine(s):

Case A: **$1000.**    per PC 1202.4(b) forthwith per PC 2085.5;    **$1000.**    per PC 1202.45 suspended unless parole is revoked.
Case B: $_____    per PC 1202.4(b) forthwith per PC 2085.5;    $_____    per PC 1202.45 suspended unless parole is revoked.
Case C: $_____    per PC 1202.4(b) forthwith per PC 2085.5;    $_____    per PC 1202.45 suspended unless parole is revoked.
Case D: $_____    per PC 1202.4(b) forthwith per PC 2085.5;    $_____    per PC 1202.45 suspended unless parole is revoked.

b. Restitution per PC 1202.4(f):

Case A: $_____   ☒ Amount to be determined   to ☐ victim(s)*   ☐ Restitution Fund
Case B: $_____   ☐ Amount to be determined   to ☐ victim(s)*   ☐ Restitution Fund
Case C: $_____   ☐ Amount to be determined   to ☐ victim(s)*   ☐ Restitution Fund
Case D: $_____   ☐ Amount to be determined   to ☐ victim(s)*   ☐ Restitution Fund

(*List victim name(s) if known and amount breakdown in item 11, below.)

c. Fine(s):

Case A: $_____ per PC 1202.5. $_____ per VC 23550 or _____ days   ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case B: $_____ per PC 1202.5. $_____ per VC 23550 or _____ days   ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case C: $_____ per PC 1202.5. $_____ per VC 23550 or _____ days   ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case D: $_____ per PC 1202.5. $_____ per VC 23550 or _____ days   ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS

d. Lab Fee and Drug Program Fee:

Case A: Lab Fee: $_____ per HS 11372.5(a) for counts _____ .   ☐ Drug Program Fee of $165 per HS 11372.7(a).
Case B: Lab Fee: $_____ per HS 11372.5(a) for counts _____ .   ☐ Drug Program Fee of $165 per HS 11372.7(a).
Case C: Lab Fee: $_____ per HS 11372.5(a) for counts _____ .   ☐ Drug Program Fee of $165 per HS 11372.7(a).
Case D: Lab Fee: $_____ per HS 11372.5(a) for counts _____ .   ☐ Drug Program Fee of $165 per HS 11372.7(a).

10. TESTING
   a. ☐ AIDS pursuant to PC 1202.1    b. ☒ DNA pursuant to PC 296    c. ☐ other (specify):

11. Other orders (specify):

12. EXECUTION OF SENTENCE IMPOSED
   a. ☒ at initial sentencing hearing. 04-14-06
   b. ☐ at resentencing per decision on appeal.
   c. ☐ after revocation of probation.
   d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
   e. ☐ other (specify):

13. CREDIT FOR TIME SERVED

| CASE | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT | |
|---|---|---|---|---|
| A | 389 | 339 | 50 | ☐ 4019 ☒ 2933.1 |
| B | | | | ☐ 4019 ☐ 2933.1 |
| C | | | | ☐ 4019 ☐ 2933.1 |
| D | | | | ☐ 4019 ☐ 2933.1 |

| Date Sentence Pronounced: | Time Served in State Institution: | | |
|---|---|---|---|
| | DMH | CDC | CRC |
| 04-14-06 | [ ] | [ ] | [ ] |

14. The defendant is remanded to the custody of the sheriff ☒ forthwith   ☐ after 48 hours excluding Saturdays, Sundays, and holidays.
To be delivered to   ☒ the reception center designated by the director of the California Department of Corrections.
   ☐ other (specify):

**CLERK OF THE COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| *[signature]* | 04-14-06 |

CR-290 (Rev. January 1, 2003)    **ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE**    Page 2 of 2

# EXHIBIT 2

COPY

Filed 8/29/07

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

**FILED**

Court of Appeal-First App. Dist.

AUG 2 9 2007

DIANA HERBERT

BY_____

DEPUTY

| | |
|---|---|
| **THE PEOPLE,**<br><br>      **Plaintiff and Respondent,**<br><br>      v.<br><br>**LACY WINZER,**<br><br>      **Defendant and Appellant.** | **A113629**<br><br>**(Contra Costa County<br>Super. Ct. No. 050508671)** |

     Lacy Winzer (Winzer) appeals from a judgment of conviction and sentence after a jury found him guilty of robbery and petty theft with a prior. (Pen. Code, §§ 211/212.5, subd. (c), 484/666.)[1] He contends the trial court erred by refusing to instruct the jury on battery and assault as lesser included offenses of robbery, and by failing to instruct explicitly that robbery requires a nexus between the force exerted and an intent to steal. We will affirm the judgment.

### I. FACTS AND PROCEDURAL HISTORY

     Winzer was charged in an information with second degree robbery (§§ 211/212.5, subd. (c)) and petty theft with a prior theft conviction (§§ 484/666). In connection with the second count, the information alleged that Winzer had five previous convictions. It further alleged four prison terms as sentence enhancements. (§ 667.5, subd. (b).) Winzer denied the charges and allegations, and the matter proceeded to trial.

_____

[1]    Unless otherwise indicated, all statutory references are to the Penal Code.

A. PROSECUTION EVIDENCE AT TRIAL

Alex Azevedo (Azevedo) was employed as a "protection specialist" at the Target store in Pittsburg on May 10, 2005. Around 4:00 p.m. he was at the front door of the store, dressed in a Target uniform, greeting customers. Winzer, known to Azevedo, entered the store with an adult female companion. Winzer, who was not carrying anything, got a shopping cart and pushed it toward the men's department.

Coworker Tommy Weaver joined Azevedo and "call[ed] out" Winzer's presence to asset protection specialist Blake Rogers (Rogers). A "call out" is made to undercover security personnel, who are authorized to apprehend an individual, when someone suspicious enters the store.

Azevedo went to the security office in the front of the store to observe Winzer on a monitor. Rogers was in a security office in the back of the store, watching the monitors with his supervisor, David De La Torre (De La Torre). The monitors in the back security office display live images from 60 surveillance cameras. The store security monitors show a steady stream of clear images, like a television.

Rogers and De La Torre in the back security office, and Azevedo in the front security office, observed Winzer take a package of Fruit of the Loom T-shirts from a shelf in the men's department and place it in the top part of his shopping cart. Winzer's female companion appeared to be a lookout. Winzer walked about 15 feet, took the package of T-shirts out of the shopping cart, and lifted up his shirt or sweater. He then turned away from the security camera, but Rogers, Azevedo, and De La Torre saw him make the motion of putting something down the front of his pants. When Winzer turned to face the camera again, the package of T-shirts was no longer visible.

When Rogers saw Winzer conceal the merchandise, he left the security office to observe Winzer in person. De La Torre continued watching Winzer on the monitors. Rogers and De La Torre remained in contact by walkie-talkie.

Rogers testified that he observed Winzer and his female companion walk to the front of the store. Winzer parked the shopping cart and walked toward the exit. Rogers was about 10-15 feet behind him. As Winzer was crossing the threshold, Winzer looked

2

back. Rogers, who was in plainclothes and by this point five feet away, immediately identified himself as Target security and attempted to grab Winzer by the arm. Winzer had just walked out the door and Rogers was still inside the store. Winzer then squared himself and struck Rogers in the face approximately three times with his closed fist. Rogers, trained in nonviolent physical intervention, struggled to gain control of Winzer and continued to identify himself as Target security and tell Winzer to stop resisting. Winzer and Rogers ended up on the ground in front of the store.

Rogers could not recall at trial whether he touched Winzer first or Winzer hit him first. At Winzer's preliminary examination, Rogers had testified that first he grabbed Winzer's arms, and then Winzer broke away with one arm and hit him.

De La Torre, watching the security monitors, observed Rogers being hit by Winzer. He could not remember at trial whether Rogers touched Winzer first or whether Winzer hit Rogers first. His recollection was that, at the time of the punch, Winzer was outside the store and Rogers was inside, right around the threshold.

Azevedo testified that he came out of the front security office when Winzer was about five feet in front of the exit doors. Rogers approached Winzer and, after Winzer stepped over the threshold, Winzer turned around and Rogers identified himself as Target security and asked Winzer to stop. Rogers then reached out to grab or grabbed Winzer's arm, and Winzer hit Rogers approximately twice. Winzer and Rogers wrestled outside the store. Azevedo heard Rogers yelling, "Target security. Stop resisting. Stop resisting."

Joseph Mahoney, a 17-year-old high school student, was standing outside of Target, about five feet from Target's entrance doors, waiting for his grandmother. Mahoney "heard like a bunch of yelling coming out of, like, the doors." He turned toward the doors and saw Winzer run out of the store, followed by a white male (Rogers) about three footsteps behind. He did not recall specifically what was being said, but thought it was the white male, a "security guy," who was speaking. The two men started fighting, grabbed one another, got to the street area, and rolled on the ground. The white male tried to handcuff the other man (Winzer), who continued to struggle. Two more

3

Target "security guys" jumped on Winzer. On cross-examination, Mahoney testified that he had not known that the white male was a Target security person when he first came out of the store. He further testified as follows: "Q. Did you ever hear this white male say out loud: [']I'm Target Security[']? [¶] A. No. [¶] Q. Did you hear him -- strike that. [¶] And did you see this white male touch the black male first? [¶] A. Yes."

Azevedo helped Rogers gain control over Winzer and handcuffed him. Rogers, Azevedo, and De La Torre escorted Winzer to the front security office, where he was handcuffed to a bench. Azevedo and De La Torre saw the package of T-shirts protruding from Winzer's waistband. De La Torre removed the package from Winzer and placed it on a desk. There was pubic hair on the package. As they waited for police to arrive, Azevedo said to Winzer, "You know you're going to jail because you assaulted [Rogers]." Winzer replied, "No, I'm not." "I'm not going to jail. I have my ways. I'll get out."

Pittsburg Police Officer Michelle Ligouri responded to the scene. Officer Ligouri saw the package of T-shirts on the desk in the security office and noticed pubic hair on the package and on the table around the package. A search by the officer determined that Winzer was not wearing underwear. Officer Ligouri took pictures to document Rogers' injuries but forgot to collect the T-shirts as evidence.

Because the T-shirts had pubic hair on them, De La Torre instructed one of his employees to photograph the shirts and then dispose of them for health reasons, after he had obtained permission from the police department. De La Torre believed that photographing and discarding the evidence complied with Target policy and procedures, until confronted with the written Target directive indicating that the T-shirts seized from Winzer should have been stored. Rogers acknowledged that discarding the package of T-shirts was not in compliance with Target's operating procedures.

The next day, Officer Ligouri called Target about the T-shirts and was informed that the shirts had been thrown away. A similar package of T-shirts was provided to police as evidence.

4

At trial, the jury was shown photographs of Rogers' injuries, indicating red marks on his temple and cheek and an injury to his elbow. The jury was also shown a time-lapse videotape from a Target surveillance camera, which De La Torre had compiled and given to the police.[2] This videotape included zoom-in shots depicting Winzer concealing the package of T-shirts. The videotape was not as clear as the steady stream of images on the monitors in Target's security offices, because the videotape was comprised of still photos taken every two to three seconds, causing the tape to look choppy. Rogers described the quality of the video shown to the jury as "horrible."

In the 10 months Rogers had worked at Target, he had been written up twice by supervisor De La Torre: once in December 2004 for assisting a Target employee apprehend a suspected shoplifter while Rogers was off duty, and once in April 2005 for detaining someone who did not have Target items on him. In the latter incident, Rogers had seen the individual take some merchandise out of a package, but the individual had apparently discarded them when Rogers lost sight of him. De La Torre testified that Rogers did not do anything improper in this case. (Rogers had acknowledged that he mistakenly wrote in his incident report that Winzer had stolen socks rather than T-shirts.

B. JURY INSTRUCTIONS

At the conference to settle jury instructions after the People had rested their case, the court rejected the notion that battery was a lesser-included offense of robbery and refused to give an instruction on battery.[3] The court agreed to give, and subsequently gave, several jury instructions relating to robbery, including CALJIC Nos. 9.40, 9.40.2, and 9.40.3.

---

[2]    In this regard, De La Torre did not comply with Target's polices and procedures, which required that he retain the non-time-lapse video of the incident. He explained at trial that he gave the police the time-lapse video because it was easier to record and compile in chronological sequence.

[3]    The reporter's transcript indicates that the court asked if "anybody disagree[d]" on this point, and neither defense counsel nor the prosecutor voiced any objection. During a later hearing on Winzer's motion for a new trial, the court nonetheless agreed with defense counsel that the battery instruction had been requested by the defense.

C. DEFENSE EVIDENCE AT TRIAL

Winzer did not testify. Officer Ligouri testified that Mahoney told her he heard a lot of movement. She also testified that Rogers did not tell her that he said anything to Winzer when they were on the ground or when Winzer was being handcuffed.

In closing argument, defense counsel argued: the prosecution's witnesses failed to follow Target's internal operating directives and Rogers had been written up in the past; there was no evidence Winzer took any merchandise from Target because Target did not retain the package; and when Winzer hit Rogers, he was "not fighting back to retain property" but just defending himself, because Winzer had no merchandise, Rogers did not look like Target security and did not identify himself as Target security, and Rogers accosted Winzer from behind.

D. JURY VERDICT, NEW TRIAL MOTION, AND SENTENCE

The jury found Winzer guilty of second degree robbery and petty theft with priors. Winzer waived a jury trial on the allegations of the prior convictions.

Winzer moved for a new trial on the ground that the jury should have been instructed on battery as a lesser included offense to robbery. If this instruction had been given, Winzer maintained, the defense would have argued at trial that Winzer was at most culpable of petty theft and battery, not robbery. The court denied the motion.

A bifurcated bench trial on the prior conviction allegations was held on April 14, 2006. The prosecutor withdrew two of the prior convictions previously alleged for purposes of the section 484/666 violation in count two. The court found true the three other prior theft-related convictions connected with that count. (§ 666.) For purposes of sentence enhancements under section 667.5, subdivision (b), the court granted the prosecutor's motion to amend the information to combine two of the allegations into one, and then found that Winzer had served three prior prison terms.

The court sentenced Winzer to the aggravated term of five years for second degree robbery and stayed the midterm two-year sentence for petty theft with a prior, pursuant to section 654. For sentencing purposes, the three prior prison term enhancements (§ 667.5, subd. (b)) were stricken.

This appeal followed.

II. DISCUSSION

Winzer contends that the trial court should have instructed on battery and assault as lesser-included offenses of robbery, because there was substantial evidence that he struck Rogers not with the intent to steal the Target merchandise secreted in his pants, but in self-defense against the attack of an unknown assailant. He also contends that the trial court erred in failing to instruct the jury of the required nexus between the force he exerted and an intent to steal. Neither argument has merit.

A. FAILURE TO INSTRUCT ON ASSAULT OR BATTERY AS LESSER INCLUDED OFFENSE

A trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. (*People v. Birks* (1998) 19 Cal.4th 108, 118 (*Birks*); *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*) [court not obligated to instruct sua sponte on lesser offense unless there is substantial evidence from which reasonable jury could conclude that the lesser offense, but not the greater, was committed].) We consider first whether battery or assault may be considered a lesser included offense of robbery. We then determine whether an instruction on battery or assault was required in light of the evidence. We conclude that the court did not err in this regard and, in any event, any purported error was harmless.

1. Assault and Battery as Lesser-Included Offenses of Robbery

Two alternative tests are used to determine whether a lesser offense is necessarily included in a greater offense. (*People v. Moon* (2005) 37 Cal.4th 1, 25.) Under the *elements test*, the lesser crime is included if all of its legal elements are included in the definition of the greater crime, such that the greater cannot be committed without committing the lesser. (*Ibid.*) Under the *accusatory pleading test*, the lesser crime is included if the accusatory pleading describes the greater offense in language such that the offender, if guilty, must necessarily have also committed the lesser crime. (*Id.* at pp. 25-26.)

7

Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) By contrast, a battery "is any willful and unlawful use of force or violence upon the person of another." (§ 242.) Thus, battery requires use "of force or violence," while robbery requires "force *or fear*." Because it is possible to commit robbery without committing battery, battery is not a lesser included offense of robbery under the elements test. (*People v. Romero* (1943) 62 Cal.App.2d 116, 121.)

Winzer argues, however, that battery was a lesser included offense of robbery in this case under the accusatory pleadings test. In accusing Winzer of robbery, the information alleged that he, "by means of force *and* fear, did unlawfully take" personal property belonging to another. (Italics added.) Winzer argues that the force required for battery is not materially different than the force required for robbery. Therefore, he urges, battery (requiring force) is a lesser included offense of the robbery alleged in the information (referring to both fear *and* force).

The allegation that the robbery was perpetrated by means of "force and fear," rather than "force or fear," was merely a function of conjunctive pleading. Conjunctive pleading is employed to avoid uncertainty. (*In re Bushman* (1970) 1 Cal.3d 767, 775 (*Bushman*), disapproved on other grounds in *People v. Lent* (1975) 15 Cal.3d 481, 486, fn. 1; *People v. Tuggle* (1991) 232 Cal.App.3d 147, 154, disapproved on other grounds, *People v. Jenkins* (1995) 10 Cal.4th 234, 252; *People v. Fritz* (1970) 11 Cal.App.3d 523, 526; see also *People v. Chacon* (1995) 37 Cal.App.4th 52, 62, fn. 4.) In *Bushman*, for example, the complaint had charged malicious disturbance of the peace by "'tumultuous and offensive conduct.'" (*Bushman, supra,* at p. 774.) The court held it was nevertheless proper to instruct the jury that the defendant could be found guilty if, in accord with the statute, he committed tumultuous *or* offensive conduct. (*Ibid.*) The court explained: "When a statute such as Penal Code section 415 lists several acts in the disjunctive, any one of which constitutes an offense, the complaint, in alleging more than one of such acts, *should do so in the conjunctive to avoid uncertainty.* [Citations.] Merely because the complaint is phrased in the conjunctive, however, does not prevent a trier of fact from

8

convicting a defendant if the evidence proves only one of the alleged acts. [Citation.]" (*Bushman, supra,* at p. 775, italics added.) We question whether the accusatory pleading test was intended to be met by allegations asserted merely to satisfy our Supreme Court's directive to plead in the conjunctive.

On the other hand, it is literally true that a defendant who exerts "force and fear" in an attempt to deprive another of personal property has committed a battery (willful and unlawful use of force upon the person of another), unless the use of "force" upon the person of another can be accomplished by something other than a physical touching. On this point, respondent refers us to *People v. Wright* (1996) 52 Cal.App.4th 203 (*Wright*), which held that assault was not a lesser included offense of robbery under the accusatory pleading test. (See *id.* at p. 211.)[4]

In *Wright*, the prosecution had charged that the defendants "'unlawfully, and by means of force *and* fear attempt[ed] to take personal property'" from the victims. (*Wright, supra,* 52 Cal.App.4th at pp. 209-210, italics in original.) The Court of Appeal considered whether the force required to commit a robbery necessarily includes the force required to commit an assault. (*Id.* at p. 210.) The court concluded that the force necessary to commit robbery could be merely "constructive" force, defined as "'force not actual or direct, exerted upon the person robbed, by operating upon [a] fear of injury . . . .'" (*Id.* at p. 210.) Included within the meaning of "force," therefore, is "'such *threat* or *display* of physical aggression toward a person as *reasonably inspires fear* of pain, bodily harm, or death.'" (*Id.* at pp. 210-211, italics in original, quoting Webster's

---

[4]    In this appeal, Winzer argues that assault is also a lesser included offense under the accusatory pleading test. Assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Winzer did not request an assault instruction, although a court must also instruct on a lesser included offense sua sponte, if there is substantial evidence that the lesser crime was committed rather than the greater. (*Birks, supra,* 19 Cal.4th at p. 118.) A defendant may be entitled to an assault instruction on request when charged with robbery if the evidence warrants it. (*Wright, supra,* 52 Cal.App.4th at p. 209, fn. 16; *People v. Carter* (1969) 275 Cal.App.2d 815, 823-824.)

New Internat. Dict. (3d ed. 1981) p. 887.)

Applying *Wright* to the matter before us, respondent argues that a victim can be forced to surrender his property during a robbery by the means of coercive threats, without resort to assault or battery. Since a robbery could be perpetrated by a mere threat or display of physical aggression rather than an actual (or attempted) application of force upon the victim's person, robbery can be committed without necessarily committing a battery or assault and, consequently, neither battery nor assault is a lesser included offense under the accusatory pleading test.

Winzer responds that *Wright* improperly muddied the concepts of fear and force, which are intended to be separate elements. (See *People v. Davison* (1995) 32 Cal.App.4th 206, 214; *People v. Brew* (1991) 2 Cal.App.4th 99; *People v. Dreas* (1984) 153 Cal.App.3d 623, 628; *People v. Cuevas* (2001) 89 Cal.App.4th 689, 698.) More specifically, he contends that *Wright* (1) effectively rewrote the robbery statute by ruling that force is not an element of robbery independent of fear, since the statute provides that robbery can be accomplished by force *or* fear; (2) incorrectly concluded that force is synonymous with fear; and (3) relied on cases involving whether a defendant's actions constituted force or fear, rather than addressing a pleading that alleged both force and fear. Winzer also notes that our Supreme Court has not decided whether assault and battery are lesser included offenses of robbery under the accusatory pleading test. (*People v. Sakarias* (2000) 22 Cal.4th 596, 622, fn. 4 (*Sakarias*).)

We need not decide this issue in order to resolve Winzer's appeal. For purposes of our analysis we will assume, without deciding, that battery and assault were lesser included offenses of the robbery charge under the accusatory pleading test, and proceed to the next issue. (See *Sakarias, supra,* 22 Cal.4th at p. 622 [in absence of substantial evidence that defendant entered victim's home or attacked victim without an intent to steal, court declined to address defendant's claim that assault was a necessarily included offense of robbery under the accusatory pleading test].)

10

2. Substantial Evidence of Assault and Battery

Winzer does not challenge the jury's finding that he committed theft of the T-shirts or dispute that he struck Rogers while he was leaving Target with the purloined merchandise concealed in his pants. Rather, he contends that the force he used on Rogers supported a conviction only for battery (or assault), not robbery, because he did not strike Rogers with the intent to steal the merchandise. (*People v. Green* (1980) 27 Cal.3d 1, 54 (*Green*) ["the act of force or intimidation by which the taking is accomplished in robbery must be motivated by the intent to steal"], overruled on other grounds in *People v. Dominguez* (2006) 39 Cal.4th 1141, 1155 & fn. 8.) Claiming there was substantial evidence that his intent was not to steal, he urges that he was entitled to an instruction on battery or assault as a lesser-included offense. (See *Breverman, supra,* 19 Cal.4th at p. 162.) The question, therefore, is whether there is an evidentiary basis from which a reasonable jury could believe that Winzer hit Rogers to defend himself rather than to steal the T-shirts.

Winzer argues that the following constitutes such substantial evidence: Rogers was in plain clothes; according to Rogers' preliminary hearing testimony admitted at trial, Rogers grabbed Winzer by the arm before Winzer hit Rogers in the face; although Rogers and Azevedo testified that Rogers identified himself as Target security before he grabbed Winzer, high-schooler Mahoney, the only eyewitness at trial who was not a Target employee, testified that he observed the action outside the store from about five feet away and did not hear Rogers identify himself as Target security; and Rogers had been written up twice before by his supervisor. If the jurors believed Mahoney, Winzer argues, they might have found that Winzer hit Rogers in self-defense, without any intent related to stealing the T-shirts.

We begin with Mahoney's testimony, since the parties dispute how it should be construed. Mahoney testified that he "heard like a bunch of yelling coming out of, like, the doors," and he believed it was the white male (Rogers) who was speaking. Mahoney could not remember what the yelling was about. On cross-examination, Mahoney

11

testified that he did not hear Rogers identify himself as Target security: "Q. Did you ever hear this white male say out loud: [']I'm Target Security[']? [¶] A. No."

Mahoney's testimony, taken in isolation, is subject to different interpretations. Given his testimony that he heard Rogers yelling something at Winzer but did *not remember* what it was, his further testimony that he did not hear Rogers identifying himself as Target security could simply mean he did not remember any such statement. As such—and this is respondent's interpretation—his testimony is not necessarily inconsistent with Rogers' and Azevedo's testimony that Rogers did identify himself. Alternatively, Mahoney's testimony could be interpreted to mean that, although he did not remember exactly what Rogers said to Winzer, he knows it was not an identification of Rogers as Target security. This would support Winzer's position.

The problem with Mahoney's admitted lack of memory, however, is exacerbated by the fact that he did not observe the entire incident. Mahoney testified that he turned to look toward the doors when he heard yelling, and at that point saw Winzer running out the door with Rogers about three steps behind. Rogers testified at trial that he first identified himself as Target security when he was about five feet away from Winzer, just as Winzer walked out the door, while Rogers was still *inside* the store. Azevedo's testimony also suggests that Rogers was still inside the store when Rogers first identified himself as Target security. Mahoney's testimony as to what was said after Rogers and Winzer were outside the store was not in conflict with the evidence that Rogers identified himself before that point. In other words, Mahoney only provided evidence that Rogers did not identify himself as Target security *by the time Mahoney observed* them, and from what Mahoney could *understand* them saying, but not that Rogers failed to identify himself at all, including some earlier point, before he was hit by Winzer. As such, we question whether Mahoney's testimony can be considered credible and of solid value, as

required of substantial evidence, on the assertion that Winzer was unaware that Rogers was Target security when he hit him in the face.[5]

Moreover, in deciding whether the evidence cited by Winzer constitutes substantial evidence, we must determine whether the jury could reach the conclusion that Winzer was not motivated by an intent to steal when he hit Rogers in light of *all* the evidence at trial. The undisputed evidence showed that Winzer took a package of T-shirts off of a shelf, turned his back to the security camera as his companion acted as a lookout, secreted the package down the front of his pants, and then walked out the door of the store without paying for it. The undeniable inference is that Winzer harbored an intent to steal the T-shirts, including at the point he crossed the threshold and was confronted by Rogers. Given this evidence, no reasonable juror could conclude, even if Rogers was in plain clothes, had not announced himself as Target security, and had grabbed Winzer's arm, that Winzer's reaction in repeatedly striking Rogers' face was unrelated to Winzer's intent to steal the T-shirts he had concealed in his pants.

Indeed, Winzer did not testify and the defense presented no evidence that, when he hit Rogers, Winzer *was* operating under the belief that he had to defend himself against a stranger attacking him for no reason. Not once did he claim to Target security or to the police that he thought he was being accosted by someone other than Target security, even when he was being placed in handcuffs, led to the security office, held there until the police arrived, and then arrested. To the contrary, when Azevedo told Winzer while waiting for the police, "You know you're going to jail because you assaulted [Rogers],"

---

[5]    Mahoney also testified that he did not realize Rogers was a Target security person when he saw him struggling with Winzer, because Rogers was dressed in street clothes. However, Mahoney's state of mind is not probative of Winzer's state of mind: Rogers, unlike Mahoney, knew at the time of the struggle that he was walking out Target's door with stolen merchandise in his pants. Rogers was thus far more likely to expect that the person trying to apprehend him was a Target employee.

Winzer simply replied, "No, I'm not." "I'm not going to jail. I have my ways. I'll get out."[6]

Nor would the fact that Rogers had previously been written up by De La Torre in other incidents persuade a reasonable jury that Rogers had failed to identify himself as Target security. The previous incidents pertained to assisting a coworker apprehend a suspect when off duty and detaining a person who took merchandise out of a package; neither has anything to do with a failure to identify himself as Target security.

In the final analysis, Winzer failed to present substantial evidence that his striking of Rogers was unmotivated by his intent to steal. The trial court was therefore not required to instruct the jury on battery or assault.

3. Harmless Error

In any event, the failure to instruct on battery or assault was harmless. In this context we apply the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*): whether it appears reasonably probable that the defendant would have obtained a more favorable outcome had the purported error not occurred. (*Breverman, supra,* 19 Cal.4th at p. 178 ["in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*"].) As described *ante*, there was more than ample proof of robbery, given the overwhelming evidence that Winzer took the T-shirts and hit Rogers while intending to commit the theft. It is not reasonably probable the jury would have convicted Winzer of battery or assault, rather than robbery, if it had been instructed on battery or assault as a lesser included offense.

---

[6]     Winzer's reliance on *People v. Turner* (1990) 50 Cal.3d 668 (*Turner*) is accordingly misplaced. In *Turner*, the defendant *testified* that he did not form an intent to steal until after killing his victim, and therefore he did not steal by force or fear and was entitled to an instruction on theft as a lesser included offense of robbery. (*Id.* at p. 690.) The Supreme Court agreed that the defendant's testimony, though less than convincing, constituted substantial evidence requiring the instruction. (*Ibid.*) *Turner* is distinguishable: the defendant in *Turner* testified as to his intent; Winzer did not.

Indeed, Winzer does not contest the jury's finding that he committed *theft* of the T-shirts, which, like robbery, requires a finding that the defendant had the specific intent to deprive the rightful owner of the property. (*People v. Kunkin* (1973) 9 Cal.3d 245, 251.) In convicting Winzer of theft, therefore, the jury necessarily found that Winzer intended to steal the T-shirts. Given the evidence in this case, no reasonable juror, having found that Winzer intended to steal the T-shirts from Target, could have concluded that he did not intend to steal when he struck Rogers in the face as he was leaving Target with the T-shirts in his pants.

Winzer contends that the trial court's failure to instruct on assault and battery as lesser included offenses of robbery constituted structural error (requiring reversal per se) or, at a minimum, constitutional error under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). On this point he refers us to *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 739-741, in which the Ninth Circuit held that the refusal of a *requested* lesser offense instruction deprived the defendant of his right to instructions on the defense theory of the case and was thus constitutional error. (See *People v. Rogers* (2006) 39 Cal.4th 826, 871-872.) Winzer thus argues that, although *Breverman* held the *Watson* standard applicable where the court failed to instruct sua sponte on lesser included offenses, the *Chapman* standard applies where the defendant had actually requested the instruction on lesser included offenses.

Winzer's argument is unavailing. The court in *Breverman* proclaimed that "in a noncapital case, error in failing sua sponte to instruct, *or to instruct fully*, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*." (*Breverman, supra,* 19 Cal.4th at p. 178, italics added.) Although the facts in *Breverman* involved only a failure to instruct sua sponte, our Supreme Court made no distinction between the trial court's sua sponte obligation to instruct and an obligation to instruct when requested. As such, we follow the precedent of our Supreme Court and apply the *Watson* test. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, in this case, even if we were to apply the standard for constitutional error under *Chapman*, the overwhelming

15

evidence of Winzer's guilt would still lead us to conclude that any error in failing to instruct on battery or assault was harmless.

### B. ADEQUACY OF INSTRUCTIONS REGARDING NEXUS BETWEEN FORCE AND INTENT

A trial court must instruct sua sponte on the general principles of law relevant to the issues raised by the evidence. (*Breverman, supra,* 19 Cal.4th at p. 154.) Winzer contends the trial court erred in this regard, because the evidence raised the issue of whether the force Winzer applied to Rogers' face was motivated by an intent to steal, and because defense counsel requested a battery instruction and asserted Winzer's purported lack of intent as one of several defense theories. Accordingly, Winzer urges, the court should have instructed sua sponte that "the act of force . . . by which the taking is accomplished in robbery must be motivated by the intent to steal." (*Green, supra,* 27 Cal.3d at p. 54.)[7]

Winzer acknowledges that the court gave several instructions on robbery, but he maintains that none of them addressed this nexus between force and intent to steal. Furthermore, he argues, the instructions that were given were misleading. The court instructed the jury that robbery requires intent, taking, and force (or fear), explained the nexus between the intent and the taking (intent must arise at or before the taking), and explained the necessary nexus between the force and the taking (force can occur after the initial taking, in order to retain the property). Because there was no comparable instruction requiring a nexus between the intent and the use of force, Winzer asserts, the implication was that any use of force connected with an intentional taking would constitute robbery, even if the force was motivated by an intent other than theft.

A review of the instructions given in this case refutes Winzer's argument. The court initially instructed the jury on the elements of robbery, in accordance with CALJIC

---

[7]    Defense counsel did not request this instruction at trial. Winzer contends that the omission constituted ineffective assistance of counsel. Because the instructions were adequate as given, however, Winzer does not establish that counsel's failure to request the instruction was prejudicial, and the ineffective assistance claim is thus without merit.

16

No. 9.40, including the requirement of proof that: "[a] person had possession of property of some value, however slight"; "the property was taken from that person or from his or her immediate presence"; "the property was taken against the will of that person"; "the *taking was accomplished either by force or fear*"; and "the property was *taken with the specific intent permanently to deprive that person of the property.*"[8]  (Italics added.)

The court then instructed, consistent with CALJIC No. 9.40.2, that the intent to steal must be formed by the time of the initial taking: "To constitute the crime of robbery, the perpetrator must have formed the specific intent to permanently deprive the person of possession of that property, before or at the time that the act of taking the property occurred. [¶] If this intent was not formed until after the property was taken from the person or immediate presence of the victim, the crime of robbery has not been committed."

The court also read instructions submitted by the prosecutor and modified by the court, that the necessary force or fear may be used in order to escape or keep the property rather than to take the property initially: "The requisite force or fear needed to establish a robbery need not occur at the time of the initial taking. Assuming all the other required elements have been proven, the use of force or fear to escape with or otherwise retain even temporary possession of the property constitutes robbery. [¶] It is not an essential element to the crime of robbery that the use of force or fear be used to gain direct physical possession of the property taken. [¶] Again, assuming all other elements have been proven, a robbery is committed if an individual uses force or fear to retain possession of the property prior to reaching a place of relative safety."

---

[8]    The court also gave CALJIC No. 9.40.3, explaining that a store employee may be the victim of a robbery if he was in constructive possession of the property at the time of the taking.  In addition, the court instructed in accord with CALJIC No. 3.31 as follows: "For both of the crimes charged in the Information, there must exist a union or a joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. [¶] Unless this specific intent exists, the crime to which it relates is not committed. [¶] The specific intent required by the aforementioned crimes is included in the definition of those crimes set forth elsewhere in these instructions."

The implication from these instructions is that the intent to steal must be formed by the time of the initial taking, and the force must be employed at or after the initial taking. Requiring the jury to find that Winzer used force to "retain possession of the property" and had a "specific intent permanently to deprive the person of possession of that property" sufficiently tied the exercise of force with the intent to steal. In light of these instructions, no reasonable juror could have missed the connection between these two elements.

Winzer argues that the prosecutor created ambiguity by stating the following in closing argument: "Someone comes up on [Winzer], and starts hitting him. Doesn't matter if he identifies himself as Target Security or not. Why is he punching him? He's trying to get away. He's using force to get out of the store." Specifically, Winzer asserts, this comment encouraged the jury to understand the robbery instructions to mean that as long as Winzer used force, it did not matter whether the force was motivated by the intent to steal. We disagree. To the contrary, the prosecutor tied Winzer's use of force with his intention of getting out of the store with the stolen property, thus emphasizing the nexus between the use of force and the intent to steal.

Winzer has failed to demonstrate reversible error.

III. <u>DISPOSITION</u>

The judgment is affirmed.

_____

NEEDHAM, J.

We concur.


_____

JONES, P. J.


_____

GEMELLO, J.


(A113629)

19

# EXHIBIT 3

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

THE PEOPLE OF THE STATE OF CALIFORNIA,

       Plaintiff and Respondent,

v.

LACY WINZER,

       Defendant and Appellant.

No. _____

Court of Appeal
No. A113629

Contra Costa County
Superior Court
No. 050567A

*V. Lee*

DOCKETED
SAN FRANCISCO

OCT 0 2 2007

By A. NAVARRO
No. SF-2006-02318

## PETITION FOR REVIEW

AFTER DECISION BY THE COURT OF APPEAL,
FIRST APPELLATE DISTRICT, DIVISION FIVE
OF AUGUST 29, 2007

Joy Maulitz
(Cal. Bar No. 111833)
LAW OFFICES OF JOY
MAULITZ
Post Office Box 170083
San Francisco, CA. 94117
(415) 680-8046

Attorney for Appellant
LACY WINZER
By appointment of the Court
under the First District Appellate
Project's independent case
program

# TABLE OF CONTENTS

PETITION FOR REVIEW ............................................................ 1

STATEMENT OF ISSUES PRESENTED ................................... 1

WHY THE PETITION SHOULD BE GRANTED ........................... 1

STATEMENT OF THE CASE .................................................. 5

STATEMENT OF FACTS ....................................................... 5

ARGUMENT ...................................................................... 8

I.   THE COURT'S FAILURE TO INSTRUCT ON BATTERY
     AND ASSAULT AS LESSER INCLUDED OFFENSES
     VIOLATED BOTH STATE STANDARDS AND APPELLANT'S
     FEDERAL DUE PROCESS RIGHT TO INSTRUCTIONS ON
     THE DEFENSE THEORY OF THE CASE ........................... 8

     A. Factural and Procedural Summary ............................. 8

     B. Battery and Assault Are Lesser Included Offenses of
        Robbery ............................................................ 10

        1. Under the accusatory pleading test, battery is
           a lesser included offense of robbery...................... 10

        2. Assault is a lesser included offense of robbery ......... 12

        3. *Wright* was wrong, and has not been adopted
           by this Court................................................... 13

     C. There Was Substantial Evidence That the "Force" Used by
        Appellant Did Not Coincide With the Intent to Steal, and
        Thus Constituted Only Assault or Battery, Not Robbery........ 15

     D. The Failure to Instruct on Battery and Assault Was
        Federal Constitutional Error....................................... 16

     E. The Failure to Instruct on Battery and Assault Was
        Prejudicial Under Either State or Federal Standards............. 17

II.    UNDER THE UNUSUAL CIRCUMSTANCES OF THIS
       INCIDENT, THE COURT'S INSTRUCTIONS WERE
       INADEQUATE TO INFORM THE JURORS OF
       THE NEXUS BETWEEN FORCE AND INTENT
       REQUIRED FOR ROBBERY ......................................... 19

       A. The Instructions Were Incomplete and Misleading.............. 19

       B. Appellant's Request For Battery Instructions Put The Court
          On Notice Of The Defense Theory Of The Case, And
          Required Clarifying Instructions................................... 22

       C. If Counsel Waived the Issue by Failing to Raise it Below,
          She Provided Constitutionally Ineffective Assistance............ 24

          1. Failure to request clarifying instructions was
             ineffective assistance of counsel............................ 24

          2. It is reasonably probable that a request for clarifying
             instructions would have been granted, and thus that
             the failure of counsel affected the outcome of the case... 25

       D. The Court's Failure to Properly Instruct on Force and Intent
          Was Prejudicial to Appellant....................................... 26


CONCLUSION ................................................................... 28

# TABLE OF AUTHORITIES
## CASES

*Auto Equity Sales, Inc. v. Superior Court*
  (1962) 57 Cal.2d 450 ............................................... 13

*Bradley v. Duncan*
  (9th Cir. 2002) 315 F.3d 1091 ......................... 16, 21, 23

*Chapman v. California*
  (1967) 386 U.S. 18 ........................................ 4, 17, 18, 27

*Conde v. Henry*
  (9th Cir. 1999) 198 F.3d 734 ...................... 16-17, 21, 23

*Cooley v. Superior Court*
  (2002) 29 Cal.4th 228 ........................................... 14

*In re Jones*
  (1996) 13 Cal.4th 552 ....................................... 24-26

*Middleton v. McNeil*
  (2004) 541 U.S. 433 ............................................... 18

*Neder v. United States*
  (1999) 527 U.S. 1 .......................................... 21, 27-28

*People v. Aguilar*
  (1997) 16 Cal.4th 1023 ........................................... 12

*People v. Asbury*
  (1985) 173 Cal.App.3d 362 ....................................... 25

*People v. Barrick*
  (1982) 33 Cal.3d 115 ............................................. 11

*People v. Breverman*
  (1998) 19 Cal.4th 142 ......................................... 4, 19

*People v. Brew*
  (1991) 2 Cal.App.4th 99 ......................................... 14

*People v. Brookins*
  (1989) 215 Cal.App.3d 1297 ..................................... 14

*People v. Colantuono*
(1994) 7 Cal.4th 206 ........................................................ 11

*People v. Elliot*
(2005) 37 Cal.4th 453 ....................................................... 4

*People v. Falsetta*
(1999) 21 Cal.4th 903 ...................................................... 23

*People v. Flood*
(1998) 18 Cal.4th 470 ............................................. 17, 21, 27

*People v. Flynn*
(2000) 77 Cal.App.4th 766 ................................................ 14

*People v. Fudge*
(1994) 7 Cal.4th 1075 ...................................................... 23

*People v. Green*
(1980) 27 Cal.3d 1 ....................................... 16, 19-23, 27-28

*People v. Guzman*
(1975) 47 Cal.App.3d 380................................................. 23

*People v. James*
(1963) 218 Cal.App.2d 166 ............................................... 14

*People v. Kelley*
(1990) 220 Cal.App.3d 1358 .............................................. 25

*People v. LeBlanc*
(1972) 23 Cal.App.3d 902 ................................................. 14

*People v. Lee*
(1987) 43 Cal.3d 666 ................................................. 21, 27

*People v. Magee*
(2003) 107 Cal.App.4th 188 ....................................... 17, 27-28

*People v. Malone*
(1988) 47 Cal.3d 1 ......................................................... 24

*People v. Maury*
(2003) 30 Cal.4th 342 ................................................. 19-20

*People v. Modiri*
(2006) 39 Cal.4th 481 .................................................. 12

*People v. Moon*
(2005) 37 Cal.4th 1 ......................................... 10-11, 16

*People v. Moringlane*
(1982)127 Cal.App.3d 811 ................................... 19-20

*People v. Mungia*
(1991) 234 Cal.App.3d 1703 ............................... 11-13

*People v. Page*
(2004) 123 Cal.App.4th 146 .................................... 11

*People v. Prieto*
(1993) 15 Cal.App.4th 210 ..................................... 14

*People v. Rincon-Pineda*
(1975) 14 Cal.3d 864.......................................... 22-23

*People v. Rogers*
(2006) 39 Cal.4th 826 ....................................... 4, 17

*People v. Ruiz*
(1983) 142 Cal.App.3d 780 ................................... 13

*People v. Sakarias*
(2000) 22 Cal.4th 596 ........................................... 13

*People v. Thomas*
(2005) 133 Cal.App.4th 488 ............................ 11, 13

*People v. Thompson*
(1990) 222 Cal.App.3d 1647 ................................ 13

*People v. Watson*
(1956) 46 Cal.2d 818 ................................. 4, 17, 18

*People v. Whitehurst*
(1992) 9 Cal.App.4th 1045 .................................... 19

*People v. Wright*
      (1996) 52 Cal.App.4th 203 ........................................ 12-15

*Pirtle v. Morgan*
      (9th Cir. 2002) 313 F.3d 1160 ................................... 24

*Reno v. Baird*
      (1998) 18 Cal.4th 640 ............................................ 14

*Sandstrom v. Montana*
      (1979) 442 U.S. 510 .............................................. 21

*Strickland v. Washington*
      (1984) 466 U.S. 668 ............................................. 24-26

*Sullivan v. Louisiana*
      (1993) 508 U.S. 275 ............................................ 21, 26

*United States v. Gaudin*
      (1995) 515 U.S. 506 .............................................. 21

*United States v. Span*
      (9th Cir. 1996) 75 F.3d 1383 .................................... 24

*Williams v. Taylor*
      (2000) 529 U.S. 362 .............................................. 25

## STATUTES

Article I, section 15 of the California Constitution ........................... 24

California Rules of Court, rule 8.500(a) ....................................... 1

California Rules of Court, rule 2.1050 ........................................ 21

Penal Code section 211 ....................................................... 14

Penal Code section 240 .................................................... 12, 13

The Sixth Amendment to the United States Constitution ................ 21, 24

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LACY WINZER,<br><br>Defendant and Appellant. | No. _____<br><br>Court of Appeal<br>No. A113629<br><br>Contra Costa County<br>Superior Court No.<br>No. 050508671 |

## PETITION FOR REVIEW

TO:    THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE OF
CALIFORNIA AND THE HONORABLE ASSOCIATE JUSTICES
OF THE SUPREME COURT OF CALIFORNIA:

Appellant and petitioner Lacy Winzer, by and through counsel,
hereby petitions for review, pursuant to California Rules of Court, rule
8.500(a), following the decision of the Court of Appeal for the Second
District filed August 29, 2007 and attached to this Petition as Exhibit 1.

## STATEMENT OF ISSUES PRESENTED

1.  Whether the trial court's failure to instruct on battery and assault as
lesser included offenses of robbery was erroneous and prejudicial.

2.  Whether, under the unusual circumstances of this case, the jury
instructions were inadequate to explain that the force required for robbery
must be motivated by the intent to steal.

## WHY THE PETITION SHOULD BE GRANTED

This is a shoplifting case with a twist.  The security guard who
pursued appellant Lacy Winzer out of the Target store was in plain clothes.
The only independent eyewitness, Joseph Mahoney, testified that the guard
never identified himself as Target security.  The security guard, Blake

Rogers, grabbed appellant before appellant struck him. Rogers had failed to follow Target security procedures on numerous occasions. The prosecutor charged appellant with robbery and petty theft. Appellant contends that there was substantial evidence that, at most, the force used by appellant constituted assault or battery, and not robbery, because appellant did not know Rogers was a Target employee, and the force he used to defend himself was not motivated by the intent to steal. Despite appellant's request, the trial court refused to give jury instructions on battery; neither did the court give instructions on assault, or otherwise make clear that a robbery conviction would require that the force used by appellant was motivated by the specific intent to steal. The jury convicted appellant of both robbery and petty theft. The robbery conviction must be reversed.

The Court of Appeal assumes, without deciding, that -- as appellant contends -- battery and assault were lesser included offenses of the robbery charge under the accusatory pleading test. (Op. at 10.) The Court of Appeal goes on to find, however, that there was no substantial evidence that appellant's striking of Rogers was not motivated by the intent to steal. (Op. at 14.) The Court also holds that the failure to instruct on assault and battery was harmless. (Op. at 14-16.) The Court is wrong on both counts.

It is important to note that neither the prosecutor nor the trial court ever disputed that there was substantial evidence in support of a battery or assault conviction. The Court of Appeal improperly discounts the substantiality of the defense evidence in at least three ways. First, the Court points out that Mahoney testified that he did not remember what Rogers was yelling at appellant, and later testified that he never heard Rogers identify himself as Target security. (I RT 230, 236.) The Court strains to suggest that these statements may be taken together to mean that Mahoney simply did not remember if Rogers identified himself. (Op. at 12.) But this interpretation is flatly inconsistent with what Mahoney

2

actually said, especially in light of his testimony that he "could not tell" that Rogers was a Target security guard. (I RT 235-236.) Mahoney clearly indicated that he never heard Rogers identify himself as Target security.

Second, the Court of Appeal misconstrues the evidence regarding what Mahoney was able to observe. The Court states that "Mahoney only provided evidence that Rogers did not identify himself as Target security *by the time Mahoney observed*" appellant and Rogers. (Op. at 12, emphasis in original.) In fact, Mahoney was able to observe all of the relevant portion of the encounter between appellant and Rogers. Mahoney was five feet from the store's doors, facing them. He saw appellant <u>as he was exiting the doors</u>, with Rogers about three steps behind him, and heard yelling. (I RT 229-230.) Rogers testified that he did not identify himself as security until just as appellant exited the store. (I RT 57-58.) This is precisely the moment that Mahoney observed and described, and he never heard Rogers identify himself as security. Mahoney's testimony was entitled to greater weight than that accorded by the Court of Appeal.

Third, contrary to the Court of Appeal's opinion, the fact that Rogers had been written up on two previous occasions certainly would help persuade a jury that he failed to identify himself on this occasion. The fact that the previous incidents did not specifically entail a failure by Rogers to identify himself as Target security, a distinction that the Court emphasizes, is irrelevant. The point is that in his very short tenure as a Target security guard -- ten months -- Rogers had failed to follow procedure on two other occasions, egregiously enough to require documentation by his supervisor. Further, in the course of the incident at hand, Rogers failed to follow procedure by discarding the T-shirts instead of retaining them, and by describing the stolen merchandise in his report as socks instead of T-shirts. (I RT 80, 111-113, 118.) All of this evidence tended to show that Rogers did not fully understand the parameters and requirements of his position.

3

Accordingly, it is reasonably probable that the jury would have convicted appellant of battery or assault instead of robbery, if properly instructed. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836.). Moreover, the Court of Appeal errs in finding that this Court's holding in *People v. Breverman* (1998) 19 Cal.4[th] 142 requires application of the *Watson* standard in a case like this, where the instructions on lesser included offenses were expressly requested. (Op. at 15.) In fact, this court has acknowledged the distinction between cases in which the trial court failed to instruct sua sponte on lesser included offenses and those in which the instructions were requested. (*People v. Rogers* (2006) 39 Cal.4[th] 826, 872.) This court recently applied the *Chapman* standard in assessing a trial court's failure to instruct on lesser included offenses. (*People v. Elliot* (2005) 37 Cal.4th 453, 475; *Chapman v. California* (1967) 386 U.S. 18, 24.) Certainly under the *Chapman* standard, reversal is required.

The Court of Appeal also errs in finding that the instructions were sufficient to inform the jury that the force exerted by appellant upon Rogers had to be motivated by the intent to steal in order to constitute robbery. (Op. at 16-18.) As shown by the evidence discussed above, the jury may well have believed that appellant did not know Rogers was Target security when he hit Rogers after Rogers grabbed him. There is not a single instruction among those cited by the Court of Appeal that informed the jury that this scenario did not constitute robbery. (See Op. at 17-18.) The evidence may have shown that appellant intended to take the T-shirts, that he took the T-shirts, and that he applied force to Rogers. There was substantial evidence, however, that the force was not motivated by the intent to steal. The instructions did not inform the jury that, under these circumstances, there was no robbery. The petition should be granted and the judgment reversed.

## STATEMENT OF THE CASE

Appellant Lacy Winzer was charged with one count of second degree robbery committed by means of force and fear and one count of petty theft with a prior theft conviction. (Clerk's Transcript ("CT") 36.) Appellant denied all charges and allegations. (CT 51.)

The court denied the defense's request for a jury instruction on battery. (I Reporter's Transcript ("RT") 261, II RT 352-3.) The jury found appellant guilty of second degree robbery and petty theft with priors as charged. (CT 224-5.)

Appellant moved for a new trial on the grounds that the trial court improperly denied his request for a jury instruction defining battery as a lesser included offense to robbery. (CT 250-1, II RT 347-355.) The court denied the new trial motion. (CT 286, II RT 354-5.)

The trial court sentenced appellant to the upper term of five years for robbery, stayed the sentence for petty theft with a prior, and struck the prior prison term enhancements. (CT 287.)

Appellant filed a timely appeal. (CT 290.) The Court of Appeal affirmed the judgment on August 29, 2007. (See Exhibit 1, attached.)


## STATEMENT OF FACTS

At about 4:00 p.m. on May 10, 2005, appellant Lacy Winzer was viewed in person and on closed circuit television by security guards working at the Target store in Pittsburg. (I RT 50-53, 129, 181-2.) Appellant selected a shopping cart and proceeded to the Men's Department in the back of the store. (I RT 137, 163.)

Alex Azevedo was working security at the front door and noticed appellant when he walked in. (I RT 129.) His co-worker called undercover agent Blake Rogers to let him know that a suspicious person had entered the store. (I RT 132-4.)

5

Rogers and his boss, loss prevention manager David De la Torre, were in the back asset protection office, monitoring the surveillance cameras posted throughout the store. (I RT 50-52.) Rogers saw appellant on the video, in the Men's Department. (I RT 53.) Azevedo also observed appellant from the front security office. (I RT 137.)

Appellant chose a package of T-shirts off a rack. (I RT 54-5, 138,182.) Rogers saw appellant put the package in his cart, and then, from behind, Rogers saw appellant put the package down the front of his pants. (I RT 73, 105-6.) Azevedo claimed to have seen appellant conceal the merchandise, but acknowledged that he did not have a clear view of appellant. (I RT 139-140.) After Rogers saw appellant conceal the package, he left the office to go to the floor. (I RT 55, 74.) Appellant walked to the front of the store, parked his cart, and exited the building. (I RT 56.)

Rogers stated that he identified himself as Target security just as appellant walked out the doors. (I RT 57-58, 68.) Rogers was still inside the store when he identified himself to appellant, and about five feet from him. (I RT 59, 89.) Rogers was in plain clothes. (I RT 58.) According to Rogers, when he approached appellant, appellant hit him in the face about three times. (I RT 59.) De la Torre observed appellant hit Rogers on camera. (I RT 189.)

At trial, neither Rogers nor de la Torre could remember whether Rogers touched appellant first or whether appellant hit him first. (I RT 84-6, 191.) During the preliminary examination, however, Rogers acknowledged that first he grabbed appellant's arms, and then appellant broke away with one arm and hit him. (I RT 266-7.) Azevedo testified that Rogers identified himself as Target security, told appellant to stop, grabbed appellant's arm, and then appellant hit Rogers. (I RT 145-6.)

6

Rogers grabbed appellant's arm and tried to gain control (I RT 60-2.) The struggle began in the doorway and moved out onto the sidewalk or street. (I RT 61-2.) Rogers and Azevedo testified that, during the struggle, Rogers said "Target security, stop resisting." (I RT 62.) Azevedo helped Rogers gain control of appellant. (I RT 62, 147.) They handcuffed appellant and escorted him to the front office. (I RT 147.)

Joseph Mahoney, a high school student, was standing outside Target waiting for his grandmother that afternoon, about five feet from the Target entrance. (I RT 226-228.) He heard some yelling or movement, turned and saw appellant run out of the store, followed closely by a white male. (I RT 228-230.) Mahoney could not tell that the white male (Rogers) was a Target security guard. (I RT 235.) Rogers was wearing normal street clothes. (I RT 236.) Rogers touched appellant first. (I RT 236.) The two men began fighting. (I RT 229.) Mahoney never heard Rogers identify himself as Target security. (I RT 236.) Nor did he hear any of the security guards tell appellant to stop resisting. (I RT 232.)

De la Torre compiled a time-lapse videotape of the incident that was given to the police and shown to the jury. (I RT 71, 168-9.) This video showed a still photo from every two to three seconds, so it had gaps in it. (I RT 197.) De la Torre did not comply with Target's policies and procedures, which required that he retain the non-time-lapse video of the incident. (I RT 209.) As Rogers himself testified, the video shown to the jury was of "horrible" quality (I RT 71.)

When Rogers and the others detained appellant, they found the package of t-shirts in his pants, and photographed it. (I RT 79-80, 148.) Despite store policies requiring that the evidence be retained, the t-shirts were discarded upon Rogers' instruction, allegedly because they had pubic hair on them. (I RT 80, 111-113.)

A Pittsburg police officer, who later arrived on the scene, saw pubic hair on the package and on the table nearby, but neglected to put this fact in her police report. (I RT 214, 223-4.) The officer searched appellant and determined that he was not wearing underwear. (I RT 217-8.) Instead of the t-shirts allegedly found on appellant, a "similar" package of t-shirts was given to the police and introduced into evidence. (I RT 114, 200-1, 219-220.)

Rogers had only worked at Target for ten months at the time of this incident, but he had already been written up twice by de la Torre: once for apprehending someone while he was off duty, and once for apprehending someone who had no Target items on them. (I RT 49, 117-8, 122-124.) Rogers also mistakenly wrote in his report of this incident that appellant had stolen socks. (I RT 118.)

## ARGUMENT

**I. THE COURT 'S FAILURE TO INSTRUCT ON BATTERY AND ASSAULT AS LESSER INCLUDED OFFENSES VIOLATED BOTH STATE STANDARDS AND APPELLANT'S FEDERAL DUE PROCESS RIGHT TO INSTRUCTIONS ON THE DEFENSE THEORY OF THE CASE.**

### A. Factual and Procedural Summary

It is undisputed that Blake Rogers was in plain clothes when he first encountered appellant. Rogers and his colleague Azevedo claimed that Rogers identified himself as Target security before he touched appellant. But Joseph Mahoney, the only eyewitness at trial who was not a Target employee, observed the whole encounter from about five feet away, and never heard Rogers identify himself as Target security. If the jurors believed Mahoney, they may have inferred that appellant struck at Rogers to defend himself against an unknown attacker, not because he was

8

attempting to retain stolen Target property.  If the jurors understood that <u>the</u> <u>force involved in robbery must be motivated by the intent to steal,</u> and/or that the force used by appellant may have constituted some lesser crime than robbery, it is unlikely that they would have convicted appellant of robbery.

Appellant's counsel requested that the court instruct on battery as a lesser included offense of robbery.  (See II RT 352-3.)  The court denied the request as follows:

> Battery is not a lesser.  In the old days of course, lesser related... would be one that we give, but it's not a lesser included offense, because it's force <u>or</u> fear.  So, it is not a lesser.  (I RT 261, emphasis added.)

The trial court proceeded to give several jury instructions relating to robbery and the use of force, beginning with CALJIC 9.40, which states the elements of robbery. (CT 126-127.)  After several intervening instructions unrelated to robbery, the court gave CALJIC 9.40.2, which states that the intent to steal must arise "before or at the time that the act of taking the property occurred." (CT 131.)  The court gave CALJIC 9.40.3, regarding store employees as victims of robbery, and then the following non-CALJIC instructions:

> The requisite force or fear needed to establish a robbery need not occur at the time of the initial taking.  Assuming all other required elements have been proven, the use of force or fear to escape with or otherwise retain even temporary possession of the property constitutes robbery.
> It is not an essential element of the crime of robbery that the use of force or fear be used to gain direct physical possession of the property taken.  Assuming all other elements have been proven, a robbery is committed if an individual uses force or fear to retain possession of the property prior to reaching a place of relative safety. (CT 133-4.)

To summarize, the court instructed the jury that robbery requires intent, taking, and force (or fear). The court explained the nexus between the intent and the taking (i.e., that the intent must arise before the taking). (CALJIC 9.40.2, at CT 131.) And the court explained the nexus between the force and the taking (i.e., that the force can occur after the initial taking, in order to retain the property, and still constitute robbery). (CT 133.) But the court never explained the nexus between the force and the intent -- i.e., that the force has to be motivated by the intent to steal -- even though this was the crux of the defense.

Appellant moved for a new trial because of the trial court's error in refusing his request to instruct the jury on battery. (CT 250-4.) The court confirmed that defense counsel had requested an instruction on battery. (II RT 352-3.) The prosecutor did not claim that the evidence would not support a finding of battery, but argued that battery was not a lesser included offense of robbery. (CT 257-261.) The court held that battery was not a lesser included offense of robbery, and denied the motion for new trial. (II RT 353-4.)

### B.     Battery and Assault Are Lesser Included Offenses of Robbery.

#### 1.     Under the accusatory pleading test, battery is a lesser included offense of robbery.

Trial courts must instruct the jury *sua sponte* as to lesser included offenses if the evidence "raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." (*People v. Moon* (2005) 37 Cal.4[th] 1, 25.) Two alternative tests are used by the courts to determine whether a lesser offense is necessarily included in a particular crime. "Under the elements test, we look to see if all the legal elements of the lesser crime are included in the definition of the greater crime, such that the greater cannot

10

be committed without committing the lesser. <u>Under the accusatory pleading</u> <u>test, by contrast, we look not to official definitions, but to whether the</u> <u>accusatory pleading describes the greater offense in language such that the</u> <u>offender, if guilty, must necessarily have also committed the lesser crime.</u>" (*Moon, supra,* 37 Cal.4th at 25-6 (emphasis added).)

In the present case, battery was a lesser included offense of robbery under the "accusatory pleadings" test, because appellant was charged in the information with committing robbery by means of "force <u>and</u> fear." (CT 36.) In other words, if the force required to commit robbery necessarily includes the force required to commit battery, as appellant contends it does, battery was a lesser included offense within robbery in this case. (Cf. *People v. Barrick* (1982) 33 Cal.3d 115, 134-135 [finding joyriding lesser included of auto taking, due to conjunctive language of accusatory pleading].)

Force is required to commit battery, but a minimal amount of force is sufficient. "Force against the person is enough, it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark." (*People v. Colantuono* (1994) 7 Cal.4th 206, 214, fn.4; *People v. Page* (2004) 123 Cal.App.4th 1466, 1473, fn.1.) Accordingly, if the minimal force required for battery is necessarily included within the force required to commit robbery, then battery is a lesser included offense of robbery.

It is well-established that the force contemplated in the definition of robbery is "something more ... than just that quantum of force which is necessary to accomplish the mere seizing of the property." (*People v. Thomas* (2005) 133 Cal.App.4th 488, 494.) The court in *People v. Mungia* (1991) 234 Cal.App.3d 1703 stated that the question was whether the defendant "used more force than necessary to accomplish the taking... or,

11

stated another way, ... defendant engage[d] in a measure of force ... to overcome the victim's resistance." (*Id*. at 1708.)

As the court noted in *Mungia*, "the terms 'force' and 'fear' as used in the definition of the crime of robbery have no technical meaning peculiar to the law and must be presumed to be within the understanding of jurors." (*Id*.). Indeed, the CALJIC and other instructions used in this case did not define "force" for the jury.

Accordingly, for purposes of robbery, "force" must be understood by the common dictionary definition. "By definition, 'force' involves 'power, violence, compulsion, or constraint exerted upon or against a person.' (Webster's 3d New Internat. Dict., supra, p. 887; accord, Oxford English Dict., supra, p. 33; American Heritage Dict. (4th ed.2000) p. 686.)." (*People v. Modiri* (2006) 39 Cal.4th 481, 494.) This sort of "power" and "violence" that is commonly understood from the word "force" is at least as much or more than what is required for battery.

### 2. Assault is a lesser included offense of robbery.

The argument that battery is a lesser included offense of robbery -- and thus required a *sua sponte* instruction by the trial court -- applies with equal or greater force to assault. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Penal Code § 240.) This "injury" (which need not actually be achieved) can be the least unwanted touching. (*People v. Wright* (1996) 52 Cal.App.4th 203, 209.) One may commit assault without making actual physical contact with the person of the victim. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

Under the accusatory pleading test, assault is necessarily included in robbery, because if a robbery is committed by use of force and fear, it necessarily includes an assault. The force for assault need not even include physical contact. By contrast, as shown above, the force contemplated in

12

the definition of robbery is "something more ... than just that quantum of force which is necessary to accomplish the mere seizing of the property." (*People v. Thomas* (2005) 133 Cal.App.4th 488, 494.) The court in *People v. Mungia* (1991) 234 Cal.App.3d 1703 also clearly contemplated a physical act when assessing force in the robbery context. (*Id.* at 1708-9.) Such an act of force must certainly include the attempt and ability to commit the least touching required for assault. (Penal Code § 240; *Wright, supra,* at 209.)

### 3. *Wright* was wrong, and has not been adopted by this Court.

In denying appellant's request for an instruction on battery, the trial court relied on the Third District's decision in *People v. Wright* (1996) 52 Cal.App.4th 203, which held that a "trial court ha[s] no duty to instruct *sua sponte* on assault as a lesser included offense of robbery." (*Id.* at 210.) But this Court, while acknowledging the existence of the *Wright* decision, has pointedly declined to resolve whether *Wright* was correct. The Court has expressly left open whether assault and battery are lesser included offenses of robbery by "force or fear" under the accusatory pleading test. (*People v. Sakarias* (2000) 22 Cal.4th 596, 622, fn.4; see also *People v. Thompson* (1990) 222 Cal.App.3d 1647, 1649 [assuming without deciding that battery is a lesser included defense of robbery]; *People v. Ruiz* (1983) 142 Cal.App.3d 780, 782 [same re assault].)

The trial court acknowledged that it found a depublished opinion of another panel of the Court of Appeal persuasive in rejecting the reasoning in *Wright*, but stated that it was bound to follow *Wright* pursuant to *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455. (II 354.)

Appellant submits that *Wright* was incorrectly decided on a number of grounds. First, *Wright* held that "force is not an element of robbery independent of fear." (*Wright* at 210.) In so holding, *Wright* essentially

13

rewrites the robbery statute, section 211, which plainly states that robbery may be "accomplished by means of force or fear." (§ 211, emphasis added.) It is a "maxim of statutory construction" that "[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." (*Cooley v. Superior Court* (2002) 29 Cal.4[th] 228, 249; *Reno v. Baird* (1998) 18 Cal.4[th] 640, 658.) Moreover, "fear" is defined precisely, as a concept separate from force, in section 212. *Wright*'s interpretation of the words "force" and "fear" flies in the face of the robbery statute as it is properly interpreted.

Moreover, *Wright*'s interpretation of "force" and "fear" as synonymous is anomalous. The courts have consistently treated force and fear as separate and distinct means of committing robbery. (See, e.g., *People v. Flynn* (2000) 77 Cal.App.4[th] 766, 771-3 [where evidence of force not sufficient, court reviewed evidence of fear]; *People v. Prieto* (1993) 15 Cal.App.4[th] 210, 215 [since appellant used no force against victim, question was whether fear was used]; *People v. Brew* (1991) 2 Cal.App.4[th] 99, 104-5 [testimony that defendant physically forced witness to ground could establish "force" element, while shock at defendant's sudden movement toward cash register might not be sufficient to establish "fear" element]; *People v. James* (1963) 218 Cal.App.2d 166, 170 [where fear was shown by sufficient evidence, unnecessary to consider whether force was shown].)

Finally, the *Wright* court relied on only two Court of Appeal decisions to come to its unprecedented conclusion that force and fear are not independent elements of robbery: *People v. Brookins* (1989) 215 Cal.App.3d 1297, 1309, and *People v. LeBlanc* (1972) 23 Cal.App.3d 902, 908-9. (*Wright* at 210.) These were cases that considered only whether a defendant's actions constituted "force or fear" for purposes of determining whether § 211 was violated. (*Brookins, supra,* 215 Cal.App.3d at 1308-1309; *LeBlanc, supra,* at 908-909.) But the *Wright* court was asked to

14

determine whether, pursuant to a pleading that required a showing of both
force <u>and</u> fear, the force required for robbery necessarily included the force
required to commit an assault. (*Wright, supra*, 52 Cal.App.4th at 209.) By
relying on robbery cases that analyzed whether force <u>or</u> fear was present,
the *Wright* court improperly substituted the statutory elements test for the
accusatory pleading test.

> **C.    There Was Substantial Evidence That the "Force" Used
> by Appellant Did Not Coincide With the Intent to Steal,
> and Thus Constituted Only Assault or Battery, Not
> Robbery.**

If assault and/or battery were lesser included offenses under the
accusatory pleading test (see part B supra), then there is no question there
was substantial evidence to warrant instructions on these offenses. It was
undisputed at trial that appellant hit security guard Blake Rogers in the
face. (I RT 59-60, 146.) But it was also undisputed that Rogers, who was in
plain clothes, pursued appellant out of the store and grabbed appellant by
the arms <u>before</u> appellant "broke away with one arm" and hit Rogers. (I RT
145-6, 170-1, 266-7.) Rogers and another Target security guard claimed
that Rogers identified himself as Target security before he grabbed
appellant. (I RT 58-9, 145-6.) Certainly it was in their best interest, as
Target employees, to say so. But an impartial witness, Joseph Mahoney,
observed the incident from about five feet away, and described it in great
detail. (I RT 228-239.) Mahoney testified that he never heard Rogers
identify himself as Target security. (I RT 228, 236.)

If the jurors believed Mahoney rather than the two security guards,
they might have found that appellant responded to an unidentified attacker
by fighting back, without intent related to the taking of the T-shirts. Such
application of force would constitute battery or assault, but not robbery.
"[T]he act of force or intimidation by which the taking is accomplished in

robbery must be motivated by the intent to steal." (*People v. Green* (1980) 27 Cal.3d 1, 54.) Mahoney's testimony constitutes substantial evidence that "raises a question as to whether all of the elements of the charged offense are present" and "would justify a conviction of ... a lesser offense." (*People v. Moon* (2005) 37 Cal.4[th] 1, 25.) Accordingly, the trial court erred in not instructing on both battery and assault.

### D.    The Failure to Instruct on Battery and Assault Was Federal Constitutional Error.

The trial court's refusal to instruct the jury on the lesser included offenses of battery and assault, even though the battery instruction was requested by appellant, deprived appellant of due process, trial by jury on every element of the charged crime, and effective assistance of counsel. (*Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 739-741.) In *Conde*, the Ninth Circuit reviewed a state court trial on kidnapping for the purpose of robbery. In an argument analogous to the argument appellant makes in the present case, Conde argued that the kidnapping was not undertaken with the intent to steal, and so did not constitute kidnapping for robbery. The Ninth Circuit held that the refusal of the requested lesser offense instruction deprived defendant of his "well established" right to instruction of the defense theory of the case. (*Id.* at 739.) Refusal to give the instruction was constitutional error. (*Id.* at 739-740; see also *Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091, 1098-9 [failure to instruct on defense violated due process].)

Although this Court has held that the omission of sua sponte instructions on lesser offenses does not violate due process, it has acknowledged *Conde* and *Bradley* and other "defense theory of the case" opinions, and has expressly left open the question of whether it is a due process violation to refuse to instruct on lesser offenses when such

16

instruction is <u>requested</u>. (See *People v. Rogers* (2006) 39 Cal.4th 826, 871-872.)

### E.    The Failure to Instruct on Battery and Assault Was Prejudicial Under Either State or Federal Standards.

The failure to provide the requested battery and assault instructions, together with the failure to instruct properly on the elements of robbery (see Section II below) constituted structural error, which is reversible per se. (*Conde, supra*, 198 F.3d at 740-1; see also *People v. Flood* (1998) 18 Cal.4th 470, 499-501; *People v. Magee* (2003) 107 Cal.App.4th 188, 193.) Because the failure to give adequate instructions was structural error, reversal is required without a showing of prejudice. (*Magee, supra*, 107 Cal.App.4th at 193.)

If the failure to instruct is not held reversible per se, in light of the federal constitutional error it should be viewed, at a minimum, as subject to the "reasonable doubt" standard of *Chapman, supra*, 386 U.S. 18. Nonetheless, the error is prejudicial even if it is assessed under the standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, i.e., it is reasonably probable that a result more favorable to the defendant would have occurred in the absence of error. (*Id.* at 836.)

Appellant struck Rogers in the face two to three times. (I RT 59-60, 146.) The jury was shown five pictures of Rogers' injuries, revealing red marks on his right temple and cheek. (I RT 63-4.) Azevedo testified that Rogers' forehead was swollen. (I RT 150.) Without an instruction on battery or assault, even if the jurors believed that appellant did not know that Rogers was a Target security guard, they were left with no legal means of holding appellant to account for striking Rogers in the face.

There was evidence at trial that Rogers had been overzealous and detained suspects improperly on at least two other occasions, and that he failed to follow procedure in this case in a number of respects. (I RT 117-

8, 122-5.) If the jury had been instructed on battery and assault, and if they believed Mahoney's testimony that Rogers did not identify himself before he grabbed appellant, the jury could have held appellant accountable for hitting Rogers while still acknowledging that Rogers did not follow Target policies and procedures.

The prosecutor caused further damage by making the following closing argument:

> Someone comes up on [appellant], and starts hitting him. Doesn't matter if he identifies himself as Target Security or not. Why is he punching him? He's trying to get away. He's using force to get out of the store. (II RT 319.)

The prosecutor simply could not have said that it "[d]oesn't matter if he identifies himself as Target Security or not" if the jury had been properly instructed. The prosecutor's argument further encouraged the jury to understand the ambiguous jury instructions to mean that as long as appellant used force, it did not necessarily have to be motivated by the intent to steal to constitute robbery. (See, e.g., *Middleton v. McNeil* (2004) 541 U.S. 433, 438.)

Appellant clearly committed a forcible crime, rather than theft alone. But there was indisputably substantial evidence that the force used by appellant constituted only assault or battery, and not robbery. The instructions incorrectly presently jurors with a classic "all or nothing" choice, which essentially assured conviction. If the jury had known that there was a way to hold appellant accountable for his aggression against Rogers without finding him guilty of robbery, it is reasonably probable that they would have acquitted him of robbery. (*Watson, supra*, 46 Cal.2d at 836.) It is clearly not beyond a reasonable doubt that the instructional error did not contribute to the verdict. (*Chapman, supra*, 386 U.S. at 23.)

18

**II.    UNDER THE UNUSUAL CIRCUMSTANCES OF THIS INCIDENT, THE COURT'S INSTRUCTIONS WERE INADEQUATE TO INFORM THE JURORS OF THE NEXUS BETWEEN FORCE AND INTENT REQUIRED FOR ROBBERY.**

**A.    The Instructions Were Incomplete and Misleading.**

In addition to instructing on lesser included offenses, the trial court is also required to instruct *sua sponte* on "the general principles of law relevant to the issues raised by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 154; *People v. Whitehurst* (1992) 9 Cal.App.4th 1045, 1049.) "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*Id.*)

The trial court's duty includes giving instructions regarding defenses that are not inconsistent with the defendant's theory of the case. "(T)he duty to give instructions, *sua sponte*, on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Maury* (2003) 30 Cal.4th 342, 424; *People v. Moringlane* (1982)127 Cal.App.3d 811, 820.)

As shown above, the instructions given in this case did not inform the jury of the "general principles of law relevant to the issues raised by the evidence." (*Breverman, supra,* 19 Cal.4th at 154; *People v. Whitehurst* (1992) 9 Cal.App.4th 1045, 1049.) The primary issue raised by the evidence, according to appellant, is whether the force applied by appellant was motivated by the intent to steal, as required by *Green, supra,* 27 Cal.3d at 54. This issue was "necessary for the jury's understanding of the case," yet none of the instructions adequately informed the jury on this issue.

19

(*Ibid.*) This is particularly true since the instruction that <u>was</u> given suggested that the force used <u>did</u> constitute robbery:

> Assuming all other required elements have been proven, the use of force or fear to escape with or otherwise retain even temporary possession of the property constitutes robbery. (CT 133.)

Moreover, appellant's foremost defense was that he did not commit robbery because his assault on Rogers was not motivated by the intent to steal, as required by *Green.* (*Green, supra,* 27 Cal.3d at 54.) He argued that the force he used was instead motivated simply by the intent to defend himself against an attacker who was wearing street clothes and did not identify himself as Target security. (See defense counsel's opening argument at I RT 45-6, closing at II RT 307.) There is substantial evidence supporting this defense (in the form of Mahoney's testimony, and indirectly, the evidence of Rogers' overzealousness and impropriety in other detentions of suspected shoplifters) and it is in no way "inconsistent with the defendant's theory of the case." (*People v. Maury* (2003) 30 Cal.4[th] 342, 424; *People v. Moringlane* (1982) 127 Cal.App.3d 811, 820.)

Accordingly, the trial court was required, *sua sponte*, to inform the jury that "the act of force ... by which the taking is accomplished in robbery must be motivated by the intent to steal." (*Green, supra,* 27 Cal.3d at 54.)

Beyond the fact that the instructions omitted the requirement that the force was motivated by intent to steal, the instructions that <u>were</u> given were misleading. They explicitly tied intent to the "act of taking." (CT 131.) They also explained that force had to be connected with the taking or retention of property. (CT 133-134.) Because there was no comparable instruction requiring a nexus between the intent and the use of force, the implication was that any use of force connected with an intentional taking constituted robbery, even if the force itself was motivated by some intent

20

other than theft. (See CT 131 et seq.)  This is not the law.  (*Green, supra*, 27 Cal.3d 1, 54.)

The court's error amounts to a denial of due process because it misstated the crucial issue of intent.  Improper instructions on the element of intent constitute a deprivation of due process, evaluated under the *Chapman* standard.  (*Sandstrom v. Montana* (1979) 442 U.S. 510, 520.)

As shown above, the inadequate instructions also violated the Sixth Amendment, which guarantees a criminal defendant the right to a jury finding on all elements of the charges against him.  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.)  The Sixth Amendment is violated when jury instructions inadequately describe or omit elements of, or defenses against, the charges against the defendant. (*Neder v. United States* (1999) 527 U.S. 1, 8-11; *People v. Lee* (1987) 43 Cal.3d 666, 676; *People v. Flood* (1998) 18 Cal.4th 470, 480.)  Instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions.  (*Flood, supra*, 18 Cal.4th at pp.479-480; *United States v. Gaudin* (1995) 515 U.S. 506, 510.)

Moreover, the trial court's misleading instructions were violative of due process because they failed to instruct the jury adequately on the defense theory of the case.  (*Conde, supra*, 198 F.3d at 739-740; *Bradley, supra*, 315 F.3d at 1098-1099.)

Although the trial in this case occurred in 2005 just a few days before the formal adoption of the new CALCRIM instructions, it is fruitful to review the new, improved instructions on robbery, and the way they handle the question at issue here.  In contrast to the CALJIC instructions, the CALCRIM instructions have the imprimatur of the Judicial Council as official instructions.  (Cal. Rules of Court, rule 2.1050.)  CALCRIM 1600

specifically states the following as the final element of robbery (in pertinent part):

> When the defendant used force or fear to take the property, he intended to deprive the owner of it permanently ...

While the old instruction delivered here addressed only the relationship between intent and the act of taking ("the property was taken with the specific intent permanently to deprive that person of the property"), the official CALCRIM instruction on robbery makes it an element of the crime that the defendant had to have the intent to steal <u>at the time he used force or fear</u>. This is a more accurate statement of the law. (*Green, supra*, 27 Cal.3d 1, 54.) The Bench Notes to the CALCRIM instructions state that "The court has a *sua sponte* duty to give an instruction defining the elements of the crime." Appellant contends that the trial court, in light of the particular "issues raised by the evidence," failed to instruct on the elements of, and defenses to, the crime of robbery.

## B. Appellant's Request For Battery Instructions Put The Court On Notice Of The Defense Theory Of The Case, And Required Clarifying Instructions.

Appellant's request for a battery instruction was a request that the jury focus on the force used by appellant and whether it was motivated by the specific intent required for robbery. It was, in essence, a request for a instruction clarifying that the force used by appellant had to be shown, beyond a reasonable doubt, to be motivated by the intent to steal. Such a clarifying instruction would "relate the reasonable doubt standard for proof of guilt to particular elements of the crime charged." (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885.) The request concerning battery instructions clearly signaled to the trial court that appellant wanted to "direct the jury's attention to evidence from the consideration of which

22

reasonable doubt of defendant's guilt might be engendered." (*People v. Guzman* (1975) 47 Cal.App.3d 380, 387.)  Appellant was entitled to such an instruction upon request. (*Rincon-Pineda, supra,* 14 Cal.3d at 885.)

Even if the trial court felt constrained by *Wright* to deny the request for instructions on battery as a lesser included offense, it should have granted appellant's request as a request to clarify the instructions on the force required for robbery.[1]  The failure to give a clarifying instruction was a failure to instruct on the defense theory of the case, and a violation of appellant's due process rights. (*Bradley, supra,* 315 F.3d at 1098: "a defendant is entitled to instructions on any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor"; see also *Conde, supra,* 198 F.3d at 739-740.)

Further, trial courts have a duty to tailor the instructions to the particular facts of the case, even when an instruction submitted by the defense counsel is incorrect. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1110; *People v. Falsetta* (1999) 21 Cal.4th 903, 924.)  The trial court easily could have addressed the issue concerning the element of force by tailoring the instructions on robbery, even if it did not wish to give the instruction on battery or assault as a lesser included offense.

---

[1]    The court had available a simple means of addressing appellant's request: the new CALCRIM instructions, which were adopted only a few days after trial in this case. CALCRIM 1600, regarding robbery, was readily available and, as shown above, had a much clearer explanation of the law concerning force and intent.  The court could also have adopted one simple sentence from *Green, supra,* 27 Cal.3d at 54: "[T]he act of force or intimidation by which the taking is accomplished in robbery must be motivated by the intent to steal."

## C. If Counsel Waived the Issue by Failing to Raise it Below, She Provided Constitutionally Ineffective Assistance.

It appears from the record that while appellant's counsel requested instructions on battery, she did not offer the court specific proposed language that would clarify the robbery instructions regarding the use of force. Under the circumstances of this case, however, appellant contends that because the court "undertook to instruct the jury" concerning force and intent, and "had earlier instructed it on those principles," a "proper consideration of the evidence" required that the instructions given be accurate, and counsel's failure to make any further specific request on the subject did not waive the argument on appeal. (*People v. Malone* (1988) 47 Cal.3d 1, 49.) If, however, counsel's failure to offer a specific clarifying instruction is deemed to have waived the issue on appeal, her failure amounted to constitutionally ineffective assistance of counsel.

### 1.    Failure to request clarifying instructions was ineffective assistance of counsel.

Both the Sixth Amendment to the United States Constitution and Article I, section 15 of the California Constitution guarantee a criminal defendant the right to the effective assistance of counsel. (*In re Jones* (1996) 13 Cal.4th 552, 559; *Strickland v. Washington* (1984) 466 U.S. 668, 684-686.)

Failure to request an instruction on a defendant's only defense constitutes ineffective assistance of counsel. (*United States v. Span* (9th Cir. 1996) 75 F.3d 1383, 1389-1390.) Similarly, failure to request instruction on the "main thrust of the defense" has been held ineffective assistance of counsel. (*Pirtle v. Morgan* (9th Cir. 2002) 313 F.3d 1160, 1172.) The failure to object to improper jury instructions constitutes ineffective

assistance of counsel. (*People v. Asbury* (1985) 173 Cal.App.3d 362, 365-6.)

Trial counsel should have requested specific clarifying instructions on the robbery count. Her request for instructions on battery makes it evident that she was aware of the crucial role of the question of whether the intent to steal motivated the assault on Rogers. The next crucial step, which she failed to take, was to request that the instructions on robbery make clear that there was <u>no</u> robbery if there was a reasonable doubt as to whether appellant assaulted Rogers with the specific intent to retain the T-shirts. There was no absolutely no "downside" to requesting such clarifying instructions. "[T]he omissions of defense counsel involved a critical issue, and the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Kelley* (1990) 220 Cal.App.3d 1358, 1373.) There is no question that counsel should have requested clarifying instructions on robbery.

### 2. It is reasonably probable that a request for clarifying instructions would have been granted, and thus that the failure of counsel affected the outcome of the case.

Reversal based on ineffective assistance is required where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*In re Jones, supra,* 13 Cal.4th at p. 561; *Strickland, supra,* 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Williams v. Taylor* (2000) 529 U.S. 362, 391.)

This standard does not require an appellant to prove by a preponderance of the evidence that the result would have been different. (*Strickland, supra,* 466 U.S. at p. 694.) As long as appellant can raise a reasonable probability that the result would have been different with adequate counsel, a reviewing court must reverse the judgment below. (*Id.*)

25

"The ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." (*Id.*, 466 U.S. at p. 695.) This analysis requires appellate scrutiny of the nature and extent of defense counsel's error, as well as the strength of the prosecution's evidence. (*In re Jones, supra*, 13 Cal.4th at p. 587.)

Given the judge's concerned response to the motion for a new trial, it is clear that he was sympathetic to appellant's argument about the evidence of force for robbery. (See, e.g., II RT 354 [court found de-published case persuasive in rejecting the reasoning of *Wright*].) If counsel had offered the judge a way to clarify the instructions to take into account the particular evidence that had been introduced, it seems highly likely that the judge would have accepted and used such a clarification.

There is a reasonable probability that this case would have been decided differently if the jury had properly understood that the prosecutor had to prove beyond a reasonable doubt that appellant assaulted Rogers with the specific intent to retain the T-shirts. The jury, if provided accurate instructions regarding force and intent, could have reasonably concluded that appellant's assault on Rogers was not motivated by the intent to steal. Under *Strickland*, it is plain that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at 694.) Appellant received constitutionally ineffective counsel, and this petition should be granted and the judgment reversed.

## D. The Court's Failure to Properly Instruct on Force and Intent Was Prejudicial to Appellant.

The Sixth Amendment guarantees a criminal defendant the right to a jury finding on all elements of the charges against him. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.) This right is abridged when jury instructions inadequately describe or omit elements of, or defenses against,

26

the charges against the defendant. (*Neder, supra,* 527 U.S. at 8-11; *People v. Lee* (1987) 43 Cal.3d 666, 676; *People v. Flood* (1998) 18 Cal.4th 470, 480.) Under established law, instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions. (*Flood, supra,* 18 Cal.4th at pp.479-480.)

Even if the use of the misleading instructions did not constitute "structural error," federal and state law hold that the failure to instruct the jury properly as to elements of the crime charged is subject to the federal harmless error analysis set forth in *Chapman v. California* (1967) 386 U.S. 18, i.e. "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict." (*Neder, supra,* 527 U.S. at 1-2, 15; *Magee, supra,* 107 Cal.App.4th at 194.)

The misleading and incomplete instructions certainly may have contributed to the guilty verdict here. The language of CALJIC 9.40 informed the jury that the taking must be by means of force or fear and with the intent to steal, but it did not suggest that the force or fear must be motivated by the intent to steal. (*Green, supra,* 27 Cal.3d at 54.) The judge went on to tell the jury about the required connection between the intent and the taking, and the force and the taking. But the court gave no instruction on the connection between intent and force, i.e., that the force had to be motivated by the intent to steal -- even though this was the crucial issue in the case. Moreover, because the instructions did inform the jury that force had to be connected with the taking, and that the taking had to be intentional, with no further instruction regarding force, the instructions implied that any use of force connected with an intentional taking constituted robbery, even if the force itself was motivated by some intent other than theft.

27

If the jurors had understood that the force used by appellant against Rogers had to be motivated by the intent to steal in order to constitute robbery, they likely would have reached a different result. Appellant contends that, for this reason and those outlined above, the error in instructing the jury was not harmless beyond a reasonable doubt. (*Neder, supra,* 527 U.S. at 1-2, 15; *Magee, supra,* 107 Cal.App.4[th] at 194.)

## CONCLUSION

On the above grounds, appellant requests that the Court grant this petition and reverse the judgment in this case.

Date: September *28* , 2007        Respectfully submitted,

LAW OFFICES OF JOY MAULITZ


By: *Joy A. M*
Joy A. Maulitz.

Attorney for Appellant
LACY WINZER

## CERTIFICATE OF COMPLIANCE WITH
## THE CALIFORNIA RULES OF COURT, RULE 8.504(d)

I, the undersigned, hereby certify that the within Petition for Review contains approximately 8,292 words. This certification is based on the word count produced by Microsoft Word '97.

Date: September 28, 2007

Respectfully submitted,

LAW OFFICES OF JOY MAULITZ

By: _Joy A. M_____

Joy A. Maulitz

# EXHIBIT 1

Filed 8/29/07  P. v. Winzer CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LACY WINZER,<br><br>     Defendant and Appellant. | A113629<br><br>(Contra Costa County<br>Super. Ct. No. 050508671) |

Lacy Winzer (Winzer) appeals from a judgment of conviction and sentence after a jury found him guilty of robbery and petty theft with a prior. (Pen. Code, §§ 211/212.5, subd. (c), 484/666.)[1] He contends the trial court erred by refusing to instruct the jury on battery and assault as lesser included offenses of robbery, and by failing to instruct explicitly that robbery requires a nexus between the force exerted and an intent to steal. We will affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

Winzer was charged in an information with second degree robbery (§§ 211/212.5, subd. (c)) and petty theft with a prior theft conviction (§§ 484/666). In connection with the second count, the information alleged that Winzer had five previous convictions. It further alleged four prison terms as sentence enhancements. (§ 667.5, subd. (b).) Winzer denied the charges and allegations, and the matter proceeded to trial.

---

[1]     Unless otherwise indicated, all statutory references are to the Penal Code.

1

A. PROSECUTION EVIDENCE AT TRIAL

Alex Azevedo (Azevedo) was employed as a "protection specialist" at the Target store in Pittsburg on May 10, 2005. Around 4:00 p.m. he was at the front door of the store, dressed in a Target uniform, greeting customers. Winzer, known to Azevedo, entered the store with an adult female companion. Winzer, who was not carrying anything, got a shopping cart and pushed it toward the men's department.

Coworker Tommy Weaver joined Azevedo and "call[ed] out" Winzer's presence to asset protection specialist Blake Rogers (Rogers). A "call out" is made to undercover security personnel, who are authorized to apprehend an individual, when someone suspicious enters the store.

Azevedo went to the security office in the front of the store to observe Winzer on a monitor. Rogers was in a security office in the back of the store, watching the monitors with his supervisor, David De La Torre (De La Torre). The monitors in the back security office display live images from 60 surveillance cameras. The store security monitors show a steady stream of clear images, like a television.

Rogers and De La Torre in the back security office, and Azevedo in the front security office, observed Winzer take a package of Fruit of the Loom T-shirts from a shelf in the men's department and place it in the top part of his shopping cart. Winzer's female companion appeared to be a lookout. Winzer walked about 15 feet, took the package of T-shirts out of the shopping cart, and lifted up his shirt or sweater. He then turned away from the security camera, but Rogers, Azevedo, and De La Torre saw him make the motion of putting something down the front of his pants. When Winzer turned to face the camera again, the package of T-shirts was no longer visible.

When Rogers saw Winzer conceal the merchandise, he left the security office to observe Winzer in person. De La Torre continued watching Winzer on the monitors. Rogers and De La Torre remained in contact by walkie-talkie.

Rogers testified that he observed Winzer and his female companion walk to the front of the store. Winzer parked the shopping cart and walked toward the exit. Rogers was about 10-15 feet behind him. As Winzer was crossing the threshold, Winzer looked

2

back. Rogers, who was in plainclothes and by this point five feet away, immediately identified himself as Target security and attempted to grab Winzer by the arm. Winzer had just walked out the door and Rogers was still inside the store. Winzer then squared himself and struck Rogers in the face approximately three times with his closed fist. Rogers, trained in nonviolent physical intervention, struggled to gain control of Winzer and continued to identify himself as Target security and tell Winzer to stop resisting. Winzer and Rogers ended up on the ground in front of the store.

Rogers could not recall at trial whether he touched Winzer first or Winzer hit him first. At Winzer's preliminary examination, Rogers had testified that first he grabbed Winzer's arms, and then Winzer broke away with one arm and hit him.

De La Torre, watching the security monitors, observed Rogers being hit by Winzer. He could not remember at trial whether Rogers touched Winzer first or whether Winzer hit Rogers first. His recollection was that, at the time of the punch, Winzer was outside the store and Rogers was inside, right around the threshold.

Azevedo testified that he came out of the front security office when Winzer was about five feet in front of the exit doors. Rogers approached Winzer and, after Winzer stepped over the threshold, Winzer turned around and Rogers identified himself as Target security and asked Winzer to stop. Rogers then reached out to grab or grabbed Winzer's arm, and Winzer hit Rogers approximately twice. Winzer and Rogers wrestled outside the store. Azevedo heard Rogers yelling, "Target security. Stop resisting. Stop resisting."

Joseph Mahoney, a 17-year-old high school student, was standing outside of Target, about five feet from Target's entrance doors, waiting for his grandmother. Mahoney "heard like a bunch of yelling coming out of, like, the doors." He turned toward the doors and saw Winzer run out of the store, followed by a white male (Rogers) about three footsteps behind. He did not recall specifically what was being said, but thought it was the white male, a "security guy," who was speaking. The two men started fighting, grabbed one another, got to the street area, and rolled on the ground. The white male tried to handcuff the other man (Winzer), who continued to struggle. Two more

3

Target "security guys" jumped on Winzer. On cross-examination, Mahoney testified that he had not known that the white male was a Target security person when he first came out of the store. He further testified as follows: "Q. Did you ever hear this white male say out loud: [']I'm Target Security[']? [¶] A. No. [¶] Q. Did you hear him -- strike that. [¶] And did you see this white male touch the black male first? [¶] A. Yes."

Azevedo helped Rogers gain control over Winzer and handcuffed him. Rogers, Azevedo, and De La Torre escorted Winzer to the front security office, where he was handcuffed to a bench. Azevedo and De La Torre saw the package of T-shirts protruding from Winzer's waistband. De La Torre removed the package from Winzer and placed it on a desk. There was pubic hair on the package. As they waited for police to arrive, Azevedo said to Winzer, "You know you're going to jail because you assaulted [Rogers]." Winzer replied, "No, I'm not." "I'm not going to jail. I have my ways. I'll get out."

Pittsburg Police Officer Michelle Ligouri responded to the scene. Officer Ligouri saw the package of T-shirts on the desk in the security office and noticed pubic hair on the package and on the table around the package. A search by the officer determined that Winzer was not wearing underwear. Officer Ligouri took pictures to document Rogers' injuries but forgot to collect the T-shirts as evidence.

Because the T-shirts had pubic hair on them, De La Torre instructed one of his employees to photograph the shirts and then dispose of them for health reasons, after he had obtained permission from the police department. De La Torre believed that photographing and discarding the evidence complied with Target policy and procedures, until confronted with the written Target directive indicating that the T-shirts seized from Winzer should have been stored. Rogers acknowledged that discarding the package of T-shirts was not in compliance with Target's operating procedures.

The next day, Officer Ligouri called Target about the T-shirts and was informed that the shirts had been thrown away. A similar package of T-shirts was provided to police as evidence.

4

At trial, the jury was shown photographs of Rogers' injuries, indicating red marks on his temple and cheek and an injury to his elbow. The jury was also shown a time-lapse videotape from a Target surveillance camera, which De La Torre had compiled and given to the police.[2] This videotape included zoom-in shots depicting Winzer concealing the package of T-shirts. The videotape was not as clear as the steady stream of images on the monitors in Target's security offices, because the videotape was comprised of still photos taken every two to three seconds, causing the tape to look choppy. Rogers described the quality of the video shown to the jury as "horrible."

In the 10 months Rogers had worked at Target, he had been written up twice by supervisor De La Torre: once in December 2004 for assisting a Target employee apprehend a suspected shoplifter while Rogers was off duty, and once in April 2005 for detaining someone who did not have Target items on him. In the latter incident, Rogers had seen the individual take some merchandise out of a package, but the individual had apparently discarded them when Rogers lost sight of him. De La Torre testified that Rogers did not do anything improper in this case. (Rogers had acknowledged that he mistakenly wrote in his incident report that Winzer had stolen socks rather than T-shirts.

B. JURY INSTRUCTIONS

At the conference to settle jury instructions after the People had rested their case, the court rejected the notion that battery was a lesser-included offense of robbery and refused to give an instruction on battery.[3] The court agreed to give, and subsequently gave, several jury instructions relating to robbery, including CALJIC Nos. 9.40, 9.40.2, and 9.40.3.

---

[2]    In this regard, De La Torre did not comply with Target's polices and procedures, which required that he retain the non-time-lapse video of the incident. He explained at trial that he gave the police the time-lapse video because it was easier to record and compile in chronological sequence.

[3]    The reporter's transcript indicates that the court asked if "anybody disagree[d]" on this point, and neither defense counsel nor the prosecutor voiced any objection. During a later hearing on Winzer's motion for a new trial, the court nonetheless agreed with defense counsel that the battery instruction had been requested by the defense.

C. DEFENSE EVIDENCE AT TRIAL

Winzer did not testify. Officer Ligouri testified that Mahoney told her he heard a lot of movement. She also testified that Rogers did not tell her that he said anything to Winzer when they were on the ground or when Winzer was being handcuffed.

In closing argument, defense counsel argued: the prosecution's witnesses failed to follow Target's internal operating directives and Rogers had been written up in the past; there was no evidence Winzer took any merchandise from Target because Target did not retain the package; and when Winzer hit Rogers, he was "not fighting back to retain property" but just defending himself, because Winzer had no merchandise, Rogers did not look like Target security and did not identify himself as Target security, and Rogers accosted Winzer from behind.

D. JURY VERDICT, NEW TRIAL MOTION, AND SENTENCE

The jury found Winzer guilty of second degree robbery and petty theft with priors. Winzer waived a jury trial on the allegations of the prior convictions.

Winzer moved for a new trial on the ground that the jury should have been instructed on battery as a lesser included offense to robbery. If this instruction had been given, Winzer maintained, the defense would have argued at trial that Winzer was at most culpable of petty theft and battery, not robbery. The court denied the motion.

A bifurcated bench trial on the prior conviction allegations was held on April 14, 2006. The prosecutor withdrew two of the prior convictions previously alleged for purposes of the section 484/666 violation in count two. The court found true the three other prior theft-related convictions connected with that count. (§ 666.) For purposes of sentence enhancements under section 667.5, subdivision (b), the court granted the prosecutor's motion to amend the information to combine two of the allegations into one, and then found that Winzer had served three prior prison terms.

The court sentenced Winzer to the aggravated term of five years for second degree robbery and stayed the midterm two-year sentence for petty theft with a prior, pursuant to section 654. For sentencing purposes, the three prior prison term enhancements (§ 667.5, subd. (b)) were stricken.

6

This appeal followed.

II. <u>DISCUSSION</u>

Winzer contends that the trial court should have instructed on battery and assault as lesser-included offenses of robbery, because there was substantial evidence that he struck Rogers not with the intent to steal the Target merchandise secreted in his pants, but in self-defense against the attack of an unknown assailant. He also contends that the trial court erred in failing to instruct the jury of the required nexus between the force he exerted and an intent to steal. Neither argument has merit.

A. FAILURE TO INSTRUCT ON ASSAULT OR BATTERY AS LESSER INCLUDED OFFENSE

A trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. (*People v. Birks* (1998) 19 Cal.4th 108, 118 (*Birks*); *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*) [court not obligated to instruct sua sponte on lesser offense unless there is substantial evidence from which reasonable jury could conclude that the lesser offense, but not the greater, was committed].) We consider first whether battery or assault may be considered a lesser included offense of robbery. We then determine whether an instruction on battery or assault was required in light of the evidence. We conclude that the court did not err in this regard and, in any event, any purported error was harmless.

1. <u>Assault and Battery as Lesser-Included Offenses of Robbery</u>

Two alternative tests are used to determine whether a lesser offense is necessarily included in a greater offense. (*People v. Moon* (2005) 37 Cal.4th 1, 25.) Under the *elements test*, the lesser crime is included if all of its legal elements are included in the definition of the greater crime, such that the greater cannot be committed without committing the lesser. (*Ibid.*) Under the *accusatory pleading test*, the lesser crime is included if the accusatory pleading describes the greater offense in language such that the offender, if guilty, must necessarily have also committed the lesser crime. (*Id.* at pp. 25-26.)

7

Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) By contrast, a battery "is any willful and unlawful use of force or violence upon the person of another." (§ 242.) Thus, battery requires use "of force or violence," while robbery requires "force *or fear*." Because it is possible to commit robbery without committing battery, battery is not a lesser included offense of robbery under the elements test. (*People v. Romero* (1943) 62 Cal.App.2d 116, 121.)

Winzer argues, however, that battery was a lesser included offense of robbery in this case under the accusatory pleadings test. In accusing Winzer of robbery, the information alleged that he, "by means of force *and* fear, did unlawfully take" personal property belonging to another. (Italics added.) Winzer argues that the force required for battery is not materially different than the force required for robbery. Therefore, he urges, battery (requiring force) is a lesser included offense of the robbery alleged in the information (referring to both fear *and* force).

The allegation that the robbery was perpetrated by means of "force and fear," rather than "force or fear," was merely a function of conjunctive pleading. Conjunctive pleading is employed to avoid uncertainty. (*In re Bushman* (1970) 1 Cal.3d 767, 775 (*Bushman*), disapproved on other grounds in *People v. Lent* (1975) 15 Cal.3d 481, 486, fn. 1; *People v. Tuggle* (1991) 232 Cal.App.3d 147, 154, disapproved on other grounds, *People v. Jenkins* (1995) 10 Cal.4th 234, 252; *People v. Fritz* (1970) 11 Cal.App.3d 523, 526; see also *People v. Chacon* (1995) 37 Cal.App.4th 52, 62, fn. 4.) In *Bushman*, for example, the complaint had charged malicious disturbance of the peace by "'tumultuous and offensive conduct.'" (*Bushman, supra*, at p. 774.) The court held it was nevertheless proper to instruct the jury that the defendant could be found guilty if, in accord with the statute, he committed tumultuous *or* offensive conduct. (*Ibid.*) The court explained: "When a statute such as Penal Code section 415 lists several acts in the disjunctive, any one of which constitutes an offense, the complaint, in alleging more than one of such acts, *should do so in the conjunctive to avoid uncertainty.* [Citations.] Merely because the complaint is phrased in the conjunctive, however, does not prevent a trier of fact from

8

convicting a defendant if the evidence proves only one of the alleged acts. [Citation.]"
(*Bushman, supra,* at p. 775, italics added.)  We question whether the accusatory pleading
test was intended to be met by allegations asserted merely to satisfy our Supreme Court's
directive to plead in the conjunctive.

On the other hand, it is literally true that a defendant who exerts "force and fear"
in an attempt to deprive another of personal property has committed a battery (willful and
unlawful use of force upon the person of another), unless the use of "force" upon the
person of another can be accomplished by something other than a physical touching.  On
this point, respondent refers us to *People v. Wright* (1996) 52 Cal.App.4th 203 (*Wright*),
which held that assault was not a lesser included offense of robbery under the accusatory
pleading test. (See *id.* at p. 211.)[4]

In *Wright*, the prosecution had charged that the defendants "'unlawfully, and by
means of force *and* fear attempt[ed] to take personal property'" from the victims.
(*Wright, supra,* 52 Cal.App.4th at pp. 209-210, italics in original.)  The Court of Appeal
considered whether the force required to commit a robbery necessarily includes the force
required to commit an assault. (*Id.* at p. 210.)  The court concluded that the force
necessary to commit robbery could be merely "constructive" force, defined as "'force not
actual or direct, exerted upon the person robbed, by operating upon [a] fear of
injury . . . .'" (*Id.* at p. 210.)  Included within the meaning of "force," therefore, is "'such
*threat* or *display* of physical aggression toward a person as *reasonably inspires fear* of
pain, bodily harm, or death.'" (*Id.* at pp. 210-211, italics in original, quoting Webster's

---

[4]    In this appeal, Winzer argues that assault is also a lesser included offense under
the accusatory pleading test. Assault is "an unlawful attempt, coupled with a present
ability, to commit a violent injury on the person of another." (§ 240.)  Winzer did not
request an assault instruction, although a court must also instruct on a lesser included
offense sua sponte, if there is substantial evidence that the lesser crime was committed
rather than the greater. (*Birks, supra,* 19 Cal.4th at p. 118.)  A defendant may be entitled
to an assault instruction on request when charged with robbery if the evidence warrants it.
(*Wright, supra,* 52 Cal.App.4th at p. 209, fn. 16; *People v. Carter* (1969) 275 Cal.App.2d
815, 823-824.)

New Internat. Dict. (3d ed. 1981) p. 887.)

Applying *Wright* to the matter before us, respondent argues that a victim can be forced to surrender his property during a robbery by the means of coercive threats, without resort to assault or battery. Since a robbery could be perpetrated by a mere threat or display of physical aggression rather than an actual (or attempted) application of force upon the victim's person, robbery can be committed without necessarily committing a battery or assault and, consequently, neither battery nor assault is a lesser included offense under the accusatory pleading test.

Winzer responds that *Wright* improperly muddied the concepts of fear and force, which are intended to be separate elements. (See *People v. Davison* (1995) 32 Cal.App.4th 206, 214; *People v. Brew* (1991) 2 Cal.App.4th 99; *People v. Dreas* (1984) 153 Cal.App.3d 623, 628; *People v. Cuevas* (2001) 89 Cal.App.4th 689, 698.) More specifically, he contends that *Wright* (1) effectively rewrote the robbery statute by ruling that force is not an element of robbery independent of fear, since the statute provides that robbery can be accomplished by force *or* fear; (2) incorrectly concluded that force is synonymous with fear; and (3) relied on cases involving whether a defendant's actions constituted force or fear, rather than addressing a pleading that alleged both force and fear. Winzer also notes that our Supreme Court has not decided whether assault and battery are lesser included offenses of robbery under the accusatory pleading test. (*People v. Sakarias* (2000) 22 Cal.4th 596, 622, fn. 4 (*Sakarias*).)

We need not decide this issue in order to resolve Winzer's appeal. For purposes of our analysis we will assume, without deciding, that battery and assault were lesser included offenses of the robbery charge under the accusatory pleading test, and proceed to the next issue. (See *Sakarias, supra,* 22 Cal.4th at p. 622 [in absence of substantial evidence that defendant entered victim's home or attacked victim without an intent to steal, court declined to address defendant's claim that assault was a necessarily included offense of robbery under the accusatory pleading test].)

10

2. <u>Substantial Evidence of Assault and Battery</u>

Winzer does not challenge the jury's finding that he committed theft of the T-shirts or dispute that he struck Rogers while he was leaving Target with the purloined merchandise concealed in his pants. Rather, he contends that the force he used on Rogers supported a conviction only for battery (or assault), not robbery, because he did not strike Rogers with the intent to steal the merchandise. (*People v. Green* (1980) 27 Cal.3d 1, 54 (*Green*) ["the act of force or intimidation by which the taking is accomplished in robbery must be motivated by the intent to steal"], overruled on other grounds in *People v. Dominguez* (2006) 39 Cal.4th 1141, 1155 & fn. 8.) Claiming there was substantial evidence that his intent was not to steal, he urges that he was entitled to an instruction on battery or assault as a lesser-included offense. (See *Breverman, supra,* 19 Cal.4th at p. 162.) The question, therefore, is whether there is an evidentiary basis from which a reasonable jury could believe that Winzer hit Rogers to defend himself rather than to steal the T-shirts.

Winzer argues that the following constitutes such substantial evidence: Rogers was in plain clothes; according to Rogers' preliminary hearing testimony admitted at trial, Rogers grabbed Winzer by the arm before Winzer hit Rogers in the face; although Rogers and Azevedo testified that Rogers identified himself as Target security before he grabbed Winzer, high-schooler Mahoney, the only eyewitness at trial who was not a Target employee, testified that he observed the action outside the store from about five feet away and did not hear Rogers identify himself as Target security; and Rogers had been written up twice before by his supervisor. If the jurors believed Mahoney, Winzer argues, they might have found that Winzer hit Rogers in self-defense, without any intent related to stealing the T-shirts.

We begin with Mahoney's testimony, since the parties dispute how it should be construed. Mahoney testified that he "heard like a bunch of yelling coming out of, like, the doors," and he believed it was the white male (Rogers) who was speaking. Mahoney could not remember what the yelling was about. On cross-examination, Mahoney

testified that he did not hear Rogers identify himself as Target security: "Q. Did you ever hear this white male say out loud: [']I'm Target Security[']? [¶] A. No."

Mahoney's testimony, taken in isolation, is subject to different interpretations. Given his testimony that he heard Rogers yelling something at Winzer but did *not remember* what it was, his further testimony that he did not hear Rogers identifying himself as Target security could simply mean he did not remember any such statement. As such—and this is respondent's interpretation—his testimony is not necessarily inconsistent with Rogers' and Azevedo's testimony that Rogers did identify himself. Alternatively, Mahoney's testimony could be interpreted to mean that, although he did not remember exactly what Rogers said to Winzer, he knows it was not an identification of Rogers as Target security. This would support Winzer's position.

The problem with Mahoney's admitted lack of memory, however, is exacerbated by the fact that he did not observe the entire incident. Mahoney testified that he turned to look toward the doors when he heard yelling, and at that point saw Winzer running out the door with Rogers about three steps behind. Rogers testified at trial that he first identified himself as Target security when he was about five feet away from Winzer, just as Winzer walked out the door, while Rogers was still *inside* the store. Azevedo's testimony also suggests that Rogers was still inside the store when Rogers first identified himself as Target security. Mahoney's testimony as to what was said after Rogers and Winzer were outside the store was not in conflict with the evidence that Rogers identified himself before that point. In other words, Mahoney only provided evidence that Rogers did not identify himself as Target security *by the time Mahoney observed* them, and from what Mahoney could *understand* them saying, but not that Rogers failed to identify himself at all, including some earlier point, before he was hit by Winzer. As such, we question whether Mahoney's testimony can be considered credible and of solid value, as

12

required of substantial evidence, on the assertion that Winzer was unaware that Rogers was Target security when he hit him in the face.[5]

Moreover, in deciding whether the evidence cited by Winzer constitutes substantial evidence, we must determine whether the jury could reach the conclusion that Winzer was not motivated by an intent to steal when he hit Rogers in light of *all* the evidence at trial. The undisputed evidence showed that Winzer took a package of T-shirts off of a shelf, turned his back to the security camera as his companion acted as a lookout, secreted the package down the front of his pants, and then walked out the door of the store without paying for it. The undeniable inference is that Winzer harbored an intent to steal the T-shirts, including at the point he crossed the threshold and was confronted by Rogers. Given this evidence, no reasonable juror could conclude, even if Rogers was in plain clothes, had not announced himself as Target security, and had grabbed Winzer's arm, that Winzer's reaction in repeatedly striking Rogers' face was unrelated to Winzer's intent to steal the T-shirts he had concealed in his pants.

Indeed, Winzer did not testify and the defense presented no evidence that, when he hit Rogers, Winzer *was* operating under the belief that he had to defend himself against a stranger attacking him for no reason. Not once did he claim to Target security or to the police that he thought he was being accosted by someone other than Target security, even when he was being placed in handcuffs, led to the security office, held there until the police arrived, and then arrested. To the contrary, when Azevedo told Winzer while waiting for the police, "You know you're going to jail because you assaulted [Rogers],"

---

[5]    Mahoney also testified that he did not realize Rogers was a Target security person when he saw him struggling with Winzer, because Rogers was dressed in street clothes. However, Mahoney's state of mind is not probative of Winzer's state of mind: Rogers, unlike Mahoney, knew at the time of the struggle that he was walking out Target's door with stolen merchandise in his pants. Rogers was thus far more likely to expect that the person trying to apprehend him was a Target employee.

Winzer simply replied, "No, I'm not." "I'm not going to jail. I have my ways. I'll get out."[6]

Nor would the fact that Rogers had previously been written up by De La Torre in other incidents persuade a reasonable jury that Rogers had failed to identify himself as Target security. The previous incidents pertained to assisting a coworker apprehend a suspect when off duty and detaining a person who took merchandise out of a package; neither has anything to do with a failure to identify himself as Target security.

In the final analysis, Winzer failed to present substantial evidence that his striking of Rogers was unmotivated by his intent to steal. The trial court was therefore not required to instruct the jury on battery or assault.

3. Harmless Error

In any event, the failure to instruct on battery or assault was harmless. In this context we apply the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*): whether it appears reasonably probable that the defendant would have obtained a more favorable outcome had the purported error not occurred. (*Breverman, supra,* 19 Cal.4th at p. 178 ["in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*"].) As described *ante*, there was more than ample proof of robbery, given the overwhelming evidence that Winzer took the T-shirts and hit Rogers while intending to commit the theft. It is not reasonably probable the jury would have convicted Winzer of battery or assault, rather than robbery, if it had been instructed on battery or assault as a lesser included offense.

---

[6]     Winzer's reliance on *People v. Turner* (1990) 50 Cal.3d 668 (*Turner*) is accordingly misplaced. In *Turner*, the defendant *testified* that he did not form an intent to steal until after killing his victim, and therefore he did not steal by force or fear and was entitled to an instruction on theft as a lesser included offense of robbery. (*Id.* at p. 690.) The Supreme Court agreed that the defendant's testimony, though less than convincing, constituted substantial evidence requiring the instruction. (*Ibid.*) *Turner* is distinguishable: the defendant in *Turner* testified as to his intent; Winzer did not.

Indeed, Winzer does not contest the jury's finding that he committed *theft* of the T-shirts, which, like robbery, requires a finding that the defendant had the specific intent to deprive the rightful owner of the property. (*People v. Kunkin* (1973) 9 Cal.3d 245, 251.) In convicting Winzer of theft, therefore, the jury necessarily found that Winzer intended to steal the T-shirts. Given the evidence in this case, no reasonable juror, having found that Winzer intended to steal the T-shirts from Target, could have concluded that he did not intend to steal when he struck Rogers in the face as he was leaving Target with the T-shirts in his pants.

Winzer contends that the trial court's failure to instruct on assault and battery as lesser included offenses of robbery constituted structural error (requiring reversal per se) or, at a minimum, constitutional error under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). On this point he refers us to *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 739-741, in which the Ninth Circuit held that the refusal of a *requested* lesser offense instruction deprived the defendant of his right to instructions on the defense theory of the case and was thus constitutional error. (See *People v. Rogers* (2006) 39 Cal.4th 826, 871-872.) Winzer thus argues that, although *Breverman* held the *Watson* standard applicable where the court failed to instruct sua sponte on lesser included offenses, the *Chapman* standard applies where the defendant had actually requested the instruction on lesser included offenses.

Winzer's argument is unavailing. The court in *Breverman* proclaimed that "in a noncapital case, error in failing sua sponte to instruct, *or to instruct fully*, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*." (*Breverman, supra*, 19 Cal.4th at p. 178, italics added.) Although the facts in *Breverman* involved only a failure to instruct sua sponte, our Supreme Court made no distinction between the trial court's sua sponte obligation to instruct and an obligation to instruct when requested. As such, we follow the precedent of our Supreme Court and apply the *Watson* test. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, in this case, even if we were to apply the standard for constitutional error under *Chapman*, the overwhelming

15

evidence of Winzer's guilt would still lead us to conclude that any error in failing to instruct on battery or assault was harmless.

B. ADEQUACY OF INSTRUCTIONS REGARDING NEXUS BETWEEN FORCE AND INTENT

A trial court must instruct sua sponte on the general principles of law relevant to the issues raised by the evidence. (*Breverman, supra*, 19 Cal.4th at p. 154.) Winzer contends the trial court erred in this regard, because the evidence raised the issue of whether the force Winzer applied to Rogers' face was motivated by an intent to steal, and because defense counsel requested a battery instruction and asserted Winzer's purported lack of intent as one of several defense theories. Accordingly, Winzer urges, the court should have instructed sua sponte that "the act of force . . . by which the taking is accomplished in robbery must be motivated by the intent to steal." (*Green, supra*, 27 Cal.3d at p. 54.)[7]

Winzer acknowledges that the court gave several instructions on robbery, but he maintains that none of them addressed this nexus between force and intent to steal. Furthermore, he argues, the instructions that were given were misleading. The court instructed the jury that robbery requires intent, taking, and force (or fear), explained the nexus between the intent and the taking (intent must arise at or before the taking), and explained the necessary nexus between the force and the taking (force can occur after the initial taking, in order to retain the property). Because there was no comparable instruction requiring a nexus between the intent and the use of force, Winzer asserts, the implication was that any use of force connected with an intentional taking would constitute robbery, even if the force was motivated by an intent other than theft.

A review of the instructions given in this case refutes Winzer's argument. The court initially instructed the jury on the elements of robbery, in accordance with CALJIC

---

[7]    Defense counsel did not request this instruction at trial. Winzer contends that the omission constituted ineffective assistance of counsel. Because the instructions were adequate as given, however, Winzer does not establish that counsel's failure to request the instruction was prejudicial, and the ineffective assistance claim is thus without merit.

16

No. 9.40, including the requirement of proof that: "[a] person had possession of property of some value, however slight"; "the property was taken from that person or from his or her immediate presence"; "the property was taken against the will of that person"; "the *taking was accomplished either by force or fear*"; and "the property was *taken with the specific intent permanently to deprive that person of the property*."[8]  (Italics added.)

The court then instructed, consistent with CALJIC No. 9.40.2, that the intent to steal must be formed by the time of the initial taking: "To constitute the crime of robbery, the perpetrator must have formed the specific intent to permanently deprive the person of possession of that property, before or at the time that the act of taking the property occurred. [¶] If this intent was not formed until after the property was taken from the person or immediate presence of the victim, the crime of robbery has not been committed."

The court also read instructions submitted by the prosecutor and modified by the court, that the necessary force or fear may be used in order to escape or keep the property rather than to take the property initially: "The requisite force or fear needed to establish a robbery need not occur at the time of the initial taking. Assuming all the other required elements have been proven, the use of force or fear to escape with or otherwise retain even temporary possession of the property constitutes robbery. [¶] It is not an essential element to the crime of robbery that the use of force or fear be used to gain direct physical possession of the property taken. [¶] Again, assuming all other elements have been proven, a robbery is committed if an individual uses force or fear to retain possession of the property prior to reaching a place of relative safety."

---

[8]    The court also gave CALJIC No. 9.40.3, explaining that a store employee may be the victim of a robbery if he was in constructive possession of the property at the time of the taking.  In addition, the court instructed in accord with CALJIC No. 3.31 as follows: "For both of the crimes charged in the Information, there must exist a union or a joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. [¶] Unless this specific intent exists, the crime to which it relates is not committed. [¶] The specific intent required by the aforementioned crimes is included in the definition of those crimes set forth elsewhere in these instructions."

17

The implication from these instructions is that the intent to steal must be formed by the time of the initial taking, and the force must be employed at or after the initial taking. Requiring the jury to find that Winzer used force to "retain possession of the property" and had a "specific intent permanently to deprive the person of possession of that property" sufficiently tied the exercise of force with the intent to steal. In light of these instructions, no reasonable juror could have missed the connection between these two elements.

Winzer argues that the prosecutor created ambiguity by stating the following in closing argument: "Someone comes up on [Winzer], and starts hitting him. Doesn't matter if he identifies himself as Target Security or not. Why is he punching him? He's trying to get away. He's using force to get out of the store." Specifically, Winzer asserts, this comment encouraged the jury to understand the robbery instructions to mean that as long as Winzer used force, it did not matter whether the force was motivated by the intent to steal. We disagree. To the contrary, the prosecutor tied Winzer's use of force with his intention of getting out of the store with the stolen property, thus emphasizing the nexus between the use of force and the intent to steal.

Winzer has failed to demonstrate reversible error.

18

III. <u>DISPOSITION</u>

The judgment is affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

GEMELLO, J.

19

DECLARATION OF SERVICE

Re: *People v. Winzer*    No. _____,   Court of Appeal No. A113629

I, Joy A. Maulitz, declare that I am over 18 years of age, and not a party to the within cause; my business address is P.O. Box 170083, San Francisco, California 94117.  I served a true copy of the attached:

## PETITION FOR REVIEW

on each of the following, by placing same in an envelope (or envelopes) addressed (respectively) as follows:

Attorney General
455 Golden Gate Ave.,
Suite 11000
San Francisco, CA  94102

Brad O'Connell
First District Appellate Project
730 Harrison St., Suite 201
San Francisco, CA  94107

Chris Walpole
Deputy District Attorney
10 Douglas Drive, Suite 130
Martinez, CA  94553

Lacy Winzer  T86160
P.O. Box 705
Soledad, CA  93960-0705

Winnifred Gin
Deputy Public Defender
800 Ferry St.
Martinez, CA  94553

Superior Court
Contra Costa County
725 Court Street
P.O. Box 911
Martinez, CA  94553

California Court of Appeal
First Appellate District, Div. 5
350 McAllister St.
San Francisco, CA  94102

Each envelope was then, on October 1, 2007, sealed and deposited in the United States Mail at San Francisco, California, the county in which I am employed, with the first class postage thereon fully prepaid.  I declare under penalty of perjury that the foregoing is true and correct.  Executed at San Francisco, California, this October 1, 2007.

_____
Declarant

# EXHIBIT 4

Court of Appeal, First Appellate District, Div. 5 - No. A113629
**S156813**

DOCKETED
SAN FRANCISCO
NOV 1 5 2007
By____ J. HOGG

SF 06402318

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

THE PEOPLE, Plaintiff and Respondent,

v.

LACY WINZER, Defendant and Appellant.

---

The petition for review is denied.

SUPREME COURT
FILED

NOV 1 4 2007

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   VIOLET M. LEE, State Bar No. 77144
    Deputy Attorney General
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5896
    Fax:  (415) 703-1234
8   Email:  Violet.Lee@doj.ca.gov

9   Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

15   **LACY WINZER,**

                                     Petitioner,

16

17                  v.

18   **BILL CURREY, Warden,**

                                     Respondent.

19

C 08-2341 PJH (PR)

**EXHIBIT 5 (part I)**

20

21

22

23

24

25

26

27

28

EXHIBIT 5 (part 1)

Winzer v. Currey
C 08-2341 PJH (PR)

# EXHIBIT 5 (part 1)

1    IN THE DISTRICT COURT OF APPEAL OF THE STATE OF CALIFORNIA

2    IN AND FOR THE FIRST APPELLATE DISTRICT

3    ---o0o---

4

5

6    PEOPLE OF THE STATE OF CALIFORNIA,   )

7    Plaintiff and Respondent,  )

8    vs.   )  No. _____

9    LACY WINZER,   )CCC No. 050867-1

10    Defendant and Appellant.  )

11    COPY

12

13

14    REPORTER'S TRANSCRIPT ON APPEAL

15    FROM THE SUPERIOR COURT OF CONTRA COSTA COUNTY

16    HONORABLE DAVID B. FLINN, JUDGE - DEPARTMENT NO. 6

17    August 3, 2005

18    HONORABLE PETER L. SPINETTA, JUDGE - DEPARTMENT NO. 11

19    August 10, 2005

20    August 11, 2005

21    August 15, 2005

22    August 16, 2005

23    April 14, 2006

24    A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

25

26    VOLUME I

27    Pages 1 - 290

28

1    A P P E A R A N C E S

2    FOR THE PEOPLE AND THE RESPONDENT:

3                          HON. BILL LOCKYER

4                          Attorney General State of California

5                          455 Golden Gate Avenue, 1st Floor

6                          San Francisco, California 94102

7                          BY: _____

8                                          Deputy

9    FOR THE DEFENDANT AND APPELLANT:

10                          First District Appellate Project

11                          730 Harrison Street, Suite 201

12                          San Francisco, California 94107

13                          BY: _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1       INDEX OF WITNESSES

2     C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

3

4  PEOPLE OF THE STATE OF CALIFORNIA:

5          E-X-A-M-I-N-A-T-I-O-N

6       Direct  Cross  Redirect  Recross

7  Blake Rogers     50  81  117  122

8  Alexander Azevedo   126  149  169

9  David De La Torre   178  191  208  208

10  Michelle Ligouri    214  220

11  Joseph Mahoney    226  235  239

12

13       ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                          INDEX OF WITNESSES

2                     C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

3

4      DEFENDANT LACY WINZER:

5                                    E-X-A-M-I-N-A-T-I-O-N

6                          Direct  Cross  Redirect  Recross

7      Michelle Ligouri           241    242

8

9                             ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1           INDEX OF WITNESSES

2         A-L-P-H-A-B-E-T-I-C-A-L-L-Y

3

4    PEOPLE OF THE STATE OF CALIFORNIA:

5                    E-X-A-M-I-N-A-T-I-O-N

6            Direct Cross Redirect Recross

7    Azevedo, Alexander      126    149    169

8    De La Torre, David      178    191    208    208

9    Ligouri, Michelle       214    220

10   Mahoney, Joseph         226    235    239

11   Rogers, Blake            50     81    117    122

12

13                   ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                        INDEX OF WITNESSES

2                   A-L-P-H-A-B-E-T-I-C-A-L-L-Y

3

4      DEFENDANT LACY WINZER:

5                                        E-X-A-M-I-N-A-T-I-O-N

6                             Direct  Cross  Redirect  Recross

7      Ligouri, Michelle             241    242

8

9                            ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                           INDEX OF EXHIBITS

2       PEOPLE OF THE STATE OF CALIFORNIA:

3

4       Exhibit No.                            Marked   Evidence

5          1      Single Photo - Victim Rogers    Premark    254

6          2      Single Photo - Victim Rogers    Premark    254

7          3      Single Photo - Victim Rogers    Premark    254

8          4      Single Photo - Victim Rogers    Premark    254

9          5      Single Photo - Victim Rogers    Premark    254

10         6      Target Store Diagram            Premark    255

11         7      Target Store Front Diagram      Premark    255

12         8      Single Photo - Lacy Winzer      Premark    255

13         9      Single Photo - T-Shirts         Premark    255

14        10      Package of T-Shirts             Premark    255

15        11      Videotape                       Premark    255

16

17                          ---o0o---

18

19

20

21

22

23

24

25

26

27

28

1                          INDEX OF EXHIBITS

2         DEFENDANT LACY WINZER:

3

4         Exhibit                                    Marked   Evidence

5         A      Assets Protection Training          Premark    256

6         B      Assets Protection Directves         Premark    256

7         C      Assets Protection Training          Premark    256

8         D      Assets Protection Directives        Premark

9         E      Assets Protetion Op. Directives Premark        256

10

11                            ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF CONTRA COSTA

3     HONORABLE DAVID B. FLINN, JUDGE, PRESIDING

4                   DEPARTMENT 6

5

6    THE PEOPLE OF THE STATE OF    )

7    CALIFORNIA,                   )

8              Plaintiff,     )   No. 5-050867-1

9         vs.                      )

10   LACY WINZER,                  )

11              Defendant.    )

12   _____)

13

14

15

16

17        REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                 AUGUST 3, 2005

19         COURTHOUSE, MARTINEZ, CALIFORNIA

20

21

22

23

24

25

26

27

28

*VALERIE S. PRINCE – CERTIFIED SHORTHAND REPORTER #7946*

2

1                        A P P E A R A N C E S

2    For the People:     ROBERT J. KOCHLY, DISTRICT ATTORNEY

3                        BY:   JEAN SKILLING

4                        Deputy District Attorney

5                        Contra Costa County

6

7    For the Defendant:  DAVID COLEMAN, III, PUBLIC DEFENDER

8                        BY:   WINNIE GIN

9                        Deputy Public Defender

10                       Contra Costa County

11

12   For Target:         BREIDENBACH, HUCHTING & HAUBLET

13                       BY:   GARY COLLIS

14                       Attorney at Law

15                       1000 Wilshire Boulevard, 19th Floor

16                       Los Angeles, California 90017

17

18

19

20

21

22

23

24

25

26

27

28

3

AUGUST 3, 2005                                    10:37 a.m.

---oOo---

P R O C E E D I N G S

MS. SKILLING:  Department 6, add-on 2, Lacy Winzer,
050867-1.  Defendant appears in custody with Ms. Gin.
Mr. Gary Collis on behalf of Target.

MR. COLLIS:  Good morning, your Honor.

THE COURT:  Good morning.  I got that file.  What
line number was it again?

MS. GIN:  Add-on 2, your Honor.

THE COURT:  Oh, yes.

THE CLERK:  Target is by?

MR. COLLIS:  Gary, G-A-R-Y, Collis, C-O-L-L-I-S.

THE COURT:  I guess we should take the issues that
are before the court in order and hear from both sides.  Issue
by issue is probably more rational, and issue number one is
whether the service is valid.

In my experience, counsel, the burden of a motion to
quash for improper service lies with the moving party, and
that means providing to the court information in the moving
papers and to the opposing side in the moving papers what the
capacity of the person that was served is and why they're not
a managing agent.

It may follow from the title if they're not a
director or officer but they might be a managing agent, and
your papers just said that -- didn't say; they just said it
was improper.  So you want to address that?

MR. COLLIS:  Well, yes, your Honor.  It's my

4

1   understanding that the burden upon a motion to quash for

2   proper service actually falls with the serving party, but

3   we're not going to rely too strongly on that in light of the

4   declaration that we received yesterday indicating that

5   apparently CT Corporation was served.  The proof of service

6   doesn't reflect that, but there are no managing agents for an

7   out-of-state corporation in the State of California.

8          Having said that -- meaning there wouldn't be anyone

9   in the state to serve other than CT Corporation.  Having said

10  that, we received yesterday --

11         THE COURT:  I don't agree with you, but if they

12  served CT Corporation, it doesn't matter.

13         MR. COLLIS:  It doesn't matter, but we didn't know

14  that because it doesn't say that on the proof of service.

15  That was revealed for the first time to me yesterday in a

16  declaration that was attached to the opposition.

17         THE COURT:  Okay.  I guess we can pass that one.

18         MR. COLLIS:  Yeah.

19         THE COURT:  Now, my view is that in terms of the

20  privacy right, there aren't a lot of cases on it, but it seems

21  to me that the constitutional principles that are in the

22  Pitchess decision are basically applicable, that is a private

23  employee of a company seems to have the same rights of privacy

24  as does a police officer.  On the other hand, there's a

25  constitutional limit to that right depending on the person's

26  involvement and so forth.

27         MR. COLLIS:  I agree, your Honor.

28         THE COURT:  Has there been any meet-and-confer

5

1    between the two of you as to records that you might be able to

2    agree upon?

3          MS. GIN:  No, your Honor.  Mr. Collis was here

4    earlier this morning at 10, but I haven't had a chance to talk

5    to him in particular what records I was looking for.  If you'd

6    like us to meet and confer now, we can do that.

7          THE COURT:  I think it might be efficient because

8    maybe we can save argument time if there's things that you

9    know you're not really concerned about privacy on and things

10   that you are, we can get right to the meat of that.

11         MR. COLLIS:  Your Honor, I wouldn't have any

12   objection to your Honor reviewing the personnel file in

13   camera.  Our concern is just a general disclosure of the

14   information.  It's our reading --

15         THE COURT:  Oh, there's never a general disclosure.

16   I mean, I will issue a protective order in every instance.

17   Yeah, the privacy right is always there as to the general

18   public and so forth.

19         MR. COLLIS:  I couldn't say this for sure, but I

20   doubt upon review at least of the personnel file that there's

21   nothing particularly fascinating about it.

22         THE COURT:  Sounds like a lot of police officer

23   Pitchess motions.  Why don't you meet and confer.  Let's try

24   to get together in about 10 minutes.

25              (Interruption in this proceeding, 10:41 a.m. to

26              11:02 a.m.)

27         THE COURT:  Okay, the court is going to re-call the

28   matter of Lacy Winzer.

6

1            THE CLERK:   It's add-on 2 from Department 6.

2            THE COURT:   Add-on 2.  The court has concluded an

3    in-camera review and has indicated orally to counsel for

4    Target and the public defender the name of a person that

5    might -- two persons that might have relevant information, and

6    by agreement the parties have exchanged information regarding

7    the location of at least one of those people, if known, and

8    counsel for Target has indicated cooperation in locating the

9    other person if felt appropriate.  And so I think that

10   concludes -- the court finds that that is relevant.

11           The court also finds that it is relevant to provide

12   the defense with the regulations that relate to certain

13   aspects of the matter, and I think that now we have a

14   protective order that that is the proper standard.  It meets

15   the constitutional right of privacy of the company, protects

16   against the divulgence of trade secrets but gives the

17   defendant an opportunity to defend himself.  So I'm going to

18   order those produced subject to a protective order.  Thanks

19   for your cooperation.

20           MR. COLLIS:   Thank you, your Honor.

21           THE BAILIFF:   Any future dates on this?

22           MS. GIN:   Your Honor, at this time -- your Honor, I

23   talked to Miss Skilling.  It's on for readiness conference

24   today, not only the motion to quash the subpoena duces tecum.

25   I talked to Miss Skilling, I told her that we were going to

26   confirm the jury trial, which is scheduled for August 8th at

27   this time.

28           I've also discussed with her there was a videotape

*VALERIE S. PRINCE - CERTIFIED SHORTHAND REPORTER #7946*

7

1    involved in this case, and she's in the process of assisting

2    me in getting that.  But in light of the fact that we don't

3    want to waive any time at this point, we're just going to

4    confirm for August 8th at 8:30 in Department 1.

5         THE COURT:  Okay, confirmed.

6         MS. GIN:  Okay.

7         *(Whereupon, the matter concluded, 11:04 a.m.)*

8                        ---oOo---

8

```
1    STATE OF CALIFORNIA )
2                        )  ss.
3    CONTRA COSTA COUNTY )
4
5
6         I, VALERIE S. PRINCE, Certified Shorthand Reporter,
7    do hereby certify that as such I took down in stenotype all of
8    the proceedings in the within-entitled matter, THE PEOPLE OF
9    THE STATE OF CALIFORNIA, Plaintiff, versus LACY WINZER,
10   Defendant, Superior Court Action Number 5-050867-1, heard
11   before the Honorable DAVID B. FLINN, JUDGE, on AUGUST 3, 2005,
12   and that I thereafter transcribed my stenotype notes into
13   typewriting through computer-assisted transcription, and that
14   the foregoing transcript, pages 1 through 8, inclusive,
15   constitutes a full, true, and correct transcription of the
16   proceedings held at the aforementioned time.
17        IN WITNESS WHEREOF, I have hereunto subscribed my
18   name this 2nd day of June, 2006.
19
20
21
22        _____
23             VALERIE S. PRINCE
24        Certified Shorthand Reporter #7946
25
26
27
28
```

1                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  IN AND FOR THE COUNTY OF CONTRA COSTA

3                  HONORABLE PETER L. SPINETTA, JUDGE

4                        DEPARTMENT NO. 11

5                           ---o0o---

6

7    THE PEOPLE OF THE STATE OF CALIFORNIA,   )

8                           Plaintiffs,       )

9         vs.                                 )  No. 050867-1

10   LACY WINZER,                             )

11                        Defendant.          )

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       August 10, 2005

16          A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

17

18   A P P E A R A N C E S:

19   For the People:              ROBERT KOCHLY

20                                District Attorney

21                                BY: CHRISTOPHER WALPOLE

22                                Deputy District Attorney

23                                Contra Costa County

24   For Defendant:              DAVID COLEMAN

25                                Public Defender

26                                BY:  WINNIE GIN

27                                Deputy Public Defender

28                                Contra Costa County

1    Martinez, California              August 10, 2005; A.M.

2    Department No. 11           Hon. Peter L. Spinetta, Judge

3                         ---o0o---

4                   P-R-O-C-E-E-D-I-N-G-S

5           THE COURT:  Thank you, and good morning

6    everybody.  We are on the record in the matter of the

7    People of the State of California versus Lacy Winzer.

8           Am I pronouncing that correctly?

9           THE DEFENDANT:  Yes.

10          THE COURT:  Mr. Winzer present with his

11   counsel, Ms. Winnie Gin.  Mr. Christopher Walpole is

12   present on behalf of the People.

13          Before bringing in the jury, we want to

14   address any pre-trial matters that should be addressed.

15   The first matter is, it's an estimate of this trial is

16   three to four days.

17          Mr. Winzer, one thing I want to cover with you

18   that I cover with defendants in all matters that are

19   scheduled for trial before me, is this:  It is my

20   understanding that there has been an offer made by the

21   People in this case to resolve the case.  As I

22   understand it, the People have offered to resolve it

23   based upon your being sentenced on the Count One to

24   three years state prison.

25          It's not for me to comment on whether that's a

26   good offer or bad offer.  I just want to make sure that

27   you have considered it, you have discussed it with your

28   counsel, both the pros and the con.  I am sure you have.

1    But I just want to make sure that that's the case

2    because, it sometimes is is the fact occasionally -- on

3    numerous occasions has happened that people have

4    rejected offers, and then at the end of the trial they

5    look at me and, if they have been convicted, and say:

6    Why didn't you tell me this could happen, that you could

7    be sentenced to something greater than the offer?

8         That's a possibility in this case.  The

9    maximum, I think, sentence here, even taking into

10    account -- even avoiding duplicate punishment, I believe

11    is something like nine years.  In any event, you should

12    discuss all these matters with Ms. Gin.

13         Once the jury is brought into the courtroom,

14    then the People withdraw their offers effective at that

15    time.  So, before I bring the jury up, I just want to

16    make sure that you have gone over these matters with

17    Ms. Gin.

18         THE DEFENDANT:  Yes.

19         THE COURT:  You will have a few moments to do

20    that after we concluded this preliminary session.

21         Mr. Winzer is charged in this matter with two

22    counts, as I understand it.  He is charged with

23    second-degree robbery in violation of Penal Code section

24    211-212.5(c), and with petty theft with prior theft

25    conviction, both allegedly occurring on or about May

26    10th, 2005, in Pittsburg.

27         Additionally, there's a probation

28    ineligibility -- strike that.  Additionally, there is

1    four separate enhancement allegations based on prior

2    convictions pursuant to Penal Code section 667.5

3    parenthesis B, close parenthesis.

4                Estimated trial length is three to four days.

5                As I indicated, I have received from the

6    People and the defendant their witness lists.

7                I will turn to in limine motions.  I will turn

8    to the People, first.

9                Do you have any motions in limine?

10                MR. WALPOLE:  Yes, Your Honor.  I believe I

11    have given you a copy earlier.

12                THE COURT:  Actually, if you -- the only thing

13    I have is your witness list.  You may have given it to

14    me and I may -- or you may have put it on my desk.

15                MR. WALPOLE:  I will give you another copy.

16                THE COURT:  Thank you.

17                All right.  The first one is pursuant to Penal

18    Code section 1054.1 and 1054.3(a).  The People move to

19    compel the disclosure of the identity of the witness the

20    defense intends to call, together with any relevant

21    written or reported statements from those persons.

22                I expect full compliance from both sides with

23    the requirements of Penal Code section 1054.

24                Is there any reason to believe there hasn't

25    been full compliance?

26                MR. WALPOLE:  No.

27                THE COURT:  By either side?

28                MS. GIN:  No.

1          THE COURT:  Two, the People request an offer

2     of proof as to each defense witness.

3          MR. WALPOLE:  I believe, that's already been

4     done, Your Honor.

5          THE COURT:  Pardon me?

6          MR. WALPOLE:  I believe that's already been

7     done.  She faxed over a fax yesterday

8          THE COURT:  I don't know of any requirement of

9     to give an offer of proof, but I know there is a

10    requirement to relate to the other side any written or

11    recorded statements from those persons.

12         3, pursuant to Penal Code section 1054.3(b),

13    the People move to compel disclosures of any real

14    evidence.

15         Defense intend to introduce any real evidence?

16         MS. GIN:  Your Honor, let me give some

17    backgrounds to what has been done on Mr. Winzer's case.

18    I have subpoenaed duces tecum the personal records of

19    the complaining witness in this case, who is Blake

20    Rogers, who is -- who is on Count One.  He works for

21    Target Corporation.

22         I also subpoenaed duces tecum the policies and

23    procedures of Target Corporation involving the

24    apprehension and retention of evidence when they arrest

25    someone for theft out of their store.

26         That was done in front of Judge Flinn last

27    week, and Judge Flinn went ahead and, similar to a

28    Pitchess-type motion, reviewed the personnel records of

1    Blake Rogers and informed me that there were two prior

2    incidents involving Mr. Rogers.  One from December 21st,

3    2004, which was the event date that David De La Torre --

4    if you look at the witness list that the People provided

5    to you, is on that witness list, who is the supervisor

6    and the head of the Loss Prevention department at this

7    particular Target store on 49017 Century Boulevard in

8    the City of Pittsburg.  That David De La Torre offered

9    an incident report that Mr. Rogers was involved in the

10   apprehension of someone on unscheduled work hours.  That

11   was placed in Mr. Rogers' personnel file.

12          THE COURT:  Was involved in the apprehension

13   of someone on unscheduled work hours?  What does that

14   mean?

15          MS. GIN:  I took it to mean that Mr. Rogers

16   got involved in apprehending a suspected thief from

17   Target, but he was not on duty at the time.  He

18   participated when he was not actually on work hours.

19          THE COURT:  All right.  What's the relevancy,

20   if anything, of that?

21          MS. GIN:  Let me tell what you the second

22   incident is, Your Honor.

23          THE COURT:  All right.

24          MS. GIN:  The second incident occurred -- once

25   again, this is Judge Flinn gave this information to me,

26   but not the actual reports.  Just the information, so I

27   can then pursue the witnesses and talk to them about it.

28   Is that on April 2nd of 2005, David De La Torre, once

1    again the supervising Loss Prevention officer at that

2    particular Target store, authored an incident report

3    against Mr. Rogers for apprehending someone who had no

4    items of Target in their possession.

5              THE COURT:  Okay.

6              MS. GIN:  Okay.  And just to give you a

7    background why Judge Flinn allowed this information to

8    be given to me with the Target counsel there, by the

9    name of Gary Collis, was because in this particular case

10   when my client was detained by Mr. Rogers, he was

11   brought back to the Target Loss Prevention office.  At

12   that time, Mr. Rogers seized from my client's possession

13   a package described as Fruit of the Loom five-pack

14   T-shirt that was found stuffed down my client's pants.

15             Mr. Rogers testified at the preliminary

16   hearing that he then threw away this package because it

17   was touching my client's genitalia, and that Mr. Rogers

18   was not going to put back this package back on the shelf

19   of Target, but at the same time he felt that he had to

20   throw it away.

21             When the police department got there, the

22   Pittsburg Police Department got there, Mr. Rogers then

23   gave Officer Ligouri, the investigating officer in this

24   case a similar type package from the store.  Not the

25   actual package that was found in Mr. Winzer's

26   possession, allegedly, but a similar type package.  And

27   so, Officer Ligouri took that and put that into

28   Pittsburg Police Department evidence.

1          So, I explained this to Judge Flinn, to also

2     why I wanted the Target policies and procedures in terms

3     of retention of evidence because, similar to police

4     procedures, police do not throw away evidence.  They

5     take whatever they seize, bag it up no matter what kind

6     of condition it's in, and put it into evidence.

7          So, Judge Flinn gave me these two reports

8     because he thought it was similar to show that

9     Mr. Rogers is, for one thing, very aggressive, and that

10    he has made a mistake in the past arresting someone who

11    had no property on him.  (That's our defense in this

12    case, Your Honor, that Mr. Winzer had no property that

13    belonged to Target, and that there is no robbery or

14    petty theft in this case.)

15         Now, in addition to what I talked to Judge

16    Flinn, and which, of course, Mr. Walpole has in his

17    possession, one of the witnesses that has been given to

18    you is a gentleman, or a teenager -- he's 17 years-old

19    at the time of this incident -- by the name of Joseph

20    Mahoney.  When Officer Ligouri contacted him and

21    interviewed him, Officer -- I mean, Mr. Mahoney, told

22    the officer that he heard no words exchanged between

23    Blake Rogers and my client.  Now, why is that

24    significant?

25         Blake Rogers testified at the preliminary

26    hearing that before he went to touch my client on the

27    shoulder, he announced that he was from Target Security,

28    but that Blake Rogers was not dressed in any uniform.

1   He was in plain clothes.  And that when he announced he

2   was from Target Security and then touched my client's

3   shoulder, that's when my client punched him.  Of course,

4   that goes to the robbery, the essence of the robbery,

5   because if my client made physical contact with

6   Mr. Rogers with knowledge that he is from Target and

7   that he was there to retain or to keep the property that

8   he was trying to steal, that makes the essence of

9   robbery.

10          But Mr. Mahoney, who I was going to call

11   myself as a witness, told Officer Ligouri that he heard

12   no words exchanged between the two of them.  That he saw

13   Mr. Rogers bear hug my client prior to my client hitting

14   him.

15          So, with that all that information I gave

16   Judge Flinn, based on what I reviewed in the discovery

17   and what happened in the preliminary hearing, these two

18   incidents and the Target policies and procedures were

19   turned over to me.  And that's why these two incidents

20   are relevant, Your Honor, to show why Mr. Rogers would

21   fabricate the fact that there is property that belonged

22   to Target, because he has already been cited twice

23   before.  One, in being aggressive in apprehending

24   someone when he was not on duty.  Secondly, apprehending

25   someone who actually had no property in his possession.

26          And that would go to his motive to lie about

27   my client actually having possession of items that

28   belonged to Target.  Because according to Target

1  Policies and Procedures, which is very similar to police

2  procedures, you do not throw away evidence.

3      THE COURT:  However, going back to the real

4  evidence in this case, what real evidence would you

5  intend to introduce?  I could see a scenario where you

6  might be offering into evidence reports written by De La

7  Torre on this matter, incident reports, if they were

8  denials.  But does De La Torre have any personal

9  knowledge of those events?

10      MS. GIN:  I believe he does, Your Honor.

11      THE COURT:  So De La Torre -- how does De La

12  Torre have personal -- you mean, he was present when

13  those incidents occurred?

14      MS. GIN:  Yes, he is the supervisor at that

15  particular location.

16      THE COURT:  So, you are going to ask him about

17  these situations.  If he denies them, you will ask him

18  whether he wrote a report to that effect.  If he denies

19  that, then you can introduce the reports.  That's the

20  only circumstances under which that would come up,

21  right?

22      MS. GIN:  That's correct, Your Honor.

23      THE COURT:  All right.  Okay.  And also, you

24  may wish to introduce into evidence the procedures for

25  what to do with evidence -- theft-related evidence.

26      MS. GIN:  Yes.

27      THE COURT:  Any objection to that, under these

28  scenarios?

1    MR. WALPOLE:  Well, as far as what Mr. De La

2    Torre may testify to, I spoke with him and asked him

3    about the two instances that Ms. Gin has brought up in

4    regards to Mr. Rogers.  And as far as working, coming in

5    when he is not quite on duty yet to assist in the

6    apprehension of a possible thief, I don't see how that's

7    particularly relevant.  I mean, just because someone is

8    not on the clock yet and assists in the apprehension of

9    a thief, I guess Ms. Gin --

10        THE COURT:  I think the line of the defense is

11   this is a person who is over zealous, right?

12        MS. GIN:  That's correct, Your Honor.

13        THE COURT:  I think it has some defense merit,

14   connected especially with the other matters --

15        MR. WALPOLE:  As far as the other incident Ms.

16   Gin alluded to, whether or not --

17        THE COURT:  -- Arresting someone -- detaining

18   someone who didn't have any evidence.

19        MR. WALPOLE:  It is my understanding, he

20   was -- that there is a radio system, and he was radioed

21   that:  Hey, contact this guy.  He's got property on him.

22   And that he was informed this from another loss

23   prevention officer.

24        THE COURT:  Well, these are things that you

25   can develop on cross-examination.  But they do seem to

26   be relevant, in the first instance.

27        MR. WALPOLE:  Okay.  I guess, I just request

28   prior to going into that particular matter about whether

1   or not he unlawfully detained someone who didn't have

2   property on him, there be just a brief hearing outside

3   the presence of the jury.  Because if it's true that he

4   was just radioed from another loss prevention officer to

5   detain someone --

6         THE COURT:  I don't think the unlawfulness has

7   anything to do with it.  I think the point is, he

8   detained someone without evidence, without any goods on

9   him.

10        MR. WALPOLE:  That's true.  But if he was

11  radioed in by another loss prevention officer:  Hey this

12  guy has got something on him.  Stop him.  What's he

13  supposed to do?  I don't think that's particularly

14  relevant.

15        THE COURT:  That's your line of defense, but

16  their argument -- this is for the -- the jury -- your

17  line of argument, that's for the jury to resolve.

18        Their argument is gonna be:  This guy stopped

19  someone without any evidence on him.  An incident report

20  was written up because of that.  He is sensitive to that

21  sort of thing, so now he concocts some story that Mr.

22  Winzer had evidence on him.

23        MR. WALPOLE:  Understood.

24        THE COURT:  That's the argument, I take it.

25        MS. GIN:  That's right, Your Honor.

26        THE COURT:  Those things, assuming certain --

27  again, take it piecemeal and see what the witness has to

28  say, but -- the witnesses have to say, but it's possible

1    that those can come in as real evidence.

2              All right.  4, the People move the Court to

3    exclude all defense witnesses.

4              I take it, you both want an exclusionary

5    order, and I will grant that.

6              Make sure you let me know if there's anyone

7    who comes into the courtroom who is a potential witness

8    in this case.

9              No speaking objections in the presence of the

10   jury.  Neither of you should make any speaking

11   objections.  You should make your legal objection.  If

12   we need to talk about it, we will go into chambers and

13   discuss it.

14             Stipulation should not be proposed in the

15   presence of the jury.

16             Propose them to each other privately, and we

17   will go from there.

18             People move to prohibit Defense Counsel from

19   suggesting to the jury that they should view the

20   defendant as a friend or a family member, as counsel

21   would be appealing to pity or passion.

22             I take it, you don't have any intention to

23   make such an argument, Ms. Gin?

24             MS. GIN:  No.

25             THE COURT:  Any -- obviously, any argument

26   that is addressed to evoke sympathy, pity or passion,

27   would be improper.

28             The People move the Court to order that all

1    objections to the use of peremptory challenge made

2    pursuant to Wheeler or Batson be made outside the

3    presence of the jury.

4         Any such Batson or Wheeler motion will be made

5    outside the presence of the jury.  We will resolve it

6    outside the presence of the jury.

7         The People move to exclude all background and

8    biographical information regarding defendant and his

9    family, unless its relevance is first established

10   pursuant to 402.

11        Well, hard for me to rule on this motion.  The

12   way it is worded, true.  If it is irrelevant, there

13   shouldn't be any references.  Do not refer to any

14   historical or biographical or background information of

15   the defendant, unless it's relevant.  If you do refer to

16   it, be prepared to make sure you can show that it's

17   relevant, okay?

18        Are there any medical or health-related issues

19   that either of you intend to raise here?

20        MS. GIN:  No, Your Honor.  In fact, if you

21   look at No. 10, there's one line from Mr. Walpole about

22   the fact that my client made a statement that he may

23   have tuberculosis when he got arrested.  And that's also

24   my motion in limine, that it be excluded.  So, I don't

25   think there will be any disagreement about that issue,

26   and it will not be brought up.

27        THE COURT:  There will be no references to his

28   having made that statement, without first approaching

1   the bench, nor shall there be any reference to any

2   medical or mental condition, or physical condition.

3           People move to exclude mentioning the

4   defendant may have been under influence at the time of

5   the incidents.

6           Well, being under the influence may affect

7   whether the requisite specific intent existed.  So, I'm

8   not gonna preclude them from offering evidence of that.

9           MR. WALPOLE:  No, I believe it is relevant,

10  but it was a statement made by one of the loss

11  prevention officers, and I just --

12          THE COURT:  Winzer appeared under the

13  influence of a controlled substance.  What would be the

14  basis for excluding that?

15          MR. WALPOLE:  Just insufficient foundation.

16  I'm not sure if Mr. Rogers has the expertise that it

17  takes to testify that someone --

18          THE COURT:  Whether someone is under the

19  influence of controlled substance does not require an

20  expert.  A lay person can testify as to those matters.

21  So, I would not preclude the defense from developing.

22          MR. WALPOLE:  I believe we have already

23  addressed No. 12, Your Honor.

24          THE COURT:  No. 12, we have addressed.

25          No. 13.

26          All right.  Yes, the question No. 13 raises is

27  what will -- what can the defense use to impeach if the

28  defendant takes -- the People use to impeach if the

1    defendant takes the stand.  And you intend to use --

2    well, there are actually four pled -- four prior

3    convictions pled in the Information, right --

4         MS. GIN:  One is for possession of controlled

5    substance, Your Honor, which is why the People did not

6    put that down.

7         THE COURT:  -- involved in moral turpitude.

8    The other three are the three you listed here, the three

9    convictions for 10851?

10        MR. WALPOLE:  Yes.

11        THE COURT:  All right.  They are all -- I take

12   it, you concede are all crimes involving moral

13   turpitude.

14        MS. GIN:  "Concede", is not a word I like to

15   use, Judge, but I would have to concede it's a crime of

16   moral turpitude.

17        THE COURT:  All right.  Although one goes back

18   to 1993, it appears it's followed by one in 1995, and

19   one in 2002.  So, it hardly can be said that defendant

20   rehabilitated.  So, I don't think there's -- I don't

21   think the People should be precluded from using any of

22   these by reason of their age.  So, it seems to me that

23   these are highly probative, being theft-related crimes,

24   on the issue of credibility.  And I see no 352

25   considerations that outweigh the probative value.  So, I

26   would allow the People to impeach on all three.

27        Are there any other crimes you intend to refer

28   to?

1          MR. WALPOLE:  No.

2          THE COURT:  All right.  Very well.

3          Anything else we need to discuss in terms of

4    your motions?

5          MR. WALPOLE:  No.

6          THE COURT:  Defense motions?

7          MS. GIN:  Your Honor, I gave you my only copy.

8          THE COURT:  Okay.  I will turn to that.

9          MS. GIN:  And I think we addressed the

10   majority of them already.

11         THE COURT:  Let's see.  No. 1 asked to

12   determine which prior convictions could be used to

13   impeach.  We just addressed that.

14         No. 2, any evidence that the defendant was on

15   parole at the time of the arrest is not relevant and

16   should be excluded.  You don't intend to develop any

17   such evidence, do you?

18         MR. WALPOLE:  No.

19         THE COURT:  The motion would be granted.

20         3, when the defendant was arrested, he told

21   police officers that he had tuberculosis.  You, too, are

22   moving that be excluded, and both of you concur in that,

23   and the Court does as well.  So there won't be any

24   reference to that.

25         No. 4, all objections made on behalf of

26   defendant Lacy Winzer be deemed to include Federal

27   constitutional grounds, due process and equal

28   protection.

1          MS. GIN:  Your Honor, it's just a shortcut.  I

2     could say:  Objection, hearsay, made to constitutional

3     grounds.  Usually, I go to Evidence Code.  I don't state

4     similar type in the Federal Rules of Evidence.

5          THE COURT:  Yes, any objections you made will

6     be deemed also to include Federal constitutional

7     grounds, due process and equal protection.  However, in

8     so stating, I do not relieve you of the evidentiary code

9     requirement that you be specific as to your objections,

10    the grounds for your objections.

11         MS. GIN:  Of course, Your Honor.

12         THE COURT:  All right.

13         MR. WALPOLE:  Your Honor, do you have the

14    actual subpoena duces tecum?  Have they been sent?  Ms.

15    Gin talking about the Policies and Procedures for

16    Target.

17         THE COURT:  No, I don't believe I have it.  It

18    may be part of the file.

19         MS. GIN:  Just let the Court know, Judge Flinn

20    signed a protective order in which I was ordered not to

21    release any of these Policies and Procedures unless the

22    Court ruled.  I have a copy with me, because I

23    anticipate that the Court will rule that I give a copy

24    to Mr. Walpole.  If you do that, and put him under the

25    same protective order, then I can go ahead and do that

26    right now.

27         THE COURT:  I think you should do it now.

28    Provide Mr. Walpole with copies of these records that

1   you received.

2            You are subject to the same protective order

3   not to disclose to anyone, except in connection with the

4   prosecution of Mr. Winzer in this case.

5            MS. GIN:  And what I can do --

6            THE COURT:  And then also, at the conclusion

7   of this trial, you are to return the copies to Ms. Gin.

8            MS. GIN:  And it -- I will be duty bound to

9   return them to Target Corporation, Your Honor

10           THE COURT:  All right.  You are already under

11   an order to do that, aren't you?

12           MS. GIN:  Oh, absolutely.

13           THE COURT:  Okay.

14           MS. GIN:  The other thing, Your Honor.  Just

15   if I can add to my motions in limine.

16           Mr. Walpole told me that he talked to a

17   witness that's on his witness, Alex Azevedo.  And

18   there's no written statement, but he gave me what his

19   conversation with Mr. Azevedo was.  I just want to make

20   sure that any conversations with Mr. Walpole has with

21   his witnesses, that be turned over to me so I can be

22   prepared.  In light of the fact that Mr. Azevedo was one

23   of the parties involved, he's a loss prevention officer

24   for Target who was part of the team that detained my

25   client, even though Mr. Rogers is the primary loss

26   prevention officer.

27           THE COURT:  The substance of the conversation

28   with witnesses, each of you will be required to disclose

1    to the other, since there is a fairly recent, I think

2    six months to a year-old case that says that even though

3    the statute does not appear on its face to cover, that

4    that they are required.

5         All right.  Anything else?

6         All right.  Mr. Winzer, I am going to send

7    down our bailiff to get the jury.  You can have those

8    discussions which I mentioned earlier with Ms. Gin.  Our

9    bailiff will let us know when the jury is upstairs, and

10   if you have a change of heart and wish to accept the

11   People's offer you, will be given an opportunity to do

12   so before we bring them in.  Once we bring them in, we

13   will proceed with trial in this matter.

14        Thank you.

15        (Recess.)

16        (Further proceedings consist of voir dire of

17         Prospective Jurors, and is herein omitted.)

18        (Midday Recess.)

19                    ---o0o---

20

21

22

23

24

25

26

27

28

```
 1    Martinez, California              August 10, 2005; P.M.

 2    Department No. 11          Hon. Peter L. Spinetta, Judge

 3                        ---o0o---

 4               P-R-O-C-E-E-D-I-N-G-S

 5

 6

 7

 8

 9

10

11

12

13         (Proceedings consist of voir dire of

14          Prospective Jurors, and is herein omitted.)

15

16

17

18

19

20              (Midday Recess.)

21                   ---o0o---

22

23

24

25

26

27

28
```

```
 1
 2            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 3               IN AND FOR THE COUNTY OF CONTRA COSTA
 4               HONORABLE PETER L. SPINETTA, JUDGE
 5                       DEPARTMENT NO. 11
 6
 7    _____
 8    THE PEOPLE OF THE STATE OF CALIFORNIA
 9              Plaintiff,
10    versus                          Case No.   05-050867-1
11    LACY WINZER,
12              Defendant.
13    _____/
14                         ---oOo---
15
16            REPORTER'S TRANSCRIPT OF PROCEEDINGS
17            THURSDAY, AUGUST 11, 2005; 9:00 a.m.
18         A.F. BRAY BUILDING, MARTINEZ, CALIFORNIA
19                       APPEARANCES:
20    For the People:      ROBERT KOCHLY, DISTRICT ATTORNEY
                           BY:   CHRISTOPHER WALPOLE, DEPUTY
21                         725 Court Street
                           Martinez, California  94553
22
23    For the Defendant:   DAVID C. COLEMAN, PUBLIC DEFENDER
                           BY:   WINNIE GIN, DEPUTY
                           800 Ferry Street
24                         Martinez, California  94553
25
26
27    Reported by:              JANENE R. BIGGS
28                              C.S.R. No. 11307
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    Thursday, August 11, 2005:                    9:00 a.m.

2

3                    P R O C E E D I N G S

4

5            (Whereupon, previous proceedings contained

6            jury selection which were reported but not

7            transcribed.)

8

9            THE COURT:  We'll go on the record in the matter

10   of People versus Winzer, Lacey Winzer, who is present with

11   his counsel, Ms. Gin.  Mr. Walpole present for the People.

12           Mr. Walpole, you needed to put something on the

13   record?

14           MR. WALPOLE:  Yes, your Honor, in both defense

15   counsel's and in my own in limine motions we sought to

16   exclude any mention of the fact that defendant said he had

17   tuberculosis.  At the time I didn't think it was relevant.

18   With speaking with the officer last night, it appears that

19   it may be relevant.

20           Apparently, the officer forgot to actually seize

21   the actual T-shirts when she was first at the scene at

22   Target, and apparently the defendant, when the loss

23   prevention officers recovered this item, it was down the

24   defendant's pants.  The defendant wasn't wearing any

25   underwear.  The LPO's pulled it out and there was, for lack

26   of a better term, there was pubic hair and it was just not

27   something they really wanted to handle.  That's why they

28   threw it away.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

 1          The officer called back the same day on her shift,

 2     "I need to pick up that evidence."  And they told her they

 3     had already thrown it away.  The officer informed him the

 4     defendant said he had tuberculosis.  Which goes to explain

 5     why -- also goes to explain why these loss prevention

 6     officers weren't too excited about holding onto this

 7     evidence --

 8          THE COURT:  Wait a minute.  What's not clear from

 9     your presentation is this:  At the time that the evidence

10     was disposed of --

11          MR. WALPOLE:  Yes.

12          THE COURT:  -- was the person disposing of it,

13     responsible for disposing of it, aware that the defendant

14     had tuberculosis?

15          MR. WALPOLE:  I don't believe so.

16          THE COURT:  What's the relevancy?

17          MR. WALPOLE:  It goes to show why the police

18     didn't go about -- they had a photograph.  They took a

19     photograph of this evidence, and that, in conjunction with

20     the fact that the defendant said he had tuberculosis is a

21     pretty reasonable explanation why the police didn't go and

22     make further attempts or push Target to recover this item.

23          THE COURT:  Well, someone at Target was

24     responsible for disposing of this item; right?

25          MR. WALPOLE:  Yes.

26          THE COURT:  How did they dispose of it?  What did

27     they do to it?

28          MR. WALPOLE:  The supervisor told one of his

```
 1   employees to just dispose of it, and I don't actually have
 2   that employee that actually disposed of it.
 3              THE COURT:  Without knowing how they disposed of
 4   it -- I mean, if they told the police officers, "Hey, we
 5   threw it in the garbage," or something, then I don't see the
 6   relevance.  What more could the police have done?
 7              MR. WALPOLE:  They could have went back and made
 8   sure they got this evidence, but due to its hazardous
 9   nature --
10              THE COURT:  I don't know that they could have gone
11   back and retrieved this evidence.  In any event, we'll take
12   this up before opening statements again.
13              MR. WALPOLE:  Understood.
14              THE COURT:  All right.  Very well.  Let's bring in
15   the jury, please.  I am advised it's the defense challenge
16   after we voir dire this next witness?
17              THE CLERK:  Yes, sir.
18              THE COURT:  And you each have used apparently
19   five.
20              (Whereupon, jury selection continued and a
21              panel was sworn, reported but not
22              transcribed.)
23              THE COURT:  Okay.  Momentarily we're going to be
24   in the trial in this matter.  And the trial will consist of
25   the following.  Counsel will be given an opportunity to make
26   an opening statement, which is simply a statement by them as
27   to what they believe the evidence in this case will
28   disclose.  After that I'll call upon Mr. Walpole to present
```

1    evidence on behalf of the People.  Once he has done that,

2    Ms. Gin may, if she wishes, present evidence on behalf of

3    the defendant.  At the conclusion of that, I will instruct

4    you as to the applicable law.  And then we will hear the

5    arguments of the attorneys in this matter, and after that

6    we'll send you out to deliberate in this case.

7            Before we actually embark upon the trial, there

8    are a couple of things I would like to cover with you.  Some

9    deal with informal matters.  Some deal with more formal

10   matters, and I'll read you an instruction relative to those.

11           Turning first to the more informal matters, I have

12   a policy that people are not to bring foot or drink into the

13   courtroom.  That's a general rule.  Obviously the rule is

14   intended to try to keep our courtrooms in fairly good shape.

15   But there are always exceptions to every rule, and if you

16   have any special dietary need to bring food here.  Some

17   prospective jurors have indicated they're diabetic.  For

18   that reason, or for any other reason you have some special

19   need you need to bring something, you can.  Coffee and soda

20   pop unless, again, there's some special need for that, and I

21   can't think of a special need for that, I'd rather you not

22   bring such items in here.  You can bring water, bottled

23   water all you want.  Indeed if you run out of bottled water

24   replenish it for our sources back here.

25           Any questions about that, any of that?

26           Beyond that, all the other things I really want to

27   cover are really -- can all really be reduced to one

28   statement.  Please remember that you're not here for us.

1  We're here for you.  The role of the attorneys is to present
2  the evidence in this case, to argue the evidence in this
3  case from the perspective of their interest of their
4  clients.  My role is to determine what evidence can be
5  admitted.  That is to say, what information can come to your
6  attention under the rules of evidence, and also to instruct
7  you as to the applicable law in this matter, but you are
8  really the judges in this case, and it's very important that
9  you be able to follow everything that's taking place and
10  understand everything that's taking place.  If I don't make
11  myself clear, or the attorneys don't make themselves clear,
12  if we use words you don't understand, or if the witnesses
13  use words you don't understand, or if we're just mumbling or
14  not speaking loud enough, or anything of those things,
15  please, this is no time to be shy, this is no time to be a
16  wallflower, please raise your hand and let us know so we can
17  address the.
18      If something is bothering you, you've got a
19  headache, you come back from lunch and you're falling
20  asleep, let me know.  It wouldn't be the first time someone
21  has nodded off on a sunny day after lunch.  It's very
22  understandable.  I don't want you to fake through it.  Raise
23  your hand, say you need to stretch your legs and whatever.
24  Perfectly understandable.  I'll let you do that, because, as
25  I say, it's a very important issue being submitted to you,
26  whether the defendant is guilty or not guilty of the charges
27  that have been levied here.  It's very important that you be
28  able to follow all of the proceedings, all the testimony and

1 | all the evidence that's presented in this matter.
2 | So just keep that in the back of your mind that
3 | you're really in charge. You are the judges. In that
4 | capacity, you're really in charge as to what we do here, so
5 | let your feelings be known.
6 | You will be able to take notes. That's a question
7 | that jurors often ask, "Can we take notes?" You will be
8 | able to take notes.
9 | I'm going to read you an instruction of law that
10 | pertains to that at this time and ask you to keep that in
11 | mind.
12 | You're going to be given a notebook, and a writing
13 | instrument, I believe a pen. In fact you'll be given
14 | notebooks and pen. Please leave them on your seat when you
15 | adjourn, or when we adjourn, each day or when we take a
16 | recess. You'll, of course, be able to take your notebook
17 | and pen with you when you deliberate.
18 | A word of caution, you may take notes. However,
19 | you should not permit note taking to distract you from the
20 | on going proceedings. Remember, you are the judges of the
21 | believability of the witnesses and you should not allow
22 | anything to distract you from that fundamental practice.
23 | Notes are only an aid to memory and should not take
24 | precedence over recollection. A juror who does not take
25 | notes should rely on his or her are other jurors do take
26 | notes. Notes are for the note-taker's own personal use in
27 | refreshing his or her recollection of the evidence.
28 | And finally, should any discrepancy exist between

```
 1   a juror's recollection of the evidence and a juror's notes
 2   or between one juror's recollection and that of another, you
 3   may request that the reporter read back the relevant
 4   testimony which must prevail.
 5           I also want to instruct you as follows:
 6           Throughout this trial you're not to converse among
 7   yourselves or with anyone else on any subject connected with
 8   this trial, and you'll not read or listen to any accounts or
 9   discussions of the case that may be reported in the
10   newspapers or other news media.
11           Further, you should not visit or view the premises
12   or place where the offense or offenses charged in this case
13   were allegedly committed or any other premise or places
14   involved in the case.
15           And, furthermore, prior to and within 90 days of
16   your discharge in this matter, you shall not request or
17   accept any payment or benefit in consideration for supplying
18   any information concerning the trial.
19           Lastly, you will promptly report to the Court any
20   incident within your knowledge of any person trying to
21   improperly influence any member of this jury.
22           Related to this, I also want to mention one other
23   thing.  Both the attorneys here, as I think you've gathered
24   from the course of voir dire, are very friendly, very
25   gregarious.  They know, however, that they're not to speak
26   to you during the course of the trial, not to speak to you
27   about the case, and really not to speak to you about
28   anything else, because speaking to a lawyer who's trying a
```

1    case before you and then that lawyer having to speak to that
2    jury gives the wrong impression, if nothing else.  It makes
3    it appear that he or she is currying your favor or
4    schmoozing with you, and that gives the impression of
5    injustice.  So they know they have to keep their distance.
6    Make life easy for them as well.  If you see them going up
7    and down the elevator and going up and down the stairs and
8    they don't speak to you, don't say, "Oh, my God, how stuck
9    up he or she is."  That's not it at all.  They just know
10   they're not to talk to you.  And to make life simple for
11   them, don't talk to them.  It's okay to see hello, good
12   evening and such, but no more than that.
13          If you have any questions about the logistics of
14   the trial or where to go for lunch, any of these things,
15   please ask Sheriff Willett or any member of my staff or me,
16   if you see me, and we'll be happy to tell you what we can in
17   that regard.  But lawyers and jurors keep their distance.
18          Another thing, everyone's going to congregate in
19   front of the double doors here.  By that I mean it could be
20   friends and family of the defendant.  There could be
21   witnesses.  There could be friend and family of people who
22   are alleged victims.  It's possible that anybody having an
23   interest in this case may be out there.  So it's very
24   important that you wear a badge from beginning of the day to
25   when you leave here and go home so people can readily
26   recognize you as a juror in this case and make it less
27   likely for you to see anything about the case outside the
28   courtroom.

1          If notwithstanding your best efforts in that

2   regard, somebody does say something in your presence, or you

3   overhear somebody talking about this case, please let me

4   know immediately so I can ask some questions of you

5   immediately so I can determine what impact, if any, that had

6   upon you.

7          Do you have any questions at all at this juncture?

8          I'm going to take a short break for you.  During

9   that time I'm going to also take up one or two legal matters

10  with counsel.  I anticipate we'll be able to bring you back

11  here at a quarter to 10:00, at which time we will proceed

12  with the opening statements.

13          MR. WALPOLE:  Your Honor, as far as scheduling

14  concerns, I do need to get the television as well.  So if we

15  could get a little more time so I could get it?

16          THE COURT:  That's basically going across the

17  street to your offices to secure that?

18          MR. WALPOLE:  Yes.

19          THE COURT:  You be back and ready to go at quarter

20  to 10:00.  However, if we keep you waiting a little bit,

21  you'll know why.  We're trying to get all the gear necessary

22  to proceed with the trial.

23          Remember, every time we take a break I must

24  instruct you, unless counsel stipulate otherwise, not to

25  discuss this can say case among yourselves or anyone else,

26  not to form or express the opinion about any matter.  Wait

27  until you've heard all the evidence and instructions of law

28  and arguments of counsel before doing any of that.

1         We'll see you at a quarter to 10:00.

2         (Whereupon, the jury exited the

3         courtroom.)

4         THE COURT:  All right.  The (jury has exited.)

5    Defendant and counsel remain.

6         Picking up on where we left on, on the discussion

7    of whether there could be any references to defendant having

8    tuberculosis, is there anything more that you can add?  You

9    don't know how they disposed of it?

10        MR. WALPOLE:  I think they might have told me they

11   put it in a trash compactor, but I'd have to talk with the

12   supervisor and confirm exactly what he said.

13        THE COURT:  And if they put it in the trash, is

14   there any reason to believe the police considered retrieving

15   it from the trash, but decided, gee, yeah, we could probably

16   do this and that to get it back, but we're not going to do

17   it because -- because tuberculosis is contagious.

18        MR. WALPOLE:  That's what the argument is, your

19   Honor.

20        THE COURT:  At this point there will be no

21   references to that until you obtain further information with

22   respect to it.  Because at this point it doesn't appear that

23   tuberculosis really entered into the consideration in this

24   regard.  But -- So you won't refer to it in opening

25   statements, but once you learn further information, if you

26   believe that it is relevant, we can reopen this issue.

27        MR. WALPOLE:  Understood.

28        THE COURT:  All right.

1          Now, you're going to go get something to play a
2    video.
3          MR. WALPOLE:  Yes.  All right.
4          (Whereupon, a break was taken from
5          9:30 a.m. to 10:05 a.m.)
6          THE COURT:  Thank you for your patience.  I think
7    we now have the equipment necessary or us to be able to
8    proceed, and we'll go back on the record in the matter of
9    People versus Lacey Winzer.  Mr. Winzer is present, his
10   counsel, Ms. Gin is present, Mr. Walpole present on behalf
11   of the People.  All of our 12 regular jurors and our one
12   alter juror are present as well, and we're ready to proceed.
13         We'll begin the trial, ladies and gentlemen, by
14   having our courtroom clerk Ms. Gordon-King read to you the
15   Information that has been filed in this.
16         THE CLERK:  Superior Court of the state of
17   California, in and for the County of Contra Costa:
18         The People of the State of California versus Lacy
19   Winzer, Docket Number 050867-1.
20         In the Superior Court of the State of California,
21   in and for the County of Contra Costa, the District Attorney
22   of the County of Contra Costa hereby accuses Lacy Winzer,
23   defendant, of the crime of felony, a violation of Penal Code
24   Section 211/212.5(c), (second degree robbery) committed as
25   follows:
26         On or about May 10, 2005, in Pittsburg in
27   Contra Costa County, the defendant Lacy Winzer, by means of
28   force and fear, did unlawfully take personal property from

42

| | |
|---|---|
| 1 | the person, possession, and immediate presence of Blake |
| 2 | Rogers. |
| 3 | Count Two:  The District Attorney of the County of |
| 4 | Contra Costa here by further accuses Lacy Winzer, defendant, |
| 5 | of the crime of felony, a violation of Penal Code Section |
| 6 | 484, petty theft committed as follows: |
| 7 | On or about May 10, 2005, at Pittsburg in |
| 8 | Contra Costa County, the defendant, Lacy Winzer, did |
| 9 | unlawfully steal, take, lead, and drive away the personal |
| 10 | property of Target. |
| 11 | Dated June 17, 2005.  Signed by Thomas Romero, |
| 12 | Deputy District Attorney. |
| 13 | Ladies and gentlemen, the defendant was arraigned |
| 14 | on this Information, stated that he was charged by his true |
| 15 | name and entered a plea of not guilty to the offenses |
| 16 | charged. |
| 17 | Thank you. |
| 18 | THE COURT:  Thank you. |
| 19 | Now, ladies and gentlemen, please remember that |
| 20 | neither the Information nor defendant's response thereto |
| 21 | constitutes evidence.  The Information is simply a statement |
| 22 | of the charges that have been levied against the defendant, |
| 23 | all essential arguments of which have to be proved beyond a |
| 24 | reasonble doubt before the defendant can be found guilty of |
| 25 | the crimes charged. |
| 26 | We're now going to turn to opening statement, and |
| 27 | I'll call upon Mr. Walpole to make an opening statement on |
| 28 | behalf of the People first. |

|    |    |
|----|----|
| 1  | MR. WALPOLE:  Thank you, your Honor. |
| 2  | Good morning.  What you're going to hear in this |
| 3  | case is a pretty simple straightforward case.  This happened |
| 4  | out in Pittsburg, in the Target store out in Pittsburg. |
| 5  | Just to give you a little backdrop, in case you're |
| 6  | unaware, Pittsburg, and a lot of retail stores, employee |
| 7  | what's known as loss prevention officers.  Kind of like |
| 8  | security guards.  They keep an eye on the store to make sure |
| 9  | people aren't stealing from the store. |
| 10 | What you're going to hear is May 10th, 2005, just |
| 11 | a few months ago, the defendant was in the store, and he was |
| 12 | in the store with another woman.  And they were in the back |
| 13 | area of the Target store near the men's T-shirts, and the |
| 14 | loss prevention officers, the security guards, were watching |
| 15 | over a closed circuit T.V., and what happened is the |
| 16 | defendant grabbed the package of T-shirts, and he took the |
| 17 | T-shirts and he looked around and he jammed the T-shirts |
| 18 | down the front of his pants. |
| 19 | He started to walk out of the store.  He walked |
| 20 | out of the store with the woman.  They went out front.  They |
| 21 | started to approach the doors, and the loss prevention |
| 22 | officers said, "Hey, listen he's got it in his pants.  Let's |
| 23 | try to contact this guy and make sure we get him." |
| 24 | As they're walking outside, just as the defendant |
| 25 | reached the front door, one of the loss prevention officers |
| 26 | behind him, who's in normal clothes, contacts them.  The |
| 27 | defendant turns around and hits him, hits the security guard |
| 28 | who's in plain clothes at the time.  Hits him a number of |

1  times.  He's going to take the stand and testify.  He was
2  able to hold onto the defendant was eventually able to get
3  him to the ground with a couple of other security guards.
4  They recovered the merchandise.  The police ended up showing
5  up, and the defendant was arrested.
6         That's the case.  It's a pretty simple,
7  straightforward case.  You'll see a video -- we talked about
8  the T.V. -- part of the surveillance camera, what happened,
9  was recorded.  And just to give you a head's up, it's a
10 little grainy, and on something called time lapse.  So like
11 a photograph every few seconds.  As the surveillance
12 officers are watching this, they have a real time T.V. and
13 can clearly see what's happening and what was going on.
14        That's the case, and at the end of it I'm going to
15 ask you to come back with a guilty verdict on all counts.
16        Thank you.
17        THE COURT:  Thank you, Mr. Walpole.
18        Now, ladies and gentelman, Ms. Gin, has an
19 election to make.  She can either make an opening statement
20 now, or she can wait until the conclusion of the People's
21 case.
22        Ms. Gin, what is your preference?
23        MS. GIN:  I'd like to make an opening statement at
24 this time, your Honor.
25        THE COURT:  All right.  Very well.
26        MS. GIN:  Good morning.  My name, again, is Winnie
27 Gin, and I'm the attorney for Mr. Lacy Winzer, who is
28 charged with two crimes.  One is the crime of robbery and

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    one is for the crime of petty theft.

2            I will tell you that there are two issues in this

3    case.  The two issues are, was Target property taken on

4    May 10th, 2005, at approximately 4:00 p.m. in the afternoon?

5    The second issue is, did Mr. Blake Rogers, who worked at

6    Target at that Pittsburg location, who was employed as a

7    senior assets protection specialist, did he follow the

8    Target policies and procedures that he was trained to do,

9    and the rules that are governed by people in a loss

10   prevention security department in all Targets, and why

11   didn't he follow it?

12           Let me tell you what really happened on May 10th

13   of 2005.  Mr. Blake Rogers will testify that he observed my

14   client with the package, that he observed him making motions

15   as if he was putting it down his pants.  He was in the

16   closed circuit television room in which they have monitors,

17   and, of course, they have videotaping equipment, and the

18   videotape that Mr. Walpole referenced to is something that

19   you will see that shows you what Mr. Rogers saw that

20   particular afternoon.  He was at that particular closed

21   circuit T.V. room.  He thought he saw my client conceal an

22   item that belonged to Target.

23           In that same room was his supervisor, David

24   De La Torre.  He told Mr. De La Torre, "I saw someone take

25   something from Target.  I am now going to go get him."  He

26   runs out of the office.  He's in plain clothes.  He's not

27   wearing the traditional Target red shirts, if you guys are

28   Target shoppers.  He's in plain clothes, in which he's

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1   dressed in slacks and a collared shirt.

2           My client is exiting the store, and Mr. Rogers

3   says -- and he's already testified to this at a preliminary

4   hearing.  You will hear he's already testified before in

5   this particular case before we had this trial, that he

6   announced himself, he was from Target, he grabbed ahold, or

7   tried to grab ahold of my client, and at that point my

8   client hit him.  And that's where the allegations of robbery

9   occurs, because my client hits a security personnel who

10  belongs to Target while he has Target property on his

11  person.

12          But there was a young man about the age of 17 by

13  the name of Joseph Mahoney who was outside the store who was

14  waiting for his grandmother, and he observed the entire

15  incident, and he will testify that he did not hear

16  Mr. Rogers identify himself as Target security, which is

17  according to the directives, what you must do before you

18  stop someone you believe is shoplifting from your particular

19  store.

20          And Mr. Mahoney tells the police officer, Officer

21  Ligouri, who arrived at the scene later, after my client was

22  arrested by Target and the Pittsburg Police Department was

23  contacted, and he tells Officer Ligouri of the Pittsburg

24  Police Department, "I was there.  I saw what happened.  This

25  guy from Target -- who I later found out was from Target, he

26  was in plain clothes -- ran up to the African-American

27  gentleman, gave him a bear hug, didn't say anything."  And

28  he saw the African-American gentleman hit this person

1  several times in the face.

2          There will be no dispute about the hitting on the

3  face.  You'll see photographs of Mr. Blake Rogers.  There is

4  no issue about that.  I just want you to focus on the issues

5  I just told you about.

6          At that point Mr. Rogers and, I believe, three of

7  the assets protection team from Target is also running right

8  behind Mr. Rogers, and they detain my client, handcuff him

9  and bring him back to the Target store.  At that point they

10 find, so they say -- Mr. Rogers will tell you he finds a

11 package of T-shirts, Fruit of the Loom five-pack T-shirts.

12 Mr. Rogers will tell you that because my client was not

13 wearing underwear at the time, and of course, he would not

14 return it back on the shelf, he just throws it away.  He

15 throws it away before the Pittsburg Police Department gets

16 there.

17         You will hear that the Target policies and

18 procedures is that when you detain a suspected shoplifter,

19 you're supposed to take whatever things you find on that

20 person that you suspect stole from your store and turn it

21 over to the police or keep it yourself, but you keep it

22 bagged up.

23         They did not do that in this particular case, but

24 they did call the Pittsburg Police Department.  They arrive.

25 Officer Ligouri arrives, and she, of course, based on what

26 the statements are from Mr. Rogers and the rest of the

27 Target personnel, takes my client and arrests him.

28 Subsequently, she realizes, where is, you know, the package.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1  So she calls them up and they give her, not the original

2  package, but a similar type package that they said

3  represented the package they found in my client's

4  possession.

5        After you carefully hear all the evidence, and you

6  listen to what the policies and procedures are and you look

7  at that videotape, the only conclusion is that my client is

8  not guilty of both crimes.  All I'm asking, that you listen

9  and you watch very carefully what's going on in this case.

10 It is not simple.  It is something that will take your

11 attention.

12        Thank you very much.

13        THE COURT:  Thank you, Ms. Gin.

14        Thank you, Mr. Walpole.

15        Now ladies and gentlemen, the statements of

16 counsel do not constitute evidence.  They're simply

17 statements by them as to what they believe the evidence will

18 be.  We're going to return to the evidence now.

19        Mr. Walpole.

20        MR. WALPOLE:  The People call Blake Rogers to the

21 stand.

22        May we approach for a second, your Honor?

23        THE COURT:  You may.

24        (Whereupon, a side-bar conversation was

25        had.)

26        THE COURT:  Sir, if you would come up, please, to

27 the witness stand.  Please raise your right hand, we'll have

28 you sworn in as a witness.

```
1                        BLAKE ROGERS,
2            called as a witness on behalf of the People,
3               who was duly sworn to tell the truth,
4                      testified as follows:
5           THE WITNESS:  Yes, ma'am.
6           THE CLERK:  Thank you.  Please be seated.
7           Sir, would you please state for the record your
8   full name and please spell for us your full name.
9           THE WITNESS:  My name is Blake Joseph Rogers.
10  B-L-A-K-E, J-O-S-E-P-H, R-O-G-E-R-S.
11                      DIRECT EXAMINATION
12                      BY MR. WALPOLE
13          MR. WALPOLE:  Q  Good morning.
14      A   Good morning.
15      Q   What do you do?
16      A   I work for Target.
17      Q   What Target store do you work for?
18      A   In Pittsburg.
19      Q   How long have you worked for the Target store in
20  Pittsburg?
21      A   Approximately a year.
22      Q   What do you do for Target?
23      A   Currently I just went to a floor site manager.
24      Q   Back on May 10th, 2005, a few months ago, what was
25  your job at Target at that point?
26      A   I was in security.
27      Q   How long had you worked security at that point?
28      A   Approximately, I think, ten months.  Around there.
```

```
1        Q    Were you working on May 10th of 2004?

2        A    Yes, I was.

3        Q    And it was at that point as a security officer?

4        A    Yes.

5        Q    Right around 4:00 o'clock in the afternoon, where

6   were you at?

7        A    I was at work.

8        Q    Where were you at?  Inside the store?

9        A    Yeah, I was inside the store.

10       Q    Where inside the store were you?

11       A    I was in the back asset protection office, back of

12  the store.

13       Q    When you say back of the store, is that somewhere

14  that's visible to customers or something that's not visible

15  to customers?

16       A    It's not visible to customers.

17       Q    Were in a particular room?

18       A    Yes, I was.

19       Q    Where were you?

20       A    I was in the camera room.

21       Q    Describe the camera room?

22       A    When you immediately walk in, you go to the back.

23  There's a door right there.  You go inside the door.  When

24  you're in the room you look to the left and there's a whole

25  bunch of different monitors on the top, on the bottom.  We

26  have call-up monitors that we can follow people and see

27  everything.

28       Q    Are there surveillance cameras positioned
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1  throughout the store?

2      A    Oh, yes.

3      Q    About how many?

4      A    About 60.

5      Q    When you're inside the camera room, is there a

6  screen that actually shows all 60 cameras going?

7      A    There's what's called a call-up monitor, and you

8  can get little boxes of all the cameras.

9      Q    On the call-up monitor, that particular monitor,

10  does it show what's happening inside the store at that

11  particular moment?

12      A    Yes, it will show you what's happening in the

13  store.

14      Q    Is it something that's live time?  When I'm

15  talking about live time, is it something that's a continuous

16  picture, or something like picture snap shots, like time

17  lapsed?

18      A    It's continuous.

19      Q    Now that call-up monitor, are there also monitors

20  that are inside that room?

21      A    Yes, there is.

22      Q    What are those other monitors?

23      A    Just different cameras.

24      Q    For the other monitors, can you bring up something

25  that's on the call-up monitor and put it onto those other

26  pictures or other screens?

27      A    You sure can.  Say, if I see something going on on

28  one of the cameras, I can look at the camera number, and you

```
 1    can bring it up on the big screen to where you can kind of
 2    concentrate.  It's live time.
 3         Q    When you say the big screen, about how big is
 4    that --
 5         A    Probably about that big (indicating).
 6         Q    Let the record reflect about --
 7         A    12 by 12.
 8         Q    12 by 12?
 9         A    About 12 by 12.
10         Q    And when you bring up something from the call-up
11    monitor onto this 12 by 12 screen, is that in real time?
12         A    Yes, it is.
13         Q    As far as the picture quality, is it something
14    pretty clear, something that's fuzzy?
15         A    It's excellent.  It's very clear.
16         Q    When you're in this room on that particular day,
17    was anyone in this room with you?
18         A    Yes, there was.
19         Q    Who was in the room with you?
20         A    It was ETL David De La Torre.
21         Q    When you say -- you spelled something --
22         A    Executive team leader.  (My boss basically.)
23         Q    What was he doing in the room?
24         A    I can't really remember what he was doing at the
25    time.
26         Q    Was he -- Was his attention at the monitors, or
27    was he looking at something else?
28         A    His attentions were on the monitors.
```

1    Q    For -- When you're in that room at that particular

2  time, were you focused on a particular camera or camera

3  shot?

4    A    Yes.

5    Q    And which one -- Which area were you particularly

6  looking at?

7    A    I was basically looking at the the 6 camera, which

8  would be in the Men's Department.

9    Q    When you were looking at that -- and when you say

10  you're looking at it, was it one of the smaller call-up

11  ones, or on the 12 by 12?

12    A    It was the bigger one.

13    Q    When you were looking at the screen, did you see

14  anybody in that area?

15    A    Yes, I did.

16    Q    Do you see that person in courtroom today?

17    A    Yes, I do.

18    Q    For the record could you identify where that

19  person is at and what that person is wearing?

20    A    That person in the white shirt and tie

21  (indicating).

22        THE COURT:    The record will reflect he identified

23  the defendant, not only by his statement, but by pointing in

24  the direction.

25  BY MR. WALPOLE:

26    Q    And as far as where the store's at, is it in

27  Contra Costa County?

28    A    Yes, it is.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1     Q    When you were looking on this camera, or when

2    you're operating this monitor, can you actually adjust the

3    camera to get different perspectives to move the camera

4    around?

5     A    Yes.

6     Q    How do you do that?

7     A    There's a little joystick, and it has a little

8    swivel knob on the top.  You can move it around left and

9    right, and when you want to focus in on something you move

10   the nozzle, the tip of it.

11    Q    You say you saw the defendant in the Men's area,

12   was there anyone that appeared to be with him at that time?

13    A    Yes, it appeared that he had a female accomplice

14   with him at the time.

15    Q    And when you say -- What exactly did you see him

16   do?

17    A    I observed him at first.  Somebody actually called

18   him out.  I started observing him.  He made a quick

19   selection on a package of Fruit of the Loom T-shirts.  And

20   it appeared to me that his accomplice was kind of acting

21   like a watchout a little bit.

22    Q    Why do you say that?

23    A    Just the way she was kind of poking her head

24   around the corner, standing in the front of the aisle.

25    Q    What specifically did you see the defendant do?

26    A    Specifically I saw the defendant select a package

27   of T-shirts.

28    Q    Where were these T-shirts at?

1     A    They were in the Men's Department on the back of

2    the wall.

3     Q    What did you see him do with these T-shirts?

4     A    I seen him select the T-shirts, look around a

5    little bit, open up the front of his pants, place the

6    T-shirts in, put his shirt over it.

7     Q    Was the defendant when he was doing this, did he

8    have a cart with him, was he by himself --

9     A    He had a cart.  He had a push cart.

10     Q    The ones with the wheels?

11     A    The ones with the wheels, yes, sir.

12     Q    Was your supervisor, was he watching this screen

13    as you were watching this screen?

14     A    Yes, he was.

15     Q    When you saw the defendant do this, what did you

16    do?

17     A    After I seen the subject conceal the merchandise,

18    I immediately went out to the floor and had David stay in

19    the camera room.

20     Q    So your supervisor, he stayed in the camera room

21    as you went outside?

22     A    Yeah, and we kept in communications with

23    walkie-talkies.

24     Q    When you went -- And when you say outside, do you

25    mean actually into the store or outside of the store?

26     A    Actually inside the store.

27     Q    Okay.  And when you went inside the store, what

28    did you do?

1    A    Whenever I went inside the store, I immediately
2    started observing Mr. Winzer.

3    Q    Where did the defendant go to?
4    A    He walked -- There's the Men's Department.
5    There's a main -- basically the racetrack is, that's the
6    big, you know, main aisles. He went to the right-hand side
7    of the aisle, walked out, and then parked his cart by the
8    dollar spot and then proceeded on exiting the building.

9    Q    When the defendant was taking this path, was the
10   woman with him?

11   A    Yes, she was.

12   Q    After the defendant dropped the cart off -- Well,
13   actually when he dropped the cart off what happened next,
14   where did he go?

15   A    The Dollar Spot is right in front of the main
16   entrance and exit. Right as he dropped the cart, he
17   immediately started walking to the main exit of the store.

18   Q    When you say Dollar Spot, what do you mean?

19   A    It's when you walk in, just to catch the eye,
20   everything for a dollar.  It's a hot spot basically.

21   Q    Is everything on there on sale for a dollar?

22   A    Everything in there is a dollar.

23   Q    Did the defendant ever go through a register?

24   A    No, he did not.

25   Q    Instead of going to a register, where did he go
26   once he dropped the cart off?

27   A    He walked outside the store.

28   Q    Did he approach the door?

1      A    Oh, yeah, he approached the door.  Yes, sir.

2      Q    When he approached the door, about how far away

3  from him were you?

4      A    When he approached the door, I was probably 10

5  feet back, 15 feet back.  It was around there.

6           THE COURT:  Inside the store?

7           THE WITNESS:  Inside the store, yes.

8  BY MR. WALPOLE:

9      Q    And where was the female at at this time?

10     A    She was just walking with him.  I really wasn't

11  paying too much attention to him.  She didn't have any

12  merchandise.  I was mainly focused on him.

13     Q    As the defendant approached the door, what

14  happened next?

15     A    (As he approached the door, he exited.)  He kind of

16  looked back, I believe, to see if anybody was following him.

17  (I was kind of running up on him a little quickly.)

18           MS. GIN:  Objection, your Honor.  Move to strike.

19  "I believe to look."

20           THE COURT:  Sustained.

21           It will be disregarded, ladies and gentlemen.

22  That parenthetical language about "I believe" will be

23  disregarded.

24  BY MR. WALPOLE:

25     Q    As you started approaching him, as he was near

26  that door, what happened next

27     A    He turned around -- well, he exited.  And then as

28  he exited the store, right when he was crossing the

58

```
 1    threshold, he looked back to see if anybody was following
 2    him.
 3              MS. GIN:  Objection.  Move to strike about looked
 4    back to to see if anybody was following.  I have no
 5    objection to look back, but I think it's this witness'
 6    opinion about why Mr. Winzer looked back.
 7              THE COURT:  Sustained.
 8              It will be disregarded.
 9    BY MR. WALPOLE:
10         Q    Describe how he looked back.  Did he turn the
11    full -- all the way back around, or did he look over the
12    shoulder, or what did he do?
13         A    It was just like that (indicating).
14         Q    Were you able to make eye contact with him?
15         A    Yes.
16         Q    When he looked back, what happened next?
17         A    I immediately identified myself as Target
18    security.
19         Q    What were you wearing at that time?
20         A    I wear plain clothes.  I'm an undercover shopper,
21    so I can -- I dress basically just like this.
22         Q    Why do you wear plain clothes?
23         A    For the simple fact that if you're in red Target
24    outfits, most people are going to notice that you're
25    following them.  You know, or something like that.  And you
26    wear street clothes, try to be a product of your environment
27    possibly.
28         Q    When you say you identified yourself, what did you
```

```
 1   say specifically?
 2        (A)    I identified myself as Target security.
 3        Q     And about how far away from defendant were you at
 4   that point?
 5        (A)    I think I was approximately five feet away at that
 6   time now.
 7        Q     What happened next?
 8        A     As I identified myself, he struck me in the face
 9   with a closed fist approximately three times.
10        (Q)    You say he turned and looked back at you.  Was it
11   at that point you say you identified yourself as he was
12   looking back at you?
13        (A)    Immediately, yes, sir.
14        Q     When he looked back, did he then square himself,
15   or did continue to walk towards the front door?
16        A     No, he squared himself.
17        Q     You say he struck you.  Backing up a little bit in
18   time, (when he turned around,) about how far away were you
19   from him, again?  I'm sorry.
20        (A)    About five feet away at that time.
21        Q     Did you approach him any further, or did you stay
22   about that distance?
23        (A)    No, I was coming up on him.  I was coming up on
24   him immediately.  I was getting closer.
25        Q     When you say he struck you how, did he strike you?
26        A     With a closed fist.
27        Q     Do you remember if it was a right hand or a left
28   hand?
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1        A    I don't particularly remember.

 2        Q    Do you remember where he hit you?

 3        A    It was one in the forehead.  And I had a bloody

 4   lip.  So it was in the mouth.

 5        Q    How many times did he strike you?

 6             MS. GIN:  I'm sorry, your Honor, I didn't hear

 7   that last answer.

 8             THE WITNESS:  It was in the mouth and forehead.

 9   BY MR. WALPOLE:

10        Q    About how many times did he strike you?

11        A    Approximately three times.

12        Q    When he was hitting you what were you doing?

13        A    Whenever he was hitting, I got him in position of

14   control.

15        Q    Did you ever actually punch him?

16        A    No.  Excuse me, when he was hitting me, I just

17   grabbed his arm in a controlled position.

18        Q    When you say controlled position, did you receive

19   any training at Target about how to detain someone who's

20   resisting?

21        A    Yes, I did.  Nonviolent physical intervention.

22        Q    What does that mean?

23        A    Basically, it's a class to help you defend

24   yourself.  You know, we don't have any guns, pepper spray,

25   or nothing.  We have to know how to handcuff somebody

26   properly.  We have to know how to, you know, to detain the

27   subject.

28        Q    You said at some point you tried to grab him.
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

61

```
 1   What happened?

 2        A     When I went to grab him was right when I basically

 3   identified myself, and he struck me in the face.

 4        Q     Were you able to grab him at all, stop him from

 5   hitting you?

 6        A     Yes, I was able to grab him.  I don't know -- yes,

 7   I was.

 8        Q     Okay.  When you grabbed him, the location where

 9   this happened, (the first punch) did that happen right at

10   this door area where you were approaching him, or did it

11   happen someplace else?

12        A     It happened at the door area.

13        Q     Did your struggle with the defendant, did it move

14   or stay right at the door?

15        A     It moved.

16        Q     Describe what happened.

17        A     To my best knowledge, Lacy Winzer struck me

18   approximately three times in the face, and then I gained

19   control of one of his arms.  I don't remember how I took him

20   down, but we ended up on the ground, and I believe it was --

21   in the main sidewalk right there in the front sidewalk.  Or

22   maybe it was in the street a little bit.  I'm not sure.  I

23   don't remember that.

24        Q     So it started in the doorway and started to go out

25   toward the parking lot?

26        A     Yes, sir.

27        Q     When you were finally able to get control of him

28   and get him down on the ground, how far was it from the
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1   doorway to where you were able to get him down on the
 2   ground?
 3       A    Probably 10, 12 feet before he went down.
 4       Q    And were you able to finally gain control of the
 5   defendant?
 6       A    Yes, I was.
 7       Q    Was there other loss prevention officers that
 8   helped you gain control?
 9       A    Yes, there was.
10       Q    Who was that?
11       A    Alex Azevedo.
12       Q    As you were struggling with the defendant, as it
13   moved out towards the street, did you ever reidentify
14   yourself as a loss prevention officer?
15       A    Yes, we're trained to -- if somebody's struggling
16   I repeatedly tell him, "Target security.  Stop resisting.
17   Target security.  Stop resisting."  Numerous times.
18       Q    I forget to ask this, are you feeling under the
19   weather today?
20       A    Oh, yeah, I'm a little sick.  Can I have some
21   water?
22       Q    Go ahead.
23            Actually, may we approach on one thing, your
24   Honor?
25            THE COURT:  You may.
26            (Whereupon, a side-bar conversation was
27            had.)
28            THE COURT:  Please proceed as discussed.
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1              MR. WALPOLE:  Thank you, your Honor.
 2              May I approach, your Honor?
 3              THE COURT:  You may.
 4    BY MR. WALPOLE:
 5       Q    Showing you what's been previously marked as
 6    People's Exhibit 1, do you recognize that?
 7       A    Yes, I do.
 8       Q    What does that appear to be?
 9       A    Me.  A picture of myself.
10       Q    Is that a fair and accurate depiction of what you
11    looked like after this incident occurred?
12       A    Yes.
13       Q    And when you say you received injuries, there
14    appears to be some red mark over your right temple area and
15    on your -- it seems to be reddish on your right cheek.  Is
16    that the general area where you were struck?
17       A    Yes, it was.
18       Q    Showing you what's been previously marked as
19    People's Exhibit 2, do you recognize this?
20       A    Yes, I do.
21       Q    And what does that appear to be?
22       A    Another picture of myself.
23       Q    Why don't you take a look at all these,
24    People's 3, 4, and 5.  Just flip through them briefly.
25       A    Okay.
26       Q    Are those all pictures of what you looked like
27    after you were struck?
28       A    Yes, it was.
```

1    Q    I think one of them is a picture of your elbow, I

2    believe.  I don't know which picture that is?

3    A    Number 4.

4    Q    Number 4.  Do you recall how, or if, you received

5    any injuries to your elbow?

6    A    Yeah, I received that injury.

7    Q    How did you get that?

8    A    During the struggle when we were on the ground.

9    Q    Showing you what's previously been marked as

10   People's Exhibit 6, do you recognize that?

11   A    Yeah.

12   Q    What does that appear to be?

13   A    A picture, a layout of the store.

14   Q    Approximately a layout of the store?

15   A    Approximate.

16   Q    And if you wouldn't mind standing up, it looks

17   like there's some markers to your right.

18         THE COURT:  Use these.  These are permanent.

19   BY MR. WALPOLE:

20   Q    With a black marker, can you circle the general

21   area of where you were at when you were watching the

22   defendant on the closed circuit T.V.

23   A    I was back here.

24   Q    Why don't you do a CC for a closed circuit.  Put

25   CC in black.

26   A    Okay.

27   Q    It looks like there's a certain hole right there

28   just blow the CC.  What is that?

1      A      That is the double doors that you would walk out

2   to go out inside the store on the floor.

3      Q      And that general box area where the CC is in, the

4   smaller one on the top, is that something that customers can

5   access, or is that something different?

6      A      Where is that at?  I'm sorry, here (indicating)?

7      Q      No.  This longer rectangular box inside the CC?

8      A      Yeah, I'm sorry.

9      Q      Is that something that customers have access to,

10   or is that just an employee area?

11      A      That's just an employee area.

12      Q      Is there another area where you can actually

13   observe over a closed circuit T.V. what's going on inside

14   the store?

15      A      Yes, there is.

16      Q      And, if you could mark CC-2 for the general area

17   of where it's at.

18             And the inside, the larger box, the whole box,

19   there are smaller rectangular boxes.  What generally does

20   that represent?

21      A      Like the Home Furnishing, Domestics.  This one

22   right over here (indicating) would be Electronics,

23   basically.

24      Q      Which one are you pointing at?

25      A      This one over here (indicating) would be the

26   electronic area.

27      Q      This is, just for the record, the smaller

28   rectangular box inside the larger box on the far right.

1           Is electronics did you say?

2      A    Yeah, electronics.

3      Q    The area in between these boxes, what does that

4  represent?

5      A    These right here (indicating)?

6      Q    Yes.

7      A    We have aisles here.  That would represent the

8  aisles.

9      Q    Could you mark FD where the front doors are

10  located at Target.

11          If you can grab a different pen, can you grab

12  maybe the red one, and with the red pen can you circle the

13  general area where the defendant grabbed these T-shirts?

14     A    Just put an X?

15     Q    Why don't you put a big circle for the general

16  area.

17          Okay.  And to the right of that red circle you

18  just drew, there appears to be a smaller line to the right

19  of rectangle that you just drew the circle inside?

20     A    This right here (indicating)?

21     Q    Yes.

22     A    It's a dividing wall.

23     Q    A dividing wall?

24     A    Yes, it is a dividing wall.

25     Q    And the path that the defendant took to exit the

26  door, can you mark that with a dotted red line.  So just do

27  dots from the circle to where you went to the front door.

28     A    No problem.

1      Q    If you could grab a different colored pen.  Let's

2  go with blue.  And with a blue circle can you draw the area

3  you were in where you were watching on the closed circuit

4  T.V.?  And then also, again, draw a dotted line -- actually,

5  make it a straight line --

6      A    Where was I watching the CC T.V. at?

7      Q    Yeah.  A blue circle for that.

8      A    Okay.

9      Q    Actually, why don't you go ahead and grab that

10 pink one, I guess.  So do a pink circle and then with a

11 solid line draw the general path to where you contacted him

12 at the front doors.  Do you know what I'm saying?

13     A    Yeah.

14     Q    You can go ahead and -- actually, why don't you

15 remain standing.  I'm going to go onto another diagram.

16         Showing you what's been previously marked as

17 People's Exhibit 7, do you recognize that?

18     A    Yes.

19     Q    What is does that appear to be?

20     A    A layout of the store, but mainly just the front

21 entrance basically.

22     Q    On People's 7 there appear to be some smaller

23 triangle shapes, for lack of a better term.  On the map

24 there's "Guest Service" written, and to the lower left

25 there's some smaller triangles.  What does that represent?

26     A    The doors.

27     Q    The front doors of the store?

28     A    Yep.

1      Q      Where were you at -- Why don't you go ahead and
2    use another marker.  Go ahead and stand up again.  The red
3    marker, let's go with a triangle.  Make a triangle where you
4    were at when you identified yourself as Target security.
5      A      So this is the front doors right here
6    (indicating)?
7      Q      Yes.
8      A      What about the top?  What is this right here?
9      Q      Actually you tell me.  Is there two sets of doors
10   for Target?
11     A      No.  There's only one set of doors.
12     Q      Oh, there's only one?  Okay.
13            So let's go with -- there's only one set of doors.
14   The set of doors that's on the bottom, have that be the exit
15   and ignore the upper doors.
16     A      Okay.
17     Q      Why don't you use a red circle for where you were
18   at when you first identified yourself as security?
19            THE COURT:  Was that inside the store?
20            THE WITNESS:  That is still inside the store.
21   BY MR. WALPOLE:
22     Q      And with a red triangle can you approximate where
23   he was when you said that?
24            THE COURT:  And he was outside the store?
25            THE WITNESS:  He just walked outside.
26   BY MR. WALPOLE:
27     Q      And for -- Where's the approximate area, this
28   dollar -- dollar thing you were talking about earlier?

```
 1        A    It would be pretty much like right here
 2   (indicating).
 3        Q    Why don't you just do a dollar sign for that
 4   particular area.  And for the cart, at some point did the
 5   defendant leave his cart behind?
 6        A    Yes.
 7        Q    Why don't you write cart for the general area
 8   where he left the cart?  On the map that says registers
 9   that's in the larger box area, what does that represent?
10        A    The registers at the store, the check lanes.
11        Q    And did you ever see the defendant ever try to pay
12   for any items?
13        A    No, definitely not.
14        Q    When you first got out of that closed circuit T.V.
15   area and tried to approach the defendant, when did you
16   first, People's 6.  When you first left the closed circuit
17   T.V. area in the far back, when did you first see the
18   defendant yourself physically?
19        A    I believe I'm pretty sure I seen him through just
20   like watching him from, you know, aisle to aisle basically.
21   I'm in a different aisle, but I could see him through
22   crossing through the openings.  And then I got in front of
23   the Dollar Spot -- or excuse me -- in front of behind the
24   cash registers basically, and I seen the defendant pushing
25   the shopping cart, and leave it there at the Dollar Spot.  I
26   seen all that with my own eyes.
27        Q    When you first saw him when you got out of that
28   closed circuit T.V., with a red square, could you put in
```

```
 1    approximately the general area when you first saw him?

 2            And that represents where you were at when you

 3    first saw him; correct?

 4       A    Yeah

 5       Q    With a larger triangle could you approximate where

 6    he was when you first saw him?

 7            You could go ahead and have a seat.

 8            Did you have a chance to review the surveillance

 9    tapes after this occurred?

10       A    Yes, I did.

11       Q    And did you give a copy of the surveillance tapes

12    to the police?

13       A    Yes.

14            MR. WALPOLE:  If I could have a moment, your Honor

15    to set this up?

16            THE COURT:  All right.

17            MS. GIN:  Your Honor, at this time can I position

18    myself and Mr. Winzer so we can observe the video?

19            THE COURT:  You may.

20            MS. GIN:  If I could use Mr. Walpole's chair, if

21    that's okay with you?

22            MR. WALPOLE:  That's fine.

23       Q    I'm going to ask you to get up for a second, and

24    then I'm going to ask you if you recognize what's on this

25    screen.

26            MS. GIN:  Mr. Walpole, if you don't mind, if you

27    could move back an inch or two.

28            MR. WALPOLE:  Sure.
```

```
 1              (Whereupon, People's Exhibit Number 11 was
 2              played.)
 3              MR. WALPOLE:   I'm just going to stop it for a
 4    second.
 5         Q    That short section that you saw, did you recognize
 6    that?
 7         A    Yeah.
 8         Q    What did that appear to be?
 9         A    Mr. Winzer in the Men's Department.
10         Q    And is that the angle that you had when you saw
11    him back in the closed circuit T.V. room?
12         A    Yes.
13         Q    When you look at this, is it of the same picture
14    quality that you had when you were back in the picture room?
15         A    No, definitely not.
16         Q    Now, describe, was it clear?  Was it worse?  Was
17    it better?
18         A    It was much better.  When you use it on a color
19    monitor, when you're actually watching them, it's live-time.
20    I think.
21              THE COURT:   Which was clearer?
22              THE WITNESS:   The original, whenever I was
23    originally observing him.  This is horrible, if you ask me.
24    BY MR. WALPOLE:
25         Q    So it looks like there was some white lines going
26    across it.  Did you see anything like that when you were
27    watching it on live-time?
28         A    No, there was nothing like that.
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    Q    When the I was talking about live-time, when we

2  were watching it a minute ago, it appeared to be segmented

3  in time?

4    A    Yes.

5    Q    When you say you're back in the closed circuit

6  T.V. room, is it like that or is it different?

7    A    It's different.

8    Q    How is it different?

9    A    There's no choppiness.  There's no blotches.

10  There's no lines in it.  It's clear as day.  It's every

11  second.  It records every second.

12    Q    When you say every second, is it one shot per

13  second, or is it a continuous like you're --

14    A    Continuous like you're watching television.

15    Q    The person that you saw on this tape right here

16  just then, is that the person you see in court here today?

17    A    Yes, it is.

18    Q    Actually, let me back up for a second.  I

19  apologize.  For the record, I'm starting the tape over.

20         (Whereupon, People's Exhibit Number 11 was

21         played.)

22  BY MR. WALPOLE:

23    Q    This moment right here, I've paused the tape, and

24  although it appears fairly grainy, does it appear that he's

25  pushing anything at this point?

26    A    Yeah.

27    Q    What was he pushing at this point?

28    A    A shopping cart.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1        Q    And it appears to be something in the child seat,

2    I guess for lack of a better term.  What did that appear to

3    be when you were watching it on closed circuit T.V.?

4        A    A package of T-shirts.

5             (Whereupon, People's Exhibit Number 11 was

6             played.)

7    BY MR. WALPOLE:

8        Q    This motion right here, what did you see at this

9    point?

10       A    Him concealing the product, the merchandise.

11       Q    What did you base that on?

12       A    Well, like I said, this is choppy.  I think this

13   goes every three seconds.  It's clear as day that he put it

14   in his pants with the shirt over.

15       Q    Did you see him make this backward motion with his

16   arm as well?

17       A    Oh, yeah, definitely.

18            (Whereupon, People's Exhibit Number 11 was

19            played.)

20   BY MR. WALPOLE:

21       Q    When he left the area, could you see any T-shirts

22   in the basket, or in his hands, or anything like that?

23       A    No.

24            (Whereupon, People's Exhibit Number 11 was

25            played.)

26   BY MR. WALPOLE:

27       Q    This individual that appears to be next to him at

28   this point in the tape, is this the person that you saw the

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    defendant with earlier?

2        A    Yes.

3        Q    Were you able ever to find out who she was?

4        A    No.

5        Q    At some point you said the police arrived.  Was

6    she still around when the police showed up?

7        A    No.

8            (Whereupon, People's Exhibit Number 11 was

9            played.)

10   BY MR. WALPOLE:

11       Q    While I was playing this tape, at what point did

12   you leave this closed circuit T.V. room to go out front?

13       A    After I seen him conceal the merchandise I

14   immediately left.

15       Q    Okay.

16           (Whereupon, People's Exhibit Number 11 was

17           played.)

18   BY MR. WALPOLE:

19       Q    Now, as far as these pictures that are being shown

20   at this moment, and I want to talk about the recording

21   system in general.

22           Is this exactly what, let's say, David was seeing

23   at the time when you were going out front, or would he still

24   have the capacity or the ability to appropriately position

25   the cameras to follow the defendant outside the store?

26           MS. GIN:  Objection, your Honor.  Foundation.

27           THE COURT:  Sustained.  Rephrase it.

28

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1    BY MR. WALPOLE:
 2        Q    As -- How familiar are you with this camera system
 3    and the recording system?
 4        A    Very familiar with them.
 5        Q    During your entire time as a security officer,
 6    were you using these cameras and trying to record things and
 7    providing tapes to the police officers?
 8        A    Yes.
 9        Q    And based on your experience and your training,
10    do -- although this picture here shows various angles where
11    it does not appear the defendant is in the picture, a person
12    watching someone at the time, do they have the capability to
13    look at different cameras and perspectives despite what's
14    actually being recorded?
15            Do you understand what I'm saying?  You said David
16    was in the room.  Is this exactly what David was looking at?
17    Or does he have the capacity or the ability to see what
18    others are looking at at the time?
19            MS. GIN:  Objection.  Foundation.
20            THE COURT:  Yes.  Are you objecting to the portion
21    that relates to what David was looking at?
22            MS. GIN:  Yes.
23            THE COURT:  That part will be sustained.
24    BY MR. WALPOLE:
25        Q    I'm not asking what David was actually looking at.
26    I'm talking about does the system have the capacity, the
27    ability to have different camera angles on there despite the
28    fact that it's being recorded?
```

```
 1        A    Yes, if a camera was pointed that way at that
 2   particular time, it's a stationary camera, but that's what
 3   they would see, what we're watching right now.
 4             MS. GIN:  Objection.  Move to strike about what
 5   David had seen.
 6             THE COURT:  The part about what David saw will be
 7   stricken without a greater foundation.
 8             (Whereupon, People's Exhibit Number 11 was
 9             played.)
10   BY MR. WALPOLE:
11        Q    This path the defendant took, is that the same
12   path that you described in your earlier testimony?
13        A    Yes, it was.
14             (Whereupon, People's Exhibit Number 11 was
15             played.)
16   BY MR. WALPOLE:
17        Q    These doors right here that are on the screen
18   right now, are these the front doors to Target?
19        A    Yes.
20        Q    Are there security gates, meaning alarm detectors?
21        A    Yes.
22        Q    Did the alarm detectors go off in this particular
23   instance?
24        A    No.
25        Q    Why is that?
26        A    Soft lines isn't usually tagged with sensors.
27        Q    Let me stop you there.
28             You said soft lines.  What do you mean by that?
```

77

1      Ⓐ      Clothes.  They don't usually have sensor tags on

2    them.

3      Q      What usually has sensors tags on them?

4      Ⓐ      Electronics, high-dollar merchandise, you know,

5    video cameras, things of that sort.

6             (Whereupon, People's Exhibit Number 11 was

7             played.)

8    BY MR. WALPOLE:

9      Q      Stopping it right here, what does this camera

10   angle depict?

11     A      That is the outside of the store now pointing

12   towards the exit.

13     Q      Okay.

14            And it appears there's two people up here in the

15   upper right-hand corner.  Do you know who that is?

16     A      That's myself and Mr. Winzer.

17            (Whereupon, People's Exhibit Number 11 was

18            played.)

19   BY MR. WALPOLE:

20     Q      And these other individuals that ran out

21   immediately after, who are those people?

22     A      I believe they're just -- it was a younger male

23   adult, and he was a witness to what happened.

24     Q      There's some people up here (indicating) that

25   appear to be in black that ran out to apparently where you

26   were at.  Who was that?

27     A      That was Alex Azevedo, a Target protection

28   specialist.

```
 1              (Whereupon, People's Exhibit Number 11 was
 2              played.)
 3   BY MR. WALPOLE:
 4        Q    Have you had a chance to look at the remainder of
 5   the security tape?
 6        A    No.
 7              (Whereupon, People's Exhibit Number 11 was
 8              played.)
 9   BY MR. WALPOLE:
10        Q    To your knowledge, does it depict anything else
11   that occurred following that moment?
12              If you're not sure, you're not sure.
13        A    I'm not sure.
14        Q    Okay.
15              And there's actually nothing else on there, but it
16   will be back in the jury room for you to take a look at it.
17   Actually, your Honor --
18              THE COURT:  We'll take a break at this time,
19   ladies and gentlemen of the jury.  We'll take our midmorning
20   break.  Please remember not to the discuss this case amongst
21   yourselves or with anyone else or form or express any
22   opinions.  We'll resume these proceedings in approximately
23   15 minutes, at 11:25.
24              (Whereupon, a break was taken from
25              11:10 a.m. to 11:30 a.m.)
26              THE COURT:  All right.  Once more on the record in
27   the matter of People versus Winzer.  Mr. Winzer present,
28   counsel present, jurors present, and Mr. Rogers still on the
```

```
 1    witness stand.

 2              You may continue, Mr. Walpole.

 3              MR. WALPOLE:  Thank you.

 4       Q    Taking a look again at People's 7, the point I

 5    whited out is the section of the doors that you say were not

 6    there.  Is that a more accurate description of what the

 7    doors look like now?

 8       A    Yes.

 9       Q    When you were finally able to detain the defendant

10    did you recover any property on him?

11       A    Yes.

12       Q    What did you recover?

13       A    A pack of shirts.

14       Q    And where were the package of his shirts?

15       A    In his pants.

16              THE COURT:  Let's start that question again,

17    please.

18    BY MR. WALPOLE:

19       Q    What did you find on the defendant's person?

20       A    Some shirts.

21       Q    Where was that at?

22       A    In his pants.

23       Q    Was it in the front of the pants, the back of the

24    pants?

25       A    It was in the front part of his pants.

26       Q    Did you actually pull the T-shirts out of his

27    pants?

28       A    Yes.
```

```
 1          Q    Did you photograph those T-shirts?

 2          A    Yes, I did.

 3          Q    Showing you what's previously been marked as

 4     People's Exhibit 9, do you recognize People's Exhibit 9?

 5          A    Yes, I do.

 6          Q    What does that appear to be?

 7          A    A package of T-shirts that he appeared to shove in

 8     the.

 9          Q    Were those the actual T-shirts that you recovered?

10               THE COURT:  You mean was that a photograph?

11               MR. WALPOLE:  Yeah.

12          Q    Was that a photograph of the actual T-shirts that

13     you recovered?

14          A    Yes.

15          Q    Were those T-shirts handed over to the police

16     department?

17          A    Yes.

18          Q    So the police saw these T-shirts?

19          A    I believe it was a day later they got the

20     merchandise.

21          Q    Was it these actual T-shirts, or were these actual

22     T-shirts thrown away?

23          A    The actual T-shirts thrown away.

24          Q    Why were they thrown away?

25          A    They were in the front part of his pants, there

26     was pubic hair on them.  Didn't want them.

27          Q    So I take it you weren't going to resell these to

28     customers based on where it was at?
```

```
 1         A      Definitely not.
 2                THE COURT:  Were you the person who disposed of
 3    them?
 4                THE WITNESS:  No, sir.
 5                THE COURT:  Were you the person responsible for
 6    them being disposed?
 7                THE WITNESS:  No.
 8    BY MR. WALPOLE:
 9         Q      As part of Target's policies, did you also take a
10    picture of the defendant?
11         A      Yes, I did.
12         Q      Showing you what's previously been marked as
13    People's Exhibit 8, do you recognize that?
14         A      Yes.
15         Q      What does that appear to be?
16         A      A picture of Lacy Winzer.
17         Q      Was that a picture of the defendant how he looked
18    at or near when this happened?
19         A      Yes.
20         Q      Did you also take for Target's own records various
21    other pictures of your own injuries that you got on March
22    10th?
23         A      Yes.
24         Q      Did you also take pictures of what was on other
25    items that were on the defendant's person?
26         A      Yes.
27                MR. WALPOLE:  Thank you.  No further questions.
28                THE COURT:  All right.  Thank you.
```

82

```
 1              And, Ms. Gin, cross-examination.
 2                     CROSS-EXAMINATION
 3                        BY MS. GIN
 4   BY MS. GIN:
 5       Q    Good morning, Mr. Rogers.
 6       A    Good morning.
 7       Q    Do you remember me from the hearing that we had in
 8   Pittsburg earlier this year?
 9       A    Yes, ma'am.
10       Q    And do you remember testifying just like you're
11   testifying today under oath to tell the truth?
12       A    Yes, ma'am.
13       Q    Do you remember testifying on June 7th of this
14   year?
15       A    That was when we met; right?
16       Q    Correct.
17       A    Yes, I do.
18       Q    When Mr. Winzer turned around and squared up
19   towards you, he was outside the store at that time; is that
20   correct?
21       A    He just stepped outside.
22       Q    Because part of Target policies and procedures is
23   that you wait for the suspected thief to exit the store
24   before you contact them?
25       A    Correct.
26       Q    Now, you said that you've been working for Target
27   for about nine to ten months as a loss prevention officer on
28   the date that you detained Mr. Winzer; is that correct?
```

```
 1        A    That's correct.

 2        Q    And you did go through the Target Corporation

 3   training in terms of being a loss prevention officer?

 4        A    Yes.

 5        Q    And Target actually calls you "assets protection

 6   specialists"; is that correct?

 7        A    Yes, ma'am.

 8        Q    And how long was this -- how long is this training

 9   that you have to take before you become an assets protection

10   specialist?

11        A    About a month.

12        Q    There are also written policies and procedures

13   that Target gives you for you to read and be familiar with

14   before you're actually hired as an assets protection

15   specialist; is that correct?

16        A    No.

17        Q    Are you familiar with the assets protection

18   external directives?

19        A    Yes.

20        Q    Did they provide that to you when you were going

21   through this month long training?

22        A    Yes.

23        Q    And part of your training is to read up on what

24   the assets protection external directives are, be familiar

25   with them and follow those policies and procedures?

26        A    Yes, ma'am.

27        Q    When this occurred on May 10th of this year, were

28   you familiar with the Target procedures in terms of
```

1  apprehending suspected thieves and retaining property?

2       A    Yes.

3       Q    In fact, as part of your ongoing training, you

4  received any directives that may have been updated, so you

5  are familiar with them and you get a copy of them; is that

6  correct?

7       A    Yeah, we're up to date.

8       Q    And your boss at this time was Mr. De La Torre?

9       A    Yes.

10      Q    Now focusing your attention on what occurred

11 outside the store, when you actually for the first time made

12 contact with Mr. Winzer, your testimony is that after he

13 exited the store, that's when he turned around and squared

14 up towards you; is that correct?

15      A    Yep.

16      Q    And at that time you were still inside the store,

17 or were you now in the process of walking outside the store?

18      A    I was still in the store.

19      Q    Prior to Mr. Winzer hitting you, isn't it true

20 that you touched him first?

21      A    I can't recall.  I believe he struck me first.

22 After I identified myself.  I'm not too sure on that.  It's

23 kind of blurry, just to let you guys know.

24           THE COURT:  Which part of that?

25           THE WITNESS:  I'm not sure if he struck me first,

26 or if I touched him first.  I'm not sure.

27 BY MS. GIN:

28      Q    Would looking at a preliminary hearing transcript

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1   perhaps refresh your recollection of the sequence of events?
 2              If I could direct court and counsel page 22 --
 3              MR. WALPOLE:  I'm sorry, I couldn't hear an
 4   audible responsible.
 5              MS. GIN:  I saw a nod.
 6              THE COURT:  Yeah.  Whether he thinks he would or
 7   would not, you still could show him the portions and see if
 8   it does.
 9              MS. GIN:  On page 22 lines 21 and 24.
10        Q    Mr. Rogers, if you could just take a moment, and
11   if I could just direct to you...
12              THE COURT:  Question.
13   BY MS. GIN:
14        Q    Now that you have looked at the preliminary
15   hearing transcript of your testimony, do you recall now
16   whether you touched Mr. Winzer first or he touched you
17   first?
18        A    No, I'm still unaware.
19        Q    So after reviewing your statement, "I put my hand
20   on his wrist and he swung on me," that does not refresh your
21   recollection?
22        A    It refreshes my recollection, but I don't
23   particularly recall if that's what happened or not.
24        Q    Now, you know at the preliminary hearing you were
25   sworn to tell the truth; is that correct?
26        A    Most definitely, yes.
27        Q    In looking at page 14 of the preliminary hearing
28   transcript, lines 24 and 26, if I could show this to you, if
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    it would refresh your recollection about the sequence of

2    events?

3            THE COURT:  Let's be more specific.  Are you

4    talking about the same manner.

5    BY MS. GIN:

6        Q    In terms of if you touched Mr. Winzer first or if

7    he touched you.

8            THE COURT:  You can show him anything you wish.

9            Okay.  Looking at those bottom of page 14 and page

10   15, does that serve to refresh your recollection any further

11   as to what occurred, or the sequence of events?

12           THE WITNESS:  It's still the same.  I mean, what I

13   said.  I just -- I don't remember it as of right now, so I'm

14   not going to say anything.

15   BY MS. GIN:

16       Q    So in looking at your testimony that you grabbed

17   Lacy Winzer's arms, that does not refresh your recollection

18   as to whether he grabbed him first or he grabbed you?

19       A    Or he hit me first, no.

20       Q    But that's what you testified to earlier in a

21   proceeding?

22           MR. WALPOLE:  Objection, your Honor.

23           THE COURT:  Sustained.

24           MS. GIN:  It goes to impeachment purposes.

25           MR. WALPOLE:  He says he can't remember.

26           THE COURT:  But he can't recollect.  Sustained.

27   BY MS. GIN:

28       Q    In looking at the video recording that you saw

1    earlier this morning, you testified that there was a frame

2    with you holding onto Mr. Winzer; is that correct?

3         A    Yes.

4         Q    And that was outside the store?

5         A    Yes, it was.

6         Q    You're telling us today that when Mr. Winzer was

7    outside the store and squared toward you, he then swung one

8    of his arms towards your face; is that correct?

9         A    When he was square with me did he swing at me?

10        Q    Yes.

11        A    Yes.

12        Q    Do you recall which arm he swung at you, the right

13   or the left?

14        A    No, I don't.

15        Q    And when he swung at you, were you in physical

16   contact with him in terms of trying to stop him?

17        A    I don't particularly remember.

18        Q    Was he able to get in three swings before you were

19   able to try to control hold him?

20        A    It was approximately three closed fist hits to the

21   face.

22        Q    And then you were able to control hold him?

23        A    Yes.

24        Q    Do you recall -- Oh, did you prepare an incident

25   report on this case?

26        A    Yes, I did.

27        Q    As part of your duties as an assets protection

28   specialist you prepared a report of what occurred in this

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1   situation?

2          A    Yes, ma'am.

3          Q    It's a four-page report?

4          A    I don't know how many pages there are.

5          Q    Do you have a copy with you today?

6          A    No, I don't.

7          Q    Is that your report?

8          A    Let me look through it real quick.

9          Q    Sure.  Take your time.

10         A    Yeah, that's my report.

11         Q    If I can show you page 4 of your report, looking

12  at the paragraph.

13              And for counsel and Court, the fourth paragraph

14  from the bottom, or the fourth paragraph from the top.

15              And for you, Mr. Rogers, the highlighted portions

16  I did in purple, if you could read that paragraph of your

17  report, and if that will assist you in refreshing your

18  recollection in terms of the sequence of events in terms of

19  who touched who first.

20         A    The highlighted area I'm going to read right now?

21              THE COURT:  No.  Just read it to yourself.

22              THE WITNESS:  Oh, okay.  Okay.

23  BY MS. GIN:

24         Q    Does that help refresh your recollection about

25  whether you touched Mr. Winzer first or the other way, or he

26  touched you first?

27         A    No, it doesn't.  I do not remember in my head

28  right now at this time what -- who touched who first.

1      Q    Now, the purpose of the report is to document what
2  occurred; is that correct?
3      A    That's correct.
4      Q    And if it turns out that you have to come to court
5  later, after May 10th, 2005, you can look at your report to
6  sort of remind you what occurred on that day?
7      A    Yes.
8      Q    And you've been given this training when you first
9  started as an asset protection specialist, and it's ongoing
10 in your duty as an assets protection specialist; is that
11 correct?
12     A    Yes, ma'am.
13     Q    So now that you're looking at that report, it
14 still does not refresh your recollection on who touched who
15 first?
16     A    No, ma'am, it doesn't.  I do not particularly
17 remember who touched who first.
18     Q    When you identified yourself as a Target security
19 person, was that while you were inside the store or outside
20 the store?
21     A    That was while I was inside the store.
22     Q    In looking at that particular paragraph that I
23 directed your attention to, does that help refresh your
24 recollection as to whether it was inside or outside?
25     A    It appears that he was -- that I was inside the
26 store.
27     Q    Does it say so there in the report?
28          MR. WALPOLE:  Objection.  Relevance.

```
 1              THE COURT:  Overruled.

 2              MR. WALPOLE:  Hearsay.

 3              THE COURT:  Overruled.  As I understand it, this

 4   is the report which this witness has prepared.  So the

 5   objection's overruled.

 6              THE WITNESS:  Can you please repeat your question?

 7   BY MS. GIN:

 8       Q    Does it say so in the report that you were inside

 9   the store when you identified yourself as a Target security

10   person?

11              THE COURT:  I beg your pardon.  Two questions.

12   The report is not in evidence.  So if it's in the report or

13   not, you can't ask him that at this point.  So the objection

14   is sustained.

15              The second thing is the objection is hearsay.  I

16   take it you're offering it as a prior inconsistent

17   statement?

18              MS. GIN:  That's correct, your Honor.

19              THE COURT:  And the witness has said he can't

20   recall.  The witness has said that he was inside the store.

21   Are you suggesting that this statement says the contrary?

22              MS. GIN:  That's correct, your Honor.

23              THE COURT:  Then I can allow it.  It will come in

24   as an inconsistent statement.  You can read it.

25              THE WITNESS:  I can read it?

26              THE COURT:  Yes.

27              THE WITNESS:  It says, "As Winzer exited, he

28   turned around, and I identified myself as Target security."
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1   BY MS. GIN:

2        Q    Does it say in your report that you were inside

3   the store at the time?

4        A    Do you want me to look at my report?

5        Q    If you'd like.

6             THE COURT:  Ms. Gin, it may appear to be a small

7   matter, but your question is acceptable if you're asking

8   "did you put into the report" as opposed to what's in the

9   report.

10            MS. GIN:  That's fine.

11       Q    Did you put into your report that you were inside

12  the store at the time you identified yourself as Target

13  security?

14       A    No, I don't believe so.

15            MR. WALPOLE:  Objection.  Hearsay.  It's not

16  inconsistent.

17            THE COURT:  No, the question here is not whether

18  he made an inconsistent statement, but whether he put

19  information of that effect into the report.  Overruled.

20  BY MS. GIN:

21       Q    If I can have your report back?

22       A    Yeah, most definitely.

23       Q    Did you actually see Mr. Winzer take a package of

24  five T-shirts from the shelf in the Men's Department?

25            MR. WALPOLE:  Objection.  Vague as to actually

26  see.

27            THE WITNESS:  I mean, I can't recall.

28            THE COURT:  Hold on a second.  Overruled.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

92

BY MS. GIN:

   Q    I'm sorry?

   A    I can't recall.

   Q    When did you first see the package of T-shirts?

   A    I can't recall that either.  However, Lacy Winzer was called out to me.  So I probably observed him with the selection.  I just can't totally remember.  It was quite a few months back.  So I'm just trying to be totally truthful.

       THE COURT:  What do you mean by Lacy Winzer was called out to me.

       THE WITNESS:  Target protection specialists called him out when he entered the store.  So I was probably -- I probably seen the selection.  Like I said, I do not want to say yes to something that I'm not 100 percent sure on.

BY MS. GIN:

   Q    Let me make sure I understand this correctly.

       THE COURT:  And let me clarify something.

       Maybe this is what you're objecting to, Mr. Walpole.

       When we talk about actually see, that would include seeing on the --

       THE WITNESS:  Monitor.

       THE COURT:  -- on a monitor.

       THE WITNESS:  Yes, sir.

       THE COURT:  You understood the question in that way?

       THE WITNESS:  Yes.

1   BY MS. GIN:

2       Q    Who was this person who alerted you to Mr. Winzer

3   coming into the store?

4       A    Can I see my report again, please?

5       Q    Sure.

6       A    Okay.

7            THE COURT:  You having seen that, do you now

8   recollect who it was?

9            THE WITNESS:  I believe it was a gentleman, it was

10  either -- it was one of the TPS's.  I believe it was Alex,

11  Alex Azevedo or Tommy Weaver who was from a different store

12  who was working for us.  It may have been Tommy Weaver.

13  BY MS. GIN:

14      Q    Did you write down in your report which person it

15  was that alerted you to Mr. Winzer?

16      A    No, ma'am, I didn't write down.

17      Q    And when you heard the alert, that was through the

18  walkie-talkie system that you made reference to earlier?

19      A    Yes, ma'am.

20      Q    And this is when Mr. Winzer entered into the

21  Target store; is that correct?

22      A    Yes, ma'am.

23      Q    And when you first observed Mr. Winzer through the

24  closed circuit monitor system, where was he at?

25      A    I don't remember.

26      Q    Was he at the Men's Department at that time, or

27  was he going through the front area of Target?

28      A    Like I said, I don't remember all that.  I

```
 1   remember -- I just remember observing him in the Men's
 2   Department.  I don't know.  I could have been watching him
 3   before.  I watch hundreds of people a day.  I don't
 4   remember --
 5            THE COURT:  Again, when you say observing him, at
 6   all times you refer to observing him on the monitor?
 7            THE WITNESS:  On the monitor, closed circuit
 8   television.  I don't know.
 9   BY MS. GIN:
10        Q    And when you're observing someone through your
11   monitoring system, there is a videotaping capacity; is that
12   correct?
13        A    Yes.  I mean, it's videotaping, yes, ma'am.
14        Q    So even when there may be -- strike that.
15            So you have about 60 monitors that you're looking
16   at at one time?
17        A    No, 60 cameras.
18        Q    And is your system videotaping everything that's
19   being observed by these 60 cameras?
20        A    Yes, ma'am.
21        Q    So you don't have to Target anyone in particular.
22   The videotaping is ongoing whenever the store is open?
23        A    Yes, ma'am.
24        Q    And in this particular videotape that we saw
25   earlier this morning, is it the original or the copy that
26   you gave to the Pittsburg Police Department?
27        A    I believe it's a copy.
28        Q    Were you the one who made the copy for the
```

```
 1    Pittsburg Police Department?

 2         A    No, ma'am.

 3         Q    Before you handed it over to the Pittsburg Police

 4    Department, did you look at it?

 5         A    I believe so.

 6         Q    And when I say you, I don't mean you personally

 7    handing it over to the Pittsburg Police Department, but did

 8    you look at a copy that was to be given to the Pittsburg

 9    Police Department and say, that's what happened, and it's

10    okay to give it to the Pittsburg Police Department?

11         A    I'm not sure.

12         Q    Do you know who gave it to the Pittsburg Police

13    Department?

14         A    No, ma'am.  I would think it would be David

15    De La Torre.

16         Q    If Mr. Winzer took a package from the Men's

17    Department where the T-shirts are located, it would have

18    been videotaped; is that correct?

19              MR. WALPOLE:  Objection.  Speculation.

20              THE COURT:  I think you have to rephrase it.

21    BY MS. GIN:

22         Q    From your knowledge of the videotaping capacity of

23    your store, and your vantage point of where the cameras are

24    looking at, do the cameras point at the rack where the

25    T-shirts are located?

26         A    No, you have to move the camera that way.

27         Q    So when you saw Mr. Winzer in that videotape,

28    could you see the rack where the T-shirts are located?
```

1       A    Yes.

2       Q    So the camera is pointing at the rack where the

3   T-shirts are located?

4       A    Only when you move it that way.

5       Q    But when you saw Mr. Winzer in that aisle you did

6   see the rack of the T-shirts, so you did move the camera

7   that way?

8       A    I did move the camera that way.

9       Q    So you could see someone in front of the rack

10  where the T-shirts are if you move the camera that way?

11      A    Yes, ma'am.

12      Q    And video whether they were taking that package or

13  not, if you move the camera that way?

14      A    Yes, ma'am.

15           THE COURT:  This is take good time for us to

16  adjourn for noon.

17           Mr. Rogers, you're going to have to return at 1:30

18  this afternoon.  All right?  This cross-examination will

19  continue at that time.

20           Ladies and gentlemen, please do not discuss the

21  case among yourselves or with anybody else.  Please don't

22  form or express any opinions.  Please wait until you've

23  heard all the instructions of law and arguments of counsel.

24           Thank you.  1:30 this afternoon.

25           MS. GIN:  May we approach, your Honor?

26           THE COURT:  Yes.

27           (Whereupon, a lunch break was taken from

28           12:00 p.m. to 1:43 p.m.)

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | VIOLET M. LEE, State Bar No. 77144
Deputy Attorney General
6 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
7 | Telephone: (415) 703-5896
Fax: (415) 703-1234
8 | Email: Violet.Lee@doj.ca.gov

9 | Attorneys for Respondent

10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

15 | **LACY WINZER,**

Petitioner,

16

17 | v.

18 | **BILL CURREY, Warden,**

Respondent.

19

C 08-2341 PJH (PR)

**EXHIBIT 5 (part 2)**

20

21

22

23

24

25

26

27

28

EXHIBIT 5 (part 2)

Winzer v. Currey
C 08-2341 PJH (PR)

# EXHIBIT 5 (part 2)

```
 1   Thursday, August 11, 2005:                      1:43 p.m.

 2

 3                    AFTERNOON PROCEEDINGS

 4

 5        THE COURT:  The record will reflect Mr. Winzer is

 6   present, counsel is present, counsel for the People is

 7   present (outside the presence of the jury.)

 8        You wish to raise some subject matter?

 9        MS. GIN:  Yes, your Honor.

10        When Mr. Rogers was testifying on

11   cross-examination, I had shown him the preliminary hearing

12   transcript, and I was asking questions, "Did you testify at

13   the preliminary hearing that you touched my client," and the

14   District Attorney objected as hearsay, and the Court

15   sustained that objection.

16        THE COURT:  No, I believe I did to that specific

17   question, "did you testify."

18        MS. GIN:  I wasn't allowed to ask him the

19   question.  I was in the process of asking, "Did you testify

20   that you touched my client," and I referenced the page and

21   counsel objected as hearsay.

22        THE COURT:  Did you testify at that prior hearing?

23        MS. GIN:  Yes.

24        THE COURT:  Correct.  After he testified he simply

25   doesn't recall.

26        MS. GIN:  That's correct, and you said that that

27   isn't inconsistent.  My concern is when he said he doesn't

28   remember at that proceeding, but he remembered on June 6th
```

1  at the preliminary hearing that is inconsistent.  I don't
2  remember today, but I remember two months ago that it
3  happened this way.
4        THE COURT:  No.  The prior statement, the prior
5  statement -- he said here at this hearing that he doesn't
6  remember.  So his previous testimony to the effect that -- I
7  think the effect was your client only struck him after he
8  was touched by the witness is not inconsistent, because he
9  just doesn't remember now.  That's not an inconsistent
10 statement.  If he had testified here, expressly or
11 implicitly, that, no, that wasn't the case, that would be
12 inconsistent, but to say I don't remember, allows for it to
13 be true or not true both.
14        MS. GIN:  But his statement today, if you take it
15 to the full cause, "I do not remember if I hit Mr. Winzer
16 first or if Mr. Winzer hit me."
17        THE COURT:  Correct.
18        MS. GIN:  But at the preliminary hearing, "I
19 remember that I hit Mr. Winzer first."
20        MR. WALPOLE:  It wasn't hit.
21        THE COURT:  He didn't say -- he said, "I hit him
22 first."
23        MS. GIN:  Yeah.
24        THE COURT:  Words to that effect.
25        MS. GIN:  Words to that effect.
26        That is inconclusive, your honor, because what
27 you're saying to me -- let's say we had a prosecution
28 witness on a domestic violence case -- and this is not

```
 1   uncommon -- the woman testifies at the preliminary hearing
 2   to great details about what the defendant did to her, but at
 3   the trial, let's say, she has a change of heart and now her
 4   testimony is I don't remember.
 5            THE COURT:  Well, that's right, and the court
 6   should find before he allows that in, those are purposefully
 7   evasive answers.  You did not ask me to make that finding,
 8   and I must say even you ask me to make that finding, I'm not
 9   inclined to make it.  He seems very genuine in his belief
10   that he simply presently does not remember.
11            MS. GIN:  What happens now, your Honor, is that
12   I'm precluded from introducing a statement from which he
13   took under oath to show it's inconsistent.  And I think
14   you're reading inconsistent too narrow.
15            If you look at Evidence Code 1235, it doesn't have
16   to say it's contrary.  It's just not consistent with his
17   testimony today.
18            THE COURT:  That's right.
19            MS. GIN:  And you --
20            THE COURT:  And the statement "I don't remember"
21   is not inconsistent.
22            MS. GIN:  It's also implicit in his testimony that
23   my client hit him first.  When he said that my client
24   squared around, he said, "I'm Target security.  He hit me
25   three times."  It's implicit that my client hit him first.
26            THE COURT:  None of the statements that he made
27   previously that you referred to at the preliminary
28   hearing -- in the preliminary hearing transcript are
```

1    inconsistent with what he said now.  He's not denying in any

2    sense that he touched your client first.  He's not denied

3    that.  He simply says, "I don't know.  I don't remember."

4        MS. GIN:  Do you see where my concerns are, your

5    Honor?  Because under oath at a prior hearing he testified

6    that he touched my client first.

7        THE COURT:  That's right.

8        MS. GIN:  So now at this trial he says, "I don't

9    remember," and he comes across in a way that may seem

10   believable to the Court that you don't find that he's being

11   purposefully evasive.  That means I can't get in the prior

12   statement.

13       THE COURT:  I don't know if you have some

14   alternative business for getting it in, but it doesn't come

15   in as a prior inconsistent statement.

16       MS. GIN:  Your Honor, I beg to differ, and that's

17   why I wanted to bring it up, because when the Court

18   articulated sustaining the objection I was really taken

19   aback, but at that time we didn't have enough time because

20   it was so close to the noon hour to discuss this issue.

21       THE COURT:  I'll tell you what, you will have an

22   opportunity over this weekend to research the matter

23   further.  If it is not hearsay, you will be allowed to read

24   into the record the portion of the preliminary hearing

25   transcript.  So I'm willing to listen further, but you're

26   going to have to find me a case that matches our situation

27   here.  The witness says I don't remember what happened, and

28   then you want to introduce prior testimony of that person on

1   the grounds that it's inconsistent.  It's not inconsistent
2   with his testimony here, because what he said previously can
3   be very much consistent with what he said.  But if you
4   find -- you know, if you can find any authority to the
5   contrary, or either expressly, on the issue or further
6   argument, I'm more than willing to entertain it.  If you
7   persuade me that that's the case, you'll be allowed to read
8   those portions of the transcript.
9           MS. GIN:  On the other area that you touched upon,
10  your Honor, I would ask the Court, at the end of his
11  testimony, once I complete my cross-examination, if you will
12  make a finding whether he's being purposefully evasive or
13  not, because "I don't remember," in light of the fact that I
14  directed both Court and counsel to portions of the
15  transcript that are relevant.
16          THE COURT:  Let me address it this way:  So far,
17  based on everything that I've heard so far, I don't find his
18  responses of "I don't remember" to be evasive.  However, at
19  the end of his testimony, we can revisit that.  If there's
20  anything that warrants my changing my mind, I will do so.
21          All right.  Let's bring him back in and bring the
22  jury in.
23          Do we have now equipment that works?
24          MS. GIN:  I don't know, your Honor.  We're trying
25  it now, because I need to reference Mr. Rogers to a portion
26  of the video.
27          (Whereupon, the (jury) entered the
28          courtroom.)

102

```
 1          THE COURT:  Okay.  Thank you for your patience
 2   once more.  We addressed some further equipment problems,
 3   and some legal problems, some other problems, but we're
 4   ready to proceed now in the matter of the People of the
 5   state of California versus Lacy Winzer, who is present.  His
 6   counsel, Ms. Gin, is present.  Mr. Walpole is present on
 7   behalf of the People.  All of our jurors, including our
 8   alternate, are back in the courtroom, and we have Mr. Rogers
 9   back on the witness stand.
10          We're ready to proceed with cross-examination.
11   BY MS. GIN:
12      Q    Before we broke for lunch, Mr. Rogers, I recognize
13   you weren't feeling well because.  Do you still want to
14   proceed this afternoon?
15      A    Yeah, I can't keep coming back.
16      Q    I just want to ask you, because if you're not
17   feeling well, you can come back another day.  If you're up
18   to it, I'll still ask you some questions.
19      A    Yes, ma'am, that's fine.
20      Q    Can you see the screen from where you're sitting?
21      A    Yes.
22      Q    This is the beginning of -- strike that.
23          This is the videotape that we observed earlier
24   this morning; correct?
25      A    Yes.
26      Q    Now, of course, all you see -- I put it on
27   pause -- all you see is a lot of fuzz and stuff like that.
28   Is it fair to say that the package of Fruit of the Loom
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    T-shirts is on this rack in the back?

2        A    Somewhere in the area.

3        Q    Let me play it a little forward.

4            (Whereupon, People's Exhibit Number 11 was

5            played.)

6    BY MS. GIN:

7        Q    So right there in the back; is that correct?

8        A    Yes ma'am.

9        Q    Once again back there?

10       A    Yes, ma'am.

11       Q    Before we broke for lunch, I was talking to you

12   about your observations of Mr. Winzer taking this package of

13   T-shirts from that particular area.  Do you recall that?

14       A    Yes, ma'am.

15       Q    And I think I asked you specifically if you

16   actually observed Mr. Winzer through the monitors taking

17   something from that rack area, and your response was that

18   you didn't remember?

19       A    Yes, ma'am.  That's correct.

20       Q    Now, if I can show you what's been marked as

21   Defense Exhibit A.  Showing to you what's been marked as

22   Defense Exhibit A, which has at its title, "Assets

23   Protection External Directives, Apprehension Guidelines,

24   effective March 7th, 2005."  Are you familiar with that

25   directive?

26       A    I believe so.  Yes.  Definitely.

27       Q    You've had a chance to look at this now, and you

28   are familiar with this directive?

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1          A    I am familiar.

2          Q    And you were operating under this directive when

3     you were employed on May 10th of this year?

4          A    Yes, ma'am.

5          Q    This directive gives you five -- five areas that

6     you must cover before you apprehend someone; is that

7     correct?

8          A    That's correct.

9          Q    And one of them is that you must observe the

10    individual select merchandise from the display location?

11         A    Correct.

12         Q    You must also observe the individual in the area

13    without the company's merchandise?

14         A    Correct.

15         Q    And, in fact, that's the first step, which is the

16    initiation of observation, that you observe -- let's say,

17    for example, Mr. Winzer coming into the store without any

18    Target property.

19         A    Correct.

20         Q    And then the next step is you must actually

21    observe, for example, Mr. Winzer take something from a

22    display location in Target.

23         A    Correct.

24         Q    Now, you've testified that your observation,

25    through the monitors, of course, was much more clearer than

26    what we saw on that video?

27         A    Yes.

28         Q    Now, on that video we saw Mr. Winzer with a cart

```
 1   and a package; is that correct?  Is that what you saw that
 2   day?
 3        A    Yeah.
 4        Q    Now, on that video, we only saw his back to the
 5   camera, to the point where you testified that he was
 6   concealing the package.  Could you see the front of him?
 7        A    No, ma'am.
 8        Q    So what you saw on that nice 12 by 12 screen, as
 9   you said, clear as day, is actually the same vantage point
10   we see in that video; is that correct?
11        A    Not necessarily.  That has three seconds lapse in
12   between the time.
13        Q    So you're saying that that video does not cover --
14   maybe three seconds are missing from it?
15        A    It goes in what's 24 hours, so it does it like
16   segments.  You can't see exactly what happens.  It was a lot
17   clearer when I was observing it.
18        Q    Did you ever see the front of Mr. Winzer from your
19   location at the closed circuit T.V. room where you actually
20   saw him put his hands down his pants with the package?
21        A    I seen him put the package in his pants from
22   behind.
23        Q    You've seen the video today.  Did you see
24   something more than what we saw?
25        A    Yeah, it was more.  You can actually see the
26   package go up with the back of his hand.  You can see him
27   look over, lean over, and you can see him shove it down in
28   his pants.
```

1    Q    With his back to the camera?

2    Ⓐ    With his back to the camera.

3    Q    And this portion would have been videotaped by

4    your video equipment; is that correct?

5    A    Yes, ma'am.

6    Q    And as you testified before we went on the lunch

7    break, you actually directed the camera to that particular

8    section of the Men's Department so you could see what

9    Mr. Winzer was doing?

10    A    Yes, ma'am.

11    Q    Do you remember through the television monitors

12    and your recording equipment if you recorded Mr. Winzer

13    taking something from that shelf area in the back?

14    A    It wasn't on this tape today?  No.  I'm not sure.

15    Q    Did you see it on the tape today?

16    A    No, I didn't see it on today's tape.  I was

17    actually going to ask, is that as much of the tape as you

18    have?

19    Q    Yes, I believe so.  I believe it was given to the

20    Pittsburg Police Department.  Is there another tape out

21    there that would show more?

22    A    No, but I would think that -- I'm trying to

23    remember, I think I seen him coming right before he got

24    into -- excuse me -- the Men's.  So I was thinking there

25    might be a little more tape, and especially since Tommy

26    Weaver called him out, that's when I started observing him.

27    That's what I would normally do 99.9 percent of the times.

28    I just can't remember if that's what I did in this case.

1    Q    And your memory is you remember Tommy Weaver or

2    Alex Azevedo calling out to focus your attention on Lacy

3    Winzer.  You don't know where Lacy Winzer was when you

4    focused your attention on him?

5    A    No.

6    Q    Now, this Men's Department, using -- okay.

7    Looking at People's Exhibit 6, the Men's Department is right

8    here (indicating); is that correct?

9    A    Yes, ma'am.

10    THE COURT:  Why don't you, for the record,

11    indicate what you're pointing at?

12    MS. GIN:  I'm pointing at the red circle within

13    the rectangular box towards the top of the diagram on

14    People's -- I'm sorry -- towards the bottom of People's

15    Exhibit 6, using the tag as the bottom.

16    Q    On People's Exhibit 6, "FD" stands for front door;

17    correct?

18    A    Yes, ma'am.

19    Q    And so to get to the Men's Department from the

20    front door of your particular Target store, you have to walk

21    all the way to the back of the store?

22    A    Yes, ma'am.

23    Q    Okay.  Looking at People's Exhibit 7, this zero

24    and the triangle, that's the front door of the store;

25    correct?

26    A    Yes, ma'am.

27    Q    So looking at People's Exhibit 7, when you walk

28    through the front doors, you don't walk to the back to the

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1  Men's Department.  You just make a left turn to go to the
 2  Men's Department?
 3       A    No, you just walk straight up.  That (indicating)
 4  shouldn't be there.
 5       Q    So this is wrong?
 6            THE COURT:  "This" for the record?
 7  BY MS. GIN:
 8       Q    This label that says "Men's" on People's
 9  Exhibit 7, that's not where men's is located.
10       A    Yes.
11            MS. GIN:  Mr. Walpole --
12            MR. WALPOLE:  It's the restroom actually.
13  BY MS. GIN:
14       Q    Could you is -- Is that the Men's and Women's?
15  Must be the men's and women's restroom?
16       A    Yeah.
17       Q    If you could mark with black the Men's Department?
18            Do you mind Mr. Walpole if he marks it?
19            MR. WALPOLE:  That's fine.
20  BY MS. GIN:
21       Q    On People's Exhibit 7 --
22            THE COURT:  Doesn't that assume that it's shown on
23  that exhibit?
24  BY MS. GIN:
25       Q    Is it on this?
26       A    No.  It would be way up here (indicating).
27            MS. GIN:  Oh.  Thank you, your Honor.
28       Q    So the Men's Department wouldn't encompass what's
```

```
 1   in People's Exhibit 7?
 2        A    No.
 3             THE COURT:  As I understand it, 7 is simply an
 4   enlargement of a small portion of 6?
 5             THE WITNESS:  Yes, sir.  It's mainly the front
 6   area right here, just the front of the store.
 7   BY MS. GIN:
 8        Q    So going from the front door, looking at People's
 9   Exhibit 6, all the way to the back where the Men's
10   Department is, you walk through a number of departments,
11   such as the Women's Department?
12        A    No.
13        Q    What departments do you walk through before you
14   get to the Men's Department?
15        A    Domestics and Housewares.
16        Q    And the Men's Department where the T-shirts are
17   located is absolutely at the back of the store; is that
18   correct?
19        A    That's correct.  That is correct.
20        Q    And you recall seeing Mr. Winzer prior to him
21   arriving at the Men's Department from your location at the
22   closed circuit T.V.?
23        A    I believe so.  I don't want to say yes, but I'm
24   pretty sure I did.
25        Q    And so you followed his movement as he was going
26   through the store?
27        A    Yes, ma'am.
28        Q    Now, you testified this morning that you saw a
```

1    woman with Mr. Winzer who was acting as a lookout?

2        A    Yes, ma'am.

3        Q    Was she acting as a lookout right where the

4    T-shirts were located?

5        A    No.  No, she wasn't.  She was in the front, kind

6    of like in the main aisle looking basically on the

7    racetrack, where there's more people.

8        Q    The racetrack, as you refer to, is, if you started

9    from the front of the store through the front doors, you can

10   actually go around in an oval shape throughout the whole

11   store?

12       A    Yes, ma'am.

13       Q    And that when you saw Mr. Winzer in the aisle in

14   the back was the T-shirts and the aisle that he was actually

15   in with the shopping cart is where the socks were located;

16   is that correct?

17       A    Yeah, I believe so, yes, ma'am.

18       Q    And as you go past from the T-shirts through the

19   socks aisle, then you go right into the racetrack; is that

20   correct?

21       A    That's correct.

22       Q    And you saw this woman standing in that aisle

23   where the socks were located?

24       A    Yeah, she was in the -- not in the aisle where the

25   socks were.  I think she was just around either in the

26   racetrack or right on the edge of the racetrack.  Like a

27   lookout is really what I remember.  I couldn't tell you the

28   exact place.  Sorry.

1     Q    So you don't recall if she was in the aisle next
2    to the socks.  You just remember she was in racetrack
3    someplace near Mr. Winzer?
4     A    Yeah, I believe she was in the front of the
5    racetrack, looking out.
6     Q    And when you say looking out, she was moving her
7    head back and forth?
8     A    Yeah, just kind of taking a look, taking a nice
9    look around seeing who's present.
10     Q    And you observed that on the 12 by 12, or on all
11    those other T.V. monitors?
12     A    12 by 12.
13     Q    And that, of course, is videotaped too, as well?
14     A    Yes, ma'am.
15     Q    If you can look at Defendant's E, which states
16    "Assets Protection Operational Directives Preserving,
17    Processing, and Documenting Recovered Evidence, effective
18    March 7th, 2005, two of two pages."  Can you just take a
19    look at that, Mr. Rogers?
20     A    I took a look at it, ma'am.
21     Q    Are you familiar with it?
22     A    Yes, ma'am.
23     Q    And were you following that directive when you
24    were working for Target on May 10th as an assets protection
25    specialist?
26     A    Yeah.
27     Q    This directive instructs you on how to preserve
28    evidence that is taken from a suspected thief; is that

1    correct?  Or shoplifter.

2        A    Yes, ma'am.

3        Q    Does this directive instruct you to preserve

4    evidence?

5        A    Yes, ma'am.

6        Q    And part of your duties is to preserve evidence;

7    is that correct?

8        A    Yes, ma'am.

9        Q    And that you are supposed to put the evidence

10   either in your evidence locker or give it to the police?

11       A    Yes, ma'am.

12       Q    And when we talk about evidence, we're talking

13   about things that you have taken from the shoplifter that

14   belongs to Target; is that correct?

15       A    Yes, ma'am.

16       Q    And that you're instructed to store all physical

17   evidence in a bag or container and seal the evidence in a

18   bag or container to protect the items from tampering?

19       A    Yes, ma'am.

20       Q    Then you're also instructed to have an evidence

21   property tag identifying who the asset protection specialist

22   was, who the shoplifter was, the date that this item was

23   taken from the shoplifter; is that correct?

24       A    Yes, ma'am.

25       Q    And that at that point you, as an assets protects

26   specialist has the option of keeping it in the Target for

27   protection of evidence, or give it to the police department?

28       A    Yes, ma'am.

1    Q    Okay.  In this particular case with Mr. Winzer,
2  you did not do any of these things; is that correct?
3    A    Yes, ma'am.
4    Q    And you said that this item that was taken from
5  Mr. Winzer was thrown away, but you didn't do it?
6    A    Yes, ma'am.  We could not resell the package.
7    Q    Does the directive tell you to throw away the
8  evidence if you can't resell it?
9    A    I'm not sure.  It was my call to throw that
10  package away -- well, we didn't want it in there with, like
11  I said, the pubic hair on it, and the package was ripped,
12  and no one was to come in contact with that.
13    Q    But this directive tells you that if Target
14  property is taken from a shoplifter, you actually take that
15  property away from the public in terms of selling it, you
16  put it in evidence, either in your property evidence locker
17  or in the police evidence locker; is that correct?
18    A    Usually if we do anything, we give it to the
19  police.  We don't have an evidence locker at Target.
20    Q    So you don't sell, necessarily, things you take
21  from suspected shoplifters that is Target property?
22    A    That is correct.
23    Q    In looking at People's Exhibit 9 this is the
24  picture of the package you said -- you testified to -- came
25  from my client; is that correct?
26    A    Yes.  Yes.
27    Q    Did you take the photograph, or did someone else
28  take it?

1       A     I took it.

2       Q     And I'm sorry, what date did you take it?  The

3   date that my client was arrested by Pittsburg Police

4   Department, or the next day?

5       A     The same day that your client was arrested.

6       Q     Was there any Target tags on this package?

7       A     No, there is no Target tags on any of the

8   packages.

9       Q     Was there any tags from another store on that

10  package?

11      A     No, ma'am.

12      Q     You're sure there was no other tags on that

13  package?

14      A     Not that I recall.

15      Q     Do you recall -- strike that.

16            And when you photographed this package, did you

17  photograph both the front and the back, or just the front?

18      A     I did just the front.  Just this one picture right

19  here (indicating).

20      Q     Did you dispose of this particular package before

21  the police got there or after the police got there?

22      A     I'm not sure, ma'am.

23      Q     Did you eventually give to the police another

24  package?

25      A     Yes.

26            MS. GIN:  If I could have that.  If I can have

27  this marked, it's actually the People's exhibit, your Honor,

28  but we actually have this witness here, next in order

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1    People's Exhibit 11.
 2              THE CLERK:  10.
 3              MS. GIN:  10.
 4              (Whereupon, People's Exhibit Number 10 was
 5              marked for identification.)
 6    BY MS. GIN:
 7         Q    In looking at People's 10, did you give that
 8    package to a Pittsburg police officer by the name of Officer
 9    Ligouri?
10         A    It wasn't me.  It was somebody on the asset
11    protection team.
12         Q    Were you the one who went to the rack at the back
13    of the Target store to get that particular package so it
14    could be given to the Pittsburg Police Department?
15         A    No.
16         Q    Someone else did from your team?
17         A    Yes, ma'am.
18         Q    And your testimony -- strike that.
19              Is that package similar to the one that you
20    photographed?
21         A    It's similar.
22         Q    Well, similar says it's not the same package, but
23    is it the same brand, the same size, the same type?
24         A    I'm not sure what size it was.  This is the double
25    extra large right here.  The package appears to be the same,
26    Fruit of the Loom.  I remember it being a Fruit of the Loom.
27              THE COURT:  Ms. Gin, we may need to lay a greater
28    foundation.  It does not appear that this is the individual
```

```
 1    who provided the package.
 2              MS. GIN:  Let me follow up with some other
 3    questions, your Honor.
 4              THE COURT:  Because he may not have personal
 5    knowledge of these matters.
 6    BY MS. GIN:
 7        Q    Were you ever shown this package by one of your
 8    fellow assets protection people before it was given to the
 9    Pittsburg Police Department?
10        A    I can't recall.
11        Q    Is this the first time you've seen this particular
12    package today, I mean right now in trial?
13        A    No.  I seen this earlier.
14        Q    When?
15        A    When we were in his office, I seen it on his desk.
16              THE COURT:  His, Mr. Walpole's office?
17              THE WITNESS:  Yeah.
18    BY MS. GIN:
19        Q    So your testimony today is you're not too sure if
20    you had seen this package the day it was given to the
21    Pittsburg Police Department?
22        A    No, I'm not sure, ma'am.
23        Q    Do you know which person handled this -- gave a
24    package to the Pittsburg Police Department?
25        A    Like I said, no, no, I do not.
26        Q    In looking at Defendant's Exhibit C, which is
27    "Assets Protection External Directives, Pursuit of
28    Shoplifters, effective March 7th, 2005," can you just take a
```

```
 1    look at that?

 2         A     Yeah.   Okay.

 3         Q     This -- Are you familiar with this directive?

 4         A     Yes, ma'am.

 5         Q     And were you operating under this directive back

 6    in May 10th of this year when you were an assets protection

 7    specialist?

 8         A     Yes, ma'am.

 9         Q     This directive tells you what to do when you

10    pursue shoplifters; is that correct?

11         A     Yes, ma'am.   This is a pursuit of a shoplifter if

12    they run.

13         Q     The guidelines is that if a shoplifter attempts to

14    flee after being confronted, team members of the assets

15    protection unit will not give chase in any manner, running

16    or driving; is that correct?

17         A     Yes, ma'am.

18         Q     And that includes touching them; is that correct?

19         A     No, that's not true.

20         Q     You can't run after them, but you can apprehend

21    them?

22         A     Oh, yes.

23         Q     Now, Mr. Rogers, were you written up in December

24    of last year for being involved in the apprehension of

25    someone when you were off duty?

26         A     Yes, ma'am.

27         Q     And that's part of your personnel file; is that

28    correct?
```

```
 1        A    Yes, ma'am.

 2        Q    Were you also written up --

 3        A    However, I think --

 4        Q    If I can ask the question?

 5        A    Go ahead.  Sorry.

 6        Q    Were you also written up on April 2nd, 2005, by

 7   your supervisor David De La Torre for a non-productive

 8   incident in which you apprehended someone who had no items

 9   of Target on them?

10        A    Yep.

11        Q    And that's also part of your personnel file?

12        A    Yeah.

13        Q    And in your report in this case, did you write

14   down that the property taken by Mr. Winzer was Fruit of the

15   Loom socks?

16        A    Yes, I did.

17        Q    And that's a mistake?

18        A    That's a mistake.

19        Q    In terms of People's Exhibit 10, do you know where

20   that particular package is located in terms of the rack in

21   the back of the store?  Is it the top, in the middle, or

22   down at the bottom?

23        A    That I don't know.  I do not know.

24        Q    Did you identify the UPC code of the item that was

25   stolen or that was retrieved in this case?

26        A    Yes, ma'am.

27        Q    And did you note that in your report?

28        A    No, I didn't.  But I did do an evidence list,
```

1    which is basically that, but I didn't note it in my report.

2        Q    I'm sorry, you did an evidence list, but you

3    didn't note the UPC code in your report?

4        A    I used the evidence list and the UPC just came up

5    on the evidence list, but I did not type it into my report.

6        Q    But you did type in Fruit of the Loom socks?

7        A    Yes, I did.  I did type in Fruit of the Loom

8    socks.  And that was the mistake; it was socks instead of

9    T-shirts.

10           MS. GIN:  I have no more questions at this time,

11   your Honor.

12           THE COURT:  All right.  Thank you.

13           Mr. Walpole, any redirect?

14           MR. WALPOLE:  Yes, your Honor.

15                    REDIRECT EXAMINATION

16                      BY MR. WALPOLE

17   BY MR. WALPOLE:

18       Q    Again, good afternoon.

19       A    Good afternoon.

20       Q    So this particular item, you checked the UPC code

21   on the item?

22       A    Yes, sir.

23       Q    And as far as a store policies is concerned,

24   sometimes if you catch someone stealing property and there's

25   nothing wrong with the item that's been stolen, that you

26   recover, is it okay for Target to go ahead and resell that

27   item?

28       A    Yeah.

1    Q    And in those particular instances and part of the

2    policies, do you have to seize evidence, or can you just

3    take a photograph of the evidence?

4    A    No, you can just take a photograph.

5    Q    In this particular case, you did take a photograph

6    of the evidence?

7    A    Yes, sir.

8    Q    As far as Target's policies is concerned, that's

9    entirely appropriate?

10    A    Yeah.

11    Q    As far as whether or not you remember trying to

12    actually just touch the defendant at the doors and not

13    specifically remembering on today's date, why is that?

14    A    It's been three months, and I arrest a lot of

15    people.  I mean, it's so many instances, and it happened

16    that quick.  It was probably one of the quickest

17    apprehensions I've had as far as reaction.  You know, him

18    turning around, me identifying myself, get hit.  It was

19    really, really quick.

20    Q    Now, do you recall -- I think defense counsel

21    asked you this earlier, but do you recall whether or not you

22    remember him coming into the store and going towards the

23    Men's Department or no?

24    A    I'm not totally sure, but I'm pretty sure that's

25    what he did.  But like I said, I don't want to say yes for

26    sure, but I'm pretty sure that he did that.

27    Q    And say, for example, that you saw the defendant

28    with some sort of items, like he was carrying something with

1     him, would that be something that you would remember, prior

2     to grabbing another item?

3          A     If he had some either item on his person?

4          Q     Yes.

5          A     I would remember that.

6          Q     Would that be something you put inside your

7     report?

8          A     It depends.  This report, how it ended up

9     happening, I would probably make that into a detail note.

10         Q     And as far as when you looked at the surveillance

11    camera today and -- actually, strike that.

12               When you were looking at the 12 inch monitor --

13    and at some point did you see that the defendant had those

14    T-shirts in that shopping cart?

15         A     Yes.

16         Q     When you're looking at on the 12 inch monitor, was

17    it inside some other bag, like a Ross bag or anything like

18    that?

19         A     No, definitely not.

20         Q     Was it just by itself?

21         A     Yes.

22         Q     And did you find any receipts on the defendant

23    from like another store?

24         A     Not that I can recall.  No.

25         Q     One of the directives that defense counsel pointed

26    out, she --

27               MS. GIN:  I believe that Mr. Rogers has them.

28               MR. WALPOLE:  May I approach, your Honor?

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1              THE COURT:  You may.
 2   BY MR. WALPOLE:
 3       Q    Showing you what's been previously marked as
 4   Defense Exhibit A, and specifically Numerically Number 3,
 5   could you go ahead and just read that to yourself real
 6   quickly?
 7       A    Okay.
 8       Q    It talks about whether or not you can see
 9   concealment?  Is that what 3 addresses?
10       A    Yes, Number 3 addresses concealment.
11       Q    "Number 3, concealment.  You must observe
12   concealment or have no reasonable doubt based on your
13   observation that the individual has concealed the
14   merchandise"?
15       A    Correct.  It says that.
16       Q    When you looked on that 12 by 12 inch monitor, do
17   you have any doubt that he took these items and stuffed them
18   down his pants?
19       A    No.  No, not at all.
20       Q    And Ms. Gin brought out that you were written up
21   for working on off hours.  What does that mean?  What
22   happened?
23       A    There was a known shoplifter in the store that hit
24   up Target, Wal-Mart.  He was a big guy --
25       Q    Just so the record's clear we're not talking about
26   the defendant?
27       A    No, we're not.  We're talking about someone
28   totally different.
```

1      A    One of my buddies, who is also an asset protection
2    specialist with me, called me up, told me he needed my help.
3    Once we're there, we could just write -- fill out a time
4    form.  I was working, but I did come in when I was off.  So
5    I got paid for that time I was there.  I was technically
6    working.  He called me up.  I responded from my house seven
7    minutes away from the store.
8         Q    You don't have to go into great detail.
9         A    Drove over there.  He told me he needed my help.
10   Once I was inside the store -- once I was in the store, they
11   ended up exiting.  We were watching them for a minute.
12   That's why I was written up.
13        Q    Is that part of store policy that you have to be
14   on the clock, even if you go in to help somebody out?
15        A    Yeah.
16        Q    And the other incident defense counsel talked
17   about, what happened in that particular instance?
18        A    The second one with the kid where I got what's
19   called an NPI, non-productive incident, I detained him
20   without him having any product on him.  However, he did
21   vandalize the product.  Walked in, selected.  I observed
22   him.  He selected.  He ripped the tags off the gloves.  As I
23   was following him, he was like in an aisle where there was
24   no one else around.  So I didn't want to get burned when
25   somebody would see me.  So I seen him around the corner,
26   someone told me -- somebody was watching him --
27             MS. GIN:  Objection.  Move to strike.
28             THE COURT:  Sustained.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    BY MR. WALPOLE:

2        Q    Was it an instance where you actually saw him grab

3    some items?

4        A    Oh, yes.

5        Q    And at some point you lost sight of this person?

6        A    When he went around the corner he flicked them

7    with his wrist real quick.  He didn't set them down.

8        Q    But that flick you're describing, that's nothing

9    you actually saw?

10       A    No.

11       Q    And you stopped this person outside?

12       A    Yes.

13       Q    And that item that he ended up flicking, was that

14   actually recovered?

15       A    Oh, yes, most definitely.

16       Q    But a part of Target's policies, as far as

17   stopping someone without an item, do they require that a

18   writeup is done?

19       A    Yeah, they still require that a writeup is done.

20   Even if they went to steel it and vandalize the property.

21   It doesn't matter.

22            MR. WALPOLE:  No further questions.

23            THE COURT:  Anything further?

24                    RECROSS-EXAMINATION

25                       BY MS. GIN

26   BY MR. WALPOLE:

27       Q    A writeup is also done if you did something wrong;

28   is that correct?

1    A    If you did something wrong, yes, ma'am.

2    Q    And it was Mr. De La Torre who wrote you up on

3    both times?

4    A    Yeah.  Yes, ma'am.

5         THE COURT:  What are you looking for, Ms. Gin?

6         MS. GIN:  I think one of the directives, your

7    Honor.

8         MR. WALPOLE:  It's right here.

9         THE COURT:  Counsel, both of you keep the evidence

10   together, if you would, please, and then return it to

11   Madam Clerk after you're finished using them.

12   BY MS. GIN:

13   Q    In directing your attention to Defendant's

14   Exhibit E and People's Exhibit 9, Mr. Rogers, Mr. Walpole

15   asked you if it was okay to photograph the items seized from

16   the suspected shoplifter.  Looking at Defendant's Exhibit E,

17   you're directed actually to follow a certain procedure if

18   you do decide to take photographs; is that correct?

19   A    Not really.  I'll take a look at where it says

20   that on here.  Do you want to show me here?

21   Q    Sure.  If you can look at "Photographing of

22   Evidence," that's the third paragraph on page 1 of 2,

23   observing, processing, and doucmenting the item."

24   A    Could I have a second to read this now?

25   Q    Sure.

26   A    Okay.

27   Q    This directive tells you to take a full shot of

28   the item; is that correct?

1      A     Yes, ma'am.

2      Q     And also to photograph, if possible, price tags,

3   labels or damage to the item?

4      A     Correct.

5      Q     And that all photographs of evidence should be

6   properly labeled with the date, time, name of subject, who

7   the evidence was received from, physical description of the

8   evidence, by whom the evidence was collected, and the CIRS

9   number.  And retained in the case file; is that correct?

10     A     Yes, ma'am.

11     Q     Did you do that in this particular -- looking at

12  People's Exhibit -- and I lost track.  Is it 9?

13     A     It's 9.

14     Q     Did you do that?

15     A     We didn't have the labels at that time actually,

16  so, no.  No, I didn't.

17     Q     Was this particular photograph turned over to the

18  Pittsburg Police Department, or did you retain it in the

19  case file?

20     A     That was retained in the case file.

21     Q     And who has charge of the case file?

22     A     What do you mean who has charge?  Who as access?

23     Q     I'm sorry.  Who has access to the case file?

24     A     That would be TPS's.  All of them four guys, five

25  guys that have it.  Myself, David De La Torre.

26     Q     And if you do photograph the evidence, you're also

27  directed that all evidence is to be returned to the owning

28  department after final disposition of the case.  Who is the

```
 1   owning department involving these T-shirts?
 2        A    You mean like the Men's Department?
 3        Q    I'm asking.  This is the directive.
 4        A    Men's Department, but we couldn't resell the
 5   package.
 6        Q    But did you return the T-shirt to the Men's
 7   Department?
 8        A    No, no.  Definitely not.
 9        Q    And that the owning department team lead should
10   sign the evidence property tag indicating receipt?
11        A    Can you repeat that?
12        Q    The owning department team lead should sign the
13   evidence property tag indicating receipt.  That wasn't done
14   in this case; is that correct?
15        A    No, it wasn't.
16             MS. GIN:  I have no more questions.
17             THE COURT:  Any further questions?
18             MR. WALPOLE:  No, your Honor.
19             THE COURT:  May this witness be excused?
20             MS. GIN:  Subject to recall, your Honor.
21             THE COURT:  Subject to recall means if either of
22   the attorneys or their representatives would ask you to come
23   back and testify further, you'd be obligated to do so
24   without the need of a subpoena issuing.
25             MR. WALPOLE:  Actually, your Honor, before he
26   steps down, could I have the tape marked as People's
27   Exhibit 11?
28             THE COURT:  Sure.
```

```
 1              (Whereupon, People's Exhibit Number 11 was
 2              marked for identification.)
 3              THE COURT:  Is there a need to keep Mr. Rogers
 4    here?
 5              MR. WALPOLE:  No.
 6              THE COURT:  Thank you, Mr. Rogers.
 7              THE WITNESS:  Thank you, sir.  Have a good day.
 8              THE COURT:  Our next witness, please.
 9              MR. WALPOLE:  The People call Alex Azevedo the
10    stand.
11              THE COURT:  Sir, if you'd come over here to the
12    witness stand, we'll have you sworn in as a witness.  Please
13    raise your right hand.
14                        ALEX AZEVEDO,
15         called as a witness on behalf of the People,
16              who was duly sworn to tell the truth,
17                   testified as follows:
18              THE WITNESS:  I do.
19              THE CLERK:  Thank you.  Please be seated.  Would
20    you please state for the record your full name, and please
21    spell for us your full name.
22              THE WITNESS:  Alexander Azevedo.
23    A-L-E-X-A-N-D-E-R.  A-Z-E-V-E-D-O.
24                   DIRECT EXAMINATION
25                     BY MR. WALPOLE
26    BY MR. WALPOLE:
27         Q    Good afternoon.  What do you do?
28         A    I'm a TPS, Target protection specialist.  I work
```

129

```
 1    at Target in Pittsburg.  Basically security.  The front
 2    door.
 3        Q    How long have you done that?
 4        A    Nine months.
 5        Q    Were you on duty working at the store on May 10th
 6    of 2005?
 7        A    Yes, sir.
 8        Q    Is that the store in Pittsburg?
 9        A    Pittsburg.
10        Q    Right around 4:00 p.m., where were you at in the
11    store?
12        A    I was actually standing on the front door.  Part
13    of my job is to stand, greet customers, be a visual
14    presence, and I was standing at the front door at that time.
15        Q    Did someone draw your attention when you were
16    standing at the front door?
17        A    Yes.
18        Q    Who was that?
19        A    Known to me as Mr. Winzer.
20        Q    Do you see that person here in the courtroom
21    today?
22        A    Yes, he's to my left.
23             MS. GIN:  Your Honor, before proceeding, may we
24    approach the bench?
25             THE COURT:  You may.
26             (Whereupon, a side-bar conversation was
27             had.)
28             THE COURT:  All right.  Ladies and gentlemen I
```

1    want to take up something with counsel.  I think it will
2    take just a couple minutes, so we'll take our midafternoon
3    break early at this time rather than keep you here waiting.
4           Please don't discuss this case with anyone, or
5    form or express any opinion until you've heard all the
6    evidence, the instructions of law and arguments of counsel.
7           We'll resume these proceedings at five minutes
8    after 3:00.
9               (Whereupon, a break was taken from
10              2:50 p.m. to 3:05 p.m.)
11          THE COURT:  We're back on the record now in the
12   matter of People versus Winzer with Mr. Winzer present,
13   Ms. Gin present, Mr. Walpole present.
14          Before we bring in the jury, is there anything we
15   need to cover?
16          MS. GIN:  No, your Honor.  The concern that I
17   raised when we were back in chambers was that Mr. Azevedo
18   had testified that he had known Mr. Winzer, and I was
19   concerned if there was any prior contact, and Mr. Azevedo
20   has told both Mr. Walpole and myself that after he saw
21   Mr. Winzer for the first time, now he knows the defendant to
22   be Lacy Winzer.  So that settles whatever problems I had.
23          THE COURT:  All right.
24          By the way, before I bring in the jury, although
25   this could wait until later.  I note in Simon's relative to
26   the subject matter of whether the hearsay objection that
27   Mr. Walpole raised was raised correctly in the situation
28   where the witness had testified he couldn't remember, and

1    then you had wanted to introduce his prior testimony to a

2    certain effect.

3        I bring your attention to paragraph 2, colon 42 on

4    page 103 of Simons California Evidence Manual, especially at

5    the bottom of the page.  There's a case called People versus

6    Sam, which we probably all should look at.  It says, "Where

7    the entire testimony of the witness says he or she does not

8    recollect the particular incident, an earlier statement

9    describing the incident is inadmissible since it is not

10    inconsistent with the present testimony."  People versus

11    Sam, 71 Cal 2nd, 194.  71 Cal 2nd 194.

12        I think the only time it can serve to impeach is

13    if the Court finds the memory loss is evasive or false.

14    Anyway, you may want to look at that section and that case.

15        Very well.  Bring in the jury.

16        (Whereupon, the jury entered the

17        courtroom.)

18        THE COURT:  All right.  Thank you.  We're back on

19    the record in the matter of People versus Winzer.

20    Mr. Winzer present, counsel for both sides present, all

21    jurors present.

22        And you may continue with your examination of this

23    witness.

24        MR. WALPOLE:  Thank you, your Honor.

25    Q    When you saw the defendant enter into the store,

26    was he carrying anything on him?

27    A    No.

28    Q    Did you see him select a shopping cart, or did he

1   bring a shopping cart in with him?

2        A    He selected a shopping cart right after entering

3   the front doors.

4        Q    Taking a look at what's previously been marked as

5   People's 7, do you recognize that?

6        A    Yes.

7        Q    Is that a general layout of the front area of the

8   store where the front doors are located?

9        A    Yes, sir.

10       Q    And about where?  Can you just verbally describe?

11       A    Roughly directly through the front doors.

12       Q    Is it maybe to the left of where it says

13  "registers"?  Is it in that general area?

14       A    Yes, sir.

15       Q    Was he carrying anything with him when he came

16  inside?

17       A    No.

18       Q    You didn't see him bring any bags or any T-shirts

19  with him?

20       A    No, sir.

21       Q    When you saw him enter inside, was he with anyone?

22       A    He was with an unknown female adult.

23       Q    When they entered into the store, what did you do?

24       A    I waited till they passed, and then one of my

25  fellow peers who works with me came out.  We called him to

26  APS, which is asset protection specialist, and Blake Rogers

27  started watching him right around the front area, right

28  around jewelry.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1        Q     Was there ever a call up done?

 2        A     Yes.

 3        Q     What is a call up?

 4        A     Call out is when somebody suspicious comes into

 5   the store, we call them out to our undercover agent who is

 6   therefore allowed to make an apprehension if something

 7   happens.

 8        Q     Was there a call out done in this particular case?

 9        A     Yes.

10        Q     Who made that call out?

11        A     Tommy Weaver.

12        Q     Did Mr. Weaver tell you why a call out was made?

13              MS. GIN:  Objection.  Hearsay.

14              THE COURT:  Sustained.

15   BY MR. WALPOLE:

16        Q     Did you maintain surveillance of the defendant?

17        A     Yes.

18        Q     Why did you do that?

19        A     I had a fellow team member who works at another

20   store in Pinole.  We had a situation in the store where he

21   came in from another store to keep an eye on the parking lot

22   and situations that were occurring in the parking lot, and

23   he had noticed --

24              MS. GIN:  Objection.  Hearsay and foundation.

25              THE COURT:  Sustained.

26              MR. WALPOLE:  Not -- May I respond your Honor?

27   It's not for the truth of the matter stated.  It's why he

28   was maintaining surveillance of these people when they
```

1   entered into the store.

2              THE COURT:  But you don't need to get into what

3   was said in order to establish that.

4              MR. WALPOLE:  Okay.

5       Q    Did you personally see what was going on out in

6   front of the store?

7       A    No.

8       Q    Did you personally see what the defendant and this

9   woman were doing out in front of this store?

10      A    No.

11      Q    Were you relayed some sort of information about

12  what the defendant and this woman were doing out in front of

13  the store?

14      A    Yes.

15      Q    And was it based on that information that

16  Mr. Weaver made this call out?

17      A    Yes.

18      Q    Without telling us the substance of it, did he

19  describe what kind of conduct was going on outside?

20      A    Yes.

21      Q    And when a call out is done -- well, when you

22  received this information, how did you receive it?

23      A    He approached me.

24      Q    And when you say "he," who are you talking about?

25      A    Weaver.

26      Q    And after this call out was made, what did you

27  specifically do?

28      A    I proceeded to the front security office, also

```
 1  known as the booking office, to maintain observation on
 2  camera.
 3      Q    Okay.  Taking, again, a look at this diagram
 4  that's right there, People's Exhibit 7, the area that's
 5  marked with an S, do you see that?
 6      A    Yes.
 7      Q    What is that area?
 8      A    That's the front security office or booking
 9  office.
10      Q    Inside that front security office, is there any
11  sort of monitors or cameras?
12      A    Yes, we have one monitor and a joystick that
13  controls six movable cameras throughout our store.
14      Q    Do you have the authority to watch this monitor
15  and take a look at what's going on?
16      A    Yes.
17      Q    Also on this map, the area that's marked "Guest
18  Services," what is that area?
19      A    That's guest service, is a place guests can go to
20  get help with store issues, return merchandise, and any
21  other kind of issues as well as.
22      Q    The lower left-hand portion that says "Men's" and
23  "Women's," what does that depict?
24      A    That's the men's and women's restrooms.
25      Q    The area that says "food," what's that?
26      A    That's the food court that's inside the store.
27      Q    The area marked jewelry in the upper right, what's
28  that area?
```

1     A    That's the jewelry area of the store where
2  jewelry's located.
3     Q    Taking a look at People's Exhibit 7 and
4  cross-reference that with People's Exhibit 6, does People's
5  Exhibit 7 depict anywhere on there People's Exhibit 6?
6     A    The lower left-hand corner.
7     Q    Is People's Exhibit 7 a blowup area of the lower
8  left-hand corner of People's 6?
9     A    Yes.
10    Q    So at some point did you go back inside the nearby
11 security area where the cameras are located, or the video
12 surveillance equipment is located?
13    A    Yes.
14    Q    What did you do when you went inside there?
15    A    I maintained observation.  I did not control the
16 joystick.  We had already at this time made the call out to
17 Blake Rogers who was in the back office.  We have two
18 security offices in our store.  He was in the back.  We also
19 have control of cameras back there, and at that time he was
20 already watching the subject.
21         MS. GIN:  Objection.  Foundation as to what
22 Mr. Rogers was doing.
23         THE COURT:  Sustained.  It will be disregarded,
24 the answer.
25 BY MR. WALPOLE:
26    Q    The cameras that you have right near the front
27 doors, versus the cameras that you have in the back of the
28 store, are you able -- can you watch two different things?

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1   If someone's in that room right in the front, can someone in

2   that back room in that different office watch a different

3   area of the store on different cameras?

4       A    Yes

5       Q    When you were right inside this area near the

6   front of the store were you looking at the monitor?

7       A    Yes.

8       Q    What did you see?

9       A    I noticed Lacy Winzer heading towards the back

10  operator's booth.  Somebody was following him on camera at

11  this time.

12      Q    What do you mean?  When you looked on the camera,

13  where did you see the defendant at when you first were

14  watching the camera?

15      A    He was on the floor heading from the front of the

16  store towards the back of the store.

17      Q    You said someone was following him?

18      A    Someone was following him on camera.

19      Q    You mean someone was watching his movements while

20  they were manipulating the camera?

21      A    Yes.

22      Q    It wasn't a physical movement?

23      A    No.

24      Q    What did you see the defendant do?

25      A    He went to the Men's Department.

26      Q    Did the woman who entered into the store with him,

27  did she follow him or did she go somewhere else?

28      A    They walked together all the way to the Men's

1   Department.

2       Q    While he was in the Men's Department, the camera

3   that you saw in front of you -- actually let me step back.

4            The camera that you had in front of you, is that

5   something that was on time delay, or is that something that

6   was a steady stream of images?

7       A    It's a steady stream.  It's live.  The camera's

8   hooked up.  So the picture it's looking at goes directly to

9   the monitor, and from the monitor to the VCR which is on

10  time delay.

11      Q    And earlier this morning, did I show you a

12  surveillance tape depicting this general time frame?

13      A    Yes.

14      Q    And on the tape, is that live time or is that --

15      A    That's time delay.  It takes a shot of recording

16  every three seconds.

17      Q    And as far as comparing the quality, the screen

18  that you were in front of, is it a better quality than the

19  tape you watched this morning?

20      A    It's pretty, pretty clear.  The tape this morning

21  was pretty fuzzy.  We don't have any problems like that.

22  It's just like watching television.

23      Q    When you saw the defendant in the Men's

24  Department, what did you see specifically?

25      A    I saw him select a pair of T-shirts, a package of

26  T-shirts.  At that time he walked approximately 15 feet

27  away, put them down the front of his pants.

28      Q    So on this camera shot that you had, you actually

```
 1   saw him select the T-shirts.

 2        A     Yes.

 3        Q     Where were the T-shirts at?

 4        A     They're on the back wall of the Men's, the left

 5   side of the store.

 6        Q     When he grabbed them off the shelf, did he

 7   immediately put them in his pants, or did he put them

 8   somewhere else?

 9        A     No, he put them in the top of the shopping cart

10   that he selected at the front.  He still had the shopping

11   cart with him, still pushing it around.

12        Q     How much time passed from the time that he

13   selected -- initially selected these T-shirts to when he put

14   it down the front of his pants.

15        A     Approximately one minute.

16        Q     The tape that I showed you this morning, is that

17   the same camera angle that you saw the defendant when he

18   selected this merchandise and concealed it?

19        A     Yes.

20        Q     Is there any portions in the time delay where --

21   in comparing the time delay tape versus when you're watching

22   it live, did you have a clearer shot of him concealing this

23   merchandise?

24        A     Not a clear shot.

25        Q     Could you actually see the merchandise going in,

26   or was it just more of a movement of his hands?

27        A     We saw him select it on the live time.  We saw him

28   select merchandise out of the top portion of the basket and
```

```
 1    lift up his shirt, and then he turned away.  So we saw more
 2    or less the back of him, and then his arm moved in an upward
 3    position down the front of his pants.  He turned back
 4    around, and the T-shirts were gone.
 5         Q    After you saw the defendant do this, did you see
 6    him go anywhere?
 7         A    He hung around in Men's about 30 more seconds,
 8    heading towards the operators booth, which is in the top
 9    left-hand corner the store.  At that time he exited back
10    out to the main aisle and proceeded to the front.
11         Q    From when he left -- From when he first concealed
12    the merchandise in his pants to the point where he was
13    coming down the aisles, did you maintain a visual on him as
14    far as the camera monitors are concerned?
15         A    Yes.
16         Q    At any point did you ever see him dispose of these
17    items?
18         A    No, he was in plain view, in the center of the
19    main aisle.  We had a pretty good camera shot on live time.
20    The video that is taken on time delay, it's kind of hard to
21    see, but on live time it's real.  So it's real clear.  We
22    have real good shots.  We were able to maintain significant
23    observation as he headed back towards the front of the
24    store.
25         Q    When he was heading back towards the front of the
26    store, was that in back towards you?
27         A    Yes, at the front office.
28         Q    As he was heading back towards the front of the
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    store, toward you, what did you do?

2        A    I stayed.  At this time I did not low the booking

3    office, front camera room since I had gone in the first

4    time.  I was keeping an eye on what was going on.  TPS's go

5    in to get descriptions, get better descriptions so we don't

6    take the wrong person.

7            At that time I was still in the camera room as he

8    got towards the front.  If I would have left where the

9    security office is, it cuts right cross the front counter

10   and Food Avenue and all the way to the operators booth.  So

11   anyone coming down from where the operator's booth is

12   located you can see anybody coming out.

13       Q    At some point did you actually leave the room

14   marked S with the cameras inside?

15       A    Yes.

16       Q    And as far as where the defendant was when you're

17   looking at the camera, about where was he at when you

18   decided to come out of that security room?

19       A    He was approximately five feet in front of the

20   automatic exit doors.

21       Q    And taking a look at People's 7, these triangles

22   right here (indicating), and the doorway, which is right

23   near a red circle and a red triangle, what does that

24   represent?

25       A    That's the doors.

26       Q    Are the doors actually -- Are the doors actually

27   right there (indicating), or are they higher up?  There's a

28   certain area that's kind of been whited out.  Are the doors

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1   higher up on that map or whited out?

2        A    They're up higher.  They're where the whiteout is.

3   The lower portion is actually -- We have an overhang

4   outside, and that might represent that.  This is our store's

5   picture.  It is a blueprint.  I'm unsure of what the lower

6   markings meant, but the upper markings are the front

7   entrance and doors.

8        Q    So where the whiteout is, that's the level of the

9   entrance and where the front can doors are located?

10       A    Yes.

11       Q    What were you wearing that day?

12       A    I was in a TPS uniform, blue pants, black shoes,

13   blue T-shirt.

14       Q    Did you have a radio on you anywhere?

15       A    Yes.  I have a radio attached to my belt, as well

16   as handcuffs, and a walkie piece that comes on to your

17   shoulder.

18       Q    The defendant was coming towards you.  Was he

19   walking down the main aisle?

20       A    Yes.

21       Q    As he's walking down the main aisle, why didn't

22   you come outside the door at that point?

23       A    I didn't come out because where the security

24   office is, once you leave the door you can be seen by

25   anybody going toward the bathrooms or going towards the

26   fitting bedrooms.

27       Q    Did you not want to be seen by the defendant?

28       A    I didn't want to be seen by the defendant.  I

1   didn't want to burn him, which means he would turn around,

2   drop the merchandise, or put it down somewhere else, and

3   Blake would not have been able to apprehend the suspect.

4        Q    At some point you did leave the office; right?

5        A    Right.

6        Q    And when you left the office, what did you see?

7        A    When I left the office, we used the corner of the

8   office right past the door to look around to make sure the

9   subject is far enough toward the doors that we can come out

10  without being seen.

11       Q    Which corner are you talking about?  There's some

12  markers behind you.  Go ahead and use the pink one, and

13  which corner did you kind of wait at?

14       A    We wait approximately right here (indicating).

15       Q    And you just marked that with a pink X?

16       A    Yes.

17       Q    And when you came around that corner, about how

18  close to the doors, or where was the defendant in relation

19  to the front doors?

20       A    He's probably 30 feet away.

21       Q    Okay.  30 feet away from you or 30 fight away from

22  the doors?

23       A    The exit door that he left through is about 30

24  feet away from the office door.

25       Q    So it's 30 feet from the pink X to the front door.

26  Is that what you're saying?

27       A    Right.

28       Q    How close was the defendant?  I'm talking about

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1  the defendant to the door?

2      A    He's probably about five feet away from the door

3  at this time.

4      Q    And we say five feet away inside the store --

5      A    Five feet away from the. EAS antennas, which is

6  an electronic article surveillance alarm. They set off

7  soft tags, or hard tags, on merchandise. These antennas are

8  inside of the store located on the entrance and the exit

9  doors. He had not hit that. He was roughly a foot and a

10  half away from the antennas.

11      Q    As far as T-shirts, do they actually have

12  triggering devices that will set off the alarms?

13      A    We do not put soft tags on clothes. We do not use

14  hard tags at our store that you would find in other clothing

15  stores.

16      Q    So did you have a good angle -- despite where the

17  front doors are actually supposed to be moved up, did you

18  have a good angle from where you were positioned on the

19  corner to see where he was positioned at that point?

20      A    Yes.

21      Q    And at that point when you first looked around,

22  you saw the defendant was five feet inside the store,

23  approaching the doors?

24      A    Correct.

25      Q    How far behind the defendant was Blake, or did you

26  see him behind the defendant?

27      A    I did not see Blake at that time. I was looking

28  at the suspect. I did see Blake approach the suspect after

| 1 | he had stepped foot outside of the door. |

1   he had stepped foot outside of the door.

2          Q    Is it like during the process as he's walking out?

3          A    Right.  As he came towards the front of the store,

4   as soon as he got close enough to the store door, we come

5   out of the office.  It's a gamble we take.  Sometimes we get

6   seen.  Sometimes we don't.  At this time we did not get

7   seen.  We come out, myself and Tommy Weaver was right behind

8   me.  We were looking around the corner and we noticed him

9   approaching the door.  As soon as he stepped out, Blake came

10  up behind him.

11         Q    Did you hear whether or not Blake identified

12  himself?

13         A    Yes, Blake.  He got to the door.  After he stepped

14  outside of the store threshold -- basically after he stepped

15  out of the door --

16         THE COURT:  He being who?

17         THE WITNESS:  Sorry.  Mr. Lacy Winzer.  After

18  Mr. Winzer stepped outside of the door, Blake Rogers was on

19  his way to make an apprehension.  As Mr. Winzer turned

20  around and Blake at that time identified himself as Target

21  security.  "You need to stop."

22  BY MR. WALPOLE:

23         Q    Did Blake ever touch the defendant in any way?

24         A    He reached out and grabbed a hold of his arm.  At

25  this time both the defendant and Blake were outside of

26  the -- right outside of the store.

27         Q    Let me see if I get the sequence down.  So Blake

28  identified himself.  When Blake reached out for him, was

```
 1   that before or after he identified himself?
 2       A    It was after.
 3       Q    So Blake identified himself, and he reached out
 4   and tried to touch the defendant?
 5       A    Yes.
 6       Q    And as he reached out what happened at that point?
 7   What did the defendant do?
 8       A    Myself, saw the defendant hit Blake in the face
 9   approximately two times.
10       Q    Were you actually able to see Blake actually
11   physically touch the defendant or no?
12       A    Yes.
13       Q    Did he punch him, or was he just trying to grab
14   him?
15       A    Blake just grabbed his arm.  He was trying to get
16   his arm or get him in handcuffs or bringing him back the
17   office.  We're never sure if people are going to resist
18   arrest or if people are going to go compliant.  So we always
19   try to get them in such a way so that they can't run.  Blake
20   had him by the arm and he turned around and hit him in the
21   face.
22       Q    When you say he hit him in the face --
23       A    That is Mr. Winzer hit Blake Rogers in the face.
24       Q    How many times did he punch him?
25       A    I saw two.
26       Q    What happened next?
27       A    They were in a pretty fast motion heading out
28   towards the street, which is approximately 20 feet away from
```

```
 1   the exit door that they exited.  At this time they were
 2   being -- Blake was trying to apprehend him with his arm.
 3   Blake had his arm, Mr. Winzer's arm, and they were more or
 4   less wrestling back and forth towards the street when Blake
 5   got control of his other arm and placed him on the ground.
 6   At that time I was already on my way out of the office --
 7   out of the front doors -- excuse me.  I was already on my
 8   way out of the front doors to help Blake in the
 9   apprehension, because I carry handcuffs myself.  Since this
10   was a struggle, Blake didn't want to release --
11            MS. GIN:  Objection.  Move to strike as what Blake
12   would do.
13            THE COURT:  Sustained.
14   BY MR. WALPOLE:
15       Q   So did you go up and help Blake apprehend the
16   defendant?
17       A   Yes.
18       Q   Were you able to eventually handcuff the
19   defendant?
20       A   I was, yes.
21       Q   After you were able to handcuff him, did you bring
22   him anywhere?
23       A   Myself, no.  After he was handcuffed, Blake Rogers
24   helped him off the ground, and then we all three escorted
25   him to the front office, but I did not have my hands on him
26   at that time.
27       Q   When you're all escorting him, did you see if the
28   defendant had any property on him?
```

1      A    His shirt was pulled up right around his chest
2  area and he had a package of T-shirts in his front
3  waistband, half of which was sticking out, half of which was
4  still concealed.
5      Q    When you say in his waistband, was it in his back,
6  was it in his side?
7      A    It was in his front waistband, his pants.
8      Q    Did any of you there recover this item, pull this
9  item out?
10     A    After he was in the office, after we had the
11  situation under control and out of everybody's way, we
12  handcuffed him to the bench and removed the T-shirts at that
13  time.
14     Q    Did you have a look at the T-shirts?
15     A    Yes.
16          MR. WALPOLE:  May I approach, your Honor?
17          THE COURT:  Yes.
18  BY MR. WALPOLE:
19     Q    Showing you what's previously been marked as
20  People's Exhibit 9, do you recognize that?
21     A    Those are the T-shirts that we recovered from his
22  front waistband.
23     Q    When you went outside, could you see Blake still
24  trying to wrestle with the defendant?
25     A    At that time, the time that I exited the doors,
26  Blake was already on the ground.  He was trying to gain
27  access to both -- to bringing both hands behind his back.
28     Q    During this whole process, Blake trying to handle

```
 1   it, did Blake say anything?  Did he announce himself at that
 2   point?
 3        A    Blake was still yelling --
 4             MS. GIN:  Objection.  Hearsay.
 5             THE COURT:  Yes, if it's being offered for the
 6   truth of the matter asserted.
 7             MR. WALPOLE:  It's not being offered for the
 8   truth, your Honor.
 9             THE COURT:  For what purpose?
10             MR. WALPOLE:  To be shown what was actually said,
11   what was told to the defendant.
12             THE COURT:  What was actually done is something
13   that you could ask this witness what he observed.
14             MR. WALPOLE:  Okay.  I don't want to give a
15   speaking objection.  Can we address this?
16             THE COURT:  Certainly.
17             (Whereupon, a side-bar conversation was
18             had.)
19             THE COURT:  Hearsay objection is overruled.
20             You may proceed, Mr. Walpole.
21   BY MR. WALPOLE:
22        Q    During this struggle and after Blake was struck,
23   did Blake still continue to identify himself as a loss
24   prevention agent?
25        A    Yes.
26        Q    What did he say specifically?
27        A    When I exited the building I could hear Blake
28   yelling, "Target security.  Stop resisting.  Stop
```

```
 1    resisting."  Blake kept yelling "stop resisting," until the
 2    handcuffs were actually put on both arms -- both wrists.
 3         Q     Did you see any injuries to Blake after this?
 4         A     He had some swelling on the forehead area, as well
 5    as I believe he had a little scrape.  I'm not positive.
 6         Q     Did you actually see these items being removed
 7    from the defendant's waist area?
 8         A     Yes.
 9         Q     Did you actually inspect the package yourself,
10    take a look at it?
11         A     I noticed what it was.  I was close enough.  I
12    didn't pick it up and examine it.
13         Q     Was there any hair on the package?
14         A     I don't recall.
15         Q     At some point did the police arrive?
16         A     Approximately 20 minutes after he was detained
17    into the front.
18         Q     Before the police arrived, did you speak with the
19    defendant?
20         A     Yes.
21         Q     Did you ask him anything?
22         A     I asked why he did it.  I always like to find out
23    why.
24         Q     Why is that?
25         A     Just kind of curiosity.  Why do people do things
26    that they do.  He didn't respond to the question I asked.
27         Q     Did he eventually respond in some manner?
28         A     Yeah.  I said that I approached more or less when
```

```
 1   I was in the front.  It was myself and Tommy.  I said, "You

 2   know you're going to jail because you assaulted Blake."

 3           He said, "No, I'm not.  I'll make a deal.  I'll

 4   get out."

 5        Q   Did he ever mention that "I've got my ways"?

 6        A   Yes, he did.

 7           MS. GIN:  Objection.  Leading the witness.

 8           THE COURT:  Yes, but to refresh his recollection.

 9           You may answer.

10          THE WITNESS:  Yes, he did.  It was within the same

11   sentence.

12   BY MR. WALPOLE:

13        Q   What specifically did he say?

14        A   "I'm not going to jail.  I have my ways.  I'll get

15   out."

16        Q   During the entire time that you were watching on

17   surveillance and you actually physically saw the defendant,

18   did he ever attempt to pay for any of these items?

19        A   No.  The registers are located on the opposite

20   side of the carts.  He was as far as away from the registers

21   as he could possibly go.  Then he passed through the EAS

22   antennas with merchandise still on his person, never failing

23   to pull it out or pay for the items.

24        Q   Did you have any doubt as to whether or not the

25   defendant took and concealed these items?

26           MS. GIN:  Objection.  Relevance.

27           THE COURT:  Sustained as to whether he had any

28   doubt.
```

```
 1   BY MR. WALPOLE:
 2        Q    Are you certain that happened?
 3             MS. GIN:  Objection.  Relevance.
 4             THE COURT:  No.  The degree of certainty is
 5   admissible.
 6             You may answer.
 7             THE WITNESS:  I have no doubt in my mind.
 8             MR. WALPOLE:  Thank you.  No further questions.
 9             THE COURT:  Thank you.
10             Ms. Gin.
11                      CROSS-EXAMINATION
12                       BY MS. GIN
13   BY MS. GIN:
14        Q    Mr. Azevedo, did you prepare a report in this
15   case?
16        A    I did not, myself, prepare a report.
17        Q    Did you provide any written statements to either
18   Mr. De La Torre or to Mr. Blake Rogers about what you saw
19   and what you heard?
20        A    No.
21        Q    Did you provide any recordings, such as an
22   audiotape or videotape to either Mr. Rogers or
23   Mr. De La Torre as to what you saw, or what you heard in
24   this case?
25        A    No.
26        Q    Did you document in any way what you heard
27   Mr. Winzer tell you when you were with him?
28        A    No.
```

```
 1        Q    When did you first tell anybody about what
 2   Mr. Winzer told you?
 3        A    To my recollection I told David De La Torre what
 4   had happened when he came back into the room.  Blake and him
 5   had left, because Blake was a little upset.
 6        Q    So you actually told Mr. De La Torre, who is your
 7   boss, on May 10th of this year?
 8        A    Right.
 9        Q    Now, you say that your title is TPS?  I'm sorry,
10   what does that stand for again?
11        A    It's Target protection specialist.
12        Q    And you've done that for about nine months as of
13   today?
14        A    Roughly nine months.
15        Q    Before that did you work for Target in any other
16   capacity?
17        A    No.
18        Q    And as a Target protection specialist, did you get
19   any special training in terms of your position?
20        A    We've had handcuff training.  Also we do online
21   training from Target Corporation to where we learn
22   directives.  They don't apply to us as much as they apply to
23   the apprehending, which would be Blake Rogers' position, the
24   undercover agent.  But we still follow them to a certain
25   point.
26        Q    So before, or when you got your job as a Target
27   protection specialist you took a course in how to handcuff
28   someone?
```

1      A    I was taught by one of the -- there was an ETLAP

2   which is an Executive Team Leader Asset Protection.  That is

3   David De La Torre's position.  He was training another

4   gentleman by the name of Allen Humphrey, and he's the one

5   who gave me training.  He had gone through the Target

6   training.  Once you're certified through Target you can

7   train other people.

8      Q    And this handcuffing training was done in a day?

9      A    More or less, yes.

10     Q    And then you did some online training, which is

11  through a computer which is about -- within the directives

12  for Target when it talks about shoplifters and preservation

13  of evidence?

14     A    Right.  It's not just the directives, but it's

15  actually what your job is about, how you effectively do your

16  job.  And then we have saying what my job is, what Blake's

17  job is, to help us better understand.

18     Q    And how long is this online course?  Is it a day,

19  a week, a month?

20     A    It is self-paced.  Some people are slower than

21  others.  It took me approximately a week to do.  Sometimes

22  it's shorter for other people.

23     Q    When you did this online training, that is when

24  you were already employed as a Target protection specialist?

25     A    Yes, I did do training before I was allowed to

26  suit up in a uniform.

27     Q    So once you completed the online training about

28  the handcuff course, then you were allowed to wear your blue

```
 1    uniform and actually work out at the store?
 2        A    The handcuff course came later.  We go through an
 3    NCI class.  It takes a day to do.  It's how we can support
 4    an APS in making an apprehension nonviolently.  We don't
 5    want to get abusive.  We don't want to get violent.  We want
 6    to take them with as much ease as possible.  That course
 7    takes about a day.  The handcuff course came after.  They
 8    covered a little in this, but my handcuff training came one
 9    on one through one of my supervisors.
10        Q    And you've been employed at this particular store
11    for the whole nine months you've been a Target protection
12    specialist?
13        A    Yes, ma'am.
14        Q    During this nine-month period you've come in
15    contact with Blake Rogers?
16        A    Yes, ma'am.
17        Q    So you've known for your entire nine-month career
18    as a Target protection specialist?
19        A    Yes, ma'am.
20        Q    During this time he's been an assets protection
21    specialist, which is considered a little bit above your
22    position; is that correct?
23        A    No, ma'am.
24        Q    You guys are equal?
25        A    He's actual a senior asset protection specialist,
26    which is twice above me.
27        Q    So in instead of being one above you, he's two
28    above you?
```

1      A    Right.  He's more or less our supervisor.  If we

2   have any issues, we go to him.  They have a regular APS who

3   is just an asset protection specialist.  He's actually above

4   him.

5      Q    So just a regular asset protection specialist is

6   one step above you?

7      A    Right.

8      Q    Just so I understand this clearly, in looking at

9   People's Exhibit 6, you were at the front closed circuit

10  T.V. room; is that correct.

11     A    Yes, ma'am.

12     Q    This one right here that's noted CC-2; is that

13  correct?

14     A    Right.

15     Q    But you have been into the back room, RC number 1;

16  is that correct?

17     A    I have been, yes.

18     Q    On this particular day when you were in the front

19  room where you had a camera, how many cameras are there --

20  strike that.  How many monitors are there in that front

21  closed circuit room?

22     A    We have one monitor in that room.

23     Q    But you can control 6 cameras from that room?

24     A    We can control 37 total cameras, 6 movable

25  cameras.

26     Q    So there's 37 cameras and 6 movable?

27     A    Total of 37 cameras.  6 of those are moveable.

28     Q    Now, when you testified earlier that someone was

 1  manipulating the camera from where you were at in that
 2  particular room, who was that someone?
 3      A    That was from the back room.  You can adjust the
 4  camera or you can call up.  We have a call up -- they're
 5  called call up monitors.  We have a joystick in there that
 6  controls the 6 moveable cameras.  The way that it works is
 7  the monitor in the front can work with the monitor in the
 8  back.  So if someone in the back office is controlling
 9  Camera Number 5, then you can actually watch what is going
10  on in the front.  Two people cannot move Camera Number 5 at
11  the same exact time, but you can watch what is being
12  watched.
13      Q    So what you're telling us is that as you were
14  looking at your monitor in closed Circuit Room Number 2, you
15  could follow what Mr. Lacy Winzer was doing because someone
16  was manipulating the camera in the other room?
17      A    Yes, ma'am.
18      Q    And if someone is manipulating the camera in the
19  other room, it is still recording someplace, either in your
20  room, Number 2, or in the back room; is that correct?
21      A    Yes, ma'am.
22      Q    So when you actually observed Mr. Winzer taking a
23  package from that back wall, that was being taped; is that
24  correct?
25      A    Yes, ma'am.
26      Q    Was it being taped in your particular room, Room
27  Number 2?
28      A    All the VCR's are in the back office, CC T.V. Room

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1    Number 1.  That's where everything is being recorded at.
 2         Q    So there's no VCR's in your Room Number 2?
 3         A    No, ma'am.
 4         Q    So the only purpose of Room Number 2 is to
 5    actually have someone there looking at what's going on in
 6    the store live?
 7         A    No, ma'am.  CC T.V. Room Number 2 is we have a few
 8    different reasons.  If an APS is on the floor, and he needs
 9    to come to the front, he can watch monitors throughout the
10    store.  He can call up the back ones if something serious is
11    going on and change the back monitors from the front office.
12    By doing that it will be recording on the back camera it
13    also --
14         Q    If I can stop you.
15              When you say record on the back camera, are you
16    talking about recording in Room Number 2 where you were at,
17    or recording at Room Number 1 where Mr. Rogers is at?
18         A    Room Number 1.
19         Q    So all the recording devices are Room Number 1?
20         A    Yes, ma'am.
21         Q    But you in Room Number 2 can actually direct the
22    recorders in Room Number 1 to record what you see?
23         A    Yes, ma'am.
24         Q    And how would you do that?  When you saw
25    Mr. Winzer taking that package from that back shelf, did you
26    direct the recorders in Room Number 1 to record that?
27         A    No, ma'am, I did not need to do so due to the fact
28    that there was somebody already until CC T.V. Room Number 1.
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1         Q     And you knew that?
 2         A     Yes.
 3         Q     Because somebody was already controlling that
 4    camera for you?
 5         A     Yes, ma'am.
 6         Q     Did you ever see the woman be a lookout?
 7         A     Not to my knowledge.
 8         Q     Did you ever -- You know what the racetrack is;
 9    right?
10         A     Yes.
11         Q     Did you ever see this woman in the racetrack area
12    near the men's sock and underwear area?
13         A     Yes, ma'am.
14         Q     Did you see her looking around as if being a
15    lookout?
16         A     I do not recall.
17         Q     Do you recall seeing her with Mr. Winzer as he was
18    taking this package?
19         A     She was within ten feet of him.  That's as close
20    as I remember.
21         Q     When you say ten feet, was she in the aisle in
22    front of the T-shirt shelf or where was she at?
23         A     She was closer to the aisle than he was.  He was
24    still on the back toward the back wall, and she was
25    approximately ten feet wards the aisle.  So she was between
26    him and the aisle.
27         Q     When we're talking about the aisle, we're talking
28    about the aisle directly in front of the T-shirts which is
```

```
 1     the aisle for men's stocks; is that right?

 2          A     Yes, ma'am.

 3          Q     So she was in the that aisle?

 4          A     Yes, ma'am.

 5          Q     And you saw that from your location in CC Room

 6     Number 2?

 7          A     Yes, ma'am.

 8          Q     And once again, as you observed her in that aisle,

 9     you could tell that someone in the back Room Number 1 was

10     directing the camera; is that correct?

11          A     Yes, the camera was moving.  We were not touching

12     it.

13          Q     Could you tell from what location from that rack

14     on the back wall where Mr. Winzer took the T-shirts from?

15          A     I believe there's about five or six shelves.  I

16     believe it was about the third shelf down right about in the

17     center.

18          Q     When you say center, is it about four feet from

19     the ground?

20          A     Approximately, yes.

21          Q     And from your vantage point from your monitor, you

22     could clearly see him reaching over, taking that package of

23     T-shirt from the center shelf?

24          A     Yes, ma'am.

25          Q     Nothing impeded your vision in any way?

26          A     Not to my knowledge.  There's some stuff, but

27     where he was standing, that was not blocking any of our

28     view.
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    Q    And after you observed him taking that package off
2    the center shelf, what did you see him do with it?
3         A    He placed it in a child seat in the cart, it's the
4    uppermost section of the cart.
5    Q    And this woman that was with him was still in the
6    aisle in the men's sock area?
7         A    Yes, ma'am.
8    Q    Who else was with you in the closed circuit T.V.
9    Room Number 2?
10        A    My peer from another store, Tommy Weaver.
11   Q    Now, you've seen the video that Mr. Walpole
12   referenced today?
13        A    Yes, ma'am.
14   Q    And, of course, the quality is not that great,
15   as --
16        A    It's nowhere near what we had.
17   Q    I guess the question I have for you, Mr. Azevedo
18   is that from your -- when you watched what was going on in
19   the store involving Mr. Winzer, you said it was like
20   watching T.V.?
21        A    Yes, ma'am.
22   Q    You didn't have all the shaky lines, or what we
23   call snow on the video?
24        A    No, ma'am.
25   Q    So actually, I guess the question is, from your
26   vantage point would you see more, or would you see better
27   compared to what you saw on the video?
28        A    I would say both.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1       Q     And when you say more, you're saying that there's

2   a three second delay from the taping.  So you take one shot,

3   and then there's one, two, three -- three seconds delay and

4   then another shot?

5       A     Yes, ma'am.

6       Q     And that's how the video recorder works?

7       A     Yes, it's set up that way so we could have one

8   single videotape record, be set on a single record for 24

9   hours.  So when we come to work we change the videotapes.

10  They record.  It will tape for a whole 24 hours.  The next

11  day whoever opens will change the videotapes and it will

12  record.

13      Q     Did it take Mr. Winzer longer than three seconds

14  to grab that package, actually go up there, reach over, grab

15  it from the shelf and put it on the child seat cart?

16      A     Not to my knowledge.

17      Q     So if it was videotaped, it would be within those

18  three seconds?

19      A     No, it took a little longer than three seconds.

20  He selected the merchandise, put it in his cart.  I believe

21  we saw him putting it down to his cart on the videotape.

22  Myself saw him from CC T.V. Room Number 2, select the

23  merchandise.  Nobody was in the back on that camera yet.  So

24  it was not recording.  That's why when the tape is started

25  you see him walking away.  I was in the camera room at the

26  time he was in Men's.

27      Q     So your testimony, as we're talking about right

28  now, is it wasn't recorded, what you saw in terms of when

1    you saw him take the package?

2       A    That first 20 seconds or so, no.

3       Q    But didn't you testify earlier that you called

4    Blake Rogers to direct his attention, or someone called

5    Blake Rogers to direct his attention to Mr. Winzer?

6       A    Yes, he was on the floor at that time.

7       Q    Did you actually see Mr. Rogers on the floor?

8       A    I seen him on the floor.  When we previously

9    called him out, he was up front.  He said he was on his way

10   to the back camera room.  At that time was when the incident

11   happened, he entered into the store.  And then we called him

12   out, and Mr. Rogers proceeded to the back camera room.  He

13   picked him up approximately 20, 30 seconds later.

14      Q    So I can get the sequence correct, Mr. Azevedo,

15   you saw Mr. Winzer come into the store; correct?

16      A    Yes.

17      Q    You were actually on the floor itself inside the

18   Target store dressed in your uniform?

19      A    Yes, ma'am.

20      Q    You got information that you should observe what

21   Mr. Winzer was doing.  Is that fair to say?

22      A    Yes.

23      Q    Mr. Winzer gets a cart.  He's with a unidentified

24   female, and he's starting from the front of the store going

25   towards the back of the store.  Is that fair to say?

26      A    Yes, ma'am.

27      Q    Yes?

28      A    Yes, ma'am.

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    Q    When you first got information to pay attention to
2    Mr. Winzer, did you then immediately contact Mr. Rogers to
3    let him know that he should be doing the same thing?
4    A    Yes, ma'am.
5    Q    And when you contacted Mr. Rogers, was it in
6    person or through the walkie-talkie or through some other
7    method?
8    A    It was through the radio, walkie-talkie.
9    Q    And when you contacted through the radio, could
10    you see where Mr. Rogers was located when you called him on
11    the radio?
12    A    No, at that time he said he was heading towards
13    the back camera room.
14    Q    But you don't know if he was actually there or
15    not.  That's all you heard was he was on his way back?
16    A    Yes.
17    Q    You don't know how far he was away from the back
18    camera room or anything like that?
19    A    No.
20    Q    And when you made that call to Mr. Rogers, where
21    was Mr. Winzer?  What department was he in?
22    A    He wasn't quite to Maternity we have on the female
23    side.  If up look at the map right here (indicating).
24    Q    If you can show me in People's Exhibit 6 where FD
25    stands for front door, where is the maternity section that
26    you saw Mr. Winzer at when you made that call to Mr. Rogers?
27    A    The maternity section, I said he was not quite
28    towards it.  Maternity is in this area of the store right

165

```
1   here (indicating).
2       Q    If you can write maternity, or if I can do that
3   for you.
4           As you just noted, Mr. Azevedo, I just wrote
5   maternity.  Is that the section where you saw Mr. Winzer at
6   when you made the call to will Rogers?
7       A    He was more down to where this triangle is when I
8   noted him to Mr. Rogers.  We like to wait until he's far
9   enough away.  We don't want him to hear that he's being
10  called out.
11      Q    If you could put L.W. for Lacy Winzer one when you
12  first made the call to Mr. Rogers.
13          Okay.  Thank you.  How far away -- when you made
14  that call to Mr. Rogers where Mr. Winzer was located to.
15  Where the men's underwear were located?  In terms of feet.
16  For example, you're Mr. Winzer; you're right close to the
17  maternity section; how far away is the Men's area with the
18  underwear and T-shirts, using this courtroom as a basis?
19      A    It's actually farther away from this courtroom.
20  It's actually more out toward the hallway.
21          MS. GIN:  Your Honor, I always forget the
22  dimensions of your courtroom.
23          THE COURT:  Well, from the witness stand to the
24  back row of the courtroom is 34 feet.
25  BY MS. GIN:
26      Q    Give a range of maybe 35 to 40 feet?
27      A    I'd say more approximately 50 feet towards the
28  back, and then over towards the right-hand side 30 feet.
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    Q    Oh, because when you get all the way to where
2    these men's T-shirts are, you have to go straight all the
3    way to the back and then make a right turn; is that correct?
4    A    Yes, ma'am.
5    Q    And is there a way to note from where you were at
6    that time in Closed Circuit Room Number 2 where the video
7    recording was on or not when you observed Mr. Winzer take
8    that T-shirt?
9    A    No, ma'am.  We normally just watch someone in the
10   front office until somebody in the back picks it up.  At
11   that time we know it's recording.  So what they see is what
12   they see.  I saw him select it.  To my knowledge, Blake also
13   saw him select it.
14        That's part of the directives.  You know, we have
15   to have observation.  We have to see selection.  We have
16   five different -- six different steps we have to maintain
17   before we can make an apprehension.
18   Q    So the time -- when you just testified that it
19   wasn't being recorded, did you know for a fact it wasn't
20   being recorded?
21   A    No, ma'am.
22   Q    It's just that on the video that you saw, you
23   didn't see that portion; is that correct?
24   A    As the video that I saw, I didn't see it as well
25   as what Blake had told me he was on his way to the back.  He
26   was not there yet.
27   Q    Had you talked to Mr. Rogers about what happened
28   on that day?

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1        A     No, it just happened.  We normally leave it at
 2   that.
 3        Q     You didn't tell him what Mr. Winzer said to you?
 4        A     I think I did at a later time.  Maybe two days
 5   later.
 6        Q     And when you got subpoenaed to come to court on
 7   this case, did you discuss this matter with Mr. Rogers?
 8        A     Not really.  Blake Rogers does not work in our
 9   department anymore.  He's on the store side.  We don't
10   really have contact as much as we used to.  He's been off
11   the past couple days.
12        Q     But you still work the same sore at the Century
13   Boulevard in Pittsburg?
14        A     Yes, ma'am.  I was actually asked to come in as a
15   witness roughly two days ago.
16        Q     So your testimony is you've talked a little bit
17   about this case with Blake?
18        A     Nothing major, but yes.
19        Q     In terms of the T-shirt that you observed halfway
20   down my client's pants, as you said, was there a Target tag
21   on it?
22        A     No, ma'am.  They come from a distributor.  We
23   don't have special tags that go on Target merchandise.
24   There was still packaging around the T-shirts, though.
25        Q     Was there any other tag on the package?
26        A     Not to my knowledge.
27        Q     And are you familiar with the directive that
28   you're supposed to retain the evidence that you take from a
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    shoplifter?

2        A    Yes, ma'am.

3        Q    Are you familiar with the directive that when you

4    take something from a shoplifter that belongs to Target,

5    you're supposed to bag it and keep it?

6        A    No, ma'am, I'm not aware of that.

7        Q    Are you aware that you're supposed to preserve

8    evidence, and if you don't keep it, you give it to the

9    police?

10       A    Yes, ma'am.

11       Q    In this particular case, did you see the package

12   of T-shirts taken from my client Mr. Winzer bagged up in any

13   way and given to the police?

14       A    No, ma'am.

15       Q    Were you present when the police arrived 20

16   minutes later?

17       A    Yes, ma'am.

18       Q    At that time was any evidence given to the police

19   officers who showed up -- with his evidence, the T-shirts?

20       A    I'm unaware.  I was not in the front office.  When

21   they went in, I exited.  It is a pretty small office.

22       Q    So when the police arrived at that office, you had

23   already gone back to your duty on the floor?

24       A    Yes, ma'am.

25       Q    When did you see the video?  Was it this morning?

26       A    I've seen it previously.  I saw it the day it was

27   made, the original copy.  I don't know if this is original.

28   This is the one that the police had.  I saw it the day it

1  was being made.

2      Q    When you say you saw it being made, who made it?

3      A    I believe it was my boss, David.

4      Q    So you saw it being made in terms of making sure

5  that all the images that you needed was recorded on the

6  videotape?

7      A    Yes, from the end sheet.  From what we had

8  starting out to when he left, as much stuff as we had.

9      Q    Anything in this video that you don't recall

10 seeing when you saw David make it?

11     A    No.  Everything's there that I remember.

12     Q    Did you ever tell David that, hey, the shot of

13 Mr. Winzer taking that T-shirt is not on that video?

14     A    I did not see the whole thing.  I saw it about

15 halfway through.  I did not rewind it, review it.  He was

16 there as well.  He takes over that.  My job description --

17 My job duties don't really get into that much of the

18 apprehension, or the external stuff.  That's why Blake is

19 there.  And that's also the David situation.  They deal with

20 all of that stuff.  We're just there for the visual

21 presence, as well as to help him out with the apprehension.

22     Q    And when you saw Mr. Winzer exit the store, he

23 actually went outside the doors; is that correct?

24     A    Yes, ma'am.

25     Q    Before Mr. Rogers made contact with him?

26     A    No, ma'am.  He was outside when Blake Rogers made

27 contact with him.

28     Q    Because it's important that the suspected

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    shoplifter is outside the store first; right?

2        A    Yes, ma'am.

3        Q    That's part of the directives of Target?

4        A    Yes, ma'am.

5        Q    When you saw Blake touch Mr. Winzer was that

6    outside the store?

7        A    It was outside of the store.

8        Q    And so Mr. Rogers was outside the store when he

9    touched Mr. Winzer; is that correct?

10       A    He -- Blake followed him out.  He touched him

11   after Mr. Winzer had exited the store.

12       Q    So Mr. Rogers was outside the store?

13       A    Yes, ma'am.

14       Q    When I say outside the store, he had gone past the

15   doors?

16       A    When he made contact and touched him, he was

17   outside of the store as Blake Rogers being outside of the

18   store.  When he identified himself as Target security, he

19   was inside of the store.  Mr. Winzer was outside of the

20   store.

21       Q    And when you said you saw Mr. Winzer hit

22   Mr. Rogers, you said that Mr. Winzer turned around; is that

23   correct?

24       A    Right.

25       Q    So when Mr. Rogers touched Mr. Winzer, where was

26   that at?  On his shoulder?

27       A    I believe that he grabbed him on this part, the

28   bicep portion of his arm.  That was after Mr. Winzer had

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    turned around.  I don't know why he turned around.  I just

2    noticed him turn his head back, look behind him, and that's

3    when Blake went up to make -- identified himself as Target

4    security and placed his arm on his bicep area.

5        Q    When you say that Mr. Winzer turned around, are

6    you staying he turned his entire body and squared up with

7    Blake Rogers, or did he just turn his head?

8        A    He turned his head.

9        Q    So you never saw Mr. Winzer square up to

10   Mr. Rogers?

11       A    No, he was about halfway.  Blake grabbed his -- to

12   my knowledge, I believe Blake had grabbed his left arm and

13   he was turning around this way.

14       Q    So Mr. Winzer was still walking outside past the

15   front doors, towards the parking lot turned his head when

16   Mr. Rogers grabbed his elbow?

17       A    Identified himself first and then grabbed his arm.

18       Q    Because identification is part of the directives;

19   right?

20       A    Yes, ma'am.  We try to follow it as best as

21   possible.

22       Q    Do you know if it's part of the directives to

23   throw away merchandise you take from a shoplifter?

24             MR. WALPOLE:  Objection.  Argumentative.

25             THE COURT:  Argumentative.

26   BY MS. GIN:

27       Q    Is it part of directives that you throw away

28   evidence that you seize from a shoplifter?

| 1 | MR. WALPOLE: Objection. Argumentative. |
|---|---|
| 2 | THE COURT: You're asking him if it's part of any |
| 3 | directive to do that? |
| 4 | MS. GIN: Yes. |
| 5 | THE COURT: You may answer. |
| 6 | THE WITNESS: It's not a directive to throw away |
| 7 | merchandise, no. |
| 8 | MS. GIN: I have no more questions of this |
| 9 | witness. |
| 10 | THE COURT: Thank you. Anything further? |
| 11 | MR. WALPOLE: Yes, your Honor. |
| 12 | REDIRECT EXAMINATION |
| 13 | BY MR. WALPOLE |
| 14 | BY MR. WALPOLE: |
| 15 | Q    When the defendant hit Blake, at that point was he |
| 16 | squared up? |
| 17 | A    Yes. |
| 18 | Q    So at some point did defendant did square up when |
| 19 | he was punching him? |
| 20 | A    He turned the rest of the way around when Blake |
| 21 | got ahold of his arm. Like I said, I believe he had his |
| 22 | left arm, and Blake Rogers got hit with Mr. Winzer's right |
| 23 | arm. |
| 24 | MR. WALPOLE: Thank you. No further questions, |
| 25 | your Honor. |
| 26 | THE COURT: Anything further? |
| 27 | MS. GIN: Not at this time, your Honor, but I'd |
| 28 | like to have this witness subject to recall. |

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
1              THE COURT:  You're excused subject to recall, and
2    what that means, sir, is if either of the attorneys or their
3    representatives ask you to return to testify further, you'd
4    be obligated to do so without the need for subpoena to
5    issue.  Thank you very much, sir.
6              Thank you.  I think that will be it for the day.
7    We'll resume these proceedings on Monday, not tomorrow.
8    Remember?  You'll have off tomorrow.  We'll resume Monday at
9    9:00 a.m. when we'll continue with the evidence of this
10   matter.
11             Please remember over the weekend not to discuss
12   the wait until you've heard all the evidence, and
13   instructions of law, and the arguments of counsel, and do
14   not visit the Target store in Pittsburg.  All right?
15             Thank you.  You can leave your notebooks please on
16   your chair.  They will be gathered by Sheriff Willett who
17   will put them in the evidence room and he'll return them
18   first thing Monday morning.
19             (Whereupon, the jury exited the
20             courtroom.)
21             THE COURT:  All right.  Counsel, the jury has
22   exited, and defendant is still present, both counsel are
23   present.
24             Revisiting that hearsay issue that we've been
25   dealing with, I should have read on further in Simons.  I'm
26   talking about the 2005 edition of Simons California Evidence
27   Manual.
28             I had cited you a case that appears on page 103 of
```

1  that manual, People versus Sam.  At that time I had not read
2  the balance of it, but if you continue to read the balance
3  of that section you'll see another case that says -- called
4  People versus Fierro.  And Simons says this about that, "In
5  People versus Fierro, that's 1 Cal 4th 173, the California
6  Supreme Court approved for the first time the use of a prior
7  inconsistent statement to impeach a witness who testified
8  that she did not remember when there was no indication that
9  this testimony was evasive or false.  In fact, the witness
10 was the wife of the murder victim in the case and appeared
11 quite cooperative with the prosecutor.  Fierro held that the
12 prior statement could be used whenever it was inconsistent,
13 quote, unquote, 'in effect' with the testimony at trial.
14 This holding could be interpreted to permit any significant
15 forgotten facts to be introduced through a prior statement."
16        Now, again, I think we should all read, not only
17 the Sam case, but also the Fierro case, and be ready to
18 discuss this matter further Monday.
19        MR. WALPOLE:  What time do you want us here
20 Monday?
21        THE COURT:  I think it's sufficient if you are
22 here a quarter to 9:00.
23        MS. GIN:  Your Honor, just to let you know I'm on
24 the trial calendar on Monday.  I'll get here as soon as I
25 can, but I want to let the Court know --
26        THE COURT:  Let's leave it at five minutes to
27 9:00.  This issue we can find other time to discuss.
28        Mr. Walpole, if you would submit to the Court

175

1    tomorrow, please, your requested jury instructions.

2              MR. WALPOLE:  Understood.

3              THE COURT:  And also, if you have any instructions

4    that you want to submit as well, although you can probably

5    wait until you see what Mr. Walpole has submitted.

6              MS. GIN:  That's fine.

7         (Whereupon, the proceedings were concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  VIOLET M. LEE, State Bar No. 77144
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5896
    Fax:  (415) 703-1234
8   Email:  Violet.Lee@doj.ca.gov

9  Attorneys for Respondent

10

11            IN THE UNITED STATES DISTRICT COURT

12        FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14
   **LACY WINZER,**                    C 08-2341 PJH (PR)
15
                        Petitioner,    **EXHIBIT 5 (part 3)**
16
             v.
17
   **BILL CURREY, Warden,**
18
                        Respondent.
19

20

21

22

23

24

25

26

27

28

   EXHIBIT 5 (part 3)                          Winzer v. Currey
                                               C 08-2341 PJH (PR)

# EXHIBIT 5 (part 3)

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF CONTRA COSTA

3              HONORABLE PETER L. SPINETTA, JUDGE

4                      DEPARTMENT NO. 11

5                        ---oOo---

6

7    THE PEOPLE OF THE STATE OF CALIFORNIA,   )

8                          Plaintiffs,        )

9       vs.                                   ) No. 050867-1

10   LACY WINZER,                             )

11                      Defendant.            )
     _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                     August 15, 2005

16        A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

17

18   A P P E A R A N C E S:

19   For the People:              ROBERT KOCHLY

20                                District Attorney

21                                BY: CHRISTOPHER WALPOLE

22                                Deputy District Attorney

23                                Contra Costa County

24   For Defendant:               DAVID COLEMAN

25                                Public Defender

26                                BY:  WINNIE GIN

27                                Deputy Public Defender

28                                Contra Costa County

| | |
|---|---|
| 1 | Martinez, California                    August 15, 2005; A.M. |
| 2 | Department No. 11          Hon. Peter L. Spinetta, Judge |
| 3 | ---o0o--- |
| 4 | P-R-O-C-E-E-D-I-N-G-S |

5       THE COURT:  All right.  I think we are ready

6    to begin now.

7            We are back on the record in the matter of

8    People versus Lacy Winzer.  Mr. Winzer is present.  His

9    counsel, Ms. Gin, is present.  Mr. Walpole is present.

10   All of our jurors are back in the courtroom, seated in

11   their assigned seats, including our alternate.  We are

12   ready to proceed.

13          Mr. Walpole.

14          MR. WALPOLE:  The People call David De La

15   Torre to the stand.

16          THE COURT:  All right.  Mr. De La Torre, if

17   you would remain standing.  Please raise your right

18   hand.  Ms. Simmons, our courtroom clerk, will administer

19   to you the oath as a witness.

20               DAVID DE LA TORRE

21          called as a witness by the People, was sworn

22          and testified as follows:

23          THE CLERK:  Thank you.  Please have a seat.

24          Tell us your name, and spell your last name,

25   please.

26          THE WITNESS:  David De La Torre.  D-e L-a

27   T-o-r-r-e.

28          THE CLERK:  Thank you.

<u>DIRECT EXAMINATION</u>

BY MR. WALPOLE:

          Q.    Good morning.

          A.    Good morning.

          Q.    What do you do?

          A.    I am a manager at Target for Loss Prevention.

          Q.    How long have you been a manager for Loss Prevention at Target?

          A.    About one-and-a-half years.

          Q.    How long total have you been working for Target?

          A.    One year and eight months actual time.

          Q.    Which Target store do you work for?

          A.    Pittsburg, California.

          Q.    And the entire time you have worked for Target, has it been at the Pittsburg store?

          A.    No.

          Q.    When did you start working at the Pittsburg store?

          A.    August of 2004.

          Q.    In August of 2004, were you manager of the other Loss Prevention officers at that time?

          A.    Yes.

          Q.    Were you on duty on May 10th, of 2005?

          A.    Yes.

          Q.    Who were you working with?

          A.    I was working with Blake Rogers, Alex

1   Azevedo, Tommy Weaver, and an employee named Pierre

2   Reed.

3          Q.    Right around 4:00 o'clock that day in

4   the afternoon, were you working at Target?

5          A.    Yes.

6          Q.    Where were you at?

7          A.    I was in the rear camera room in the

8   back of the store.

9          Q.    And when you say "rear camera room",

10  what are you talking about?

11         A.    Um, our store has two separate Asset

12  Protection offices.  The front one is the booking room

13  for processing shoplifters, and the back office is a

14  camera room where we have camera equipment.

15         MR. WALPOLE:  May I approach, Your Honor?

16         THE COURT:  You may.

17  BY MR. WALPOLE:

18         Q.    Showing you what has been previously

19  marked as People's Exhibit 6.  Do you recognize that?

20         A.    Yes, that looks like a diagram of our

21  store layout.

22         Q.    And that back camera room that you are

23  talking about, where is that depicted on the diagram?

24         A.    On the circle, in the little purple

25  circle in the back.

26         THE COURT:  Why don't you hand him the

27  pointer.

28  BY MR. WALPOLE:  Sure.  Why don't you step to the

1    pointer that's on the back wall.

2           Q.    Why don't you point to the area where

3    you were at at that time.

4           A.    (Complies.)

5           Q.    So, right where the two -- the CC1 is?

6           A.    Correct.

7           Q.    CC, or just CC in the circle?

8           A.    Yes.

9           Q.    And next to it is what appears to be a

10   pink circle?

11          A.    Yes, sir.

12          Q.    You can have a seat.

13          A.    (Complies.)

14          Q.    Was anyone -- was anyone in that room

15   with you?

16          A.    Yes.

17          Q.    Who was with you?

18          A.    Blake Rogers.

19          Q.    And what does he do?

20          A.    He is -- his title is Asset Protection

21   Specialist.  He makes apprehensions of shoplifters.

22          Q.    Were you watching the camera when you

23   were in that room?

24          A.    Yes.

25          Q.    What specifically -- as far as the

26   camera is concerned, what type of set up is there in

27   that?

28          A.    There are multiple monitors and VCRs.

1       Q.    Does one of the monitors depict a number

2    of camera shots, smaller pictures?

3       A.    Yes.

4       Q.    And is there also a larger screen, a 12

5    by 12 screen, also located in that room?

6       A.    Yes.

7       Q.    Which were you watching at this time?

8       A.    I was watching one of the smaller

9    monitors, the 12 by 12.  We call them call-up monitors,

10   because we can pull any camera up from those monitors.

11      Q.    When you say one of the smaller ones, is

12   there also bigger monitors in there?

13      A.    Yes, the multi-plex monitors are about

14   19-inch screens.

15      Q.    Does that depict just one camera angle,

16   or does that depict numerous camera angles on it?

17      A.    There are several camera shots on each

18   monitor.

19      Q.    When you are looking on that 12 by 12

20   monitor, did you see anyone on the monitor that's here

21   in the courtroom today?

22      A.    Yes.

23      Q.    And for the record, can you identify

24   where this person is at and what this person is wearing?

25      A.    He is seated over there.  He is wearing

26   a white shirt and gray tie.

27            THE COURT:  The record will reflect that he

28   has identified the defendant.

```
 1    BY MR. WALPOLE:
 2         Q.    What drew your attention to watch the
 3    monitor at this time?
 4         A.    Um, he had been -- the gentleman sitting
 5    over there, he had been called out by one of my
 6    employees.  He was accompanied by another female -- an
 7    unknown female, and they were pushing an empty shopping
 8    cart, walking fast in the men's department.
 9         Q.    What specifically did you see?
10         A.    I saw him select a package of white
11    T-shirts on camera, and I observed him conceal them down
12    the front of his -- in his front waistband.
13         Q.    Did you have a chance to watch a
14    videotape, I guess it -- it was Friday morning?
15         A.    Yes.
16         Q.    And was that -- was I present?
17         A.    Yes.
18         Q.    And did that -- that videotape, did it
19    depict what you saw on that particular day?
20         A.    It depicted what I saw, because time
21    lapse videotape, it records every three seconds.  So, it
22    looks somewhat choppy.
23         Q.    When you say you saw him grab a package
24    of T-shirts, where did he grab the package from?
25         A.    From the display the shelf.
26         Q.    Was that on the tape that I showed you
27    on Friday morning, the actual selection of the items?
28         A.    I don't recall if it was on the tape.
```

1    Q.   After you saw him select the items, what
2  did he do with the items?
3         A.   He placed it in the top of the -- his
4  shopping basket, the child seat portion, and then he
5  moved -- he reselected from the shopping cart, lifted up
6  his sweater or jacket he was wearing, and put it in his
7  waistband, front waistband.
8         Q.   Now, were you actually able to see him
9  with the item, put it in, or did he have the back to the
10  camera?
11        A.   I believe he had his back to the camera,
12  but I had no reasonable doubt that he discarded the
13  merchandise in there.  I saw the motion of him placing
14  it in his front waistband, and then putting the jacket
15  over.
16        Q.   After you saw him do that, what happened
17  next?  What did you see?
18        A.   At that point, he and an unidentified
19  female, left the men's department and proceeded past
20  women's maternity wear towards the front of the store.
21        Q.   Did you stay in the room, or did you
22  leave the room?
23        A.   I stayed in the room.
24        Q.   Did Blake do anything?
25        A.   Yes.  After we had observed the
26  concealment of the merchandise, Blake Rogers proceeded
27  to the sales floor to watch him live, while I stayed in
28  the camera room on camera surveillance.

1        Q.    While you were on camera surveillance,

2    did you switch cameras to follow the defendant's path?

3        A.    Yes.

4        Q.    As the defendant started to leave, what

5    did you see?  What happened next?

6        A.    I saw the defendant leave the shopping

7    cart by the front lanes, the front checking lanes, and

8    he proceeded out the main exit doors.  At that point, I

9    saw Blake Rogers approach him.  The subject -- I saw him

10   turn around and I saw a punch thrown at Blake, at

11   Blake's face.

12             MR. WALPOLE:  One second, Your Honor.

13             MS. GIN:  Your Honor, if I could have a moment

14   to move to the proper location, so I can observe?

15             THE COURT:  You may.

16   BY MR. WALPOLE:

17       Q.    Do you recognize this?

18       A.    Yes.

19       Q.    What does it appear to be?

20       A.    It appears to be the defendant, Mr.

21   Winzer.

22       Q.    Is this -- is this what you saw when you

23   were looking at the 12 by 12 monitor?

24       A.    Yes.

25       Q.    This item that appears to be in the

26   cart, is that the item that you saw in the child's seat

27   that you described earlier?

28       A.    Yes, a plastic package of T-shirts.

1           Q.    For the record, I'm playing People's --

2    I believe it's been marked People's Exhibit 11, the

3    videotape in this particular instance.

4           Is this the motion you described earlier of

5    the concealment in the shorts?

6           A.    Yes.

7           Q.    When you are watching it at the time,

8    was it clear, this image?

9           A.    Yes, it was clearer watching live

10   viewing.

11          Q.    When you were watching on the clear

12   screen, was there any indication that the T-shirts were

13   still in the -- in the shopping cart after he made that

14   backward moving motion?

15          A.    No.

16          Q.    Were you the one that was operating the

17   surveillance camera at this time?

18          A.    Yes, sir.

19          Q.    When I say "operating" how do you

20   operate it?

21          A.    It's controlled by a joy stick.

22          Q.    So, it was you, not Blake, that was

23   operating it at this point?

24          A.    Correct.

25          Q.    Do you have the capacity to zoom in and

26   zoom out on these cameras?

27          A.    Yes, sir.

28          Q.    Is that what you are doing on this

1    particular instance, at this particular moment, with

2    this video camera?

3              A.    Yes, sir.

4         Q.    Now, at this point it appears the

5    defendant has gone off of camera?

6              A.    Correct.

7         Q.    Are you able to see -- when you are in

8    the room and you have the 12 by 12 monitor, and the

9    other monitor that shows numerous camera angles, were

10   you able to see where he was on the other -- on the

11   other screen?  Do you know what I am saying?

12             A.    Yes.  Yes, I could see his motion while

13   he was leaving the store.

14        Q.    What were you doing at this point, once

15   the defendant walked off camera?  Were you looking at

16   the other monitor?

17             A.    I was temporarily looking at the other

18   monitor, in the meantime switching the camera shot to

19   the camera that he was on at the time.

20             Q.    Meaning, you were trying to bring up

21   that one of the images on the other monitor, to the 12

22   by 12?

23             A.    Yes.

24        Q.    What does this image here depict?

25             A.    That is the image of the main entrance.

26        Q.    Now, did you bring this image up

27   yourself?

28             A.    Yes.

1          Q.    The last image that's scrolled by fairly

2    quickly, what was that image of?

3          A.    The parking lot.

4          Q.    Why did you bring up an image of the

5    parking lot?

6          A.    I was trying to scroll through the

7    cameras to find the camera he was on.

8          Q.    Can you tell when you were looking at

9    the other monitor, not the 12 by 12, but the other

10    monitor, where he was at and what he was doing?

11          A.    Yes.

12          Q.    What does this image here depict?

13          A.    That is the Women's Department.

14          Q.    Okay.

15          A.    And Mr. Winzer walking through.

16          Q.    You take a look at the diagram that's

17    behind you, that you previously looked at.  Where on

18    that diagram would this image be at?  If you would go

19    ahead and grab a -- go ahead and just use the pointer

20    and just circle the general area that this depicts.

21          A.    This general area, right here

22    (indicates).

23          THE COURT:  He's circling the area where the

24    triangle appears.

25          MR. WALPOLE:  Thank you.

26          THE WITNESS:  Yes.

27          THE COURT:  I should note for the record,

28    circling with his pointer, as opposed to some sort of

1    writing instrument.

2    BY MR. WALPOLE:

3         Q.    This image here, what does this depict?

4         A.    That is the image of the front check

5    lanes, the cart area, and the main entrance-exit.

6         Q.    Did you see what if anything the

7    defendant did with the cart that he had earlier?

8         A.    He had left it -- it appeared to be off

9    the screen view.  It's an area called the Dollar Spot,

10   which is in front of the cart well.

11        Q.    This image here, what does this depict?

12        A.    That's an exterior shot of the main

13   exit.

14        Q.    And this image, although it's not overly

15   clear here, were you able to tell if you could see the

16   defendant on this image, or did you have to rely on the

17   previous image of the front store area with the Dollar

18   Spot?

19        A.    At this point, I had switched to this

20   camera shot to view him exiting.  So, I was able to see

21   from other camera views him walking towards that main

22   entrance, but I was mainly focused on that exit shot.

23        Q.    This image that just flashed by there,

24   what was that?

25        A.    That appeared to be Mr. Winzer and Blake

26   Rogers moving through the screen.

27        Q.    And you say you -- testified earlier

28   that you actually saw the punches that were thrown?

1      A.    Yes, because in live time this -- is

2    time-lapsed in this video.  In live time, I was able to

3    see Mr. Winzer turn around and throw a punch at

4    Mr. Rogers' face.

5           Q.    Were you able to get any other shots or

6    images of the struggle that ensued afterwards, at that

7    point?

8           A.    No.  As soon as I saw the punch, I

9    immediately left my office and I ran to the front of the

10   store to assist the apprehension.

11          Q.    After you saw that and you went up front

12   to assist, what happened?  What did you do?

13          A.    I arrived on the scene and the defendant

14   was struggling on the ground with my employees.  Blake

15   Rogers, Alex Azevedo, Tommy Weaver and Pierre Reed were

16   trying to place handcuffs on him.

17          Q.    Did you ever see if the defendant had

18   anything concealed on his person?

19          A.    Yes, I did observe the package of white

20   T-shirts still in his waistband.

21          Q.    When did you see that?

22          A.    Once he was handcuffed and lifted off

23   the ground, it was protruding from his waistband,

24   underneath his jacket.

25          Q.    Did you pull that item out, or did

26   someone else do that?

27          A.    Once inside the office, the booking

28   office, myself and -- I don't recall if I had

1    assistance, but I was able to retrieve it from his

2    waistband.

3              Q.    When you retrieved it from his

4    waistband, did you notice that the defendant was wearing

5    any underwear at that time?

6              A.    It did not appear he was wearing any

7    underwear.

8              Q.    What did you do with the item, the

9    T-shirts, after you pulled it out of his waistband?

10             A.    I placed it on a desk.

11             Q.    What did you do with the item after

12   that?

13             A.    It remained there until the police

14   arrived.

15             Q.    And did you show the police officer this

16   item that was on the table?

17             A.    Yes.

18             Q.    Did you dispose of the item?

19             A.    I did not personally dispose of it.  I

20   instructed one of my employees to dispose of it because

21   it had pubic hair on it.

22             THE COURT:  Who did you so instruct?

23             THE WITNESS:  I don't recall, Your Honor, who

24   I specifically instructed to dispose of it.

25             THE COURT:  Did you advise that individual how

26   to dispose of it?

27             THE WITNESS:  I told him to place it in a

28   plastic bag and let the store managers know to process

1    it out of the system so it wouldn't result in a loss,

2    just being thrown away.  I wanted them to properly

3    defect it out and to throw it in the garbage.

4    BY MR. WALPOLE:

5         Q.    Blake Rogers, the other Loss Prevention

6    officer who was in the office with you, have you

7    personally written him up in the past?

8         A.    Yes.

9         Q.    And did you do that on two separate

10   occasions?

11        A.    Yes.

12        Q.    Was there any indication that Mr. Rogers

13   did anything improper in this particular instance?

14        A.    No.

15        MS. GIN:  Objection, relevance.

16        THE COURT:  Overruled.

17        MR. WALPOLE:  Thank you.

18        No further questions, Your Honor.

19        THE COURT:  All right.

20        Ms. Gin.

21                  CROSS-EXAMINATION

22   BY MS. GIN:

23        Q.    Good morning, Mr. De La Torre.

24        A.    Good morning.

25        Q.    When you observed the punch that you

26   said my client gave Mr. Rogers, did Mr. Rogers touch

27   Mr. Winzer first?

28        A.    I do not recall if he touched him first.

1    I saw a hand placed on an arm, but I don't remember in

2    which sequence the punch was thrown first or Blake

3    Rogers put his hand on him first.

4         Q.    And when you observed this punch, was it

5    inside or outside the store?

6         A.    It appeared to be just as they are

7    exiting the threshold of the store, Mr. Winzer turned

8    around and the punch was thrown.

9         Q.    So, was Mr. Winzer outside the store at

10   this time?

11        A.    He was already outside.

12        Q.    And when you say outside the store, had

13   he crossed where the exit doors were and had actually

14   stepped outside?

15        A.    Yes.

16        Q.    And Mr. Rogers, was he still inside the

17   store or outside the store?

18        A.    He -- he may have been still inside,

19   right there that threshold of the door, when he

20   approached Mr. Winzer.

21        Q.    And that's where he was struck?

22        A.    It appeared that that was at the point

23   where he got struck.

24        Q.    Now, that threshold of the door, you

25   have a video -- you have the capacity to observe that

26   through the camera; is that correct?

27        A.    Yes, that exit shot that we saw.

28        Q.    And you have the capacity to videotape

1    what you observed on the monitor; is that correct?

2          A.    Yes.

3          Q.    In fact, when you talk about your camera

4    and video system, even when you are observing on the

5    smaller monitor, the 12 by 12, you are still taping

6    what's on the multi-plex monitor, the 19-inch; is that

7    correct?

8          A.    That's correct.

9          Q.    You can -- in fact, it's ongoing, 24

10   hours a day; is that correct?

11         A.    Yes.

12         Q.    So, even if you pulled up a specific

13   image that you wanted to see on that smaller monitor,

14   your VCRs are still taping all the camera shots?

15         A.    That's correct.

16         Q.    And when you observed the physical

17   contact between Mr. Rogers and my client, Mr. Winzer, it

18   was through a monitor which is through a camera; is that

19   correct?

20         A.    That's correct.

21         Q.    And that shot was being taped by your

22   VCR equipment; is that correct?

23         A.    Yes.

24         Q.    Did you ever see Mr. Winzer square up to

25   Mr. Rogers prior to punching him?

26         A.    No.

27         Q.    And could you hear from your location in

28   the close circuit room No. 1, whether Mr. Rogers

1    identified himself as Target security to Mr. Winzer?

2              A.    No, we do not have audio surveillance.

3              Q.    Mr. Rogers was dressed in plain clothes;

4    is that correct?

5              A.    Correct.

6              Q.    And what that means, he was not dressed

7    in any uniform that identified himself as a Target

8    personnel?

9              A.    That's correct.

10             Q.    You testified that you have been a

11   manager of Loss Prevention at this particular Pittsburg

12   store since August of last year?

13             A.    Correct.

14             Q.    And the training that you received, was

15   it a month-long training?

16             A.    For my position, it was about

17   one-and-a-half months of training.

18             Q.    Was that on-line, through a computer, or

19   was that actual classes where you had people teaching

20   it?

21             A.    It -- it was a combination of both.

22             Q.    And how long was -- how long the time

23   was on-line computer training?

24             A.    I would say about two, two-and-a-half

25   weeks.

26             Q.    And then, the remainder was in

27   classroom?

28             A.    Classroom and job shadowing-type

1    training.

2          Q.    How much of it was classroom time?

3          A.    Two weeks.

4          Q.    The video that you observed this

5    morning, were you the one who made the video and gave it

6    to the Pittsburg Police Department?

7          A.    Yes, ma'am.

8          Q.    What you did was to look at all the

9    shots that you had recorded, and compiled it for the

10   Pittsburg Police Department?

11         A.    Correct.

12         Q.    And that was your responsibility in this

13   case?

14         A.    Um, I assisted in it, because Blake

15   Rogers was writing his report and processing Mr. Winzer,

16   so I assisted in creating the video.

17         Q.    But normally, it would have been

18   Mr. Rogers who would have done it?

19         A.    Um, not necessarily.  It's -- it's a

20   team effort.

21         Q.    When you say it's a team effort, in this

22   case, was it a team effort where you and Mr. Rogers

23   looked at what shots had been recorded and then composed

24   it for -- for evidence to give to the Pittsburg Police

25   Department?

26         A.    No, I was the sole person who compiled

27   the tape.

28         Q.    When you observed my client taking a

1    package of T-shirts, you were the one in control of the

2    camera that was following him through the store, prior

3    to that; is that correct?

4              A.    Correct.

5              Q.    And of course, it was recording his

6    actions as he was going through the front of the store

7    to the back to the Men's Department; is that correct?

8              A.    Correct.

9              Q.    So, when you observed him taking that

10   package from the Men's Department, it was being

11   recorded?

12             A.    Correct.

13             Q.    Now, you have seen the shot of

14   Mr. Winzer with the shopping cart, and in the background

15   is the back wall with the shelf of items.  Is that where

16   the T-shirts were taken?

17             A.    Yes.

18             Q.    So, there was a clear view to the rack

19   where the T-shirts are located?

20             A.    Yes.

21             Q.    There's no impediment to the camera in

22   terms of viewing where the packages of Fruit of the Loom

23   T-shirts are located?

24             A.    No.

25             Q.    Where did you see Mr. Winzer take this

26   package from?  Was it top of the shelf, middle of the

27   shelf, bottom of the shelf?

28             A.    I don't recall what area.

1           Q.   But whichever area he took that

2   particular package of T-shirts, you had a clear view

3   from your monitor position; is that correct?

4           A.   Yes.

5           Q.   When you talk about the three-second

6   delay, does that mean that a video -- it only tape

7   records every three seconds?

8           A.   On the multi-plex, because it is 24-hour

9   time lapse, it extends the recording time.  So,

10  basically, it does record every two to three seconds.

11  It's basically frame -- frame by frame, or every other

12  frame.

13          Q.   So, what you are telling us is that

14  there is gaps in the videotape that you provided?

15          A.   In that particular video that I

16  provided, yes.

17          Q.   But there are videos that do real time

18  or live time as you say?

19          A.   Yes.

20          Q.   And in this particular case, you had

21  already concentrated on Mr. Winzer from the moment he

22  came into the store; is that correct?

23          A.   I did not initially begin surveillance

24  when he first entered the store.  He had already been in

25  the store on his way to the Men's Department, when I

26  gave surveillance.

27          Q.   If I could show you People's Exhibit 6.

28  Using this triangle right here, near the Maternity

```
 1    section, is that when you first started focusing on
 2    Mr. Winzer?
 3         A.   I don't remember exactly where it was
 4    when I picked up camera surveillance, because there were
 5    other people on the camera.  Blake was on the camera
 6    also, in the room with me, and then in the booking
 7    office we also have a monitor where they had begun
 8    observation of him.
 9         Q.   Was it somewhere near the maternity
10    section, do you recall?
11         A.   I don't recall exactly where.
12         Q.   When you first observed or directing
13    your attention to Mr. Winzer, was he already in the
14    Men's Department, or was he on his way up to the back of
15    the store?
16         A.   I believe he was on his way to the back
17    of the store.
18         Q.   But you had control of the camera at
19    this time; is that correct?
20         A.   At that point when I -- after my
21    employees had directed my attention to him, then I took
22    over control of the cameras.
23         Q.   And at that time, then the image is then
24    on your smaller monitor, the 12 by 12; is that correct?
25         A.   Yes.
26         Q.   And that is being tape recorded live
27    time; is that correct?
28         A.   Yes.
```

1    Q.    So, there's no two to three-second delay

2    on that particular video recording device?

3         A.    Correct.

4         Q.    And it was on that smaller monitor that

5    you observed Mr. Winzer take that package; is that

6    correct?

7         A.    Correct.

8         Q.    When you observed Mr. Rogers and Mr.

9    Winzer make physical contact with each other, did you

10   observe that through your smaller monitor, the 12 by 12,

11   or on the multi-plex monitor?

12        A.    I observed it on the smaller monitor via

13   the exit shot that was shown on the screen.

14        Q.    Once again, that's live-time recording;

15   is that correct?

16        A.    When I viewed it, it was live time.

17        Q.    You had a camera that can observe the

18   exit doors from inside the store; is that correct?

19        A.    Correct.

20        Q.    And you also have a camera that can

21   observe the exit doors outside the store; is that

22   correct?

23        A.    That's correct.

24        Q.    Now, is it -- are you familiar with

25   Target policy and procedures when it comes to retention

26   of property taken by shoppers?

27        A.    Yes.

28        Q.    And back on May 10th of this year, were

1    you in compliance with those Target policies and

2    procedures?

3         A.    For the most part, yes.

4         Q.    And as manager of the Loss Prevention

5    Department for Pittsburg Target store, is it part of

6    your duty to make sure that your employees are in

7    compliance with those Target policies and procedures?

8         A.    Yes.

9         Q.    In relationship to what happened in

10   Mr. Winzer's case, were you in compliance with Target

11   policies and procedures in retaining the T-shirts that

12   were allegedly found on him?

13        A.    Um, they were retained until the police

14   got there and they observed the, you know, the pubic

15   hair on them.  We photographed the item of evidence

16   before we discarded it.

17        Q.    Was that in compliance with Target

18   policies and procedures?

19        A.    I believe so.  We are allowed to

20   photograph evidence.  We don't have to retain that exact

21   item.

22        Q.    Are you aware that a similar type

23   package was given to the Pittsburg Police Department as

24   evidence in this case?

25        A.    Yes.

26        Q.    Were you the one who did that?

27        A.    I don't remember physically giving it to

28   them myself.

```
 1              Q.    If I can show you what has been marked

 2    as People's Exhibit 10, a Fruit of the Loom five

 3    T-shirts, men's.

 4              You testified you did not give that to

 5    Pittsburg Police Department; is that correct?

 6              A.    I don't remember giving them this

 7    package.

 8              Q.    Did you direct someone to give a package

 9    of Fruit of the Loom five-pack T-shirts to the Pittsburg

10    Police Department?

11              A.    I do recall instructing one of my

12    employees to retrieve a package from the sales floor

13    identical to the one that was retrieved from Mr. Winzer.

14              Q.    In looking at People's Exhibit 10, was

15    that identical to the package that you retrieved or that

16    you saw being retrieved from Mr. Winzer on May 10th,

17    2005?

18              A.    It appears to be.

19              Q.    So, you directed your employee -- do you

20    remember who?

21              A.    I don't recall who exactly it was.

22              Q.    And you directed this employee to get

23    from the shelf a Fruit of the Loom five-pack T-shirt 2X

24    men's; is that correct?

25              A.    Yes, identical to the one that was on

26    Mr. Winzer.

27              Q.    Is that in accordance with Target

28    policies and procedures?
```

1      A.    I am not sure.  We disposed of the

2  other -- the original package for health reasons, and we

3  had informed the Pittsburg PD that we were doing so and

4  they said it was okay.

5      Q.    Did you provide Pittsburg Police

6  Department with a copy of the photograph that you had

7  taken of the package that was taken from Mr. Winzer?

8      A.    I don't recall if we gave them a

9  photograph copy.

10      Q.    If I can show you what has been marked

11  as People's Exhibit 9, a Polaroid shot.

12         Were you present when that picture was taken?

13      A.    I don't recall being in the office when

14  this photo was taken.

15      Q.    Does that look like the package that was

16  retrieved from Mr. Winzer?

17      A.    Yes, it does look like the package,

18  because I was the one who retrieved it and I can see the

19  tears and the stretching of the plastic as a result of

20  the struggle in getting it out of his waistband.

21      Q.    Is it part of Target policy and

22  procedures to maintain a copy of the photograph, as well

23  as providing a copy to police if they -- if so required?

24      A.    If they request it, we provide it.  But

25  this was retained in our case file, I recall.

26      Q.    Now, when you testified that you wanted

27  to have the -- that particular item in People's Exhibit

28  9 bagged, do you know who -- whether it was bagged or

1    not?

2                    A.    When it was thrown away?

3                    Q.    Yes.

4                    A.    I instructed my team to put it in a bag.

5    I didn't physically observe it get thrown away, though.

6                    Q.    And you said that you wanted to have it

7    properly defected out.  What does that mean?

8                    A.    Um, Target has a system of damaged

9    goods.  They are marked down in the system or removed

10   from the system, so it doesn't result in shortage or

11   loss for the company.

12                   Q.    So, part of Target policies and

13   procedures is to go ahead and contact the store manager

14   of that particular department to let them know that you

15   have an item of their's; is that correct?

16                   A.    Um, it's not policy.  It's just let

17   somebody know the situation.  Usually, they handle it at

18   Guest Service, and they will properly defect it out of

19   the system.

20                   Q.    Did you do that in this case?

21                   A.    I personally did not do it.

22                   Q.    And is it your normal practice to

23   substitute another piece of item that a shoplifter took

24   to give to the police?

25                   A.    It's not normal practice to substitute.

26   In this case, due to the health concerns, we did it in

27   this situation.

28                   Q.    Now, just to ask you about what occurred

1    when Mr. Rogers left the -- left the close circuit TV

2    room No. 1.   .

3         You observed Mr. Winzer going back down the

4    aisle he had come up from; is that correct?

5         A.    Correct.

6         Q.    And Mr. Rogers was parallel to him on

7    the aisle next to it; is that fair to say?  In that

8    would be, say, looking at this pink line from CC room

9    No. 1, would you say that was the path Mr. Rogers took,

10   as far as you know?

11        MR. WALPOLE:  Objection, foundation.

12        THE COURT:  Sustained.

13   BY MS. GIN:

14        Q.   Did you see where Mr. Rogers went after

15   he left the room?

16        A.    I did not see Mr. Rogers' exact path,

17   because I was at that point focused on Mr. Winzer.

18        Q.    But there is an aisle next -- parallel

19   to the aisle that you saw Mr. Winzer; is that correct?

20        A.    Yes.

21        Q.    You are familiar with the store layout?

22        A.    Yes.

23        Q.    You have been there for over a year?

24        A.    Correct.

25        Q.    Are there products or merchandise in

26   between these two aisles?

27        A.    In those areas are racks, and primarily

28   clothing, clothing racks.

1          Q.    So when you see these boxes that's on

2    this diagram, these are boxes representing merchandise

3    and racks; is that correct?

4          A.    Correct.

5          Q.    So if someone was on the other side of

6    the aisle, right where I am pointing my finger at, right

7    here parallel to where Mr. Winzer took, you would not be

8    able to see across; is that correct?

9          A.    You could still see across to the racks,

10   because the racks are usually low enough to get not to

11   impede the view.

12         Q.    How tall would you have to be?

13         A.    I'm not sure, like, exactly how tall you

14   would have to be.

15         Q.    Okay.  But there are racks that are in

16   between the two aisles?

17         A.    Yes.

18         Q.    In fact, there are a number of racks

19   that are in between the two aisles?

20         A.    Yes.

21         Q.    Did you talk to Mr. Azevedo about what

22   occurred in this case?

23         A.    At what point?

24         Q.    At the time that Mr. Winzer was detained

25   outside the store?

26         A.    I talked to my entire team about it.

27         Q.    Did Mr. Azevedo ever tell you anything

28   unusual that occurred?

```
 1              A.     No.

 2              Q.     Did Mr. Azevedo report to you about

 3      anything that he did in this case?

 4              A.     No.

 5              Q.     Anything that he heard in this case?

 6              A.     Oh, I do recall he said that once

 7      Mr. Winzer was handcuffed, he said something.  I guess

 8      he had mumbled something, but I don't recall exactly

 9      what he had said.

10              Q.     Did Mr. Azevedo write a report on this

11      case, as far as you know?

12              A.     No.

13              Q.     Did you write a report on this case?

14              A.     No.

15              Q.     The only person who wrote a report was

16      Mr. Rogers?

17              A.     Yes.

18              Q.     Did you know that he identified the item

19      that was shoplifted as Fruit of the Loom socks?

20              A.     I don't recall.

21              Q.     In looking at his report on page 2, if

22      you look at that to refresh your recollection, under

23      merchandise evidence.

24              MR. WALPOLE:  Objection, relevance.

25              THE COURT:  Lay a foundation, yes.  Lay a

26      foundation that he at some point reviewed the report.

27      BY MS. GIN:  Okay.

28              Q.     Mr. De La Torre, as supervisor, do you
```

1    review the reports of your employees?

2         A.    Yes.

3         Q.    Are you aware that Mr. Rogers wrote up a

4    report in this case?

5         A.    Yes.

6         Q.    Did you review it?

7         A.    Yes.

8         Q.    Now, looking at page 2 of 4 under

9    merchandise evidence.

10        THE COURT:    Your question, Ms. Gin?

11   BY MS. GIN:

12        Q.    You say you don't recall whether

13   Mr. Rogers had written in his report that it was Fruit

14   of the Loom socks that was taken in this case.    In

15   looking at this report now, does it refresh your

16   recollection?

17        A.    Right here, it says Fruit of the Loom

18   socks.

19        THE COURT:    Separate and apart from --

20   separate and apart from what's in the report, do you

21   have now a refreshed recollection as to what if anything

22   was in the report?    Independent of the report, do you

23   remember whether Mr. Rogers described the item as socks,

24   or you simply basing  -- or the only thing you recollect

25   is what you are now reading?

26        THE WITNESS:    As far as this in the report, I

27   don't recollect that.    I remember seeing it with my own

28   eyes, it was T-shirts.

1          THE COURT:  Okay.

2          MS. GIN:  I have no more questions at this

3     time.

4          THE COURT:  All right.  Thank you.

5          Mr. Walpole, do you have any?

6          MR. WALPOLE:  Yes.

7                    REDIRECT EXAMINATION

8     BY MR. WALPOLE:

9          Q.   As far as your ability to record what

10    happened on live time, why did you provide the police

11    with a time-lapsed copy rather than the actual live

12    time?

13         A.   I believe I did so because it was --

14    it's easy to record in, you know, sequence.  I can call

15    up the cameras and record in sequence his progress

16    through the store.  We have two separate call-up

17    monitors, which I described the 12 by 12 monitors in the

18    office.  And we were viewing him on both of those

19    call-up monitors.  So, it would have had to take a lot

20    of time to compile all those different shots onto one

21    live videotape.

22         MR. WALPOLE:  Thank you.

23         No further questions, Your Honor.

24         THE COURT:  Any questions?

25                    RECROSS EXAMINATION

26    BY MS. GIN:

27         Q.   Mr. De La Torre, I'm gonna show you what

28    has been marked as Defendant's Exhibit B, titled Assets

1    Protection External Directives.  CCTV Shoplifter

2    Apprehensions, effective March 7th, 2005.  If you could

3    take a look at that.

4         THE COURT:  Ms. Gin, do you have a question?

5    BY MS. GIN:

6         Q.   Now that you have had a chance to review

7    what has been marked as Defense Exhibit B, are you

8    familiar with that directive?

9         A.   Yes.

10        Q.   And were you operating under that

11   directive back on May 10th of this year?

12        A.   It appears that the guidelines were

13   adhered to.  However, not retained -- or I should say

14   the directive states non time-lapsed surveillance should

15   be maintained.  I retained time-lapsed surveillance.

16        Q.   Were you operating under this directive

17   on May 10th of this year?  Strike that.

18        Were these the Target policies and procedures

19   that you were supposed to follow back in May 10th of

20   this year

21        A.   Yes.

22        Q.   And as you just testified to, you did

23   not comply one hundred percent with these directives; is

24   that correct?

25        A.   Yes.

26        Q.   In this directive, it tells you that you

27   may make apprehensions of shoplifters using close

28   circuit TV, providing each of the following guidelines

1    are met; is that correct?

2              A.    Correct.

3              Q.    And that incident or any portion of the

4    incident is recorded or captured using available close

5    circuit TV equipment, non time-lapsed with sufficient

6    surveillance maintained by an Assets Protection

7    Investigator to observe the five steps; is that correct?

8              A.    Yes, when I viewed this incident

9    occurred it was non time-lapsed.

10             Q.    And the reference that we have in that

11   directive when it talks about close circuit TV

12   shoplifter apprehensions, it references the five-step

13   Apprehension Guidelines have been adhered to; is that

14   correct?

15             A.    Correct.

16             Q.    And looking at Defendant's Exhibit A,

17   which is a directive on Apprehension Guidelines.  You

18   must be also in compliance with that directive; is that

19   correct?

20             A.    That's correct.

21             Q.    And part of that directive in

22   Defendant's Exhibit A on the Apprehension Guidelines is

23   that you must observe the individual select merchandise

24   from the display location?

25             A.    Correct.

26             Q.    And were you in compliance with that

27   directive?  Strike that.

28             Was that directive, Defendant's Exhibit A,

1    something you were aware of before May 10th, 2005, and

2    that you were aware of on May 10th, 2005?

3             A.    Yes.

4             Q.    And part of your job as being the

5    manager of the Loss Prevention Department, is to be in

6    compliance with both those directives?

7             A.    Yes.

8             MS. GIN:  Your Honor, this will be beyond the

9    scope of redirect, but I want him to look at the rest of

10   the directives.

11            THE COURT:  You may.

12            MS. GIN:  In looking at what has been marked

13   as Defendant's Exhibit E, which is titled Preserving

14   Processing and Documenting Recovered Evidence.  If you

15   could look at this two-page directive.

16            A.    (Complies.)

17            Q.    As the manager of the Loss Prevention

18   Department, were you operating under the Defendant's

19   Exhibit E before May 10th, as well as on May 10th of

20   this year?

21            A.    No, not exactly.

22            Q.    But these are directives that you must

23   comply with as a Loss Prevention officer, Assets

24   Protection officer, as well as manager; is that correct?

25            A.    Yes.

26            Q.    And when you say "not really", are you

27   referring to page 2 of 2 of Defendant's Exhibit E?

28            A.    Yes, in regards to retention of

1    evidence.

2              Q.    Under this particular directive, are you

3    allowed to throw away evidence?

4              A.    It says, store all evidence in a bag or

5    container and seal the evidence in a bag or container to

6    protect the item from tampering.  It doesn't say

7    anywhere about not throwing away merchandise.

8              Q.    Did you store the T-shirt bag that was

9    seized from Mr. Winzer, allegedly, on this day?

10             A.    No.

11             Q.    And that's what you meant when you say

12   you weren't in compliance?

13             A.    Yes.

14             Q.    In looking at that particular section,

15   it's pretty specific what you are supposed to do with

16   physical evidence taken from a shoplifter; is that

17   correct?

18             A.    Yes.

19             Q.    It talks about printing name, initial,

20   and the date that the evidence was seized?

21             A.    Correct.

22             Q.    And that if law enforcement takes the

23   evidence from you, you are supposed to secure or place a

24   tag saying that particular police department has come

25   and taken that property from you?

26             A.    Correct.

27             Q.    And that when you store all the physical

28   evidence in a bag with a container and sealing it, you

```
 1    either store it at your store, or you give it to the

 2    police department?

 3            A.    Correct.

 4            Q.    And that you always make sure you have a

 5    tag affixed to that property, identifying who was

 6    responsible for it, what date, and all the relevant

 7    information?

 8            A.    Correct.

 9            MS. GIN:   I have no more questions.

10            MR. WALPOLE:   No questions, Your Honor.

11            THE COURT:   All right.   Thank you very much,

12    Mr. De La Torre.   You are excused, subject to recall.

13    Which means, if either of the attorneys or their

14    representatives were to contact you, ask you to come

15    back, you would have to come back without the need for a

16    subpoena to issue, okay?

17            THE WITNESS:   Yes, sir.

18            THE COURT:   Thank you very much.

19            Ladies and gentlemen, we will take a

20    mid-morning break.   We will resume these proceedings at

21    five minutes to 11:00.   Five minutes to 11:00.

22            Please remember not to discuss this case among

23    yourselves or anyone else.   Don't form or express any

24    opinion until you have heard all the evidence, the

25    instructions of law, and the arguments of counsel.

26            We will see you at five minutes to 11:00.

27            (Recess.)

28            THE COURT:   I will state for the record, we
```

```
 1     are back on the record in the matter of People versus

 2     Winzer, with Mr. Winzer present, both counsel present,

 3     (all jurors presented) seated in their assigned seats.

 4               We are ready to proceed.

 5               MR. WALPOLE:  People cause Michelle Ligouri.

 6               THE COURT:  Officer, if you would remain

 7     standing and raise your right hand, we will swear you

 8     in.

 9                    Ò  MICHELLE LIGOURI

10               Called as a witness by the People, was sworn

11               and testified as follows:

12               THE COURT:   Thank you.  Please have a seat.

13               Tell us your name and spell your last name,

14     please.

15               THE WITNESS:  Michelle Ligouri.

16     L-i-g-o-u-r-i.

17               THE CLERK:  Thank you.

18                    DIRECT EXAMINATION

19     BY MR. WALPOLE:

20          Q.   Good morning.

21          A.   Good morning.

22          Q.   What do you do?

23          A.   I'm a police officer for the City of

24     Pittsburg.

25          Q.   How long have you been a sworn police

26     officer?

27          A.   I have been a sworn peace officer for

28     approximately eight months.
```

1          Q.    Were you on duty on May 10th of 2005?

2          A.    Yes, sir.

3          Q.    And back in May, how long were you a

4    sworn peace officer?

5          A.    Back in May, approximately five months.

6          Q.    Around 4:00 o'clock in the afternoon

7    that day, were you dispatched to a particular location?

8          A.    Yes, sir.

9          Q.    Where did you go?

10         A.    I was dispatched to Target in Pittsburg.

11   So, I -- on Century Boulevard.

12         Q.    Did you go there?

13         A.    Yes, I did.

14         Q.    When you went there, did you go inside

15   the store?

16         A.    Yes, sir.

17         Q.    And did you speak with anyone?

18         A.    I did, yes, sir.  I spoke with the

19   victim.

20         Q.    And who is that?

21         A.    That would be Blake Rogers.

22         Q.    Where did you first speak with

23   Mr. Rogers at?

24         A.    He first met myself and Officer Brown at

25   the entrance of the store.

26         Q.    You mentioned Officer Brown.  Did he go

27   there at the same time as you, in the same car, or was

28   it --

```
 1              A.     We were in two separate police vehicles.
 2              Q.     And when you showed up, did you also see
 3       anyone that you see in the courtroom here today?
 4              A.     Um, I later saw Mr. Winzer in the Loss
 5       Prevention office.
 6              Q.     Did you go inside the Loss Prevention
 7       office?
 8              A.     Yes, sir.
 9              Q.     When you say the Loss Prevention office,
10       where was it at in the Target store?
11              A.     In the Target store, you enter the
12       Target store and you make a left, and it's a little
13       office towards the front of the store, but --
14              MR. WALPOLE:  May I approach, Your Honor?
15              THE COURT:  You may.
16       BY MR. WALPOLE:  Showing you what has been previously
17       marked as People's Exhibit 7, I believe.
18              Q.     Is that a map of the front area of the
19       Target store in Pittsburg?
20              A.     Yes.
21              Q.     And the smaller triangles on the bottom
22       right-hand center, or bottom right-hand corner, are
23       those the -- do those appear to be the front doors of
24       the store?
25              A.     Yes, sir.
26              Q.     The office where you said the defendant
27       was inside, where is that at on this map?
28              A.     It's right here.  It's marked S.
```

1        Q.    At some point during your investigation

2    of this case, did you see a package of T-shirts?

3        A.    Yes, sir.

4        Q.    Where did you first see these package of

5    T-shirts at?

6        A.    In the Loss Prevention office.

7        Q.    And where were they at in the office?

8        A.    On the desk.

9        Q.    Did you have a look at the T-shirts?

10       A.    Yes, sir.

11       Q.    Showing you what has been previously

12   marked as People's Exhibit 9.  Does that appear to be a

13   photograph of the shirts that you saw?

14       A.    Yes, sir.

15       Q.    And showing you People's Exhibit 10.

16   Does People's Exhibit 10 appear similar to the actual

17   T-shirts -- T-shirts that you saw on that particular

18   day?

19       A.    Yes, sir.

20       Q.    When you looked at the actual T-shirts

21   that were inside the office, did you notice that there

22   was anything on them?

23       A.    Yes, sir, there was pubic hair on them.

24       Q.    And did you ever conduct a search of the

25   defendant?

26       A.    Yes, sir.

27       Q.    Were you able to tell if the defendant

28   was wearing any underwear?

```
 1                A.    Yes, sir.

 2                Q.    Was he wearing any underwear?

 3                A.    He was not wearing any undergarments,

 4     sir.

 5                Q.    Did you have a look at Mr. Rogers to see

 6     if he had any injuries on him?

 7                A.    Yes, sir.

 8                Q.    Did he have any injuries on him?

 9                A.    Yes, sir, he had injuries.

10                Q.    Did you photograph those injuries?

11                A.    Yes, sir.

12                Q.    Taking a look at what has been

13     previously marked as People's Exhibit -- Exhibits 1

14     through 5. If you could thumb through those for a

15     moment and look up when you are done.

16                A.    (Complies.)

17                Q.    What do those pictures depict?

18                A.    These are injuries to the victim, Blake

19     Rogers.

20                Q.    Did you take those photographs yourself?

21                A.    Yes, sir.

22                Q.    Did they look like how Mr. Rogers looked

23     on that day?

24                A.    Yes, sir.

25                Q.    How long did it take you to get to this

26     Target store when you were dispatched to that location?

27                A.    Sir, I believe it took me approximately

28     10 minutes.
```

1    Q.    When you were at the Target store, did
2    you collect the actual T-shirts as evidence?
3    A.    No, sir, I did not.
4    Q.    Okay.  Why not?
5    A.    I had forgotten to take the T-shirts at
6    that time.  At the time of the arrest.
7    Q.    Where -- when did you realize that you
8    had forgotten to pick-up those T-shirts?
9    A.    I realized I had forgotten to pick up
10   the T-shirts first that evening, but at that time I
11   believe the store was closed, and so I called back the
12   next day.
13   Q.    When you called -- did you call the next
14   day, the store?
15   A.    Yes, sir, I did.
16   Q.    When you called, did you ask for those
17   T-shirts?
18   A.    I asked for the T-shirts that they had
19   taken from the suspect, yes, sir.
20   Q.    And were you informed whether or not
21   they still had those T-shirts?
22   A.    I was informed that they had thrown them
23   away.
24   Q.    Did you request that similar T-shirts be
25   provided?
26   A.    Yes, sir.
27   Q.    And the T-shirts that you see in front
28   of you, People's Exhibit 10, are those similar or are

```
 1      those in fact the T-shirts that you received from

 2      Target?

 3                  A)      Those were the T-shirts that they

 4      provided for me.

 5                  MR. WALPOLE:  Thank you.  No further questions

 6                  THE COURT:  All right.  Thank you.

 7                  Cross-examination.

 8                       CROSS-EXAMINATION

 9      BY MS. GIN:  Good morning, officer.

10                  Q.    You prepared a five-page report on this

11      case; is that right?

12                  A.    Yes, ma'am.

13                  Q.    When you took the photographs of

14      Mr. Rogers, you had your digital camera with you on that

15      particular day?

16                  A.    The sergeant delivered a digital camera,

17      yes, ma'am.

18                  Q.    When you took the pictures of the --

19      Mr. Rogers, it was at that particular office that you

20      observed Mr. Winzer in?

21                  A.    Yes, ma'am.

22                  Q.    Do you recall what time you took the

23      pictures of Mr. Rogers?

24                  A.    I don't recall exactly what time, but it

25      was within the time that -- I hadn't left the store and

26      come back.  It was during that time, yes, ma'am.

27                  Q.    And the package of T-shirts was still on

28      the table?
```

1          A.    Yes, ma'am.

2          Q.    When you observed the package of

3    T-shirts on the table, did you handle it in any way?

4          A.    I don't believe I did.

5          Q.    In looking at People's Exhibit 9, was

6    that how the package was located on the table when you

7    went into the loss prevention office?

8          A.    I don't recall.  This -- it doesn't look

9    like the picture was taken while it was on the table.

10         Q.    When you saw the package on the table,

11   did you move it in any way, as far as you remember?

12         A.    As far as I remember, no.  No, I don't

13   remember.

14         Q.    And do you remember if the package that

15   you observed had the labeling of Fruit of the Loom, five

16   T-shirts, just like you see in People's Exhibit 9?

17         A.    Yes, ma'am.

18         Q.    During the time that you were there in

19   that room, did you ever notice anybody else turning the

20   package over to the back of it?

21         A.    Ma'am, they may have moved the package,

22   yes, ma'am.

23         Q.    I guess the question is:  Do you

24   remember that happening?

25         A.    Do I recall specifically, whether or not

26   that happened?

27         Q.    Yes.

28         A.    No.  No, ma'am.

1          Q.    Do you recall any tag on this particular

2    package on the table that identified itself as belonging

3    to Target?

4          A.    Like a price tag, ma'am?

5          Q.    Yes, with a price tag with a name Target

6    on it?

7          A.    I don't recall, ma'am.

8          Q.    Did you recall if there were any other

9    tag on it that may have stated that it belonged to

10    another store?

11          A.    No, ma'am, I don't recall.

12          Q.    You don't remember that, either?

13          A.    I don't -- I don't recall, no.

14          Q.    In looking at People's Exhibit 9, and

15    what's been marked as the actual T-shirts in front of

16    you, People's Exhibit 10, is People's Exhibit 10 the

17    same package -- not of course the same package, but is

18    it similar in terms of appearance that you saw back on

19    May 10th at that Loss Prevention office?

20          A.    Yes, ma'am.

21          Q.    You have had a chance to look at

22    People's Exhibit 10, correct?

23          A.    Yes.  This package here.

24          Q.    And to the best of your recollection,

25    that is similar in every way to the package you saw in

26    the Loss Prevention office?

27          A.    It's similar, yes, ma'am.

28          Q.    Now, this area of Target on Century

1      Boulevard, there's other businesses there; is that

2      correct?

3            A.    Yes, ma'am.

4            Q.    It's part of a strip mall, so to speak?

5            A.    Yes, ma'am.

6            Q.    There are other stores, such as Ross and

7      other boutique-type stores in that area?

8            A.    There are other stores, yes, ma'am.

9            Q.    And when you noticed the pubic hair on

10     the package, was it on the front of the package as it is

11     displayed on People's Exhibit 9?

12           A.    Ma'am, I just recall that there is pubic

13     hair on the package, as well as on the table around the

14     package.

15           Q.    And the picture that we are seeing in

16     People's Exhibit 9, you don't recall that package being

17     located in that way.  That's not a table there; is that

18     what you are telling us?

19           A.    Yes, ma'am.

20           Q.    You also interviewed a witness by the

21     name of Joseph Mahoney in this case; is that correct?

22           A.    Yes, ma'am.

23           Q.    Did you note in your police report that

24     you noted pubic hair on the package?

25           A.    I don't recall if I put that in the

26     police report, ma'am.  May I look?

27           Q.    Would it refresh your recollection if

28     you looked at your police report now?

1    A.    Yes.

2    Q.    Do you have it?

3    A.    Yes, I do.  May I look at it?

4    Q.    Sure.  If you could look at your

5    narrative portions, if that would assist you, pages 3

6    through 5?

7    A.    Ma'am, I didn't put in my report that

8    the package had pubic hair on it.

9    Q.    And did you have an opportunity -- did

10   you have the digital camera at the time when the package

11   was still on the table?

12   A.    No, ma'am, I did not.

13   Q.    The digital camera came later?

14   A.    Yes, ma'am.

15   Q.    What happened to the package on the

16   table?

17   A.    I believe it was moved aside when I was

18   searching the suspect.

19   Q.    And was -- do you know a person by the

20   name of David De La Torre?

21   A.    I don't recall that name, no.

22   Q.    Do you recall on Thursday afternoon

23   sitting next to a gentleman in a suit, he looked

24   Hispanic, in his early 30s?

25   A.    Another person that worked for Target,

26   yes, ma'am.

27   Q.    Did you see him at the store at the Loss

28   Prevention office on that particular afternoon?

```
 1              A.    Yes, ma'am.

 2              Q.    And was he present when you were taking

 3    the photographs of Mr. Rogers?

 4              A.    I believe he may have been.

 5              Q.    And was present when you first got there

 6    and observed the T-shirt package on the table?

 7              A.    Yes, ma'am.

 8              MS. GIN:  I have no more questions at this

 9    time.

10              THE COURT:  Any further questions,

11    Mr. Walpole?

12              MR. WALPOLE:  No questions, Your Honor.

13              THE COURT:  Officer, thank you very much.

14              May this witness be excused altogether, or

15    subject to recall?

16              MS. GIN:  Your Honor, if I could request

17    Officer Ligouri to stay at this point, subject to

18    Mr. Mahoney's testimony.  I don't want her to leave this

19    building until Mr. Mahoney testifies.

20              THE COURT:  If you would do that.

21              THE WITNESS:  Yes, Your Honor.

22              THE COURT:  Thank you.

23              Is Mr. Mahoney here?

24              MR. WALPOLE:  Let me take a look, Your Honor.

25              The People call Mr. Mahoney to the witness

26    stand.

27              THE COURT:  Sir, if you would come on up to

28    the witness stand, if you would.
```

1            And if you would remain standing and raise

2     your right hand, Ms. Simmons, our courtroom clerk, is

3     going to administer to you an oath as a witness, okay?

4            THE WITNESS:  Okay.

5                     JOSEPH MAHONEY

6            called as a witness by the People, was sworn

7            and testified as follows:

8            THE CLERK:  Thank you.  Have a seat.

9            THE COURT:  Mr. Mahoney, pull that seat close

10    to that microphone.  Thank you.

11            THE CLERK:  Tell us your name, and spell your

12    last name, please.

13            THE WITNESS:  Joseph Mahoney.  M-a-h-o-n-e-y.

14            THE CLERK:  Thank you.

15            THE COURT:  You may proceed, Mr. Walpole.

16                   DIRECT EXAMINATION

17    BY MR. WALPOLE:  Good morning.

18            How old are you?

19        A.    17, sir.

20        Q.    Are you still in high school?

21        A.    Yes.

22        Q.    Which high school do you go to?

23        A.    Antioch high.

24        Q.    I'm going to ask you to try to remember

25    a particular day back on May 10th, 2005.  Do you

26    remember that day?

27            A.    I don't know, like, the day of the week

28    it was, but I know it pretty well.

 1              Q.    Do you remember seeing something happen

 2      in front of the Target store in Pittsburg?

 3              A.    What happened?  Like, what happened?

 4              Q.    Do you remember like some sort of

 5      altercation -- were you at Target on that day?

 6              A.    Well, like right in front of, um, like

 7      where they go in, like the opening?

 8              Q.    Yeah.

 9              A.    Like where the doors?  Okay.

10              Q.    Do you remember something unusual

11      happened that day?

12              A.    Well, I saw, like, the one dude ran out.

13              Q.    Actually, let me slow you down a little

14      bit.

15              Why were you at the Target store?

16              A.    I was waiting for my grandma.

17              Q.    Your grandparents in the back of the

18      courtroom?

19              A.    Yes.

20              Q.    Was it around 4:00 o'clock?

21              A.    I don't know.

22              Q.    Was it in the afternoon or in the

23      morning?

24              A.    It was in the afternoon.

25              Q.    Now, were you in the Target store or

26      were you out in front of the Target store?

27              A.    I was out, like outside.

28              Q.    When you say "outside", were you near

 1          the front doors, at all?

 2                   A.    Yes.

 3                   Q.    About how far away from the front doors

 4          were you?

 5                   A.    I would say, like, like five -- five

 6          feet away from the entrances.

 7                   Q.    Okay.  And what were you doing there?

 8          Were you coming in the store?

 9                   A.    No, I was just waiting out there,

10          waiting for my grandma.

11                   Q.    Okay.  Were you looking out towards the

12          street to see if a car was going to come by, or were you

13          looking back towards the --

14                   A.    I was, like, facing the doors.

15                   Q.    You were facing the Target doors?

16                   A.    Yes.

17                   Q.    Okay.  And do you remember seeing

18          anything?

19                   A.    No.

20                   Q.    Do you remember hearing anything?

21                   A.    No.

22                   Q.    Did anything happen that day?  What did

23          you see?

24                   A.    I saw the -- I saw him run out, and

25          then --

26                   Q.    Actually, let me slow you down a little

27          bit.  When you say "'him", do you see someone here in

28          the courtroom that you saw that day?

```
 1                    A.       The criminal, sir.

 2                    Q.       Just for the record, she's taking stuff

 3       down.  Can you tell me, when you say you saw someone, is

 4       he in the courtroom here today?

 5                    A.       Yes, yes.

 6                    Q.       And can you point out where he's at and

 7       what he's wearing?

 8                    A.       (Indicates.)

 9                    Q.       Can you tell me what he's wearing?

10                    A.       The white -- oh, the day, or now?

11                    THE COURT:  At this time, today.

12                    THE WITNESS:  The white, like.

13                    MR. WALPOLE:  Your Honor, the record reflect

14       the witness has identified the defendant?

15                    THE COURT:  The record will so reflect.

16       BY MR. WALPOLE:

17                    Q.       I am asking you some of these questions,

18       because we have a court reporter here who is taking

19       everything down and preserving it for a record, okay?

20                    A.       Yes.

21                    Q.       When you say you saw the defendant,

22       where did you see him at?

23                    A.       I saw him running outside of Target,

24       followed by a white male.  And they started fighting.

25       And I don't think that really, like, punches got, like,

26       connected, but they got, like, in like a bear hug.  And

27       then they got out to, like, the street area, and --

28                    Q.       Let me slow down a little bit.
```

1           Q.   Did you see one person -- you say "punches".

2   Did you see who threw the punches?

3           A.      Not particularly.

4           Q.      Okay.  When you say you saw the

5   defendant coming out the front doors and there was a

6   person behind him --

7           A.      Um-hum.

8           Q.      -- do you know about how far behind the

9   defendant this other person was?

10          A.      Like, three footsteps maybe.

11          Q.      And why were you looking -- if your

12  grandma was coming to pick you up, why were you looking

13  back towards the Target doors?

14          A.      Just pacing, I guess, waiting for her.

15          Q.      Was there a particular noise or some

16  sort of sound that drew your attention?

17          A.      I just heard like a bunch of yelling

18  coming out of, like, the doors.

19          Q.      So, you heard someone yell something?

20          A.      Yes.

21          Q.      Do you recall what specifically you

22  heard being yelled or said?

23          A.      No.

24          Q.      When you saw this whole struggle, did

25  you ever hear the defendant say anything?

26          A.      No.

27          Q.      Did you ever hear the other person say

28  anything?

1           Ⓐ      No.

2           Ⓠ      But someone did say something at the

3    front doors?

4           Ⓐ      Yes, I just can't remember who it was.

5           THE COURT:  Can you remember who said it?

6           THE WITNESS:  It was, I think, the security

7    guy.

8           THE COURT:  The what?

9           THE WITNESS:  The security guy.  The white

10   male.  I don't know his name.

11          THE COURT:  All right.

12   BY MR. WALPOLE:

13          Ⓠ      So, you heard the security guy say

14   something?

15          Ⓐ      Yes.

16          Ⓠ      And then, there was some punches thrown?

17          Ⓐ      Yes.

18          Ⓠ      And then, what happened?

19          Ⓐ      They were like in a bear hug, and --

20          Ⓠ      Did you see who grabbed who?

21          Ⓐ      I think it kind of just both grabbed

22   each other at the same time.

23          Ⓠ      Then, what happened?

24          Ⓐ      Then, they got out like towards the

25   street area, and I think they lost balance, whatever,

26   were struggling, and they were rolling on the ground,

27   and that's -- and then the white male tried to get like

28   the handcuffs on the defendant, and he was struggling,

1    and two more security guys came and jumped on the

2    defendant, and they --

3            Q.    Do you recall what the other two

4    security guys looked like?

5            A.    I think one was a white male, and the

6    other one was a black male.  And they were both security

7    people for Target.

8            Q.    You said there were some punches thrown

9    and that there was a -- they were grabbing each other?

10           A.    Yes.

11           Q.    Someone was grabbing someone?

12           A.    Yes.

13           Q.    Do you remember what happened, first,

14    the punches or the grabbing?

15           A.    The punches, first.

16           Q.    Did you hear the security guards ever

17    tell the defendant to stop resisting, when they were

18    trying to get him in handcuffs?

19           A.    I did not hear that.  They probably said

20    that before they came out of Target, but I didn't hear

21    anything after that.

22           MS. GIN:  Move to strike about "probably said"

23    that, Your Honor.  Calls for speculation.

24           THE COURT:  Sustained.  Just testify to what

25    you saw and heard.  The last question and answer will be

26    disregarded.

27    BY MR. WALPOLE:

28           Q.    At some point, were they able to get him

1       into handcuffs?

2                   A.    Yes.

3                   Q.    What happened next?

4                   A.    Then they took him back to, like, a

5       room.

6                   Q.    Did you see them take him back to a

7       room?

8                   A.    No.  No, I didn't.

9                   THE COURT:  That last question and answer will

10      be disregarded, as well.

11      BY MR. WALPOLE:

12                  Q.    After you saw the defendant on the

13      ground, did you actually see him get handcuffed?

14                  A.    No, because once everyone jumped on him,

15      I went back inside.

16                  Q.    Oh, so then, once they had him on the

17      ground, you went inside the store?

18                  A.    Yes.

19                  Q.    And did you see anything else that

20      happened after that point?

21                  A.    No, they just told me that they took

22      him.

23                  THE COURT:  You don't have to answer what they

24      told you.

25                  THE WITNESS:  Sorry.

26      BY MR. WALPOLE:

27                  Q.    Did the security guards, the Target

28      security guards, did they talk to you?

1    A.    Yes, they brought me in a room

2    afterwards and asked me some questions.

3         Q.    How long after you went back inside, you

4    stopped watching, you went inside, how long after that

5    did the Target Security talk to you?

6         A.    Like 10, 15 minutes.

7         Q.    Did they ask that you stick around at

8    some point?

9         A.    Yes, they had a female cop come and talk

10   to me, and they gave me the phone number and told me if

11   I had any questions to call them, whatever.

12        Q.    Did the security guards ask that you

13   stay there and wait until the police officer arrived?

14        A.    Yes.  Yes, she did.

15        Q.    Did you say, "Yes, she did"?

16        A.    Yes.

17        Q.    Or was it a female security guard?

18        A.    Sorry.  Yes, he did.

19        Q.    So, it was one of the Target people that

20   said:  Hey, stick around.  Wait until the police show

21   up?

22        A.    Yes.

23        Q.    Did you provide your phone number?

24        A.    Yes.

25        Q.    Before you saw this happen out front,

26   were you inside the store, at all?

27        A.    No.

28        MR. WALPOLE:  No further questions, Your Honor

```
 1              THE COURT:  Thank you.

 2              Ms. Gin.

 3                   CROSS-EXAMINATION

 4    BY MS. GIN:

 5              Q.   Good morning.

 6              A.   Good morning.

 7              Q.   Did you tell the female police officer

 8    what happened?

 9              A.   Yes.

10              Q.   Was your memory -- was your memory of

11    what happened better when you talked to the officer, or

12    is it better now?

13              A.   Um, probably back when I told the female

14    police officer.

15              MR. WALPOLE:  I'm sorry, I couldn't hear that

16    answer.

17              THE WITNESS:  It was probably right when I

18    talked to the female police officer.

19    BY MS. GIN:

20              Q.   Did you tell the female police officer

21    that you heard a lot of movement or a lot of yelling?

22              A.   Lot of yelling.

23              Q.   And when you saw the white male, could

24    you tell he was a Target security person?

25              A.   No, because he was like undercover

26    security for the Target.

27              Q.   Had you known that when you first saw

28    him come out of the store?
```

```
 1              A.    No.

 2              Q.    In fact, when you first saw the white

 3    male, he was dressed --

 4              A.    Just like --

 5              Q.    -- just like you and me?

 6              A.    Yes.

 7              Q.    Did you ever hear this white male say

 8    out loud:  I'm Target Security?

 9              A.    No.

10              Q.    Did you hear him -- strike that.

11              And did you see this white male touch the

12    black male first?

13              A.    Yes.

14              Q.    And did you see the white male touch the

15    black male on his shoulder?

16              A.    I don't remember, now.

17              THE COURT:  For clarification purposes, when

18    you say "first", perhaps you could amplify on what you

19    mean by "first".  Before what?

20    BY MS. GIN:

21              Q.    You saw the black male outside the

22    store; is that right?

23              A.    Yes.

24              Q.    Then, you saw the white male outside the

25    store?

26              A.    Yes.

27              Q.    Right behind the black male?

28              A.    Yes.
```

1      Q.    Did you see the white male then reach

2    out with his hand to touch the black male's shoulder?

3      A.    Yes.

4      Q.    As they were outside the store?

5      A.    Yes.

6      Q.    At that point, when you saw the white

7    male touch the black male's shoulder, did the black male

8    turn around and hit the white male, or did the black

9    male seem to be continuing to run outside the store?

10     A.    I think he was trying to run continuing.

11     Q.    At that point, as the white male has his

12   hand on the black male's shoulder and the black male is

13   seemed to be running away from the white male, did you

14   see the white male bear hug the black male?

15     A.    I can't remember.

16     Q.    Would it refresh your recollection to

17   look at the statement you made to the female officer?

18     A.    Yes.

19     Q.    On page 4 of Officer Ligouri's report.

20   If you could just read this paragraph.  Take your time.

21     A.    Okay.

22     Q.    In looking at that portion of the report

23   by the female officer, does it help refresh your

24   recollection about the bear hug?

25     A.    Yes.

26     Q.    Did you see the white male bear hug the

27   black male?

28     A.    Yes.

1    Q.    And when you saw that bear hug from the

2    white male, was that outside the store?  Was that

3    outside the store?

4    A.    Yes.

5    Q.    How far outside the store, was it?  Was

6    it closer to the parking lot, now, or was it still in

7    that area in the front entrance of Target?

8    A.    It was like -- like I say, a little like

9    in between.  Like in the middle, maybe.

10    Q.    Were they on the ground when you saw the

11    bear hug, or were they still standing upright?

12    A.    No, they were still standing.  They

13    didn't get on the ground until they were on the street.

14    Q.    And the street that we are talking

15    about, is the parking lot street?

16    A.    Yes.

17    Q.    And you didn't hear any conversation

18    between the white male or the black male before the bear

19    hug?

20    A.    No.

21    Q.    Any statements between the black male

22    the white male when they were down on the ground?

23    A.    No.

24    Q.    Or after the bear hug?

25    A.    No.

26    Q.    And you didn't know either of the two

27    people?

28    A.    No.

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  VIOLET M. LEE, State Bar No. 77144
   Deputy Attorney General
6  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
7  Telephone: (415) 703-5896
   Fax: (415) 703-1234
8  Email: Violet.Lee@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **LACY WINZER,** | C 08-2341 PJH (PR) |
| Petitioner, | **EXHIBIT 5 (part 4)** |
| v. | |
| **BILL CURREY, Warden,** | |
| Respondent. | |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 5 (part 4)                                    Winzer v. Currey
                                                    C 08-2341 PJH (PR)

# EXHIBIT 5 (part 4)

```
 1            MS. GIN:   No more questions

 2            THE COURT:  Any questions?

 3            MR. WALPOLE:  Yes, Your Honor.

 4                    REDIRECT EXAMINATION

 5     BY MR. WALPOLE:

 6            Q.    When you had a chance to look at your

 7     statement to the police, do you recall whether or not

 8     you were actually facing the front doors, or you were

 9     facing the street and then turned around?

10            A.     I was facing the doors.  Here is the

11     door, and I was facing -- they came out like that side

12     of the doors, and I had, like, turned my head.  Like I

13     heard like a bunch of yelling, so I turned my head to

14     see what was going on.

15            Q.    When you say turned your head, which --

16            A.    Turned my head (indicates).

17            THE COURT:  Indicating to the right.

18            THE WITNESS:  Yes.

19            MR. WALPOLE:  No further questions

20            THE COURT:  Anything further?  May this

21     witness be excused?

22            MR. WALPOLE:  Yes, Your Honor.

23            THE COURT:  Subject to recall?

24            MS. GIN:  Yes, Your Honor.

25            THE COURT:  Mr. Mahoney, subject to recall

26     means that if either of the attorneys or their

27     representatives were to contact you and ask you to come

28     back and testify some more, you would be obligated to do
```

```
 1     so without the need for a subpoena to issue, okay?
 2               THE WITNESS:  Okay.
 3               THE COURT:  It's not anticipated, but if they
 4     do, you will have to come back.
 5               THE WITNESS:  Okay.
 6               THE COURT:  Thank you very much.
 7               Counsel, may I see you both at side bar for a
 8     moment.
 9               (Discussion in chambers not reported.)
10               THE COURT:  All right.  Thank you for your
11     patience, ladies and gentlemen.  I just wanted to talk
12     to counsel about the remaining witnesses and the -- how
13     we can best utilize our time.
14               In order to best utilize our time, at this
15     time I am going to give Defense Counsel, Ms. Gin, an
16     opportunity to call a witness out of order.
17               You want to recall Ms. Ligouri?
18               MS. GIN:  That's correct, Your Honor.  If I
19     could call Officer Ligouri?  If I could go get her?
20               THE COURT:  Please.
21                    MICHELLE LIGOURI,
22               called as a witness by the Defendant,
23               having previously been sworn,
24               testifies as follows:
25               THE COURT:  Officer, if you would return to
26     the witness stand, please.
27               As you do so, I will simply remind you, you
28     are still under oath and expected to answer all
```

```
 1     questions fully and truthfully, okay?

 2                THE WITNESS:  Yes, Your Honor.

 3                THE COURT:  Ms. Gin.

 4                     DIRECT EXAMINATION

 5     BY MS. GIN:

 6          Q.    Officer Ligouri, did you talk to a

 7     witness by name of Joseph Mahoney?

 8          A.    Yes, ma'am.

 9          Q.    And you document it in your police

10     report?

11          A.    Yes, ma'am.

12          Q.    Did Mr. Mahoney tell you that he heard a

13     lot of yelling or a lot of movement?

14          A.    A lot of movement, ma'am.

15          Q.    When you talked to Mr. Blake Rogers, did

16     you document your conversation with him?

17          A.    Yes, ma'am.

18          Q.    And you talked to him about what

19     happened when he had Mr. Winzer down on the ground in

20     the process of being handcuffed; is that correct?

21          A.    Yes, ma'am.

22          Q.    Did Mr. Rogers tell you that he said

23     anything to Mr. Winzer when they were down on the ground

24     struggling, or in the process of being handcuffed?

25          A.    He didn't tell me that he said anything

26     during, no.

27          Q.    In fact, Mr. Rogers told you that he did

28     not exchange any other words with the suspect during
```

1    this encounter?

2         A.    Yes, ma'am.

3         MS. GIN:  No more questions.

4         THE COURT:  Any further questions?

5         MR. WALPOLE:  Yes, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. WALPOLE:

8         Q.    As far as your conversation with

9    Mr. Mahoney, did he indicate which direction he was

10   facing when he first heard something?

11        A.    Yes, sir.  He said he was facing the

12   street.

13        Q.    Towards the street?

14        A.    Yes.

15        Q.    And did he tell you whether or not he

16   turned around?

17        A.    Um, I believe he told me when he started

18   hearing movement that he may have looked to the side,

19   but he wasn't sure where -- he knew that the noise was

20   coming from behind him, but wasn't sure exactly where.

21        Q.    Did he ever indicate that he ever saw

22   Mr. Rogers strike the defendant or hit the defendant?

23        A.    I'm sorry, sir?

24        Q.    Did Mr. Mahoney ever tell you that he

25   saw Mr. Rogers hit the defendant or strike the

26   defendant?

27        A.    No, sir.

28        MR. WALPOLE:  No further questions, Your

1     Honor.

2              THE COURT:  Anything further?

3              MS. GIN:  Nothing, Your Honor.

4              THE COURT:  All right.  Thank you, officer.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  All right.  You want to check

7     outside to see if you have another witness?

8              MR. WALPOLE:  Yes, sir.

9              Negative.

10             THE COURT:  We will resume these proceedings,

11    ladies and gentlemen, at 1:30.  Apparently, this witness

12    there may be some delay and, rather than keep you here

13    to wait, we will just resume these proceedings at 1:30

14    this afternoon.

15             In the meantime, please remember not to

16    discuss this case among yourselves or with anyone else.

17    And don't form or express any opinions, until -- you

18    have heard from several witnesses, but you haven't heard

19    all the evidence yet.  Please wait until you hear all

20    the evidence, the instructions of law, and the arguments

21    of counsel.

22             MR. WALPOLE:  Just so the Court is aware, the

23    other witness may not be available to testify this

24    afternoon, per scheduling.

25             THE COURT:  If that witness is not available,

26    we will proceed with the witnesses that are, or we will

27    close the case.

28             MR. WALPOLE:  Understood.

1           THE COURT:  Thank you very much.

2           (Jurors exit the courtroom.)

3           THE COURT:  All right.  The record will

4    reflect the jury has exited.  The defendant and both

5    counsel remain.

6           With respect to this witness, is it

7    Mr. Weaver?

8           MR. WALPOLE:  Yes.

9           THE COURT:  You don't know whether Mr. Weaver

10    is coming or not?

11           MR. WALPOLE:  I haven't got any return phone

12    calls from him the last time I checked an

13    hour-and-a-half ago.  He is not essential.  If I don't

14    have him, I will be closing the case

15           THE COURT:  All right.  Very well.

16           And your client is thinking about whether to

17    testify or not.

18           In this connection, Mr. Winzer, let me tell

19    you.  You have a right, as you heard me explain to the

20    jury, not to take the stand.  You cannot be compelled to

21    testify, and you have a right not to take the stand.  At

22    the same time, if you want to take the stand and

23    testify, that's a right, as well.  I just want to make

24    sure that you discuss with Ms. Gin the pros and cons of

25    each alternative course of action.  I will assume,

26    however, that you understand that you can elect to

27    testify or not to testify.  Ultimately, the choice is

28    yours, okay?

1          All right.  Make sure you discuss the

2    advantages is and disadvantages with your attorney,

3    Ms. Gin, beforehand.

4          Do you understand these matters?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.

7          Before everybody leaves, I want to have a

8    little bit further on the -- what I am now

9    characterizing as the Ferrero issue.  You remember that

10   defense sought to impeach Mr. Rogers about a statement

11   that he made in the courtroom.  He was asked whether he

12   put his hand on the defendant, before the defendant

13   threw a punch at him.  And he said during the course of

14   the trial, "I don't remember".

15         Ms. Gin wishes to introduce evidence that

16   prior to the trial, he had testified that he -- that the

17   defendant threw a punch at him before he placed his

18   hand.

19         Is it still your desire to do that?

20         MS. GIN:  Yes, Your Honor.

21         THE COURT:  Then the question becomes as to

22   whether that is inadmissible hearsay on not, in light of

23   the fact that Mr. Rogers said at trial he didn't know

24   whether he made that statement or not.

25         I brought to your attention two cases.  One

26   was People versus Sam, which involved a case where a

27   witness testified several times with regard to various

28   questions concerning an incident that he didn't

1    remember, and then the -- one of the parties sought to

2    impeach him by reference to his prior description of

3    what happened during that incident.  The Court said he

4    couldn't do so, because "I don't remember" is not

5    inconsistent.

6         However, we have the Ferrero case

7    subsequently, with the Supreme Court, and the passage

8    which I will be -- which I confess I have difficulty

9    understanding, but certainly seems to be saying that

10   there are at the very least circumstances when you can

11   impeach a statement to the effect of "I don't recall",

12   by reference to a prior statement that is inconsistent,

13   in effect.  Whatever that means.

14         I asked you both to consider that and give me

15   your thinking on it.

16         You know, I also looked at the case called

17   People versus Green, which is discussed in the Ferrero

18   case, to see if that would shed some greater light on

19   it.

20         The best I can put together is this:  It is

21   sometimes possible that an "I don't know" statement is

22   inconsistent with a prior statement describing

23   something, where the "I don't know" -- or "I can't

24   recall", rather.  I have been saying "I don't know", but

25   I should be saying, "I don't recall".  Where the "I

26   don't recall" statement implies something different than

27   the prior statement.  But how do you differentiate --

28   how you are supposed to tell when there is such and when

 1    there isn't, is not made very clear in the discussions.

 2         There is some suggestion:  Well, you make that

 3    decision based on the totality of the evidence and the

 4    totality of the circumstances.  So, I certainly agree,

 5    the totality of it should be taken into account before

 6    you make that decision.

 7         But where does that leave us in terms of,

 8    let's say, our particular case?  When Mr. Rogers said --

 9    said, "I don't recall", is there some implication in

10    that, that he didn't put his hand on first?  Is he

11    trying to imply that, or is that the effect on the jury?

12         Ms. Gin?

13         MS. GIN:  The bottom line, Your Honor, is that

14    Mr. Rogers testified at a prior hearing relating to the

15    same circumstances, the same situation in this case.

16         THE COURT:  Yes.

17         MS. GIN:  He was under oath.

18         THE COURT:  Yes.

19         MS. GIN:  There was direct examination by the

20    District Attorney relating on the touching.  The fact

21    that I pointed out to him, included both direct as well

22    as cross-examination.  I think the fact that he does not

23    recall, even when I showed him portions of the

24    transcript, shows that it is inconsistent.

25         I'm not saying it's diametrically opposed,

26    because if you look at the language of Ferrero --

27         THE COURT:  Inconsistent in what sense?

28         MS. GIN:  Is that he remembered back in June

1    7th of this year, that he touched my client first.

2        THE COURT:  Right.

3        MS. GIN:  He doesn't remember it today.

4        THE COURT:  But under that rationale, every "I

5    don't remember" statement is inconsistent with a prior

6    statement describing an event.

7        MS. GIN:  But I think that's what _Ferrero_

8    stands for, and that's why _Ferrero_, which is a later

9    Supreme Court case in 1991, and _Sam_, of course, was

10   decided in 1969, that I think the _Ferrero_ case is

11   controlling.

12       And if the Court is not inclined to allow me

13   to introduce the prior testimony under oath into

14   evidence, then I would ask the Court to consider under

15   past recollection recorded under Evidence Code 1278.

16   But I think that I am on sound ground that this should

17   becoming in for impeachment purposes to say it's not

18   consistent.

19       THE COURT:  Have you read the _Ferrero_ case?

20       MR. WALPOLE:  I took a look at it, Your Honor.

21   And as far as --

22       THE COURT:  What do you make of that statement

23   that limits the _Sam_ case to simply situations where a

24   witness exclusively describes an incident by reference

25   to "I don't know"s?  Suggesting that if -- that the rule

26   is otherwise, if he tells us something about the

27   incident, but says "I don't recall" other aspects of the

28   incident?

1          MR. WALPOLE:  When I was looking at that, I

2     just kept thinking about the purpose behind a prior

3     inconsistent statement.  And typically, although can be

4     used for the truth of the matter stated, it's really

5     usually just to impeach a witness.  And when Mr. Rogers

6     took the stand, I think he was very credible when he is

7     saying:  Listen, when I'm just sitting here today, I

8     can't exactly remember.  You know, he wasn't denying

9     that he made prior statements under oath, and that he

10    may have touched the defendant.  But he just genuinely

11    can't recall on this particular instance right here,

12    today, when he testified on Thursday.

13          So, I think if you look at the whole general

14    purpose behind allowing in prior inconsistent

15    statements, it doesn't appear to be a proper means to

16    impeach this witness when he genuinely says "I can't

17    remember", in this particular instance.

18          I will note out, there was other things he

19    said he couldn't particularly remember.  Whether or not

20    he actually saw the defendant lift the merchandise, the

21    T-shirts off the rack.  So, I mean, it's entirely

22    consistent with his testimony, that he is credible and

23    honest in his testimony that, you know, just today as he

24    is sitting here, even though he says things in the past

25    under oath, he can't exactly remember.

26          THE COURT:  Well, I certainly agree with your

27    analysis.  I just -- but I don't know what to make of

28    the Ferrero case.

1          MR. WALPOLE:  It's difficult to reconcile.

2          THE COURT:  Pardon me?

3          MR. WALPOLE:  It appears to be difficult to

4     reconcile.

5          THE COURT:  Yeah.

6          MS. GIN:  Your Honor, if I could remind the

7     Court, I tried and I attempted to ask Mr. Rogers:  Did

8     you testify at the preliminary hearing that you touched

9     my client, and Mr. --

10          THE COURT:  He objected on hearsay grounds.

11          MS. GIN:  He objected on hearsay grounds.

12     It's interesting that he is talking about two things

13     here.  One is for impeachment purposes, that you make a

14     prior statement that is not that you said something

15     differently than today to offering it for the truth of

16     the matter asserted.  So, I just am reminding the Court

17     that I was not even allowed to ask Mr. Rogers if he even

18     made a similar -- if he made a statement that he was

19     sure what he did.

20          So, I'm just reminding the Court that right

21     now, we are talking about my client's right to have a

22     fair trial.  And I think that if the Court is wobbling

23     between which direction to go to, I think it's only fair

24     that the jury hear that this witness did testify under

25     oath at a prior hearing about this case, that he said it

26     one way, that he touched my client prior to my client

27     touching him.

28          THE COURT:  Yeah.  Well, if this were an -- a

1    completely unimportant matter, I wouldn't care as much.

2    But it is very important with reference -- or may be

3    important to be honest with the jury with reference to

4    the robbery charge.  So I am going to therefore allow it

5    in, because of the language in Ferrero.  I think it's

6    possible to distinguish away -- it may be possible to

7    distinguish away the Ferrero case, but given the way it

8    was written, and given the way that Judge Simon -- I

9    mean, Justice Simon in his book accounts for it, it

10   seems to suggest that "I don't care" is -- "I don't

11   remember" is inconsistent with a prior statement

12   describing it.  Therefore, it should come in.

13           I am going to allow it in, basically on the

14   theory that, on a close issue like this, if we are going

15   to err, we should err in favor of the defendant.  I am

16   going to allow it in.

17           MR. WALPOLE:  In that instance, as I referred

18   to my argument, Mr. Rogers did testify under oath that

19   he saw the defendant select the merchandise and conceal

20   it.  So, when -- with Mr. Rogers on the stand, he said:

21   You know what, I don't really remember if I did see him

22   grab the merchandise or not.  He did testify at the

23   preliminary hearing that did he see the defendant.

24           THE COURT:  On the same rationale, you want to

25   allow it in on the grounds that it is inconsistent to

26   his statement.

27           What's your answer to that?

28           MS. GIN:  That he's -- that the People are

1    impeaching its own witness?

2          THE COURT:  No, the People can impeach their

3    own witness.  We all know that, right?

4          MS. GIN:  I would just submit it, Your Honor.

5    Just making a comment on what Mr. Walpole is doing.

6          THE COURT:  So, you can impeach him on that

7    basis.

8          MR. WALPOLE:  Okay.

9          THE COURT:  Both of you can read those

10   portions of the preliminary hearing transcript.

11         MR. WALPOLE:  And that's the difficulty, you

12   know, of couching it in terms of impeachment, because

13   truthfully I still don't think it's really amounting to

14   impeachment.  I mean, under the same rationale, you got

15   to let it in, but is it really -- it's just a prior --

16         THE COURT:  Under the Ferrero rationale it's a

17   prior inconsistent statement.

18         MR. WALPOLE:  I agree.

19         THE COURT:  Thank you.

20         (Midday recess.)

21                    ---o0o---

22

23

24

25

26

27

28

```
 1    Martinez, California              August 15, 2005; P.M.
 2    Department No. 11          Hon. Peter L. Spinetta, Judge
 3                         ---oOo---
 4                   P-R-O-C-E-E-D-I-N-G-S
 5           THE COURT:  All right.  We will go on the
 6    record in the matter of People versus Winzer, with
 7    Mr. Winzer present, his counsel, Ms. Gin present, and
 8    Mr. Walpole present.  Mr. Walpole for the People
 9    present, as well.
10           Before we bring in the jury, it's my
11    understanding you are going to rest, Mr. Walpole.  Is
12    that correct?
13           MR. WALPOLE:  Yes, Your Honor.
14           THE COURT:  How about exhibits?  What's the
15    status of exhibits?  People's exhibits -- the People
16    have marked exhibits 1 through 11.
17           MR. WALPOLE:  That's correct.
18           THE COURT:  No. 1 is photograph of injuries to
19    Mr. Rogers' face.  In fact, that's 1 through 5, correct?
20           MR. WALPOLE:  Correct.
21           THE COURT:  I take it, there are no objections
22    to those.  Admitted.
23           MS. GIN:  I have no objection to the
24    photographs coming in.  My only concern is the
25    redundancy of them but, other than that, I'm fine
26    because I know they depict how Mr. Rogers looked at the
27    time.
28           THE COURT:  Let me see the photos.
```

1      You are raising a 352 objection on the grounds
2  that they are redundant?
3           MS. GIN:  Yes.
4           THE COURT:  All different aspects of the
5  injury.  The objection is overruled.  1 through 5 will
6  admitted.
7                (Whereupon, People's Exhibit Nos. 1 - 5,
8                are received in evidence.)
9           THE COURT:  6, the diagram of the layout of
10  the Target store, that's admitted.
11           7, diagram of the front of the Target store,
12  that's admitted.
13           8, is a photograph of Lacy Winzer on date of
14  the incident.  I don't recall that.  May I see that?
15           THE CLERK:  What number was that, Judge?
16           THE COURT:  8.
17           THE CLERK:  There's 8 and 9, Judge.
18           THE COURT:  8.  Did that come up in evidence?
19           MS. GIN:  It did, Your Honor.  It was
20  identified by Mr. Rogers.
21           THE COURT:  All right.  Thank you.  All right.
22  I take it there are no objections.  Admitted.
23           9, is the photograph of the actual T-shirts
24  recovered from Mr. Winzer.  That's admitted.
25           10, is a package of T-shirts, so-called
26  similar items.  That's admitted.
27           11, is the surveillance videotape of the
28  Winzer incident.  That was shown to the jury and

```
 1        implicitly admitted already, and is admitted.

 2                        (Whereupon, People's Exhibit Nos. 6 - 11,

 3                        are received in evidence.)

 4              THE COURT:  My understanding, before we went

 5        on the record, is your client will not be testifying.

 6        Is that correct, after deliberating on the matter?

 7              MS. GIN:  Yes.

 8              THE COURT:  Are there any other witnesses you

 9        are going to call?

10              MS. GIN:  No witnesses, Your Honor.

11              THE COURT:  All right.  Thank you.

12              I understand, both of you have some prior

13        inconsistent statements.

14              A, is Asset Protection Training Guidelines.  I

15        take it those -- there is no objection to that.  That's

16        admitted.

17              Well, we have B -- let me go in the order they

18        appear.

19              E, is the Asset Protection Operational

20        Directives.  That's admitted.

21              C, is Assets Protection Training Guideline.

22        Is that it?  C?  Asset Protection External Directives

23        Pursuit of Shoplifters.  That's C?

24              MS. GIN:  Yes.

25              THE COURT:  These descriptions here leave

26        something to be desired.

27              B, is the Asset Protection External

28        Directives.  Admitted.
```

1              And C, is the Asset Protection Internal

2       Directives.

3              MS. GIN:  Just to let you know, I did have

4       defendant's Exhibit D marked, but I never asked any of

5       the witnesses, since it did not apply.  Just to be more

6       clear on the record, what it is, is Assets Protection

7       External Directives.  The category itself is Productive

8       Merchandise Recoveries.

9              THE CLERK:  That's the one that is not

10      offered?

11             THE COURT:  That's correct.

12             THE CLERK:  So, is that withdrawn?

13             MS. GIN:  It is withdrawn.  It was only marked

14      for purposes of identification.  But I do not intend to

15      introduce it into evidence.

16             THE COURT:  That's D, as in David?

17             MS. GIN:  Correct.

18             THE COURT:  So, admitted are A, B, C and E.

19             THE CLERK:  Thank you, Judge.

20             THE COURT:  A, B, C and E.

21             THE CLERK:  Um-hum.

22                         (Whereupon, Defense Exhibits A, B, C

23                          and E, are received in evidence.)

24             THE COURT:  D is withdrawn, correct?

25             MS. GIN:  Yes.

26             THE CLERK:  Thank you, Judge.

27             THE COURT:  All right.  Let's go over jury

28      instructions in this matter.

1    Let me do this.  Sheriff Willet, will you go

2    out and tell the jury, please, that it will be another

3    10 to 15 minutes before we bring them back; that we are

4    going over some legal matters.  Tell them to be here at

5    least in 15 minutes.

6        All right.  CALJIC instruction -- here are the

7    instructions I intend to give, and the order I intend to

8    give them.  You lodge any objections or raise any point

9    you wish, as I mention them.

10        1.00.

11        1.01.

12        1.02.

13        1.03.

14        Ms. Gin, you haven't requested.  It is my --

15    because the way these courtrooms are designed, it's my

16    practice to customarily give 1.04, physical restraint

17    instruction, because so often the way this courthouse is

18    designed jurors see defendants being brought in.  You

19    wish me to give it, or not?

20        MS. GIN:  Yes, please.

21        THE COURT:  1.04.

22        1.05.

23        2.00.

24        2.01.

25        2.11.

26        2.13.

27        2.20.  Let's pause for a moment with respect

28    to 2.20.  Let's see.  The factors to be considered in

1    determining credibility here.  There has been no

2    character evidence.  There hasn't been any evidence of a

3    witness sustaining a prior conviction of a felony, or

4    testifying under a grant of immunity.  All the other

5    factors appear to be pertinent.

6              2.21.1.

7              2.21.2.

8              2.22.

9              2.27.

10              2.52 would be appropriate to prove as

11    consciousness of guilt for the petty theft.

12              2.60

13              2.61.

14              2.90.

15              9.40.

16              9.40.2.  Let's pause on that one, because I do

17    think we should make a change.

18              MS. GIN:  I'm sorry, Your Honor, what was it?

19    9.40.2?

20              THE COURT:  9.40.2.  To constitute the crime

21    of robbery, the perpetrator must form a specific intent

22    to permanently deprive before or at the time of the

23    taking of the property.  Okay?

24              You see that?

25              My only change to that is where it says to

26    deprive an owner of the property, I would substitute it

27    read as follows:  To constitute the crime of robbery,

28    the perpetrator must have formed the specific intent to

1   permanently deprive the person in possession of the

2   property of that property before or at the time that the

3   act of taking the property occurred.

4           The "person in possession" substituted for the

5   word "owner".

6           Then, 9.40.3, showing that a store employee

7   can be a person in possession.

8           Now, the People have submitted two

9   instructions.  One, the way you have it, reads as

10  follows:  The requisite force or fear needed to

11  establish a robbery need not occur at the time of the

12  initial taking.  The use of force or fear to escape or

13  otherwise retain even temporary possession of the

14  property constitutes robbery.

15          My problem with that, is this, is with the

16  second sentence, and in two respects.

17          First of all, I think it has to be made clear

18  it constitutes robbery if all the other required

19  elements have been proven.  So, I would preface that

20  sentence -- I would -- that second sentence would read

21  as follows:  Assuming all other required elements have

22  been proven, the use or force -- of force or fear to

23  escape with or otherwise retain even temporary

24  possession of the property constitutes robbery.

25          Next instruction, with respect to the second

26  paragraph, I have a similar problem.  It says it is not

27  essential -- an essential element of the crime of

28  robbery that the use of force or fear be used to gain

1    direct physical possession of the property taken.
2    That's true.
3           Assuming -- I would add again the language:
4    Assuming all other elements have been proven, a robbery
5    is committed if an individual uses force or fear to
6    retain possession of a property prior to reaching a
7    place of relative safety.
8           I want to make clear that all the other
9    elements have to be proven.
10          MR. WALPOLE:  Understood.
11          THE COURT:  Then, 9.43.  I think we are all in
12   agreement that in the circumstances of this case, if a
13   robbery has been proven it is second-degree, right?
14          MR. WALPOLE:  Yes.
15          MS. GIN:  Yes.
16          THE COURT:  Then, I am going to go directly to
17   14.02.  I am gonna delete the references to the word
18   "grand" theft.  First sentence will read:  Defendant is
19   accused in Count Two of having committed the crime of
20   theft, a violation of section 484 of the Penal Code.
21   And then it will continue on.
22          Then, 14.03.  Theft, intent, further defined.
23          And then, I'm gonna modify 14.20 to read as
24   follows:  Theft is either grand theft or petty theft.
25   If you find the defendant guilty of theft, it is, in the
26   circumstances of this case, petty theft, right?  It's
27   not grand theft?
28          MR. WALPOLE:  That's correct.

1        THE COURT:  Both the crimes charged here,

2    Count One and Count Two, constitute specific intent

3    crimes.  So, we will give 13.31.

4        Petty theft is a lesser to robbery, but in

5    this case we have charged petty theft, so I take it

6    there's not two -- the way that two separate petty

7    thefts could have been committed here.

8        MR. WALPOLE:  No.

9        THE COURT:  So, there are no lessers here that

10    I can see.  Anybody disagree?

11        Battery is not a lesser.  In the old days, of

12    course, lesser related it would have -- it would be one

13    that we give, but it's not a lesser included offense,

14    because it's force or fear.  So, it is not a lesser --

15    assault or battery is not lesser.  So, I won't give

16    that.

17        Then 17.30.

18        17.31.

19        17.40.

20        17.41.

21        17.42.

22        17.45.  I always add the following paragraph

23    to 17.45:  The title or heading of each instruction is

24    provided you only for the purpose of assisting you in

25    locating that instruction.  The title or heading is not

26    part of the instruction and should not be considered by

27    you for any purpose other than that for which it is

28    provided.

1           THE COURT:  17.43.

2               17.47.

3               17.50.

4               17.52, and 17.53.

5           The People have requested the following

6       instructions, and which I am not going to give.  And let

7       me see -- let me hear from you, if you think I should be

8       giving it.

9           2.03, consciousness of guilt, falsehood.  Is

10      there any evidence here that defendant made a willfully

11      false or deliberately misleading statement?

12          MR. WALPOLE:  No, not necessarily, Your Honor.

13      It's withdrawn.

14          THE COURT:  So, that -- withdrawn?

15          MR. WALPOLE:  Yes.

16          THE COURT:  Withdrawn.  Okay.

17          2.23.  No witness -- we are -- we don't -- we

18      are not -- no witness was impeached by reference to

19      commission of a felony.  So that's withdrawn, too, I

20      take it?

21          MR. WALPOLE:  Yes.

22          THE COURT:  Similarly, 2.61, 2.62 is

23      withdrawn, since the defendant is not testifying?

24          MR. WALPOLE:  Yes.

25          THE COURT:  242, robbery of the first-degree.

26      I'm not going instruct them on that, because we all

27      agree it -- if robbery has been committed, it's only of

28      the second-degree.

1          4.46, theft.  Restitution not a defense.

2     There's no evidence here of any attempt to return the

3     items or make partial restitution, so --

4          MR. WALPOLE:  The only reason I include it is

5     because they did recover this property eventually when

6     he was detained.  So, that's just out of caution.

7     That's why I throw it in there, as well.

8          THE COURT:  Well, you want to modify that to

9     read:  It's not a defense to a prosecution to theft that

10    after the theft was committed, the items stolen were

11    recovered?

12         MR. WALPOLE:  No, I don't believe that's

13    necessary.  That is withdrawn.

14         MS. GIN:  I doubt very much I will be arguing

15    that, Your Honor.

16         THE COURT:  That's not given.

17         17.10, I'm not going to give, since I don't

18    think we are dealing with -- the only lesser involved

19    here is really taken care of in Count Two.

20         MS. GIN:  The interesting question, Your

21    Honor, is that if he is found guilty of Count One, then

22    automatically the jury must find him guilty of Count

23    Two.

24         THE COURT:  Technically -- I'm not sure that

25    that, technically speaking, is correct.  I think --

26    let's see.

27         This is an Estes robbery, so we have got a

28    situation there where there is force to retain, right --

```
 1              MS. GIN:  Correct.

 2              THE COURT:  -- the item.  But the item had to

 3     be initially taken.  So, I think you are probably right,

 4     as a practical matter.

 5              Are you suggesting that it creates some 654

 6     problems?

 7              MS. GIN:  654 is only for sentencing, Your

 8     Honor.

 9              THE COURT:  I -- I didn't -- you are

10     absolutely right.  But I don't mean it for sentencing

11     purposes.  But I mean, did you mean to suggest that

12     there is some problem by virtue of both?

13              MS. GIN:  I don't think there will be a

14     problem, Your Honor.  The only reason I brought it up is

15     because the fact Mr. Walpole asked for this instruction,

16     but I think the way the Information is now listed, I

17     don't think there will be any issues with the jurors.

18              THE COURT:  All right.  Anything further on

19     instructions?

20              MS. GIN:  No.  The only thing I would like,

21     Your Honor, is if I could go through Mr. Walpole my

22     suggested portions of the preliminary hearing transcript

23     and his portion, before we call in the jurors?

24              THE COURT:  You bet.

25              MR. WALPOLE:  As far as scheduling is

26     concerned.  I do have a couple -- I assume we will get

27     to closing today, or no?

28              THE COURT:  No, I won't call on you to do
```

1    that.  I will read them the instructions and send them

2    home.

3            MR. WALPOLE:  Okay.

4            THE COURT:  So, you two can argue the first

5    thing in the morning.  Otherwise, I am pretty sure we

6    will have to split.

7            MR. WALPOLE:  That would be great, Your Honor.

8    Thank you.

9            (Recess.)

10           (Jurors enter the courtroom.)

11           THE COURT:  All right.  Thank you for your

12   patience.  We are back on the record in the matter of

13   People versus Winzer.  Mr. Winzer is present.  Both

14   counsel are present.  All jurors are present, seated in

15   their assigned seats, and we are ready to proceed.

16           It does not appear we are going to have any

17   further witnesses in this case, but each side has some

18   additional evidence to present.  I will start first with

19   the People.

20           Do you have any evidence to present,

21   additionally.

22           MR. WALPOLE:  Actually, I spoke to Defense

23   Counsel and she is going to read the entirety of it.

24           THE COURT:  Very well.  So, you are going to

25   read -- tell the jury what you are going to be doing.

26           MS. GIN:  That's correct.  Your Honor.  At

27   this time, Your Honor, both counsel and I have agreed to

28   the following portions of the preliminary hearing that

1    was held on June 7th, 2005, in Delta Court, located in

2    the City of Pittsburg, in which Mr. Rogers testified

3    under oath.

4              Starting first with page 10, lines 16 through

5    21.

6              I'm sorry, starting at line 15.  Starting

7    with:     "Question.  And then what happened?

8              "Answer.  They walked in the Men's Department,

9         selected a package of T-shirts.

10             "Question.  And when you say "selected", who

11        was it that selected as between the two of the

12        individuals that you saw?  The defendant and this

13        unidentified person?

14             "Answer.  Lacy."

15             Page 14, line 17 through 27.

16         "Question.  Were the defendant and this other

17        person outside of the store when you approached

18        them?

19         "Answer.  Yes, they were.

20             "Question.  And I believe you indicated that

21        you identified yourself and, when you did so, the

22        female began to walk a different direction, or what

23        happened?

24         "Answer.  When I identified myself as Target

25        Security, they both looked back at me.  She started

26        walking very quickly, and at this time I put -- I

27        grabbed Lacy Winzer's arms."

28             Page 15, lines 4 through 7.

1    "Question.  And when you grabbed him by the

2    arms, what happened?

3         "Answer.  He broke away with one of them and

4    struck me, approximately three times, in my head."

5         Page 19, lines 14 through 20.

6         "Question.  So, when you first actually made

7    physical contact with Mr. Winzer, it was outside

8    the store?

9         "Answer.  Yes, it was.

10        "Question.  How close to the doors were you

11   when you first made contact with Mr. Winzer?

12        "Answer.  Probably two feet outside the door."

13        Page 20, line 16 to 19.

14        "Question.  Now, when you walked outside to

15   make contact with Mr. Winzer, how far away were you

16   from him when you first identify yourself as Target

17   Security?

18        "Answer.  Two feet."

19        Pages 22, lines 21 to 24.

20        "Question.  And when you told Mr. Winzer that

21   you were Target Security, that's when he swung at

22   you?

23        "Answer.  I identified myself as Target

24   Security.  I put my hand on his wrist, and then he

25   swung at me."

26        That so stipulated by Mr. Winzer.

27        THE COURT:  Both counsel have stipulated to

28   the admission of these statements which are taken from a

1    prior court proceeding in which Mr. Rogers testified

2    under oath.

3            The date of that, again?

4            MS. GIN:  June 7th, 2005.

5            THE COURT:  Thank you very much.

6            Do the People rest?

7            MR. WALPOLE:  Yes, Your Honor.  The People

8    rest.

9            THE COURT:  Does the defense rest?

10           MS. GIN:  At this time, on behalf of

11   Mr. Winzer, we do, Your Honor.

12           THE COURT:  Very well.  Now, ladies and

13   gentlemen, you have heard all the evidence you are going

14   to hear concerning this matter.  What remains are for me

15   to instruct you as to the applicable law, and then we

16   hear the arguments of counsel.

17           What we will do today is instruct you as to

18   the applicable law.  That should take approximately 45

19   minutes or so.  Then, I won't call upon counsel to begin

20   their closing arguments until tomorrow morning, because

21   I don't want to create a situation where one counsel is

22   arguing today and another has to wait until tomorrow.

23   So, in order that they both be able to address you on

24   the same day, we will then, after the instructions, we

25   will adjourn until tomorrow morning, at which time you

26   will hear the closing arguments and go out and you

27   deliberate on this matter.

28           Now, some of you have your notebooks already

1  in hand and your pens out, and you are welcome to take

2  notes if you want to.  But I should tell you ahead of

3  time, that you will receive the instructions in written

4  form to have in the jury room to look to, if you need

5  to, during the course of your deliberations.  So, you

6  might find it more profitable just to sit back and try

7  to absorb these instructions as I read them to you,

8  knowing that you will have them in written form in the

9  jury room, if you need them.

10        Ladies and gentlemen of the jury, you have

11  heard all the evidence and now it is my duty to instruct

12  you on the law that applies to this case.

13        The law requires that I read the instructions

14  to you.  And you will also, as I just indicated, have

15  these instructions in the written form in the jury room

16  to refer to during the course of your deliberations.

17        .  You must base your decision in this case on

18  the facts and on the law.  You have two duties to

19  perform.  First, you must determine what facts have been

20  proved from the evidence received in the trial, and not

21  from any other source.

22        A fact is something proved by the evidence or

23  by a stipulation.  A stipulation is an agreement between

24  the attorneys regarding the facts.  Second, you must

25  apply the law that I state to you, to the facts as you

26  determine them, and in this way arrive at your verdict.

27        You must accept and follow the law as I state

28  it to you, regardless of whether or not you agree with

1    it.  If anything concerning the law said by the

2    attorneys in their arguments or at any other time during

3    the trial conflicts with my instruction of law, you must

4    follow my instructions.

5        Now, you must not be influenced by pity for or

6    prejudice against the defendant.  You must not be biased

7    against the defendant because he has been arrested for

8    this offense, charged with a crime or brought to trial.

9        None of these circumstances is evidence of

10    guilt and you must not infer or assume from any or all

11    of them that the defendant is more likely to be guilty

12    than not guilty.

13        You must not be influenced by sentiment,

14    conjecture, sympathy, passion, prejudice, public opinion

15    or public feeling.  Both the People and the defendant

16    have a right to expect that you will conscientiously

17    consider and weigh the evidence, apply the law, and

18    reach a just verdict, regardless of the consequences.

19        If any rule, direction or idea is repeated or

20    stated in different ways in these instructions, no

21    emphasis is intended.  And you must not draw any

22    inference because of its repetition.  Do not single out

23    any particular sentence or any individual point or

24    instruction and ignore the others.  Consider the

25    instructions as a whole and each in light of all the

26    others.

27        The order in which the instructions are given

28    has no significance as to their relative importance.

1          Statements made by the attorneys during the

2     trial are not evidence.  However, if the attorneys have

3     stipulated or agreed to a fact, you must regard that

4     fact as proven as to the party or parties entering into

5     the stipulation.

6          If an objection was sustained to a question,

7     do not guess what the answer might have been and do not

8     speculate as to the reason for the objection.

9          Do not assume to be true any insinuation

10    suggested by a question asked of a witness.  Remember, a

11    question is not evidence and may be considered by you

12    only insofar as it helps you to understand the answer.

13         Do not consider for any purpose any offer of

14    evidence that was rejected, or any evidence that was

15    stricken by the Court.  Treat it as though you had never

16    heard of it.

17         You must decide all questions of fact in this

18    case from the evidence received in trial and not from

19    any other source.  You must not independently

20    investigate the facts or the law or consider or discuss

21    facts as to which there is no evidence.  This means, for

22    example that you must not on your own visit the scene,

23    conduct experiments, or consult reference works or

24    persons for additional information.

25         You must not discuss this case with any other

26    person, including but not limited to spouses, spiritual

27    leaders, or advisors or therapists, except a fellow

28    juror during the deliberations when all 12 of you are

1    together in the jury room, and then only after the case

2    is submitted to you for your decision, and only when all

3    12 jurors are present in the jury room.

4              The fact that physical restraints may have

5    been placed upon the defendant must not be considered by

6    you for any purpose.  They are not evidence of guilt and

7    must not be considered by you as any evidence that he is

8    more likely to be guilty than not guilty.

9              You must not speculate as to why restraints

10    have been used in determining the issues in this case.

11    Disregard this matter entirely.

12              At the beginning of this trial, you were given

13    notebooks and pens.  You will, of course, be able to

14    take these with you to the jury room when you

15    deliberate.

16              Remember, as I believe I previously instructed

17    you, notes are only an aid to memory and should not take

18    precedence over your recollection.  A juror who does not

19    take notes, should rely on his or her recollection of

20    the evidence and not be influenced by the fact that

21    other jurors do take notes.

22              Notes are for the note-taker's own personal

23    use in refreshing his or her recollection of the

24    evidence.

25              Finally, should any discrepancy exist between

26    a juror's recollection of the evidence and a juror's

27    notes, or between one juror's recollection and that of

28    another, you may request that the reporter read back the

1    relevant testimony which must prevail.

2            Evidence consists of the testimony of

3    witnesses, writings, material objects or anything that's

4    presented to the senses and offered to prove the

5    existence or the nonexistence of a fact. Evidence is

6    either direct or it is circumstantial. Direct evidence,

7    is evidence that directly proves a fact. It is evidence

8    which, by itself, if found to be true, establishes that

9    fact.

10           Circumstantial evidence, is evidence that, if

11   found to be true, proves a fact from which an inference

12   of the existence of yet another fact may be drawn.

13           An inference is a deduction of fact that may

14   logically and reasonably be drawn from another fact or

15   group of facts established by the evidence.

16           It is not necessary that facts be proved by

17   direct evidence. They also may be proved by

18   circumstantial evidence, or by a combination of direct

19   and circumstantial evidence.

20           Both direct and circumstantial evidence are

21   acceptable as means of proof, and neither is entitled to

22   any greater weight than the other.

23           However, a finding of guilt as to any crime

24   may not be based on circumstantial evidence, unless the

25   proved circumstances are not only, one, consistent with

26   the theory that the defendant is guilty of the crime;

27   but two, cannot be reconciled with any other rational

28   conclusion.

1          Further, each fact which is essential to

2    complete a set of circumstances necessary to establish

3    defendant's guilt must be proved beyond a reasonable

4    doubt.

5          In other words, before an inference essential

6    to establish guilt may be found to have been proved

7    beyond a reasonable doubt, each fact or circumstance

8    upon which the inference necessarily rests must be

9    proved beyond a reasonable doubt.

10          Also, if the circumstantial evidence as to any

11   particular count permits two reasonable interpretations,

12   one of which points to defendant's guilt and the other

13   to his innocence, you must adopt that interpretation

14   which points to defendant's innocence and reject that

15   interpretation which points to his guilt.

16          If, on the other hand, one interpretation of

17   this evidence appears to you to be reasonable and the

18   other interpretation to be unreasonable, you must accept

19   the reasonable interpretation and reject the

20   unreasonable.

21          Now, neither side is required to call as

22   witnesses all persons who may have been present at any

23   of the events disclosed by the evidence, or who may

24   appear to have some knowledge of these events.  Neither

25   side is required to produce all objects or documents

26   mentioned or suggested by the evidence.  Evidence that

27   at some other time a witness made a statement or

28   statements that is or are inconsistent or consistent

1  with his or her testimony in this trial, may be

2  considered by you not only for the purpose of testing

3  the credibility of the witness, but also as evidence of

4  the truth of the facts as stated by the witness on that

5  former occasion.

6       If you disbelieve a witness' testimony that he

7  or she no longer remembers a certain event, that

8  testimony is inconsistent with a prior statement or

9  statements by him or her describing that event.

10       Every person who testifies under oath or an

11  affirmation is a witness.  And you are the sole judges

12  of the believability of a witness and the weight to be

13  given the testimony of each witness.

14       In determining the believability of a witness,

15  you may consider anything that has a tendency reasonably

16  to prove or disprove the truthfulness of the testimony

17  of the witness, including but not limited to any of the

18  following:

19       The extent of the opportunity or ability of

20  the witness to see or hear or otherwise become aware of

21  any matter about which the witness has testified;

22       The ability of the witness to remember or to

23  communicate any matter about which the witness has

24  testified;

25       The character and the quality of that

26  testimony;

27       The demeanor and manner of the witness while

28  testifying;

1       The existence or the nonexistence of a bias,

2   interest, or other motive;

3       The existence or nonexistence of any fact

4   testified to by the witness;

5       The attitude of the witness towards this

6   action or towards the giving of testimony;

7       A statement previously made by the witness

8   that is consistent or inconsistent with his or her

9   testimony; and

10      Any admission by the witness of

11  untruthfulness, if there were any such admissions in

12  this case.

13      Discrepancies in a witness' testimony or

14  between a witness' testimony and that of other

15  witnesses, if there were any, do not necessarily mean

16  that any witness should be discredited.  Failure of

17  recollection after all, is common, and innocent

18  misrecollection is not uncommon.

19      Two persons witnessing an incident or a

20  transaction often will see or hear it differently.  You

21  should consider whether a discrepancy relates to an

22  important matter, or only to something trivial.

23      A witness who is willfully false in one

24  material part of his or her testimony is to be

25  distrusted in others.

26      You may reject the whole testimony of a

27  witness who you find has willfully testified falsely as

28  to a material point, unless from all the evidence you

1    believe the probability of truth favors his or her

2    testimony in other particulars.

3            You are not required to decide any issue of

4    fact in accordance with the testimony of a number of

5    witnesses who does not convince you, as against the

6    testimony of a lesser number or other evidence which you

7    find more convincing.  You may not disregard the

8    testimony of the greater number of witnesses merely from

9    caprice or whim or prejudice, or from a desire to favor

10    one side against the other.

11            But you must not decide an issue by the simple

12    process of counting the number of witnesses who have

13    testified on opposing sides.

14            The final test is not in the relative number

15    of the witnesses, but in the convincing force of the

16    evidence.

17            You should give the uncorroborated testimony

18    of a single witness, whatever weight you think it

19    deserves.  Testimony concerning any fact by one witness,

20    which you believe, whose testimony about that fact does

21    not require corroboration, is sufficient for the proof

22    of that fact.  You should carefully review all the

23    evidence upon which the proof of that fact depends.

24            The flight or attempted flight, escape or

25    attempted escape of a person immediately after the

26    commission of a crime or after he or she is accused of a

27    crime, is not sufficient in itself to establish his or

28    her guilt; but it is a fact which, if proved, may be

1    considered by you in light of all the other proved facts

2    in deciding whether a defendant is guilty or not guilty.

3                The weight to which this circumstance is

4    entitled is a matter for you to decide.

5                A defendant in a criminal case has a

6    constitutional right not to be compelled to testify.

7    You must not draw any inference from the fact that a

8    defendant does not testify.  Further, you must neither

9    discuss this case nor permit it to enter into your

10   deliberations in any way.

11               In deciding whether or not to testify, a

12   witness may choose to rely on the state of the evidence

13   and upon the failure, if any, of the People to prove

14   beyond a reasonable doubt every essential element of the

15   charge against him or her.

16               No lack of testimony on a defendant's part

17   will make up for a failure of proof by the People so as

18   to support a finding against him or her on any essential

19   count or any essential element.

20               A defendant in a criminal action is presumed

21   to be innocent until the contrary is proved, and in case

22   of a reasonable doubt whether his or her guilt is

23   satisfactorily shown, he or she is entitled to a verdict

24   of not guilty.

25               This presumption places upon the People the

26   burden of proving him or her guilty beyond a reasonable

27   doubt.

28               Now, reasonable doubt is defined as follows:

1    It is not a mere possible doubt, because everything

2    relating to human affairs is open to some possible or

3    imaginary doubt.  It is that state of the case which,

4    after the entire comparison and consideration of all the

5    evidence, leaves the minds of the jurors in that

6    condition that they cannot say they feel an abiding

7    conviction of the truth of the charge.

8    *2.40*    Now, the defendant is charged in Count One of

9    the Information of having committed the crime of robbery

10    in violation of section 211 of the Penal Code.

11            Every person who takes personal property in

12    the possession of another, against the will and from the

13    person or immediate presence of that person,

14    accomplished by means of force or fear and with the

15    specific intent permanently to deprive that person of

16    the property, is guilty of the crime of robbery in

17    violation of Penal Code section 211.

18            The words "takes or taking" require proof of

19    one taking possession of the personal property; and two,

20    carrying it away for some distance, slight or otherwise.

21            "Immediate presence", means an area within the

22    alleged victim's reach, observation or control, so that

23    he or she could, if not overcome by violence or

24    prevented by fear, retain possession of the subject

25    property.

26            "Against the will", means without consent.

27            In order to prove this crime, that is in order

28    to prove the crime of robbery, each of the following

1    must be proved:

2              A person had possession of property of some

3    value, however slight;

4              2, the property was taken from that person or

5    from his or her immediate presence;

6              3, the property was taken against the will of

7    that person;

8              4, the taking was accomplished either by force

9    or fear; and

10             5, the property was taken with the specific

11   intent permanently to deprive that person of the

12   property.

13   9.40.2    To constitute the crime of robbery, the

14   perpetrator must have formed the specific intent to

15   permanently deprive the person of possession of that

16   property, before or at the time that the act of taking

17   the property occurred.

18             If this intent was not formed until after the

19   property was taken from the person or immediate presence

20   of the victim, the crime of robbery has not been

21   committed.

22             Let me read that instruction again.

23             To constitute the crime of robbery, the

24   perpetrator must have formed the specific intent to

25   permanently deprive the person of possession of that

26   property, before or at the time that the act of taking

27   the property occurred.

28             If this intent was not formed until after the

1    property was taken from the person or immediate presence

2    of the victim, the crime of robbery has not been

3    committed.

4    9.40.3    Robbery, among other things, requires that the

5    victim be in possession of the property stolen.

6         There are two kinds of possession:  Actual

7    possession and constructive possession.

8         Actual possession requires that a person

9    knowingly exercise direct physical control over a thing.

10   Constructive possession does not require actual

11   possession, but does require that a person knowingly

12   exercise control over or the right to control the thing,

13   either directly or through another person or persons.

14        One person may have possession alone, or two

15   or more persons together may share actual or

16   constructive possession.

17        A store employee exercises control or the

18   right to control store property, if the employee under

19   the circumstances has either express or implied

20   authority over the store property.

21        A store employee may be the victim of a

22   robbery, even though he or she is not the owner and not

23   at the moment in immediate control of the allegedly

24   stolen property, so long as that employee is in

25   constructive possession of the property at the time of

26   the taking.

27   no #    The requisite force or fear needed to

28   establish a robbery need not occur at the time of the

1    initial taking.  Assuming all the other required

2    elements have been proven, the use of force or fear to

3    escape with or otherwise retain even temporary

4    possession of the property constitutes robbery.

5    no #      It is not an essential element to the crime of

6    robbery that the use of force or fear be used to gain

7    direct physical possession of the property taken.

8              Again, assuming all other elements have been

9    proven, a robbery is committed if an individual uses

10   force or fear to retain possession of the property prior

11   to reaching a place of relative safety.

12             There are two degrees of robbery.  If you find

13   that the defendant in this case is guilty of the crime

14   of robbery, I instruct you that in the circumstances of

15   this case it is robbery in the second-degree, as a

16   matter of law.

17             Defendant is accused in Count Two of having

18   committed the crime of theft, a violation of section 484

19   of the Penal Code.  Every person who steals, takes,

20   carries, leads or drives away the personal property of

21   another, with the intent to deprive the owner

22   permanently of his or her property, is guilty of the

23   crime of theft by larceny.

24             To constitute a carrying away, the property

25   need not be actually removed from the place or premises

26   where it was kept, nor need it be retained by the

27   perpetrator.

28             In order to prove this crime, each of the

1    following elements must be proved:

2            1, a person took personal property of some

3    value belonging to another.

4            2, when the person took the property, he or

5    she had the specific intent to deprive the alleged

6    victim permanently of the property; and

7            3, the person taking it, carried the property

8    away by obtaining physical possession and control for

9    some period of time, and by some movement of the

10   property.

11           The specific intent required by the crime of

12   theft is satisfied by either an intent to deprive an

13   owner permanently of his or her property, or to deprive

14   an owner temporarily but for an unreasonable time so as

15   to deprive him or her of a major portion of its value or

16   enjoyment.

17           Theft is either grand theft or it is petty

18   theft.  If you find the defendant guilty of theft, it

19   is, in the circumstances of this case, petty theft as a

20   matter of law.

21   3,31     For both of the crimes charged in the

22   Information, there must exist a union or a joint

23   operation of act or conduct and a certain specific

24   intent in the mind of the perpetrator.

25           Unless this specific intent exists, the crime

26   to which it relates is not committed.

27           The specific intent required by the

28   aforementioned crimes is included in the definition of

1    those crimes set forth elsewhere in these instructions.

2         Now, I have not intended by anything I may

3    have said or done, or by any question that I may have

4    asked, or by any ruling that I may have made during the

5    course of this trial, I have not intended by any of that

6    to intimate or suggest to you what you should find to be

7    the facts, or to intimate or suggest to you that I

8    believe or disbelieve any witness.  If anything I have

9    said or done has seemed to you to so indicate, you will

10   disregard it and you will form your own conclusions.

11        The purpose of the Court's instructions is to

12   provide you with the applicable law so that you may

13   arrive at a just and a lawful verdict.  Whether some

14   instructions apply will depend upon what you find to be

15   the facts.  Disregard any instruction which applies to

16   facts determined by you not to exist.  Do not conclude

17   that because an instruction has been given, that I am

18   expressing an opinion as to the facts.

19        Now, the People and the defendant are entitled

20   to the individual opinion of each juror.  Each of you

21   must consider the evidence for the purpose of reaching a

22   verdict, if you can do so.  Each of you must decide the

23   case for yourself, but you should do so only after

24   discussing the evidence and the instructions with the

25   other jurors.

26        Do not hesitate to change an opinion, if you

27   are convinced that it is wrong.  However, do not decide

28   any question in a particular way, simply because a

1    majority of the jurors or any number of them favor that

2    decision.

3        Do not decide any issue in this case by the

4    flip of a coin or by any other chance determination.

5        The attitude and the conduct of jurors at all

6    times is very important.  It is rarely helpful for a

7    juror at the beginning of deliberations to express an

8    emphatic opinion on the case, or to announce a

9    determination to stand for a certain verdict.  When one

10    does that at the outset, a sense of pride may be aroused

11    and one may hesitate to change a position subsequently,

12    even if it is shown to be wrong.

13        Remember, that you are not partisans or

14    advocates in this matter.  You are the impartial judges

15    of the facts.

16        In your deliberations, do not discuss or

17    consider the subject of penalty or punishment.  That

18    subject must not in any way affect your verdict.

19        The instructions which I am now giving to you

20    will be made available in written form for your

21    deliberations.  They must not be defaced in any way.

22    You will find that the instructions may be typed,

23    printed or handwritten.  Portions may have been added or

24    deleted.  You must disregard any deleted part of the

25    instruction and not speculate at as to what it was or as

26    to the reason for it's deletion.  You are not to be

27    concerned with the reasons for any modification.

28        Every part of the text of the instruction,

1    whether typed, printed or handwritten, of equal

2    importance, and you are to be governed only by the

3    instruction in its final wording.

4         The title or heading of each instruction is

5    provided you only for the purpose of assisting you in

6    locating the instruction.  The title or heading is not

7    part of the instruction, and should not be considered by

8    you for any purpose other than that for which it is

9    provided.

10        During deliberations, any question or request

11   you may have should be addressed to the Court on a form

12   that will be provided to you for that purpose.

13        If there is any disagreement as to the actual

14   testimony, you have a right if you choose to request a

15   readback by the reporter.  You may request a partial or

16   a total readback, but any readback should be a fair

17   presentation of that evidence.

18        If a readback of testimony is requested, the

19   reporter will delete objections and rulings and side bar

20   conferences, so that you will hear only the evidence

21   that was actually presented.  Please understand that

22   counsel must first be contacted, and it may take time to

23   provide a response or readback.  Continue deliberating

24   until you are called back into the courtroom.

25        Do not disclose to anyone outside of the jury,

26   not even to me or to any member of my staff, either

27   orally or in writing, how you may be divided numerically

28   in your balloting as to any issue, unless and until I

1    specifically direct you otherwise.

2         Now, tomorrow, after we have heard the

3    arguments of the attorneys, you will retire and you will

4    select one of your number to act as the foreperson or,

5    as I prefer calling that individual, the Presiding

6    Juror.  He or she will preside over your deliberations.

7         In order to reach a verdict with respect to

8    any count, all 12 jurors must agree to the decision.  In

9    other words, it makes no difference whether your verdict

10   is one of guilty or not guilty, before you can return

11   any one of those verdicts you must all be in agreement.

12   Unanimity is required.

13        As soon as you have agreed upon a verdict so

14   that, when polled, each may state truthfully that the

15   verdict expresses his or her vote, have it dated and

16   signed by your foreperson.  At the conclusion of your

17   deliberations, return all verdict forms, signed or

18   unsigned, with you to the courtroom.

19        You will be permitted to separate at the noon

20   and at the evening recesses.  You are to return

21   following any noon recesses at 1:15 p.m., and following

22   any evening recess at 8:30 a.m. on the next succeeding

23   court date.

24        During the period of recesses you must not

25   discuss with anyone any subject connected with this

26   trial, and you must not deliberate further upon the case

27   until all 12 of you are together and reassembled in the

28   jury room.  At that time, you shall notify the clerk or

1    the bailiff that the jury is reassembled, and then

2    continue your deliberations.

3           And as for our Alternate Juror, Mr. Watkins,

4    you are still bound by the admonition that you are not

5    to converse with anyone else on any subject connected

6    with this trial, or to form or express any opinion on it

7    until the case is submitted to you.  Which means, until

8    such time as you may be substituted in for one of the 12

9    jurors that will commence the deliberations in this

10   case.

11          This also means that you are not to decide how

12   you will vote if you were deliberating with the other

13   jurors.  If it becomes necessary to substitute you in

14   for one of the regular jurors, after deliberations have

15   begun, the jury will be instructed to begin

16   deliberations anew, from scratch.

17          I will have some further instructions for you

18   tomorrow, after the close of argument.

19          Those are the instructions.  You have heard

20   all the evidence now.  You have heard the instructions

21   of law.  There remains for you to hear the arguments of

22   counsel.

23          You are gonna have these instructions in

24   written form, and I think counsel will probably cover

25   some of these instructions as well and amplify on them

26   during the course of your closing argument.  But again,

27   if you need to review them, you are going to have them

28   in written form in the jury room.

1          Unless you have some other questions let me

2    just tell you what our schedule is going to be.  We will

3    resume these proceedings tomorrow morning at 9:30.   I

4    have another matter at 8:30 to start.   Though I suspect

5    it will be done by 9:00 o'clock, I will have you come

6    back at 9:30, just so you don't have to wait in the

7    hallway.

8          We will then hear from Mr. Walpole, who will

9    make his closing argument on behalf of the People.   Once

10   he has concluded, Ms. Gin will be able to address you on

11   behalf of Mr. Winzer.   And then, because the People have

12   the burden of proof and also so that they have an

13   opportunity to rebut, Mr. Walpole will have the final

14   say in this matter.

15         Once that is over, you go into the jury room

16   and commence your deliberations.

17         Any questions?

18         (No response.)

19         THE COURT:  All right.  See you tomorrow

20   morning then, at 9:30.  And please remember, in the

21   meantime, not to discuss this case among yourselves or

22   with anyone else.  And don't form or express any

23   opinions.  Wait until you have heard closing argument

24   and you are in the jury room deliberating.

25         Thank you very much.

26         (Jurors exit courtroom.)

27         THE COURT:  Counsel, the jury has exited.  As

28   I was reading these instructions, I was reminded that I

```
1    also did not give CALJIC instruction 9.41, robbery,
2    "fear" defined.  This case is really predicated on use
3    of force, right?  Not fear.
4              MR. WALPOLE:  Yes.
5              THE COURT:  I didn't see any need to give that
6    definition.  Do either of you feel that's necessary?
7              MS. GIN:  No.
8              MR. WALPOLE:  No.
9              THE COURT:  Thank you.
10             We will see you tomorrow.  Be ready to go.
11             MR. WALPOLE:  Thank you.
12             (Evening recess.)
13                      ---oOo---
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  VIOLET M. LEE, State Bar No. 77144
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
7    Telephone: (415) 703-5896
     Fax: (415) 703-1234
8    Email: Violet.Lee@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **LACY WINZER,** | C 08-2341 PJH (PR) |
| Petitioner, | **EXHIBIT 5 (part 5)** |
| v. | |
| **BILL CURREY, Warden,** | |
| Respondent. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 5 (part 5)                                    Winzer v. Currey
                                                      C 08-2341 PJH (PR)

# EXHIBIT 5 (part 5)

1    IN THE DISTRICT COURT OF APPEAL OF THE STATE OF CALIFORNIA

2    IN AND FOR THE FIRST APPELLATE DISTRICT

3    ---o0o---

4

5

6    PEOPLE OF THE STATE OF CALIFORNIA,  )

7          Plaintiff and Respondent,  )

8      vs.         )  No. _____

9    LACY WINZER,         )CCC No. 050867-1

10    _____Defendant and Appellant._____)

11    COPY

12

13

14    REPORTER'S TRANSCRIPT ON APPEAL

15    FROM THE SUPERIOR COURT OF CONTRA COSTA COUNTY

16    HONORABLE DAVID B. FLINN, JUDGE - DEPARTMENT NO. 6

17    August 3, 2005

18    HONORABLE PETER L. SPINETTA, JUDGE - DEPARTMENT NO. 11

19    August 10, 2005

20    August 11, 2005

21    August 15, 2005

22    August 16, 2005

23    April 14, 2006

24    A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

25

26    VOLUME II

27    Pages 291 -

28

1    A P P E A R A N C E S

2    FOR THE PEOPLE AND THE RESPONDENT:

3                        HON. BILL LOCKYER

4                        Attorney General State of California

5                        455 Golden Gate Avenue, 1st Floor

6                        San Francisco, California 94102

7                        BY: _____

8                                        Deputy

9    FOR THE DEFENDANT AND APPELLANT:

10                       First District Appellate Project

11                       730 Harrison Street, Suite 201

12                       San Francisco, California 94107

13                       BY: _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX OF WITNESSES

C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

PEOPLE OF THE STATE OF CALIFORNIA:

E-X-A-M-I-N-A-T-I-O-N

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Blake Rogers | 50 | 81 | 117 | 122 |
| Alexander Azevedo | 126 | 149 | 169 | |
| David De La Torre | 178 | 191 | 208 | 208 |
| Michelle Ligouri | 214 | 220 | | |
| Joseph Mahoney | 226 | 235 | 239 | |

---o0o---

```
 1                    INDEX OF WITNESSES

 2              C-H-R-O-N-O-L-O-G-I-C-A-L-L-Y

 3

 4   DEFENDANT LACY WINZER:

 5                              E-X-A-M-I-N-A-T-I-O-N

 6                    Direct  Cross  Redirect  Recross

 7   Michelle Ligouri        241    242

 8

 9                      ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX OF WITNESSES

A-L-P-H-A-B-E-T-I-C-A-L-L-Y


PEOPLE OF THE STATE OF CALIFORNIA:

E-X-A-M-I-N-A-T-I-O-N

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Azevedo, Alexander | 126 | 149 | 169 | |
| De La Torre, David | 178 | 191 | 208 | 208 |
| Ligouri, Michelle | 214 | 220 | | |
| Mahoney, Joseph | 226 | 235 | 239 | |
| Rogers, Blake | 50 | 81 | 117 | 122 |

---o0o---

1                    INDEX OF WITNESSES

2              A-L-P-H-A-B-E-T-I-C-A-L-L-Y

3

4     DEFENDANT LACY WINZER:

5                              E-X-A-M-I-N-A-T-I-O-N

6                    Direct  Cross  Redirect  Recross

7     Ligouri, Michelle        241    242

8

9                    ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                          INDEX OF EXHIBITS

2       PEOPLE OF THE STATE OF CALIFORNIA:

3

4       Exhibit No.                              Marked    Evidence

5          1        Single Photo - Victim Rogers    Premark     254

6          2        Single Photo - Victim Rogers    Premark     254

7          3        Single Photo - Victim Rogers    Premark     254

8          4        Single Photo - Victim Rogers    Premark     254

9          5        Single Photo - Victim Rogers    Premark     254

10         6        Target Store Diagram            Premark     255

11         7        Target Store Front Diagram      Premark     255

12         8        Single Photo - Lacy Winzer      Premark     255

13         9        Single Photo - T-Shirts         Premark     255

14        10        Package of T-Shirts             Premark     255

15        11        Videotape                       Premark     255

16

17                          ---o0o---

18

19

20

21

22

23

24

25

26

27

28

1          INDEX OF EXHIBITS

2     DEFENDANT LACY WINZER:

3

4     Exhibit                                    Marked    Evidence

5     A      Assets Protection Training          Premark     256

6     B      Assets Protection Directives        Premark     256

7     C      Assets Protection Training          Premark     256

8     D      Assets Protection Directives        Premark

9     E      Assets Protection Op. Directives    Premark     256

10

11                        ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF CONTRA COSTA

3              HONORABLE PETER L. SPINETTA, JUDGE

4                    DEPARTMENT NO. 11

5                        ---o0o---

6

7    THE PEOPLE OF THE STATE OF CALIFORNIA,   )

8                          Plaintiffs,         )

9        vs.                                  ) No. 050867-1

10   LACY WINZER,                              )

11                    Defendant.          )
     _____

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    August 16, 2005

16       A.F. BRAY COURTHOUSE, MARTINEZ, CALIFORNIA

17

18   A P P E A R A N C E S:

19   For the People:            ROBERT KOCHLY

20                              District Attorney

21                              BY: CHRISTOPHER WALPOLE

22                              Deputy District Attorney

23                              Contra Costa County

24   For Defendant:            DAVID COLEMAN

25                              Public Defender

26                              BY:  WINNIE GIN

27                              Deputy Public Defender

28                              Contra Costa County

1    Martinez, California                    August 16, 2005

2    Department No. 11           Hon. Peter L. Spinetta, Judge

3                        ---o0o---

4                  P-R-O-C-E-E-D-I-N-G-S

5         THE COURT:  We are on the record in the matter

6    of People versus Winzer.  Ms. Gin is present, his

7    counsel.  Mr. Walpole is present.  All our of jurors are

8    present, seated in their assigned seats, including our

9    Alternate, and we are ready to hear closing argument of

10   counsel.

11        I will first call upon Mr. Walpole to address

12   you.

13             Mr. Walpole.

14        MR. WALPOLE:  Thank you, Your Honor.

15                  PEOPLE'S CLOSING ARGUMENT

16   BY MR. WALPOLE:  Good morning.

17        I was thinking about this case last night, and

18   what really jumped to my mind was what the defendant

19   told Alex Azevedo, one of the security guards, when they

20   were in that room together.  And you heard that Alex

21   said or asked him:  I think you know you are getting

22   arrested for this and what's going on.

23        And the defendant's reply was:  I've got my

24   ways.  I'll get out.

25        "Got my ways."

26        And what it comes down to, it's just someone

27   that refuses to take responsibility for their actions

28   for what they did.  For what happened.  I am sure you

1    have all had experiences in where someone has been

2    caught in a lie or done something, and you know it's a

3    lie, yet they just maintain that position despite

4    everything that's against them.  Just refuse to take

5    responsibility for what's going on.  That's what this

6    case is about.

7          You know, Defense Counsel in her opening

8    statement said this is a case, the issue was whether or

9    not Target followed its policy.  It's not about that.

10   It has nothing do about Target's policy.  What it's

11   about, and the Judge explained to you in voir dire:  Is

12   the defendant guilty of these offenses?  Did he commit

13   these violations of the law?  That's the only thing you

14   are here to decide.

15         So, what is the law?  The Judge read you a

16   whole bunch of instructions.  Took some time to go

17   through them.  I just want to highlight a couple key

18   points.  Mainly, I am going to go over the actual

19   charges themselves.

20         Each count has certain elements, and each

21   element needs to be met in order for someone to be

22   guilty of the offense.  I'm actually going to start with

23   Count Two.

24         Count Two is theft by larceny.  It's violation

25   of Penal Code section 484.  And theft by larceny has

26   three elements.  The first one is:

27         1, a person took personal property of some

28   value belonging to another;

1          2, when the person took the property, he had a

2     specific intent to deprive the alleged victim

3     permanently of his property; and

4          3, the person carried away the property by

5     obtaining physical possession and control for some

6     period of time and by some movement of the property.

7          Well, let's go by each element.

8          No. 1, a person took personal property of some

9     value belonging to another.  The T-shirts.  The T-shirts

10    were taken in this instance, and stuffed down his pants.

11    That's the taking of the property.

12         2.  When the person took the property, he had

13    the specific intent to deprive the alleged victim

14    permanently of his property.

15         Well, of course he did.  He put it down his

16    pants and he walked straight out, without going to the

17    register.  This isn't some case where something was

18    underneath some items and someone was pushing on a cart

19    and:  Gosh, I forgot this item was there.  No, he put it

20    down his pants and he didn't go to the register, and he

21    walked straight out.

22         No. 3.  The person carried away the property

23    by obtaining physical possession and control for some

24    period of time, and by some movement of the property.

25         Yeah, he took it, put it in his pants, and he

26    walked away with it and was walking straight out that

27    door without having paid for it.

28         That's the -- that's the Count Two.  Theft by

1     larceny.

2            Count One.

3            Count One is robbery.  A lot of times, when

4     people think of robbery, they think of a bank robbery or

5     someone coming up in the middle of the night with a gun

6     and saying:  Your wallet or your life.  And it's

7     actually broader than that.  There's five elements in

8     order to have a robbery, and we will go over each one.

9            The first, someone -- 1, a person had

10    possession of property of some value, however slight.

11           2, the property was taken from that person or

12    from his or her presence.

13           3, the property taken was taken against the

14    will of that person;

15           4, the taking was accomplished either by force

16    or fear; and

17           5, the property was -- the property was taken

18    with the specific intent permanently to deprive the

19    person of the property.

20           Starting at Count One.  It's very close to

21    theft.  Some property of slight value.  The T-shirts in

22    this particular case.

23           Element No. 2, taken from that person or from

24    his or her presence.  And I'm going to get back to that

25    in a little bit.  There's a jury instruction that talks

26    about actual versus constructive possession.  Like I

27    said, I will come back to that.

28           No. 3, the property was taken against the will

1        of that person.  Well, in this particular instance,

2        Blake Rogers tried to stop the defendant.  Tried to stop

3        him from getting outside the store with the T-shirts.

4        He was punched.  He was hit.  Obviously, Rogers was

5        trying to stop him.  He was taken against his will.

6                No. 4, the taking was accomplished either by

7        force or fear.  In this particular instance, it was

8        accomplished by force.  Punching.  You have the

9        T-shirts.  He was trying to get away.

10               Robbery is considered a continuous offense.

11       It's being completed or in the act of a robbery until

12       you get away.  And in this instance, he had the

13       property.  He was still walking away with it, and he

14       used force to try to get away.  That's the use of the

15       force.  And there's actually a specific jury instruction

16       that says if someone uses force in trying to escape, in

17       trying to get away from a robbery, that's sufficient as

18       far as the force element is concerned.

19               No. 5, the property was taken with a specific

20       intent permanently to deprive the person of that

21       property.  Again.  He had in his pants.  He wasn't

22       taking this stuff back the next day.

23               There's also another jury instruction I want

24       to point you to.

25               Store employees as a victim of a robbery.

26               It says robbery requires that the victim be in

27       possession of the property.  There are two kinds of

28       possession.  Actual and constructive.  This is what I

1    was talking about a little bit earlier.  It says actual

2    possession requires that a person knowingly exercise

3    direct physical control over a thing.  Constructive

4    possession does not require actual possession but does

5    require that a person knowingly exercise control over or

6    the right to control a thing either directly or through

7    another person.

8        An employee exercises control or the right to

9    control store property if the employee, under the

10    circumstances, has either expressed or implied authority

11    over the store property.

12        So, in this particular instance, the store

13    employee had constructive control over this property.

14    The T-shirt wasn't actually on the store employee, but

15    he has constructive control over what goes on in the

16    store.  That makes sense.  That's his job.  That's what

17    he is there for, to make sure thefts don't occur.  So,

18    he has constructive control over everything in that

19    store to see if anybody is going to steal it.

20        The last paragraph.  A store employee may be

21    the victim of a robbery, even though he or she is not

22    the owner and not at the moment in immediate control of

23    the allegedly stolen property, so long as that employee

24    is in constructive possession of the property at the

25    time of the taking.

26        I mean, obviously, Target owns this property.

27    But the victim of this robbery is also Mr. Rogers, the

28    person that was punched in this particular instance.

1    Again, it's his job.  That's what he does.

2              So, those are the two offenses, and those are

3    the elements that need to be met.  In this particular

4    case, they were.  What did you hear?  You heard from the

5    three security guards who saw what happened.  Three, not

6    one witness.  There's actually a jury instruction that

7    says the testimony of one witness, if believed, is

8    sufficient to establish a fact.  So, even if there was

9    one security guard who said he saw all that, that would

10   be enough.  But in this particular instance, there's

11   three.

12             They testified that they saw him select the

13   package on the screen when they were watching it.  A

14   much clearer screen.  There's no time delay.  They are

15   watching it.  They saw the selection.  They saw him go

16   back to the aisle, reach back, put the item in.  And

17   when he pushed that cart out, you saw it yourself, you

18   saw there was a package in the cart.  He pulled back.

19   He turned around, reached back, came back, and now

20   there's no item.

21             He had the property.  He stuffed it down his

22   pants.  Which is supported by the fact that all three of

23   these security guards found that item inside of his

24   pants.

25             Did he take it?  Of course he did.  Three

26   separate witnesses, corroborated and substantiated by

27   what they saw on the videotape.  Is the videotape we

28   have here the clearest thing in the world?  No, it's

1  not.  Does it mean he's not guilty?  No.  We have three

2  separate witnesses that saw exactly what happened.

3       And this particular instance, the defendant

4  and Defense Counsel conceded this in their opening,

5  punched the victim repeatedly in the face.  You will see

6  the photographs and the injuries that are there.  And

7  just think about what's going through the defendant's

8  mind at this time.

9       When he is doing all this, he knows he is

10  stealing this item, putting it down his pants, and he's

11  walking out the door.  He's thinking to himself:  I'm

12  stealing this stuff.  I'm sure, he's nervous.  He's

13  walking out the door.  All of a sudden, gets to the

14  door.  Here is someone coming right behind him, real

15  quickly, and he turns and he starts hitting him.  He

16  knows he's gone and he's trying to get away.

17       That's what happened in this case.  And when

18  you go back there and deliberate, I will ask that you

19  come back with a guilty verdict on both counts.

20       Thank you.

21       THE COURT:  Thank you, Mr. Walpole.

22       Now, ladies and gentlemen, you will hear from

23  Ms. Gin on behalf of Mr. Winzer.

24            DEFENDANT'S CLOSING ARGUMENT

25  BY MS. GIN:  Good morning.

26       Mr. Walpole touched what is the issue in this

27  case, which is responsibility.  Responsibility.  You, as

28  jurors, have a responsibility in this case.  Your

1    responsibility is to follow the law that the Judge gives

2    you, and for you to determine whether the facts

3    presented in this case proves beyond a reasonable doubt

4    that my client, Lacy Winzer, is guilty of robbery.

5    Beyond a reasonable doubt, that he's guilty of petty

6    theft.  That's your responsibility as sitting as a juror

7    in this case.

8         The responsibility also means that, as your

9    duties as jurors, is that you are responsible for your

10   decision.  You, and you alone.  That when you are asked

11   is that your verdict, is that your final decision, that

12   you have decided that verdict based on the law and what

13   you perceive to be the truth in this case.

14        It's not a simple -- for those who have never

15   served as jurors before, you sit there and you go:

16   Well, you know -- well, if the majority says one thing,

17   I will go with the majority.  This is not the case.  It

18   is your duty.  Your independent duty to decide on what

19   the verdict is in this case.

20        And when we talk about responsibility,

21   Mr. Walpole says that my client is responsible for the

22   (theft of a five-pack Fruit of the Loom undershirt from

23   Target.) And that it's not relevant as to the

24   responsibility of the Target employees in this case.

25   That the fact that they did not follow policies and

26   procedures is not important.  That their responsibility,

27   like Rogers, Alex Azevedo, David De La Torre, that when

28   they failed to do their jobs as Asset Protection

1    Specialists, as Target Protection Specialists, as the

2    manager of the Loss Prevention Department at that

3    Pittsburg store, that it's okay that they did not

4    fulfill their responsibility in complying with their

5    duties as a security personnel.

6         (Let me tell you why their failure to be

7    responsible proves that my client is not guilty.) But

8    once again, you notice, I said "proves that my client is

9    not guilty". The question here is: Has Mr. Walpole,

10   based on what you have seen and heard, proved that my

11   client is guilty beyond a reasonable doubt?

12        When you first started, your responsibility

13   was to assume that my client was not guilty, until you

14   were satisfied, after hearing all the evidence, seeing

15   all the evidence, seeing the video, seeing the

16   photographs, that Mr. Winzer is guilty. That's the

17   premise you start with, not guilty, and has the People,

18   has the prosecution proven to you that he's guilty

19   beyond a reasonable doubt.

20        Let's go back to responsibility. Let's talk

21   about the responsibility of the Target personnel.

22        You will have this back in the jury

23   deliberation room. The Target policy and procedures

24   that I have discussed with the three witnesses here.

25   And if you look at the Target policies and procedures,

26   when they deal with shoplifters, if you think about it,

27   what they ask of their personnel what we ask of the

28   prosecution, in terms of proving someone guilty beyond a

1    reasonable doubt.

2           Let's look at what Target wants their

3    personnel to do to ensure that the person they do

4    detain, the person they do apprehend, is guilty.  The

5    standard is the same.  Guilty beyond a reasonable doubt.

6           Now, we all know that, based on what occurred

7    in this case, and we have talked about it, it was in

8    close circuit television.  They utilized close circuit

9    TV.

10           You heard about the extensive equipment that

11    Target has.  They have a huge screen that does time

12    lapses in three seconds.  They have provided a smaller

13    screen in which it was actual time.  All of this

14    videotaping camera ability is to record what is being

15    done inside the business of Target.  And in particular,

16    the Pittsburg store.  Everything that occurred on May

17    10th, approximately 4:00 o'clock in the afternoon, was

18    being recorded, as you have heard the witness testify.

19           Now, what are the rules that Target wants

20    their personnel to follow?  They want to make sure that

21    the incident, non time-lapse, is captured using the

22    available close circuit TV equipment.

23           Was there any problem with the close circuit

24    TV on this case?  No.  Was it videotaped appropriately?

25    Yes.

26           Not only the time lapse, which unfortunately

27    that's all we have, but who made that tape?  It was

28    Mr. De La Torre.  But he has ability to do the non time

1    -lapse but he chose not to.

2              What does it say?  That the surveillance by

3    camera, non time-lapse, to observe the five steps.  And

4    what are the five steps?  The five steps of Apprehension

5    Guidelines.  And what are those guidelines?

6              1.  You must observe the individual in the

7    area without the company's merchandise.

8              What testimony did we hear?  We heard that

9    they focused their attention on my client as soon as he

10   entered the store.  Do we have any videotape of showing

11   that he entered the store?  They chose not to provide

12   that to us.  And why is that important?

13             Mr. Walpole says there are three witnesses.

14   Three who say that my client did it.  So, he must be

15   guilty.  Not just one, not just two, but three.  And

16   they corroborate each other.  These are three people who

17   work for Target, who do not follow the rules of Target.

18   But the best corroboration would be the videotape,

19   because there is no biases, there is no prejudices,

20   there is no lying with a videotape in terms of observing

21   what occurred, because all it is, is a camera, a

22   monitor, a tape, and we see it ourselves because none of

23   us, none of us was there.

24             But we see on it videotape, that is proof of

25   what those three people saw.

26             Now, No. 2.  You must observe the individual

27   select merchandise from the display location.

28             The rack on where the T-shirts were located

1    was unobstructed.  All of them said that.  All three of

2    them testified to that.

3         You see Mr. Winzer.  There's no denying you

4    see him with a package of T-shirts.  The question is:

5    Why didn't we see him take it off the rack?  You must

6    observe the individual select merchandise.  Where is

7    that shot?  Concealment.  Maintain observation.

8         You must maintain sufficient observation of

9    the individual in order to know the location of the

10   merchandise at all times to ensure the individual does

11   not discard the merchandise.

12        Mr. Rogers, as you know, had been written up

13   in the past.  Just a month earlier because, oops, he

14   made a mistake.  The person he said had the item, had

15   discarded it.  And so when he detained and apprehended

16   that young person, he didn't have the property on him.

17        And so, Target wants to make sure that their

18   people maintain sufficient observation.  That you know

19   for sure that person did not discard the merchandise.

20   Because you can't be guilty of robbery if that's the

21   case.

22        Failure to pay for merchandise exiting the

23   store.  Okay.  You must observe the individual

24   attempting to exit the building without paying for the

25   merchandise.  Which goes to the fact that you have to be

26   outside the store.  All three of them said:  We do not

27   contact them until they are outside the store.

28        So, they weren't in compliance with this

1    Apprehension Guidelines, in relationship to what you

2    read about the close circuit TV.

3         (There's no evidence that he, Mr. Winzer, took

4    the merchandise off the rack.) And you will see in the

5    videotape, the rack is right behind him.  I asked

6    Mr. Rogers about that.  Yes, it's right there.  It's

7    unobstructed view.

8         Now, the pursuit of shoplifters.  Are you

9    supposed to pursue them?  If a shoplifter attempts to

10   flee after being confronted, AP team members will not

11   give chase in any manner.

12        Mr. Rogers did not fulfill his responsibility

13   to that.

14         When I first told you what this case was

15   about, I told you right up front that it's the burden of

16   the prosecutor to show you that the T-shirts are Target

17   property.  Secondly, did the Target personnel follow

18   their procedures, and why didn't they?  And the reason

19   why these procedures are important, is because these are

20   things that we would expect to see as jurors in a case

21   similar to this.  That is, someone says:  Yes, we saw

22   him on video, we saw him on camera.  You would expect to

23   see the video of that.  You would expect to see proof

24   that he actually took something that belonged to Target.

25   And more importantly, they did not retain whatever they

26   said they took from Mr. Winzer.  Where is that package

27   they said he took?

28        Of course, Mr. Walpole says:  Well, three of

 1    them saw the package.  Well, the same three who did not
 2    follow policies and procedures.
 3         How about Mr. Mahoney?  Why didn't he see the
 4    package, if this was something that was protruding from
 5    his waistband, as my client was being dragged back into
 6    the Target store?
 7         This was the condition of Mr. Winzer when he
 8    was handcuffed and brought back to the Loss Prevention
 9    officer -- office.
10         You will see that they did document that.  It
11    did have something on the back of the Polaroid to say,
12    according to the procedures when they take photographs
13    they are supposed to have this sticker.  If it was
14    stuffed down his pants, just take a photograph.  They
15    had no problem with his dignity or lack of dignity in
16    this photograph, to take a picture of him like this.
17         When you look at the video, you will note that
18    there is a time element at the bottom of it.  You will
19    see .04:22:20.  04:10, when they start recording.  And
20    the area I want you to look at is 04:22:20.  That's when
21    you observe the exiting from the Target store of a
22    person that looks like Mr. Winzer, and of someone who is
23    on his back.  And that is Mr. Rogers.
24         Both Mr. Rogers and Mr. Azevedo claim that
25    they may not have complied necessarily with all the
26    procedures here, but the one thing they did comply with:
27    I announced I was Target Security and I made contact
28    with him outside the store.  Which is what they are

1    supposed to document. And why is identification as

2    being Target Security important?  Because that goes to

3    the essence of robbery.

4         I conceded and I knew that my client, you

5    know, based on Mr. Mahoney, that yeah, I know my client

6    hit Mr. Rogers.  You see the injuries.  There's no

7    dispute over that.  But the question is:  Why did

8    Mr. Winzer hit him?  If you see the video, there's

9    someone on Mr. Winzer's back bear hugging him in plain

10   clothes, who claimed he was Target Security.  But if you

11   are being attacked from behind, and you are being pushed

12   down to the ground in a bear hug, you would fight back.

13   He's not fighting back to retain property, because there

14   was no property in this case.  He was just defending

15   himself.

16        So, he's down on the ground, dragged up,

17   looking like this, because there's three of them on top

18   of him, eventually, when he got handcuffed.  And they

19   supposedly go back to the Loss Prevention office and

20   they find this.  Not the same package, but similar.

21        Preserving, processing and document recovered

22   evidence.  Page one covers the photographing of the

23   evidence.  You can read that, about how you are supposed

24   to document it.  But more importantly, Mr. De La Torre

25   said:  Oops, we followed most of the procedures.  No, we

26   did not retain the evidence.  The evidence with the

27   pubic hair.  No, we decided we weren't going to sell it.

28   We had actual physical evidence of Mr. Winzer on it, but

1    no, we decided to throw it away, and all we did was take

2    this photograph.

3            Which Officer Ligouri said:  Wait a second.

4    This is not only the table I saw it on, but I think,

5    yeah, it must be the same one, because I recognize it to

6    be the same.

7            Compare this photograph to the package they

8    claim was exactly the same.  And of course, with a

9    Polaroid, I would expect to see if there's a pubic hair,

10    it would have been showing here, but maybe it wouldn't.

11    But who had the digital camera?  Officer Ligouri had the

12    digital camera.  Her main concern was to take the

13    pictures of the Mr. Rogers, which you will see.  But

14    once again, there's no dispute over that.

15            And how do we know that this is Target

16    property?  Does it look the same?  I mean, I was looking

17    at this photograph, because this is all I got.  It's all

18    you are gonna get.  I'm looking at the tag on the upper

19    right-hand corner.  It doesn't look similar to this.

20    But they all claim that this is the one that Mr. Winzer

21    took.  Not the exact one, but similar.

22            Why do you destroy evidence?  Store all

23    physical evidence in a bag or container, and seal the

24    evidence in a bag or container to protect from tampering

25    or handling.  Target Security, they are supposed to be

26    like police, do it.

27            You know, we jokingly talked about it during

28    voir dire, because Mr. Walpole said this is not a *"CSI"*

1    case.  So, I went ahead, seems like the quality of the

2    videotape you will be seeing when you go back to the

3    jury room in terms of the fuzziness.  But the

4    interesting point about "CSI", is that when you look at

5    it, it tells you to assume nothing.  That just because

6    what you see briefly on the videotape where you see

7    Mr. Winzer with some item that looked like T-shirts or

8    that he was making actions to conceal it, this show says

9    assume nothing.  Because what the basis of "CSI" is that

10   when you go into an area or in this particular place

11   when you take your responsibility to do your job, you

12   have to assume and, in this case, that my client is not

13   guilty.

14          So, you start from that premise.  Assume

15   nothing.  What have they shown to me?  What is the proof

16   here in this case that my client, or Mr. Lacy Winzer, is

17   guilty beyond a reasonable doubt?

18          Is there any reasonable doubt this case?  I

19   think, I have given you a whole laundry list of why

20   there's reasonable doubt in this case.  But all you need

21   is one reason.  One reason that makes sense to you, that

22   shows that my client is not guilty.

23          And when you look at "CSI" they talk about:

24   Well, you know, we can piece all these pieces of

25   evidence together to show who really did it.

26          In this particular case, the Target people and

27   the police were part and parcel of the situation where

28   three threw away evidence.  Evidence that could have

1     proven my client was guilty beyond a reasonable doubt.

2           My goodness, when you have a human sample of

3     someone supposedly on the package, what could be better

4     than that?  Take a picture of him with it.  Don't have

5     that.  The video camera with him in it.  Don't have

6     that.

7           There are a lot of holes in the prosecution

8     case.  Holes that add up to the fact that they have not

9     proven to you that he is guilty beyond a reasonable

10    doubt.

11          We all have our suspicions.  In fact, the

12    Judge may say, you might think he is more likely than

13    not, guilty.  But still, that means you must must vote

14    not guilty.

15          We have a witness or witnesses.  Blake Rogers,

16    who was written up in the past for being super

17    aggressive, for being involved in an incident in which

18    he was off duty.  That he made a mistake a month before,

19    in which he detained someone without property.

20        And he also made a mistake in this case.  He

21    wrote in his report it was Fruit of the Loom socks.

22        And the one telling thing with Mr. Azevedo and

23    Mr. Rogers, is that they both claim that Mr. Rogers

24    announced himself as Target Security, and that when they

25    had my client down on the ground struggling, that he

26    kept saying:  We are Target Security.  We are Target

27    Security.  Stop.

28          Mr. Mahoney didn't hear that.

1           And Mr. Rogers, when he initially talked to

2   the police back on May 10th, said:  Never said anything

3   during the encounter with Mr. Winzer down on the ground.

4           I think, you know, voir dire is a difficult

5   process because you don't know much about the attorneys.

6   You don't know much about the case.  And I don't know

7   much about you.  The only thing I have faith in is that

8   when you promise to do your duty as a juror, I took you

9   at face value.  That I accepted the fact that when you

10   promised to do that, you would.

11           You know, we had one potential juror who -- I

12   think it was at the end of the day on Wednesday.  Who

13   said that he went to law school.  And of course, he is

14   not practicing -- he's not practicing law, now.  And Mr.

15   Walpole asked him:  Well, why did you go to law school?

16   To right the wrongs in the world.  To do justice.  And

17   then, of course, Mr. Walpole asked the question that as

18   attorneys you never ask, if you don't know the answer

19   to.  Which side were you going towards?  Defense or

20   prosecution?  And that juror said:  Defense.  And we all

21   had a big laugh, because that was rather funny at the

22   end of a very long day on Wednesday.

23           It didn't matter what that juror said, but

24   what mattered to me, is that he wanted to do justice.

25   He wanted to do the right thing.  And that's what I'm

26   asking each and every one of you:  To do the right thing

27   in this case.  Look at this case very carefully.  Look

28   at how the videotape does not corroborate what these

1    witnesses have to say.  More importantly, at the time

2    that Mr. Winzer exits the store.  Because the robbery

3    can only occur if two things happens, that they have

4    proven to you beyond a reasonable doubt.

5         That one, Mr. Winzer had the package.  The

6    package -- when I say "the package", I'm not talking

7    about this package.  I'm talking about the package that

8    they are claiming belongs to Target -- down his pants.

9    One.  That's the first thing that they must show to you.

10   "They", I mean the prosecutor.

11        Then secondly, if he hit Mr. Rogers to retain

12   that property.  If you look at the video, there's no way

13   that my client, for one thing, had a package of T-shirts

14   that belonged to Target.  And secondly, when he was seen

15   exiting the store, he was already being assaulted from

16   the back by Mr. Rogers.  And there's no evidence, other

17   than Mr. Rogers' own word, that he announced himself as

18   Target.  Because Mr. Rogers' testimony is totally

19   inconsistent on when he made contact with Mr. Winzer.

20        I showed him the preliminary hearing

21   transcript.  He wouldn't even acknowledge that on June

22   7th he testified that he supposedly made contact with my

23   client outside the store.  But if you look at the

24   videotape, it was clearly inside the store in which he

25   was tackling my client, as they were -- as my client was

26   exiting the store.  That is wrong.  And if my client

27   fought back, it was only because he had no choice, being

28   tackled and bear hugged like that from a person who

1      didn't identify themselves as Target Security, and

2      someone who didn't look like Target Security.

3                Do your duty.  Do the right thing in this

4      case.  You will find my client not guilty of the robbery

5      and not guilty of the petty theft.

6                Thank you.

7                THE COURT:  Thank you, Ms. Gin.

8                Now, ladies and gentlemen, Mr. Walpole on

9      behalf of the People will have the last word.

10               PEOPLE'S REBUTTAL ARGUMENT

11     BY MR. WALPOLE:  Good morning, again.

12               I want to bring up some of the points that

13     Defense Counsel made in closing.  And the first thing I

14     want to mention to you, is that Target Security is not

15     on trial.  That's not what you are here for.  And

16     Defense Counsel spent a lot of time going over the

17     things that Target didn't do, according to their own

18     policy.  And she had those diagrams and those documents

19     you will see when you go back there to deliberate.

20     That's not the law.

21               You know, there's no jury instruction about

22     failing to follow Target procedure, or failing to follow

23     any type of procedures.  It just doesn't exist.  What

24     you do as jurors, is you just look at the evidence and

25     decide whether or not this person committed these

26     offenses.  That's what you are here to do.  It's not

27     about what Target did or didn't do.

28               Imagine a scenario.  Imagine we are in a

1   different store.  Imagine there's three witnesses who

2   saw someone take some items, go out the door.  One went

3   to try to stop them and got punched.  They are not

4   security guards.  There's no videotape.  But each

5   witness gets on the stand, and they tell you what they

6   saw.  They tell you what happened.  And you believe

7   them.

8          Is that defendant guilty?  Yes.  Even if

9   there's no tape.  Even if there's -- they are not store

10  employees.  Even if they are just people that are in the

11  aisles that say:  Hey, listen.  I saw some guy grab some

12  T-shirts.  He put it down his pants.  He walked out of

13  the store.  I was a good citizen.  I tried to get to him

14  and say stop, and he turned around and started hitting

15  me.  That's a crime.

16         If you believe the witness, it's a violation

17  of the law.  Hands down.  It has nothing to do with

18  whether or not Target followed their policies.

19         They can violate every policy in the world in

20  this case.  But the bottom line is, is that you heard

21  that they saw what happened, and they testified to

22  exactly what happened and corroborated -- it is

23  corroborated by what you see on the videotape.  You see

24  him with the item in his cart.  You see him back up.

25  You see him reach back, and you see him go back forward,

26  and there's no item.  And that all three of these

27  security guards said:  Yeah, this item was in his pants.

28  Is that Target's property?  Yeah.  Yeah, it is.

1        Defense Counsel also mentioned that the bag

2    was not kept.  Of course it wasn't.  I mean, first of

3    all, Target's policy, as you heard, is that if they want

4    they can take a picture of whatever property was

5    attempted to be stolen.  That's part of their policy,

6    and they are entitled to do that.  Why?  Because a lot

7    of time, they want to resell it.

8        You know, say someone just had something they

9    put in a backpack.  They go out this store.  They are

10   contacted.  They stop.  They take the item out.  Let's

11   resell it.  They are not going to seal it as evidence.

12   They just take a picture of it, say this is what the

13   stuff was, and go on their way.

14       But in this particular instance, they couldn't

15   do that.  They couldn't do that.  I mean, it's right

16   there for the police.  The police officer showed up and

17   they said:  Yeah, this is the bag.  The officer said she

18   saw the bag.  Did she forget to pick it up?  Yeah, she

19   did.  So, she called up the next day and said:  Oh,

20   gosh, you know, I need to get that.  And they said:  We

21   threw it away.  We couldn't resell it, so we threw it

22   away.

23       Is that reasonable?  Does that make sense?  Of

24   course, it does.  It makes perfect sense.

25       Now, let's go over the three witnesses and why

26   you should believe them.  Blake Rogers -- first of all,

27   as I said before, there's three.  First of all, Blake

28   Rogers.  He testified.  He's very honest when he took

1    the stand.  He got up there, even though he was ill, and

2    he told you what happened.  And he said some things

3    that, like, he was out to lie, to make this up, to stick

4    this defendant with the crime, he wouldn't get on the

5    stand and say:  Gosh, you know, trying to think about

6    it, but did I actually see him take the T-shirts off the

7    stand?  I can't say I remember that.  Well, why would he

8    say that, if he is going to stick it to this guy?

9            If he's making it up, he would say:  Oh, yeah,

10    I saw it.  No doubt.  I talked to my other co-workers.

11    I saw it.

12            He didn't do that.  He was very candid.  Very

13    honest.  And he's trying to remember.  Gosh, I'm sitting

14    here today, I see my old transcript.  Can I remember

15    whether or not I touched the defendant first or not?  I

16    can't remember today.

17            He was very honest.  Very honest response,

18    which is corroborated by the other two witnesses.

19            Also, there's a jury instruction that talks

20    about when you evaluate witnesses, what you consider.

21    And one of them is motive or lack of motive.  On this

22    instance, there's no indication, there's no evidence

23    that he knows the defendant, that he's out to get the

24    defendant, that he wants to stick it to the defendant,

25    like pin this guy with a crime.

26            No.  There's someone that walked in the store.

27            Who else did you hear from?  Alex Azevedo.

28    Again, no motive to lie.  Doesn't know this guy.

1    There's no evidence of that.  And he just testified as

2    to what he saw.

3              And most importantly, there's David De La

4    Torre.  He's the supervisor, right?  And you saw him.

5    He came in, in a suit, his tie, and he seemed like a

6    pretty by-the-books type of guy.  You know, he came in

7    and testified.  And what was important about his

8    testimony?  And why do I say he's really by-the-books?

9    Because he's the guy that wrote up Blake Rogers in the

10   past.  He's the one that says:  Hey, listen, you know

11   what, you violated whatever.  You were on duty when you

12   weren't technically on the clock.

13             Who cares?

14             And then, the other instance:  You know, you

15   stop someone and you didn't maintain constant

16   observation of them, and he discarded the property

17   beforehand, and you stopped him and he didn't have

18   property.

19             He wrote him up.  In essence, I guess, he's

20   like the whistleblower.  If something bad happens, okay.

21   I'm going take charge of this and I'm going to write

22   something up, if something doesn't go down right.  If

23   something is improper.

24             He got on the stand and testified to exactly

25   what he saw.

26             No motive, fortunately.  There's no indication

27   that he's done anything wrong as a Loss Prevention

28   officer.

1          There's no indication that Alex Azevedo has

2   ever done anything wrong before as a Loss Prevention

3   officer, and these are certainly records the defendant

4   could have access to.

5          MS. GIN:  Objection, Your Honor.  May we

6   approach?

7          THE COURT:  You may.

8          (Discussion at the bench not reported.)

9          THE COURT:  All right.  Please proceed as we

10  discussed.

11         MR. WALPOLE:  David De La Torre was honest

12  when he took the stand.  He's someone who writes

13  something if there's anything improper.  In this

14  instance, he's the one who took the stand and says:

15  This is what I saw.  This is what happened.  It bolsters

16  his credibility.  If there was something wrong, he would

17  say something.

18         Also, just think about it.  If these Loss

19  Prevention officers or these security guards did

20  something wrong, and they were out to get the defendant,

21  why in the world would they tell Joseph Mahoney, the

22  young -- the high schooler that took the stand at the

23  end.  They say:  Hey, listen.  Could you stick around?

24  The police are probably going to show up.  I want to

25  make sure you provide a statement to the police, as

26  well.

27         Why would they do that?  If they were really

28  doing something wrong in this instance, wouldn't they

1    say:  Hey, thanks for your time.  Go ahead and take off.
2    No.  Let's make sure everything is good.  Make sure
3    everything is proper.  Because they didn't think they
4    did anything wrong.  Because they didn't.  They said:
5    Hey, please stick around.  We want the police to talk to
6    you.  That would be great.
7         Also, on the subject of Joseph Mahoney, the
8    high schooler.  He testified:  You know, I heard
9    something from behind.  I heard something.  Someone
10   yelled something.
11        What do you think that was?
12         And really, whether or not Target identified
13   themselves, doesn't really matter.  Again, think about
14   the defendant's state of mind.  Think about why he's
15   using force.  Like, say, it wasn't even security guards.
16   Say, it was someone that just came up and said:  Hey,
17   stop.  He has got this item down his pants.  He
18   immediately goes to the door.  What's going through his
19   head?  Just like I talked about before:  Okay, I'm
20   walking out here.  I'm stealing this stuff.  Is anyone
21   watching me?  Probably nervous.  Probably thinking about
22   what's going on.
23        He comes to the door.  Is anyone here?  Is
24   anyone coming up on me?  Someone comes up on him, and
25   starts hitting him.  Doesn't matter if he identifies
26   himself as Target Security or not.  Why is he punching
27   him?  He's trying to get away.  He's using force to get
28   out of the store.

1     You know, when you look at the jury

2     instructions for robbery, it talks about the intent to

3     permanently deprive the property and just the use of

4     force.  He intended to steal the property, and that he

5     used the force.  He punched him, to try to get away.

6          Go over the elements.  Go over the state of

7     mind requirements.  He's guilty of this offense.

8          The Defense Counsel in her closing said:  Hey,

9     you know what?  This Loss Prevention officer, he just

10    ran up and he tackled the defendant.  There's no

11    evidence of that.  There's no evidence of that, that he

12    just ran up and, out of the blue, tackled somebody.  And

13    your duty as jurors is to consider only the evidence

14    that you hear -- and I will talk about this a little bit

15    later -- but you can't speculate.  You can't think:

16    Hey, maybe this happened.  Maybe the Loss Prevention

17    officer just ran up and tackled him.  No, you have to

18    hear evidence of it.  There has to be a witness who

19    takes the stand or some -- something that says:  You

20    know what, the defendant was tackled.  And there's

21    nothing like that in this case.  You have to base your

22    findings on evidence that you heard.

23          And on the subject of evidence, the Defense

24    Counsel talked a lot about the videotape and how that's

25    the only evidence, or that's the evidence.  You know,

26    witness' testimony is evidence.  Just like that example

27    I gave you before.  Say, there's a situation where there

28    is no videotape.  The store doesn't have surveillance

1    monitors.  But someone sees someone take property and

2    walk out.  Still guilty of the offense.

3         And it's my burden to prove the case, and I

4    want to preface what I am going to say with this.  It's

5    my burden.  I'm not trying to shift my burden over to

6    the defense, by any means.  But as a prosecutor, I can

7    comment on evidence you would expect to hear, things you

8    would expect to hear from a defendant in a case against

9    him.  And in this particular instance, the woman.  The

10   woman is with --

11        MS. GIN:  Objection, Your Honor.  May we

12   approach?

13        THE COURT:  You may.

14        (Discussion in chambers not reported.)

15        THE COURT:  Please proceed as we discussed.

16   Thank you.

17        MR. WALPOLE:  The woman in this case, that was

18   with the defendant.  There's -- how do I phrase this?

19   Some of you may be thinking:  Where is this woman?  Why

20   wasn't she on the stand?

21        MS. GIN:  Objection, Your Honor.

22        THE COURT:  I haven't heard the argument, yet.

23   Overruled.  So far.

24        MR. WALPOLE:  And you heard that she left the

25   scene; that she was gone.  She was gone before police

26   arrived, and there's no indication that either side or

27   the prosecution knows her name, knows where she's at.

28   So, the simple fact that she didn't take the stand has

1    no bearing on what happened in this case.  It has no

2    bearing, whatsoever.  She's gone.  Who knows?

3           But what you did hear from is three Loss

4    Prevention officers who saw exactly what happened.

5           I want to talk a moment about reasonable

6    doubt.  Proof beyond a reasonable doubt.

7           I believe, during voir dire, the Judge may

8    have read it to you.  But here is the actual

9    instruction.  It is not a mere possible doubt, because

10   everything related to human affairs is open to some

11   possible or imaginary doubt.  It is that state of the

12   case which, after the entire comparison and

13   consideration of all the evidence, leaves the minds of

14   the jurors in that condition that they can not say they

15   feel an abiding conviction of the truth of the charge.

16          As they point out in the very first sentence,

17   it's not a possible doubt.  It's not an imaginary doubt.

18   So, when you go back there to deliberate, what you are

19   not supposed to do is speculate.  What you do is you

20   listen to the evidence that you heard.  You don't think:

21   Oh, maybe this happened.  You don't think:  Oh, maybe

22   that happened.  You you heard from the witnesses and you

23   evaluate their testimony.  You evaluate what they said.

24   And the most important thing about reasonable doubt is

25   the first word.  Reasonable.  Be reasonable.

26          When you go back there to deliberate, don't

27   check your common sense at the door.

28          It's kind of like a jigsaw puzzle.  Everyone

1    has done a jigsaw puzzle.  Say, you had a jigsaw puzzle

2    of a horse.  And you open it up and you have some pieces

3    missing, right?  An ear is missing.  Maybe part of the

4    tail, maybe part of the foot.  But when you step back,

5    you take a look at it and you go:  Yeah, you know,

6    there's a couple things I would like to hear, but when I

7    look back, I can see it's a horse.  That's what it is

8    like in this case.  Take a step back.  Look at all the

9    evidence and say:  Yeah.  The defendant committed this

10    offense.

11            Be reasonable.  I'm confident you will come

12    back with a guilty verdict on both counts.

13            Thank you.

14            THE COURT:  Thank you, Mr. Walpole.

15            Thank you, Ms. Gin.

16            Ladies and gentlemen, you have now heard all

17    the evidence in the case.  You have heard the

18    instructions of law and the arguments of counsel.  I am

19    about ready to swear you to the charge of Sheriff

20    Willett.  Before doing so, however, I just want to read

21    to you two more instructions of law.  After hearing

22    arguments of counsel, I thought it would be best if I

23    also read to you these two additional instructions.  The

24    fact that I am reading them out of order does not

25    signify anything in particular, and you should not give

26    them any greater importance than all the other

27    instructions.  They are all to be read in light of all

28    the other instructions.

1          An "admission" is a statement made by a

2     defendant which does not, by itself, acknowledge his or

3     her guilt of the crimes for which the defendant is on

4     trial, but which statement tends to prove his or her

5     guilt when considered with the rest of the evidence.

6          You are the exclusive judges as to whether the

7     defendant made an admission and, if so, whether the

8     statement is true in whole or in part.

9          Evidence of an oral admission of a defendant

10    not made in court should be viewed with caution.

11         No person may be convicted of a criminal

12    offense unless there is some proof of each element of

13    the crime, independent of any admission made by him or

14    her outside of this trial.

15         The identity of the person who is alleged to

16    have committed the crime is not an element of the crime,

17    nor is the degree of the crime.  The identity or the

18    degree of the crime may be established by an admission.

19         I would like now to have our courtroom clerk,

20    Ms. Gordon-King, swear you to the charge of Sheriff

21    Willett.

22         (Bailiff sworn and affirms.)

23         THE COURT:  Now, ladies and gentlemen, Sheriff

24    Willett is going to take you into the jury room.  He is

25    going to take with him, to give to you, the jury

26    instructions and also the verdict forms.  There's a

27    verdict form for Count One.  There's a verdict form for

28    Count Two.  I believe you will find them

1    self-explanatory.

2           The exhibits do not automatically go into the

3    jury room.  If you want any or all of the exhibits that

4    have been admitted in evidence, you must make a request

5    for them.  You can have your Presiding Juror say you

6    want all the exhibits, or we want specified exhibits.

7    But, you must request them.  They don't automatically go

8    with you to the jury room.  All right?

9           Obviously, one of the exhibits is a videotape.

10   If you ask for that, we will also obviously provide you

11   with a player to play the videotape.  If you need

12   assistance in that regard, Sheriff Willett will come in

13   to play it for you.  However, if that occurs, make sure

14   you do not conduct any discussions in his presence.

15   Deliberations only can take place when you 12 are

16   present and no one else.  So if you ask for the bailiff,

17   Sheriff Willett, to come in and play for you the video,

18   do not conduct any deliberations in his presence and, of

19   course, don't ask him any questions.

20          All right.  Is there anything I can cover with

21   you before you go in?

22          Mr. Watkins, if you would remain here.

23          The rest of you, you can take your notebooks

24   and pens and any personal belongings, and follow Sheriff

25   Willett to the jury room.

26               (Jurors retire to deliberate.)

27          THE COURT:  Okay, Mr. Watkins.  In your case,

28   you are not joining them in the jury room.  As explained

1    to you yesterday, it's still possible for you to be

2    substituted in for one of the regular jurors.  If any

3    one of them becomes incapacitated for any reason, can't

4    go forward, you would still be placed, put in their

5    place.  So, it's very important that you not discuss the

6    case with anyone and you don't form any opinion.  Keep

7    an open mind on this.

8              In the back of your notebook -- you still have

9    it there with you, do you not?  On the -- one of the

10   last pages, write a telephone number where we can reach

11   you and get you back here within a half-hour to an

12   hour's time, if we need you.  You are free to go home or

13   to go to work, whatever you wish to to do.  But you must

14   be available at that phone number, if the need arises,

15   okay?  So, write a phone number.

16             THE ALTERNATE JUROR:  My cell number and house

17   number?

18             THE COURT:  That would be great.  You keep

19   your cell phone with you all the time?

20             THE ALTERNATE JUROR:  Yes.

21             THE COURT:  Put your cell number and your home

22   number.

23             And if for any reason you are not going to be

24   accessible to one or the other of those phones, call

25   here and let us know what phone number we can reach you.

26             THE ALTERNATE JUROR:  I will put my work

27   number down.

28             THE COURT:  Okay.

```
 1              THE ALTERNATE JUROR:  I put my cell, my work,
 2      and my house.
 3              THE COURT:  That's fine.  Just leave it there
 4      in the book.
 5              What will happen with your notebook, is
 6      Sheriff Willett will put it in the evidence room.  If
 7      you are called back and pressed into service, you will
 8      get your notebook back so you can take your notes with
 9      you to the jury room.  If there's no need for that, your
10      notes will be torn out and shredded, without anybody
11      ever reading them, okay?
12              THE ALTERNATE JUROR:  Okay.
13              THE COURT:  Now, obviously, if this jury does
14      render a verdict, our courtroom clerk will call you, let
15      you know that a verdict has been reached.  If -- and at
16      that time, release you of any admonition.  After you
17      have been notified that the proceedings have concluded
18      you can, of course, discuss the case.  But don't do so
19      until you receive word that it's over because, until
20      it's over, you could be put back onto the jury --
21              THE ALTERNATE JUROR:  Okay.
22              THE COURT:  -- at any time.
23              THE ALTERNATE JUROR:  I have a question.
24              THE COURT:  Sure.
25              THE ALTERNATE JUROR:  Suppose I go back to
26      work today and something happens, and I'm at work?  I'm
27      a UPS driver.  How would that work?
28              THE COURT:  You have your cell phone with you?
```

1          THE ALTERNATE JUROR:  Yeah, I have my cell

2    phone with me.

3          THE COURT:  You would be out in the field?

4          THE ALTERNATE JUROR:  Yeah.

5          THE COURT:  Obviously, if it's towards the end

6    of the day, what I would do is simply tell you to come

7    back the following morning.

8          THE ALTERNATE JUROR:  All right.

9          THE COURT:  If it's at the beginning of the

10   day, suppose you were out at work early in the morning

11   and --

12         THE ALTERNATE JUROR:  My schedule is from 8:00

13   to 6:00.

14         THE COURT:  Pardon me?

15         THE ALTERNATE JUROR:  My schedule is from 8:00

16   to 6:00.

17         THE COURT:  We would call you and get a hold

18   of you right away.  And if there are any problems in you

19   coming here immediately, you will discuss them with us,

20   okay?

21         THE ALTERNATE JUROR:  Okay.

22         THE COURT:  All right.  Now, if we don't see

23   you again, on behalf of the attorneys involved, both

24   parties, the attorneys, Court in general, myself in

25   particular, I want to thank you very much for your jury

26   service in this matter.  Thank you very much.

27         THE ALTERNATE JUROR:  You're welcome

28         One more question.  Do I get anything from the

1    Jury?

2            THE COURT:  Yes, go downstairs to the Jury

3    Assembly office and tell them you need juror

4    verification for your employer.

5            THE ALTERNATE JUROR:  Okay.

6            THE COURT:  Okay.

7            THE ALTERNATE JUROR:  Thank you.

8            THE COURT:  You're welcome.

9            (The Alternate Juror exits the courtroom.)

10           THE COURT:  Counsel stipulate and agree that

11   if the jury were to request for any or all the exhibits

12   that have been admitted into evidence, that those can be

13   provided to the jury by our bailiff, without need to

14   contact you further?

15           MR. WALPOLE:  Submitted.

16           MS. GIN:  Yes.

17           THE COURT:  Also, if the jurors were to

18   request of our bailiff an occasional break, stipulate

19   and agree that he can give them a break, without need to

20   contact you?

21           MR. WALPOLE:  That's fine.

22           MS. GIN:  Yes.

23           THE COURT:  Anything further we need to cover?

24           MR. WALPOLE:  No

25           THE COURT:  Make sure you leave telephone

26   numbers with Ms. Gordon-King, so she knows she can get a

27   hold of you right away.

28           All right.  Thank you very much.

```
 1                    (Recess.)

 2                    (Midday recess.)

 3                          ---o0o---

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1    Martinez, California              August 16, 2005; P.M.

2    Department No. 11           Hon. Peter L. Spinetta, Judge

3                          ---o0o---

4                    P-R-O-C-E-E-D-I-N-G-S

5         THE COURT:  We will go on the record in the

6    matter of People of the State of California verses Lacy

7    Winzer.  Mr. Winzer is present.  His counsel, Ms. Gin,

8    is present.  Mr. Walpole is present.  This is action no.

9    05-050867-1.

10        Counsel, as you both know, we have received a

11   request from the jury asking for the transcripts

12   regarding the findings of the T-shirts on the defendant

13   outside of the store, by David De La Torre and Alex

14   Azevedo.  That information has already been compiled by

15   Mrs. Keen, who did David De La Torre.  And I believe

16   Janene Biggs, our other court reporter, is in the

17   process of putting together the relevant portions of the

18   transcript relating to Alex Azevedo on this subject

19   matter, and they should be back within a half-hour.

20        So, once we have both and you have both

21   reviewed the materials and you approve of them, we need

22   to determine whether we are going to have Mrs. Keen go

23   in and read them to the jury, or whether you want the

24   jury brought back into the courtroom.

25        MS. GIN:  I have had an opportunity to talk to

26   Mr. Winzer about that, and our preference is to have it

27   read in the courtroom.

28        THE COURT:  All right.  We will bring the jury

Tamra Elaine Keen, RPR, CSR No. 5404
Official Reporter Department No. 11

1    out.  We will have it read to them at that time.

2          MS. GIN:  And just to let the Court be aware,

3    we did -- Mr. Walpole and myself did talk to Ms. Biggs

4    on the telephone about the portions that would be

5    relevant to the juror's question.  She has read us those

6    portions, and she will be in the process of faxing it to

7    us, as soon as we can.  We haven't yet finally decided

8    which portion should be read to the jury, if all of it,

9    but once we see it in written form, it will be easiest

10   for us to decide.

11         THE COURT:  All right.  Once you have done

12   that and are ready to go, let me know.  Or, if there's a

13   disagreement, let me know and we will go back on the

14   record.

15         (Recess.)

16         THE COURT:  Are we in agreement --

17         MR. WALPOLE:  Yes, Your Honor.

18         THE COURT:  -- with what is to be read?

19         MR. WALPOLE:  Yes.

20         MS. GIN:  Yes.

21         (Brief recess.)

22         THE COURT:  Let's go on the record in the

23   matter of People versus Winzer.  Mr. Winzer is present,

24   both counsel present.

25         You have agreed as to the passages of the De

26   La Torre and Azevedo testimony to be read back to the

27   jury, or so you have informed me, so we are bringing

28   back the jury to the courtroom now to have that read

1      back.

2                  Counsel, would you stipulate and agree that

3      our court reporter need not report what she is reading

4      back to the jurors?

5                  MS. GIN:  Yes.

6                  THE COURT:  Mr. Walpole?

7                  MR. WALPOLE:  Yes.

8                  (Jurors enter the courtroom.)

9                  THE COURT:  All right.  Welcome back, ladies

10     and gentlemen.  You have sent me a note asking for the

11     transcript -- portions of the transcript of the

12     testimony of David De La Torre and Azevedo relating the

13     finding of the T-shirt on the defendant outside of the

14     store.

15                 We have reviewed the testimony of

16     Mr. De La Torre and Mr. Azevedo.  We have extracted from

17     that testimony those portions relating to the subject

18     matter that you have referred to, and our courtroom

19     reporter, Mrs. Keen, will read that to you, those

20     portions, at this time.

21                 (Requested testimony read back.)

22                 THE COURT:  All right.  Ladies and gentlemen,

23     those are the portions we understood you were interested

24     in hearing.  We will now send you back to the jury room.

25                 (Jurors retire for further deliberations.)

26                 THE COURT:  All right.  Anything further?

27                 MR. WALPOLE:  No, Your Honor.

28                 THE COURT:  Counsel, anything further?

```
 1                    MS. GIN:  No.

 2                    THE COURT:  Very well.  Thank you.

 3                    (Recess.)

 4                    (Jurors enter the courtroom.)

 5                    THE COURT:  Thank you.  We will go on the

 6       record in the matter of People of the State of

 7       California versus Lacy Winzer.  Ms. Gin, his counsel, is

 8       present.  Mr. Walpole is present.  All of our jurors are

 9       back in the courtroom.

10                    *Juror No. 5*, it's my understanding you are

11       our Presiding Juror; is that correct?

12                    THE PRESIDING JUROR:  Yes, sir.

13                    THE COURT:  It's my understanding the jurors

14       have arrived at verdicts in this matter; is that

15       correct?

16                    THE PRESIDING JUROR:  Yes.

17                    THE COURT:  If you would tender those verdicts

18       to Sheriff Willett.

19                    THE PRESIDING JUROR:  (Complies.)

20                    THE COURT:  All right.

21                    Madam Clerk, I will ask you to read the

22       verdicts.

23                    Counsel, would you stipulate that she may omit

24       court and caption?

25                    MR. WALPOLE:  Yes.

26                    MS. GIN:  Yes.

27                    THE COURT:  All right.  Thank you.

28                    THE CLERK:  People of the State of California
```

1    versus Lacy Winzer, docket no. 05-050867-1.  Verdict

2    Count One:

3              We, the jury, find the defendant, Lacy Winzer,

4    guilty of second-degree robbery in violation of Penal

5    Code section 211 slash 212.5 subsection (c), as charged

6    in Count One of the Information.

7              People of the State of California versus Lacy

8    Winzer, docket no 05-050867-1.  Verdict Count Two:

9              We, the jury, find the defendant, Lacy Winzer,

10   guilty of petty theft in violation of Penal Code section

11   484, as charged in Count Two of the Information.

12             Ladies and gentlemen of the jury, is this your

13   verdict as read?

14             (Jurors respond affirmatively.)

15             THE COURT:  The record will reflect that, when

16   queried by Madam Clerk as to whether it was their

17   verdict, each and all the jurors indicated in the

18   affirmative.

19             Counsel, do either of you wish the jury to be

20   individually polled?

21             MS. GIN:  I would, Your Honor.

22             THE COURT:  With respect to?

23             MS. GIN:  Count One.

24             THE COURT:  With respect to Count One, Madam

25   Clerk, could you individually poll them.

26             THE CLERK:  Verdict Count One:

27             We, the jury, find the defendant, Lacy Winzer,

28   guilty of second-degree robbery in violation of Penal

1    Code section 211 slash 212.5(c), as charged in Count One

2    of the Information.

3              Juror No. 1, is this your verdict as read?

4              JUROR NO. 1:  Yes.

5              THE CLERK:  Juror No. 2, is this your verdict

6    as read?

7              JUROR NO. 2:  Yes.

8              THE CLERK:  Juror No. 3, is this your verdict

9    as read?

10             JUROR NO. 3:  Yes.

11             THE CLERK:  Juror No. 4, is this your verdict

12   as read?

13             JUROR NO. 4:  Yes.

14             THE CLERK:  Juror No. 5, is this your verdict

15   as read?

16             JUROR NO. 5:  Yes.

17             THE CLERK:  Juror No. 6, is this your verdict

18   as read?

19             JUROR NO. 6:  Yes.

20             THE CLERK:  Juror No. 7, is this your verdict

21   as read?

22             JUROR NO. 7:  Yes.

23             THE CLERK:  Juror No. 8, is this your verdict

24   as read?

25             JUROR NO. 8:  Yes.

26             THE CLERK:  Juror No. 9, is this your verdict

27   as read?

28             JUROR NO. 9:  Yes.

1       THE CLERK:  Juror No. 10, is this your verdict
2    as read?

3             JUROR NO. 10:  Yes.

4             THE CLERK:  Juror No. 11, is this your verdict
5    as read?

6             JUROR NO. 11:  Yes.

7             THE CLERK:  Juror No. 12, is this your verdict
8    as read?

9             JUROR NO. 12:  Yes.

10            THE COURT:  When individually polled, each and
11   all the jurors indicated that it was their verdict.  So,
12   by a vote of 12 to 0, the record will reflect that the
13   verdict was that of the jury.

14            Madam Clerk, would you record, please, the
15   verdicts as read.

16            THE CLERK:  The verdicts are recorded as read,
17   Your Honor.

18            THE COURT:  Do you waive reading of the
19   verdicts as recorded, counsel?

20            MR. WALPOLE:  Yes, Your Honor.

21            MS. GIN:  Yes.

22            THE COURT:  All right.  Very well.

23            Ladies and gentlemen, I am going to send you
24   back to the jury room for one moment, as we address some
25   matters, and then we will have you -- we will bring you
26   back shortly.

27            (Jurors return to the deliberation room.)

28            THE COURT:  All right.  The record will

1    reflect the jury has exited.  The defendant and both

2    counsel remain.

3         Mr. Winzer, as you will recall, pursuant to

4    motion of your attorney, I bifurcated certain issues.

5    That is to say, I separated certain issues from the ones

6    that were submitted to the jury.  More specifically, I

7    bifurcated the allegations in connection with Count Two,

8    that you had sustained prior theft convictions.  I also

9    bifurcated or separated out the four Penal Code section

10   667.5 subdivision (b) felony with prior California

11   prison conviction enhancement allegations.  There are

12   four separate ones of those allegations.

13        Now, you are entitled to a jury trial with

14   respect to all of the -- these bifurcated issues, if you

15   wish, or, alternatively, you can waive your right to a

16   jury trial and agree that those issues can be tried in

17   front of me as the Judge of this matter.

18        Remember, if they are tried by the jury, all

19   12 jurors must agree before any of these allegations,

20   prior conviction allegations, can be found to be true.

21   Any of the bifurcated allegations.

22        I assume, you have had a chance to discuss

23   this with Ms. Gin.  Are you prepared to waive your right

24   to a trial by jury on these issues?

25        (Attorney-client conference.)

26        THE COURT:  Do you waive your right to a trial

27   by jury?

28        THE DEFENDANT:  I would like the Judge decide.

Tamra Elaine Keen, RPR, CSR No. 5404
Official Reporter Department No. 11

1        THE COURT:  You want the Judge to try those

2   issues?

3        THE DEFENDANT:  Decide.

4        THE COURT:  what?

5        MS. GIN:  We would like the Court to decide,

6   Your Honor.  I told him he had two choices.  One was let

7   the jury decide.

8        THE COURT:  That's fine.  I just want to make

9   sure I understood you correctly.  You waive your right

10  to a trial by jury as to those issues, and agree that I

11  can try those issues as the Court, instead.

12       THE DEFENDANT:  Yes.

13       THE COURT:  All right.  Very well.

14       You concur in that, Ms. Gin?

15       MS. GIN:  Yes.

16       THE COURT:  Very well.  Any reason then to

17  hold the jury here further?

18       MR. WALPOLE:  No, Your Honor.

19       (Jurors enter the courtroom.)

20       THE COURT:  Thank you very much, ladies and

21  gentlemen.  Thank you for your patience.  The record

22  will reflect the jury has rejoined us in the courtroom.

23  The defendant and counsel are present.

24       At the beginning of this trial, certain issues

25  were bifurcated out.  They were segregated out for trial

26  later.  There are some certain allegations that

27  Mr. Winzer had been -- had sustained prior convictions,

28  and those allegations there's a question of whether they

1    were going to be tried before you or tried by the Court.

2    Mr. Winzer has waived his right to a jury trial with

3    respect to those issues.  They will be tried in front of

4    me as to whether he sustained these prior convictions.

5         So, I'm now at a point where I am releasing

6    you from any further obligations in this case.  All

7    along I have been telling you not to discuss this case

8    with anyone, and now I am at liberty to tell you, you

9    can discuss it with anyone you want to, whether it be

10   your spouse, significant other, what have you.  You can

11   discuss it with anyone, including the attorneys in this

12   matter.

13        And in fact, the attorneys may be interested

14   in knowing how you arrived at your verdict, what your

15   thinking was that led you to that conclusion.  And we

16   don't have any further matters scheduled here this

17   afternoon, so those of you who want to talk to them, can

18   remain here and talk to them in this courtroom.  I want

19   to point out, however, that if you don't want to talk to

20   them or anybody else, for that matter, concerning this

21   case, that's your right as well.

22        In other words, you have a choice.  You can

23   talk to people about it, or not talk to people about it,

24   according to your will.  If you don't want to talk to

25   people, and they persist in asking you questions, please

26   let me know and I will take steps to assure that that

27   stops.

28        I also want to point out to you, that in

1    connection with your jury service, you gave to our Jury

2    Assembly people certain personal identifying

3    information.  Not only your names, but your addresses,

4    telephone numbers, and so forth.  I will order that

5    material, as we do in all cases, sealed, not to be

6    disclosed to anyone without further order of the Court.

7    And before any such order issues, you will be given

8    notice that someone is seeking the information, and

9    given an opportunity to lodge any objection you may have

10    to its disclosure.

11            Beyond that, I just, on behalf of the

12    attorneys involved, the Court in general, myself in

13    particular, I just want to thank you for your jury

14    service.  In reaching decisions in cases such as this,

15    being a juror in a case such as this is not a

16    particularly enjoyable matter, but I hope that you find

17    it to be a worthwhile experience in the sense that you

18    have lived out the Constitution.

19            As I mentioned at the beginning of the case,

20    the power of judgment under our system of justice truly

21    is in the hands of the people.  You have lived out that

22    part of the Constitution.  And I want to thank you for

23    your duty, and from all appearances you have done so

24    responsibly and conscientiously.  And I want to thank

25    you very much on behalf of everybody involved.

26            In that connection, let me also mention this.

27    If any of you knows anybody who you think would profit

28    from coming in and watching what takes place in trial,

1    I'm thinking of course particularly of young people, but

2    it doesn't have to be young people, it could be anybody.

3    Somebody who would be interested in what goes on here,

4    by all means put him in contact with our Department.

5    They are welcome to come here and watch what takes

6    place.

7            As I like to point out to all individuals who

8    serve on my juries, I'm a great believer in the openness

9    of the process.  I think, if people come here and watch

10    what takes place -- I won't say that they always will

11    conclude that justice has been done.  I won't be so

12    presumptuous as to say that -- but I think people will

13    come out knowing that everybody involved, whether it's

14    the jurors, whether it's the attorneys, whether it's the

15    Judge, are all doing their best to see that justice is

16    done.  And so, if people see that, I think that they get

17    greater confidence in our criminal justice system, our

18    judicial system in general.

19            So, I encourage you, if you know especially

20    school teachers that have classes that they would like

21    to bring here for field trips, or service organizations

22    that you may belong to that may be interested, put them

23    in touch with us.  We will be happy to make arrangements

24    for them to come here and see what's going on.

25            Unless you have some further questions, I will

26    say this, that I now have to schedule this matter for

27    trial on the -- what are called the bifurcated issues,

28    those issues that we separated out, and also for

1    pronouncement of judgment and sentencing of these

2    matters.  I will schedule a date.  You, of course, do

3    not have to be here for any of that.  If you are

4    interested in hearing what sentence I impose in this

5    matter, you can call our Madam Clerk, and call in about

6    a month from now, and we should be in a position to tell

7    you then what sentence I have imposed in this case.

8              Any questions any of you have?

9              (No response.)

10             THE COURT:  Okay.  We will just address the

11    question, first of all, of sentencing.

12             As your client may know, Ms. Gin, certainly

13    you know, he is entitled to pronouncement of judgment

14    and sentencing within 20 court days.  Do you -- unless

15    you waive that.  Do you have a preference as to when?

16             MS. GIN:  I calculated the date to be by

17    September 14th, Your Honor.  But what also I ask is

18    that, just so I can make sure I'm ready for Mr. Winzer's

19    sentencing because I'm gone the week prior, if we could

20    have it scheduled for September 16th at 8:30 in the

21    morning.

22             If I could ask Mr. Winzer if he's okay with

23    that.

24             (Attorney-client conference.)

25             THE COURT:  All right.  Mr. Winzer, you heard

26    me mention you are entitled to have judgment pronounced

27    and sentence imposed within 20 court days.  What's being

28    proposed, is that actually we wait a little bit longer,

1    and that we proceed with sentencing on this matter on

2    September 16th.  It would be at -- it would have to be

3    at 2:00 o'clock that afternoon.

4              MS. GIN:  That would be fine, Your Honor.

5              THE COURT:  Do you waive to your right to an

6    earlier sentencing, and agree to proceed with that on

7    September 16th at 2:00 p.m.?

8              THE DEFENDANT:  Yes, I do.

9              THE COURT:  Also, you are entitled to a speedy

10   trial with respect to the bifurcated issues.  Do you

11   waive your right to an earlier trial and agree we can

12   proceed with trial of those issues on Friday afternoon

13   at 2:00, on September 16th?

14             THE DEFENDANT:  Yes.

15             THE COURT:  You concur with that, Ms. Gin?

16             MS. GIN:  Yes, Your Honor.

17             THE COURT:  That will be the dates scheduled

18   for that matter.

19             The matter will be referred, as it always must

20   be, to the Probation Department for a probation report

21   in connection with this matter.

22             Is there anything further that needs to be

23   covered?

24             MS. GIN:  No, Your Honor.

25             THE COURT:  All right.  Counsel, thank you

26   both very much.

27             Those of you ladies and gentlemen who want to

28   go home, do so.  Your badges, turn them in, please, in

1    to the Jury Assembly people downstairs.  Those of you

2    who would like to remain here a few moments and talk to

3    counsel, you are free to do so.

4              Thank you.

5              (Proceedings concluded.)

6                    ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2     STATE OF CALIFORNIA        )       ss.

3     COUNTY OF CONTRA COSTA     )

4          I, TAMRA E. STRASSBURGER-KEEN, RPR, CSR No. 5404,

5     Official Court Reporter for the Superior Court, do

6     hereby certify:

7          That I am a Certified Shorthand Reporter, duly

8     licensed so to practice by the Department of Consumer

9     Affairs, Certified Shorthand Reporter's Board of the

10    State of California, by License No. 5404.

11         That on August 10, 15 and 16, 2006, I reported in

12    stenographic writing the proceedings had in said Court

13    and cause, at the hearings in said matter, before the

14    Honorable Peter L. Spinetta, Judge, presiding.

15         That I caused said stenographic writing to be

16    transcribed by computer-aided transcription.

17         That the foregoing pages constitute and are a full,

18    true, accurate and correct transcription of my said

19    stenographic writing, and a correct and verbatim record

20    of the requested proceedings so had and taken, as

21    aforesaid, at said time and place, to the best of my

22    ability.

23         IN WITNESS WHEREOF, I have hereunto set my hand

24    this 11th day of July, year 2006.

25

26                    _____

27                    TAMRA E. STRASSBURGER-KEEN, RPR

28                    CSR #5404, OFFICIAL COURT REPORTER

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   VIOLET M. LEE, State Bar No. 77144
    Deputy Attorney General
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone:  (415) 703-5896
      Fax:  (415) 703-1234
8     Email:  Violet.Lee@doj.ca.gov

9   Attorneys for Respondent

10

11                IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14

    **LACY WINZER,**                          C 08-2341 PJH (PR)
15
                              Petitioner,      **EXHIBIT 5 (part 6)**
16
                v.
17
    **BILL CURREY, Warden,**
18
                              Respondent.
19

20

21

22

23

24

25

26

27

28

    EXHIBIT 5 (part 6)                          Winzer v. Currey
                                                C 08-2341 PJH (PR)

# EXHIBIT 5 (part 6)

1

2                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3                   IN AND FOR THE COUNTY OF CONTRA COSTA

4                    HONORABLE PETER L. SPINETTA, JUDGE

5                          DEPARTMENT NO. 11

6

7        _____

8    THE PEOPLE OF THE STATE OF CALIFORNIA

9             Plaintiff,

10   versus                              Case No.  05-050867-1

11   LACY WINZER,

12            Defendant.

13   _____/

14                        ---oOo---

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

17           FRIDAY, APRIL 14, 2006; 10:45 a.m.

18         A.F. BRAY BUILDING, MARTINEZ, CALIFORNIA

19                      APPEARANCES:

20   For the People:      ROBERT KOCHLY, DISTRICT ATTORNEY
                          BY:  CHRISTOPHER WALPOLE, DEPUTY
21                        725 Court Street
                          Martinez, California  94553
22
     For the Defendant:   DAVID C. COLEMAN, PUBLIC DEFENDER
23                        BY:  WINNIE GIN, DEPUTY
                          800 Ferry Street
24                        Martinez, California  94553

25

26

27   Reported by:            JANENE R. BIGGS

28                           C.S.R. No. 11307

            JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
 1   Friday, April 14, 2006:                    10:45  a.m.

 2

 3                    P R O C E E D I N G S

 4

 5         (Whereupon, People's Exhibits Numbs 1, 2,

 6         and 3 were marked for identification.)

 7         THE COURT:  All right.  Thank you, we'll go on the

 8   record in the matter of People versus Winzer, more

 9   specifically, Lacy Dwayne Winzer, Case Number 05-050867-1.

10   Ms. Gin appearing on behalf of Mr. Winzer, Mr. Walpole

11   appearing on behalf of the People.

12         The first matter I need to address is the motion

13   for a new trial.

14         One of our -- The earliest date we scheduled this

15   case for sentencing, I brought counsel's attention to a case

16   entitled People versus Fuentes, where the court held under

17   certain circumstances, at least the circumstances where

18   the -- more specifically where the accusatory pleading

19   charged the defendant with effectuating a theft by means of

20   force and fear, that under those circumstances, the crime of

21   robbery -- the crime of battery could be a lesser -- or

22   would be a lesser included offense to the crime of robbery.

23         During the period of time that the briefing in

24   this case was taking place, any references to the Fuentes

25   case has been published.  And it's not a situation where the

26   Court of Appeal has taken it up -- I mean the Supreme Court

27   has taken it up.  Quite the contrary, it's been published

28   period.  The case is not pending in front of the Supreme
```

1   Court.  So I'm left with the case of People versus Wright

2   which came to a different conclusion than People versus

3   Fuentes.

4        In People versus Wright, it is not enough for the

5   element of robbery independent of fear.  There's an

6   equivalency between the two, and that being the -- and that

7   the way, I should go on saying, that the way force is used

8   for purposes of robbery includes, and not only behavior,

9   which involves a touching, but is broader than that.  It can

10  also include behavior that does not include any touching.

11  And, therefore, as the case concluded in People versus

12  Wright, assault is not lesser to a robbery.  And by the same

13  rationale, neither could battery be neither in a situation

14  where the accusatory pleading charges force and fear.

15        So it seems to me that no matter what I think or

16  may have thought about the reasoning in Fuentes as compared

17  to the reasoning in Wright, that it's all irrelevant, that

18  under, what is it, auto equity, I'm bound by the Court of

19  Appeal decision, People versus Wright.  And the logic of

20  that case, as well as the holding, literally required that I

21  deny defendant's motion for new trial on specifically the

22  ground battery is not a lesser included offense.  That's

23  my -- I put my logic out on the table for you so you guys

24  can comment on that.  So it seems to me that it's called

25  upon.

26        Before I make it final you might want to address

27  that.

28        MS. GIN:  Your Honor, I can respond to the

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    statements that the Court has made.  I was going to respond
2    to Mr. Walpole's opposition to the motion for new trial.
3              Starting first with the case of People versus
4    Phillipe Fuentes, which the Court had alerted to the defense
5    back in September of last year, that this is a case that
6    might be prudent for the defense to look at in terms of the
7    battery instruction that was not begin in this case.
8              And I Shepardized it, and that's when I noted that
9    the Supreme Court denied review on May 19th, 2004, and at
10   that time ordered that the opinion not be officially
11   published.
12             So for that reason I could not cite it in my
13   papers, because it would not be appropriate.
14             THE COURT:  Understood.
15             MS. GIN:  But notwithstanding that,
16   notwithstanding the fact that I cannot cite Fuentes as a
17   case that this Court can consider in it's ruling for my
18   motion for new trial, what I'd like the Court to consider is
19   the following:
20             If you look at the prosecution's opposition, they
21   actually divide their arguments into two parts.  One is
22   whether the defense had actually requested the battery
23   instruction in this case, because Wright stands for the
24   holding that sua sponte the Court is not required to give
25   the battery instruction as a lesser included.  Because if
26   you look at the language in Wright --
27             THE COURT:  Yes, because it's not a lesser
28   included.

```
 1              MS. GIN:  But it says sua sponte.  If you look at
 2    the People's own opposition, the decision to follow the
 3    instruction wouldn't be given in a robbery case if the
 4    defense asked for it.  If you look at his own motion, if I
 5    could direct the Court to his language and the case law,
 6    which he is correct in citing, that would be on page 2 of
 7    his argument on lines 20 through 26.
 8              Then the issue --
 9              THE COURT:  Wait.  Wait.  Wait.  Let me pause
10    right there.
11              Did you mean to say that?  Did you mean what you
12    said and said what you meant?  That is to say, did you mean
13    to say if the defense had requested battery they were
14    entitled to it?
15              MR. WALPOLE:  In my brief I did come across cases
16    that stated where the defense requests --
17              THE COURT:  But those were not cases decided at a
18    time when lesser related instructions were required to be
19    given.
20              MR. WALPOLE:  That's correct.  In all candor, I
21    just wanted to have a complete brief and point out case law
22    that did mention that upon request this has been given.  If
23    a defense counsel requested it has been given, but there was
24    a time when the Court ruled you had to, there was such a
25    time.  In being candid with the Court I wanted to show it
26    was not only positive to my point of view but also had --
27              THE COURT:  Ms. Gin, we're now operating in a
28    world where lesser relateds are not required to be given,
```

1    and, some would argue, cannot be given without violating

2    separation of powers without the People agreeing to giving

3    lesser relateds.

4           So are you saying that there is some authority or

5    proposition that battery must be given when it's a lesser --

6    when it -- must be given when requested by the defendant?

7           MS. GIN:  I think so, your Honor.  In looking at

8    the cases the prosecution cited, they have been not been

9    overturned in any way.  And in looking at the case in which

10   the Court and, of course, the prosecution noted, which is

11   People versus Wright, I'm looking at the very last page of

12   the decision.  And the holding is quite clear.

13          If I can quote what the appellate justice stated.

14          "As a result the trial court had no duty to

15   instruct sua sponte as assault as a lesser included offense

16   of robbery."

17          THE COURT:  But that doesn't stand for the

18   proposition that they had the duty to so instruct when

19   requested by the defendant.

20          MS. GIN:  But I think --

21          THE COURT:  It's just a comment on the factual

22   scenario that was presented by the Wright case and the issue

23   arose of whether the judge had to do it sua sponte.

24          MS. GIN:  I understand what the Court is saying.

25   But I think it's quite telling if you look at the assault

26   cases prior to Wright that talk about defense requests, but

27   in this particular case the defense didn't ask for a lesser

28   included.

1          THE COURT:  You did.

2          MS. GIN:  No, I did in this case.

3          THE COURT:  And what we're talking about about is

4    whether there's some distinction that flows from the fact

5    that you requested it, I would -- I can't think of why there

6    would be, because we only have to -- we only have to

7    instruct if it's a necessarily included offense.  If battery

8    is not a necessarily included offense, then there is -- the

9    court refusing to give it is not error.  Whether you request

10   it or not request it.

11         MS. GIN:  So if I can understand the Court

12   correctly, because I was going to make some other comments

13   on the arguments made by the prosecution.  Regardless of

14   whether I asked for it or not, if I requested it, the Court

15   did deny it because it was not a lesser included.

16         THE COURT:  Yes, and if it need to be made clear

17   for the record, I acknowledge the fact that you did request

18   it, and we had a discussion specifically on the record.  I'm

19   sure the record will show that you requested it.

20         MS. GIN:  Unfortunately the record -- the

21   transcript I ordered did not, but it did show the Court

22   going into a conversation in which you said a battery is not

23   a lesser, because you inquired, "Anybody disagree?"  And

24   unfortunately my comment at that time, which I asked for

25   battery, is not in the transcript, but then you responded

26   battery is not a lesser in the old days.  And then you

27   talked about how it was included at that time.

28         THE COURT:  If it helps -- If it helps to clarify

1    the record in this respect for you, in some fashion or form,

2    if you didn't do it expressly on the record, you did it by

3    your submitted jury request or in some other fashion, I was

4    certainly left with the impression that you were taking the

5    position that I should instruct on battery as well.

6         MS. GIN:  It is my recollection, your Honor, I did

7    ask for a lesser included of battery, because I felt it was

8    in this case appropriate in light of the fact that the

9    language of the Information was -- the charging on Count One

10   was by force and fear.

11        THE COURT:  Right.

12        MS. GIN:  And even though this Court had

13   instructed, of course, on the robbery instruction which

14   talks about force or fear, in the disconjunctive instead of

15   the conjunctive, that I believe that the prosecution was

16   going on the theory of force, which was consistent with the

17   way it was charged in Count One.  So that's why I asked for

18   the battery instruction.

19        And also in light of the fact that if Count Two

20   was the petty theft, which, of course, is a lesser included

21   offense of robbery.  I don't think anybody disagrees with

22   that.

23        THE COURT:  We come down to the question -- I

24   mean, my position is if it's a necessarily included offense,

25   a lesser included offense, then I must give it at your

26   request or without your request.  And for me not to do so

27   would be error, even if both of you -- technically, even if

28   both of you said don't give it, it would be error for me not

```
 1    to give it.  It might not be basis for appeal, but it still
 2    would be error.  I have to give it.
 3            On the other hand, if it's not a lesser, a
 4    necessarily included offense, then I don't have to give it,
 5    regardless of whether or not you request it.  And then I'm
 6    left with Wright as the controlling decision, which says
 7    even in the situation where the accusatory pleading says,
 8    just like we have in this case, pleads it in conjunctive
 9    force and fear, it's not a necessarily included offense,
10    because force is used for robbery purposes.  This is the
11    same as fear, or, in any event, even if it's not exactly the
12    same as fear, is brought enough that includes behavior
13    beyond touching.
14            So I'm just obligated to follow that decision.
15    That's why it's auto equity.  Or auto sales.
16            MS. GIN:  It's auto sales equity, your Honor.
17            THE COURT:  And I'm bound by the Court of Appeal
18    decision in that respect.
19            For what it's worth, you know, I must say when I
20    read the Fuentes case I thought -- and it made distinctions
21    between rejecting the reasoning in Wright, and I found that
22    relatively persuasive at that time.  But the case has been
23    depublished.  It hasn't been depublished in the scenario
24    where the Supreme Court has taken up both cases and
25    therefore depublished both and wait and see what happens.
26    It just depublished the Fuentes case and left the Wright
27    case.
28            I'm bound by the law to deny motions -- motion for
```

```
 1    new trial for those reasons.
 2              So we have to proceed with sentencing in this
 3    matter.  We also have, I believe, trial of bifurcated
 4    issues, if I'm not mistaken.
 5              MS. GIN:  That's correct, your Honor.  People have
 6    shown me the exhibits.  I think they're numbered 1 through
 7    3.
 8              THE COURT:  1, 2, 3.
 9              MS. GIN:  Those are documents that establish my
10    client's prior convictions.  I talked to my client about it.
11    I will submit it based upon the documents you have in front
12    of you.
13              THE COURT:  Do you have anything else other than
14    these documents to present?
15              MR. WALPOLE:  No, your Honor.
16              THE COURT:  Is there any reason why I should not
17    admit these into evidence?
18              MS. GIN:  No.
19              THE COURT:  All right.  Admitted into evidence.
20              (Whereupon, People's Exhibits Numbers 1,
21              2, and 3 were entered into evidence.)
22              THE COURT:  With respect -- Why don't you lead me
23    through them and tell me what the documents show, or what
24    you think they show.
25              MR. WALPOLE:  Your Honor, I want to point this
26    out, and I pointed out to defense counsel last time.  On the
27    Information, we charged a number of 667.5(b) priors.
28              THE COURT:  Hold on one second.
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1          Let me note for the record that what we bifurcated

2    in this case were the prior conviction allegations attendant

3    to the Count Two, the petty theft count.  And also

4    bifurcated, of course, were the Penal Code Section 667.5(b)

5    allegations of which there were four, predicated on four

6    separate crimes.

7          So lead me through all this.

8          MR. WALPOLE:  Yes, your Honor.

9          I'll start actually with the 484/666 priors.

10         All of the theft related priors are contained

11   within -- I forgot which exhibit it actually is, but there's

12   actually an exhibit that has not only the defendant's rap,

13   but also various convictions, conviction dates, which should

14   be tabbed correctly.

15         THE COURT:  Which one is that?

16         MR. WALPOLE:  Do you mind if I approach, your

17   Honor?

18         THE COURT:  Why don't you come and show me?

19         MR. WALPOLE:  If I could just have a moment with

20   this.

21         THE COURT:  While you're doing that, off the

22   record.

23         (Whereupon, a discussion off the record

24         was had.)

25         THE COURT:  Okay.  Back on the record.

26         MR. WALPOLE:  So if you look through People's

27   Exhibit 1, that lists the certified priors.  It's not the

28   969(b) packets.  It's actually just the certified priors

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1    themselves.  And they contain further information, the prior

2    convictions for violation of California Penal Code Section

3    10851.

4            THE COURT:  Which -- Specifically which ones?  I

5    see a conviction here on 12-17; right?

6            MR. WALPOLE:  Yes, and that's the last conviction

7    or the 10851.

8            THE COURT:  12-28.

9            MR. WALPOLE:  Yes, and that is the first

10   conviction for 10851 listed on the Information.

11           THE COURT:  7-19.

12           MR. WALPOLE:  And that is the second conviction

13   for 10851.  Listed on the Information also --

14           THE COURT:  And one for 3-5-92.

15           MR. WALPOLE:  Yes, listed on the Information we

16   alleged a prior for 11350.  I'm not sure why that was there

17   for prior convictions.  As far as theft related convictions

18   are concerned I don't believe 11350 is something that falls

19   under the list of priorable offenses for petty theft.  So

20   I'll withdraw the 11350 certified prior.

21           THE COURT:  So you're withdrawing the 11550

22   conviction?

23           MR. WALPOLE:  The 11550 and 11350.

24           THE COURT:  So you're relying simply on the 12-28

25   10851, 7-19 10851, and the 12-17 10851.

26           MR. WALPOLE:  That's correct, and that's just for

27   purposes of the 484/666 alleged on Count Two.

28           THE COURT:  Okay.  And for purposes of the

1    667.5(b)?

2           MR. WALPOLE:  Yes.  For that I marked People's

3    Exhibit 2 and People's Exhibit 3.  The defendant had two

4    different 969(b) packet numbers associated with them.  So I

5    had to order two separate numbers for those prior

6    convictions.

7           Looking on the Information we allege that he

8    served separate prison terms for -- for offenses charged on

9    or about March 5th, 1992, and the first 667.5(b), and for

10   the second 667.5(b), for an offense that occurred on or

11   about December 28th, 1998.

12          In reviewing the 969(b) packet, it looks like he

13   actually served one prison term for that offense.  So I ask

14   the Information on that be merged for those allegations for

15   667.5(b).  Because it looks like actually the same prison

16   term.

17          THE COURT:  So you're moving to amend the

18   enhancement as predicated on both those convictions?

19          MR. WALPOLE:  Yes.

20          THE COURT:  But it's only one that would justify

21   it; right?

22          MR. WALPOLE:  Yes.

23          THE COURT:  Which is the -- Which is which one?

24          MR. WALPOLE:  It's actually for both.  He ended up

25   being in prison for both of these offenses, and they're just

26   merged into one prison term.  They're a valid --

27          THE COURT:  Any reason why I should not grant the

28   motion to amend to collapse the first two 667.5(b)

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

```
1    allegations?

2              MR. WALPOLE:  I'm sorry, your Honor?

3              THE COURT:  There's a motion here to collapse the

4    first two 667.5(b) allegations into one, because he was

5    incarcerated for both of those offenses.  Any reason why I

6    shouldn't grant that motion to amend?

7              MS. GIN:  That will by fine, your Honor.

8              THE COURT:  That motion will be granted.

9              MR. WALPOLE:  And the remaining should be

10   contained within People's 2 and 3, if you follow the notes.

11             THE COURT:  The July 19, '95, and the July 17th,

12   2002; is that right?

13             MR. WALPOLE:  Yes.

14             THE COURT:  All right.  Any issues?

15             MS. GIN:  In terms of the exhibits, your Honor?

16             THE COURT:  What these documents show in those

17   regards?

18             MS. GIN:  No.

19             THE COURT:  All right.  The Court does find that

20   the People have proven beyond a reasonble doubt that prior

21   to the commission of the offense of petty theft for which

22   the defendant was convicted in Count Two, that defendant had

23   sustained prior -- three prior theft related convictions,

24   specifically December 28th, 1993, conviction for violating

25   Vehicle Code Section 10851; and another conviction for that

26   offense on July 19, '95, and yet another on July -- pardon

27   me -- on December 17th, 2002.

28             The Court -- as alleged in the information.
```

1    The Court further finds that it has been -- and

2  all those having been established beyond a reasonble doubt.

3    The Court further finds that the People have

4  established beyond a reasonable doubt that prior to the

5  commission of the offenses for which he was convicted in

6  this matter, the defendant had sustained two felonies, one

7  on March 5th, 1992, in Alameda County Superior Court and

8  another on December 28th, 1993 in the -- in Contra Costa

9  County.   The first of which was for possessing a controlled

10  substance, in violation of Health & Safety Code Section

11  11350; the second of which was for the unlawful driving or

12  taking of a vehicle, in violation of Vehicle Code Section

13  10851.)  And then with respect to those crimes he served a

14  separate prison term, which he did not -- and then he did

15  not remain free for a period of five years of both prison

16  custody and the conviction of an offense resulting in a

17  felony conviction.

18    The Court also finds true beyond a reasonble doubt

19  the felony with prior California prison conviction

20  allegation pursuant to Penal Code Section 667.5(b), which is

21  predicated on the conviction occurring on July 19th, 1995,

22  and that will be the unlawful driving or taking of a

23  vehicle, in violation of Vehicle Code Section 10851, and

24  also in regards to the Penal Code Section 667.5(b)

25  allegation predicated on the conviction of December 17th,

26  2002, in Alameda County for unlawfully driving or taking a

27  vehicle, in violation of Vehicle Code Section 10851.

28    I find all the allegations in all of those felony

1  with prior California prison conviction enhancement

2  allegations to be true.

3          So defendant sits before me here as being

4  convicted of Penal Code Section 211/212.5(c), second degree

5  burglary.  Also being convicted of violating Penal Code

6  Section 484/666, petty theft with prior theft convictions,

7  and also stands before me as -- with three 667.5(b) -- Penal

8  Code Section 667.5(b), felony with prior California prison

9  conviction enhancement allegations found to be true.

10          All right.  Let me give you my tentative thinking

11  in respect to this matter.

12          I believe that Count Two, imposition of a sentence

13  or penalty on Count Two would be barred by the provisions of

14  Penal Code Section 654.

15          Do either of you disagree?

16          MR. WALPOLE:  No.

17          THE COURT:  Defendant, therefore, is subject to

18  being sentenced up to five years for Count One.  Count Two

19  would be stayed, and he could be subjected to three

20  additional years for the enhancement allegations, for a

21  total of maximum sentence in this matter of eight years.

22          The first issue we need to address, of course,

23  would be the issue of whether he should be placed on

24  probation.  I take it you both -- or perhaps you don't.  Do

25  you agree with me that he's presumptively ineligible for

26  probation?

27          MS. GIN:  Based on the conviction in Count One,

28  your Honor.

```
1            THE COURT:  It's difficult to see any rationale
2    for overcoming this limitation.  Having considered -- the
3    applicable California Rule of Court in this matter, it's
4    difficult for me to see that any of those factors come into
5    play with the possible exception that if one were to
6    consider having a drug problem a mental condition, that
7    might come into play.  But on the whole, considering the
8    fact here that defendant committed these crimes while on
9    parole and on three grants of probation at the time of this
10   crime, that he had absconded on parole, and has prior to
11   this time has had some four prior prison terms since 1994,
12   given the extensive criminality in this case, given his age,
13   which I believe was about 32 at the time of commission of
14   these offenses, 31 or 32, that it's difficult for me to see
15   that the limitation on probation ineligibility has been
16   overcome.

17            But even if it were overcome, even if I could
18   really consider him for probation, again, given the number
19   of prison terms he has served in the past, the fact that he
20   was on grants of probation at the time of the commission of
21   this offense, given he had absconded on parole, given the
22   extent of his criminality, given all these factors that he
23   does not -- additionally does not otherwise appear to be a
24   good candidate for probation, I would deny probation in this
25   matter, if he were eligible for it.

26            The question then becomes what's the appropriate
27   sentence?  Given, again, his past criminality, I think this
28   is a case that warrants the imposition of the aggravated
```

1  sentence on of five years on the robbery charge in

2  Count One.  Because I've taken into account all of the

3  convictions which form the basis of Penal Code Section 667.5

4  in deciding to impose the aggravated sentence of five years

5  on the robbery charge, I would strike the punishment with

6  respect to the 667.5 enhancement allegations.  As I say,

7  having taken into account his past criminality in that

8  regard and arriving at the aggravated sentence.

9          So the sentence I would impose in this matter

10 would be a sentence of five years in state prison.  Count

11 Two, of course, I'll stay.

12         I would also impose in this matter a $1,000

13 Restitution Fund fine, $200 for each year.  I would impose a

14 $1,000 parole Restitution Fund fine in this matter, stay it

15 unless and until Mr. Winzer violates the terms of parole,

16 once he's placed on parole.

17         I would impose a $40 Court Security fine, $20 for

18 each count.

19         And I would require him to provide buccal samples,

20 palm print samples, and otherwise provide all of the samples

21 required by Penal Code Section 296.

22         I would order that he make restitution as

23 determined to be appropriate by either our probation

24 department or the Department of Corrections, and I would

25 reserve jurisdiction in case there's any dispute as to what

26 would be involved by way of what should be restitution in

27 this matter.

28         The two victims, I note, appear to be -- actually,

```
 1   the victim appears to be the Target clerk, Blake Rogers.
 2   It's not clear to me what, if any, medical attention or
 3   other expenses he may have incurred as a result of the
 4   incident involving Mr. Winzer.  I believe everything that
 5   was taken from Target was recovered.  So if there's some
 6   sort of restitution they feel they're entitled to, they'll
 7   have an opportunity to tell that to probation.
 8             That's my tentative with respect to this.
 9             MS. GIN:  Your Honor, I think you have received as
10   part of your consideration the report that was prepared by
11   Mr. Edwards of probation?
12             THE COURT:  Yes, I have, thank you.  And the
13   probation report as well.  I should note that for the
14   record.
15             MS. GIN:  And he had included the letter I had
16   provided at the time, during the time that he initially
17   prepared the report, which was, of course, the first setting
18   we had before I attempted to do the motion for the new trial
19   in September of last year.
20             And just to update the Court in what my client has
21   done while he's been at the jail.  I noted that he was in
22   the Project DUIS program.  If I could provide a copy of the
23   printout from the West County Detention Facility.
24             I had also mentioned that he was interested in a
25   long-term treatment program, and I included a letter which
26   Ms. Norton of our office interviewed Mr. Winzer and talked
27   to Salvation Army, and it's dated November 3rd, 2005.  But
28   as of yesterday, I confirmed once again that Mr. Winzer is
```

1 eligible for the treatment program in the city of Oakland.

2 Just to let the Court be aware of that.

3         THE COURT:  Thank you.  I appreciate that.

4         I should have added, and I was aware of the fact

5 that Mr. Winzer has taken advantage of DUIS programs.  And I

6 should have mentioned that as one of the additional reasons

7 for striking the punishment for the 667.5 enhancement

8 allegations.

9         The issue of drugs is also a difficult one.

10 There's no question in my mind that Mr. Winzer's history of

11 criminality -- the responsibility for it may lay in part on

12 drug problems.  The full extent to where drugs may account

13 for his criminality, it was not entirely clear to me, and in

14 this particular case, just the extent of it is such that I

15 think it's -- that the better solution to this is to allow

16 Mr. Winzer to address his drug problems while he's in

17 prison.  Placing him on probation to address those problems

18 doesn't give me any insurance in this case that he's going

19 to address those problems any better.  If he wants to

20 address them, he can address them while he's in prison.

21         And also, I just feel that other considerations,

22 such as appropriate punishment, concepts of punishment, and

23 deterrence, not necessarily deterring him, but deterring

24 other people, require that he be in prison to make some sort

25 of example, or example and also just punishment.  I mean,

26 three grants of probation at the time of this, parole, he

27 absconded from parole.  He needs to be held accountable.

28 And I don't -- I feel that placing him on probation, even

```
 1    for the laudable purpose of participating in a residential
 2    drug program is going to send the wrong message.
 3          Obviously, drugs has a lot to do with his
 4    criminality, I would think, and I'm glad to see that he has
 5    taken advantage of DUIS programs, and I hope he takes
 6    advantage of whatever programs that prison offers, but I
 7    don't think that this is an appropriate case and that he
 8    should be put him in a long-term program without state
 9    prison incarceration.
10          MS. GIN:  Your Honor, I understand the Court's
11    concern in terms of his role in sentencing Mr. Winzer, that
12    punishment is foremost in -- in your mind in terms of how to
13    address what happened May 10th last year in this case.  I
14    don't think that it's disputed that drugs played a role in
15    this situation.  Evidence didn't come in, but there was a
16    crack pipe found in my client's possession in this case.
17    You saw the video.  You saw pictures of him and how he
18    looked and the state of disarray that he was in.  And you
19    saw the acts that occurred in this case involving a $12.99
20    package of men's underwear.
21          And your tentatively ruling right now, five years
22    state prison at 85 percent time due to the fact that this is
23    robbery, I can honestly tell you, your Honor, that I didn't
24    expect you to grant him probation in this situation, and
25    also the fact that even though the Court is going to
26    sentence him on Count One, I would hope that you would
27    sentence him on Count Two --
28          THE COURT:  Well, just to make it clear, I am
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

1  sentencing with respect to Count Two as well for the midterm
2  of two years, but I'm staying that pursuant to the
3  provisions of 654.

4          MS. GIN:  No, I understand.  I was hoping that you
5  would sentence him to Count Two as that as the base term,
6  and you would sentence him to Count One concurrently, and
7  then the controlling sentence would overlap time in the
8  Department of Corrections.  I just think five years at 85
9  percent time -- I did the calculations right now.  Of
10  course, I don't have a calculator -- that the punishment for
11  that would be -- if I can do, 5 years is 60 months.  So
12  basically he would only get 15 percent off, which would then
13  be 9 months off.  That means he'll be incarcerated for a
14  $12.99 T-shirt for four years and three months.

15          THE COURT:  It's true that the amount taken was
16  relatively -- in fact, was small, period.  I mean in
17  absolute terms, small.  However, remember, don't overlook
18  the fact that this being a robbery, it wasn't just a
19  question of a threat of any kind.  He actually engaged in
20  violence with the security officer.  And if I remember the
21  facts correctly in this matter, in fact, there was a
22  struggle to apprehend him, not only by Blake, but another
23  security guard had to come into play here, too.  So this has
24  an element of violence to it.

25          It's true the underwear, package of underwear, as
26  I remember, the value of that in and of itself was small.
27  But let me turn to focus -- But the violence on the other
28  hand is disturbing.

```
 1              Let me turn to focus a little bit on Mr. Walpole.

 2              Mr. Walpole, Ms. Gin contributed that the outlook,

 3    it's clear Mr. Winzer -- drugs contributed to this.  He's

 4    got a drug past.  He needs to address that.  And the amount

 5    taken was small.  I guess the argument is, five is maybe

 6    excessive for this.  Address that.

 7              MR. WALPOLE:  I don't necessarily think five is

 8    excessive in this case.  In fact, it's the amount I

 9    suggested in my sentencing brief.  And I don't think it's

10    excessive for the same reasons you do, your Honor.  I'm most

11    concerned with his record and the fact that he did abscond

12    and that he was on prior grants of probation and he has been

13    to prison before.  You don't take a person -- You have to

14    look at their history when looking at the sentencing, I'm

15    sure the Court is well aware.  You have to take into

16    consideration his prior convictions when sentencing and the

17    fact that he has been to prison --

18              THE COURT:  But the fact that his prior conviction

19    and prior prison record all centers around drug convictions

20    or theft related crimes that were probably for drugs.

21              MR. WALPOLE:  Yes, I'll certainly acknowledge

22    that, but, still, I don't believe that's reason to -- it's

23    kind of a double-edged sword, as the Court alluded to, as

24    far as the use of drugs.  I think the Court has come up with

25    the appropriate sentence in this matter, especially based on

26    his prior history.

27              THE COURT:  The problem is -- I acknowledge all

28    these things you're raising, Ms. Gin, but remember, I'm
```

1   already striking the enhancements as the law provides, the

2   667.5.  That's three years I'm saving him from.  And we're

3   staying, of course, the theft.  That's required by the law.

4   And if I fully aggravated this case, it would be eight

5   years, but we're knocking off three years for the reasons,

6   one, that I've taken into -- I've aggravated Count One for

7   the reasons of his prior criminal record.  So it takes into

8   account the same crimes that would be imposed for the

9   enhancements, the same crimes that are the basis for the

10  enhancements, and also takes into account, as I mentioned

11  earlier, drugs have played a role in all this.  If I go

12  beyond, below that, then I'm just -- I'm concerned that I'm

13  not -- I'm ignoring the fact that here's a person that's

14  been to state prison four times and he still goes out and

15  does this stuff.

16          MS. GIN:  Actually, your Honor, when you say four

17  times -- I think it's been concluded there's three prior

18  prison --

19          THE COURT:  Three.

20          MS. GIN:  Just to correct that.

21          THE COURT:  I think that's right.  Three prior

22  prison terms, absconds from parole.  He's on three grants of

23  probation.

24          MS. GIN:  I understand what the Court is saying.

25  It's not that I don't understand what you're saying to me

26  and why you come to this conclusion on the aggravated term

27  on Count One.  But from my perspective, in terms of

28  representing Mr. Winzer, I know this was charged as a

```
 1   robbery, and the reason why it's a robbery is because there
 2   was force used against Mr. Rogers in obtaining the property
 3   of Target.  That's the ultimate legal conclusion that was
 4   reached by the jury in this case.  This wasn't a situation
 5   where, you know, when people talk about robbery, we're
 6   talking about, you know, use of the standard gun or knife,
 7   or, "give it to me or else" kind of thing.  I understand
 8   that, and that's why I'm looking at this particular charge,
 9   this particular crime of robbery, which unfortunately if you
10   get sent to state prison you are subject to the 85 percent
11   limitation because that's what the code section says.   And
12   that's how it's treated if you get sentenced to prison.
13           But if you look at the range of robbery
14   convictions, it would seem that this case doesn't
15   necessarily fall in worst case scenario.  So to give him the
16   aggravated, I just feel that it's unjust punishment for this
17   particular crime.
18           And I appreciate the Court giving me its tentative
19   ruling so I can put my objections on the record to protect
20   both his state and federal due process rights in this case.
21   And that to me five years state prison for this conduct, and
22   I know that he's not an ideal citizen, your Honor.  We
23   wouldn't be sitting here and having this discussion in terms
24   of -- you know, he should be granted probation because he's
25   never been on probation before, or give him a second chance.
26   That's why I just presented these documents to you.   I
27   didn't argue strenuously for probation.  I know you have to
28   sentence him to prison.  The question is how much time he
```

1    ought to spend in this case.  That's all I'm asking the

2    Court to consider is give him a sentence that's less than

3    four years and three months.  That's all I'm asking for, and

4    I just want you to know that he has availed himself of

5    whatever there is in jail for the time he's been there, not

6    that I expected you give him Salvation Army.

7              THE COURT:  The other times he was sentenced to

8    state prison, what were the times?

9              MS. GIN:  Two years.

10             THE COURT:  Two years on each of the other three

11   times?  I just was looking at the exhibits, but quite

12   frankly I can't remember them.

13             MS. GIN:  There was 2 years, 2 years, and 16

14   months.  16 months the first time, 2 years and then

15   subsequently another 2 years.  The last time was 2 years in

16   state prison, the 2002 conviction.

17             And also just to remind the Court, I'm assuming

18   this will be a strike in the future as well.  There's

19   additional punishment that, you know, that's what happened

20   in this case.  The jury made their decision.  Mr. Winzer

21   feels differently, but notwithstanding that, regardless of

22   that, if the verdicts remain as is, any time he gets in

23   trouble in the future we're talking about mandatory

24   80 percent conduct time.  I doubt the judge will consider

25   any form of probation next time for any conduct.

26             MR. WALPOLE:  May I respond, Judge?

27             THE COURT:  Yes.

28             MR. WALPOLE:  We came to the same number, I guess

1    at a slightly different path.  Like the Court is
2    considering, the circumstances of this case certainly
3    don't -- just the facts of this particular case don't
4    necessarily equate to an aggravated term.  How I got to the
5    five years is I thought this was a mitigated term and each
6    term of the 667.5(b) priors be implemented for a term of 5
7    years.  Although we came to 5 years, I came to it for a
8    different rational.  And to do what the defense suggests in
9    this case is to just sentence the defendant for the petty
10   theft with prior and suspend the sentence on the robbery
11   conviction would necessarily in some respects not punish him
12   for the force and violence that was used in this case.  If
13   you just punish him to the petty theft with the prior and
14   not punish him with regard to the robbery, then you're
15   saying he didn't necessarily receive any punishment for what
16   he did to that loss prevention officer.  I'm not going to
17   rehash --
18          THE COURT:  Quite frankly, I'm not considering
19   sentencing him to two years on Count Two.  The question in
20   my mind is should I stay with the aggravated term, which
21   logic compels me to, or seems to compel me to, or should I
22   pick the midterm of three years, or three years plus another
23   year for one of the enhancements.  Those are my choices.
24   But, you know, this is robbery.
25          Now, it's true what -- Ms. Gin, what you say is
26   that one could conceive, and there do occur more serious
27   robberies than this, but the legislature has said the
28   appropriate sentence in these matters for robbery is two,

 1    three, or five years.  And then we're to consider factors in
 2    mitigation and factors in aggravation.  I consider that
 3    there are some factors in mitigation, the fact that drugs
 4    perhaps contributed to this.  You can argue that that's in
 5    mitigation.  Some people would argue that it's not.  But you
 6    could argue that that's in mitigation.  You could argue as
 7    well that not a lot was taken, but, you know -- but the
 8    reason for picking the aggravated is that, notwithstanding
 9    those factors, there's so many important factors in
10    aggravation which outweigh those in mitigation.  I won't go
11    over them again.  I've repeated them on several occasions.
12    But, you know, three times to prison, and on probation and
13    just a whole litany of crimes.
14         No, I'm persuaded in this particular case as much
15    as my emotions always reach out and incline me to say no
16    we'll pick a softer sentence, logic does not lead me there
17    in this particular case.  Logic compels me to sentence him
18    for five years, aggravated term.
19         I will strike the 667.5 punishment enhancement
20    allegations, and I will stay the midterm sentence of two
21    years on Count Two.  But the net aggregate sentence in this
22    matter will be five years.
23         How much time does he have currently?
24         MS. GIN:  339.
25         THE COURT:  Okay.  330 days.
26         MS. GIN:  339 days, Judge.
27         THE COURT:  I'm sorry.  339 days for actual time
28    served.  And if my math is correct, he's also entitled to an

1  additional 50 days of conduct credits. Let me do the math
2  one more time.
3      Yes, for a total amount of credits of 389 days of
4  credit against the five years that I've imposed the state
5  prison sentence this this matter.
6      All right. Anything further? Anything I over
7  looked?
8      MR. WALPOLE: No.
9      MS. GIN: I think, your Honor, I had my
10 opportunity to express to you why I don't believe this
11 should be aggravated and why Mr. Winzer should be given, as
12 you say, the softer sentence in this case, and you know I
13 object to the aggravated term in this case. You know, we
14 heard you. Mr. Winzer has heard what you have to say.
15      THE COURT: Thank you. Your record is, of course,
16 reserved.
17      Mr. Winzer, you are entitled to -- well, first of
18 all, you're going to be on parole in this matter for a
19 period of at least three years. You're entitled to appeal
20 my sentence or any other decisions that I or any other judge
21 has made in your case. If you're going to pursue an appeal
22 you have 60 days within which to do so. So make sure you go
23 over this with Ms. Gin. I'm sure she'll go over this matter
24 with you.
25      The buccal samples and other samples that are
26 required to be taken pursuant to 296, will be taken by the
27 Sheriff's Office since you're in custody. I don't have to
28 set a particular date for that.

375

1            MS. GIN:  I think that if you sentence him to the

2    Department of Corrections they will take care of it, if he

3    gets put on parole.

4            THE COURT:  Okay.  Thank you.

5            THE CLERK:  Judge, I notice this was placed under

6    seal.  Do you want this placed under seal in the file?

7            MS. GIN:  Are you talking about the Target matter?

8            THE CLERK:  Yes.

9            THE COURT:  Yes.

10            MS. GIN:  Judge Flinn, Judge.

11            THE COURT:  Okay.  We'll keep it under seal.

12            MS. GIN:  It has to be sealed.

13            THE COURT:  Not to be opened, except by the Court

14    of Appeals.  Thank you.

15            (Whereupon, the proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25

26

27

28

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307

376

```
 1 | STATE OF CALIFORNIA     )
 2 |                         )  Ss.
 3 | COUNTY OF CONTRA COSTA )
 4 |
 5 |     I, JANENE R. BIGGS, a Certified Shorthand Reporter in
 6 | and for the State of California, do hereby certify:
 7 |     That said proceedings were taken before me at said time
 8 | and place, and were taken down in shorthand by me, and was
 9 | thereafter transcribed into typewriting, and that the
10 | foregoing transcript constitutes a full, true and correct
11 | report of said proceedings which took place.
12 |
13 |
14 |     AUGUST 16, 2006
15 |
16 |
17 |
18 |                    _____
19 |                    CERTIFIED SHORTHAND REPORTER
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |
```

JANENE R. BIGGS - CERTIFIED SHORTHAND REPORTER #11307